# In the United States Court of Federal Claims

**FOR PUBLICATION**
No. 92-872C
Filed December 18, 2006

* * * * * * * * * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| AMERICAN SAVINGS BANK, F.A., et al., | * | |
| *Plaintiffs,* | * | |
| v. | * | *Winstar* damages |
| THE UNITED STATES, | * | |
| *Defendant.* | * | |

* * * * * * * * * * * * * * * * * * * * * * *

*Melvin C. Garbow*, Arnold & Porter, Washington, D.C. for Plaintiffs. *Howard N. Cayne, Edward H. Sisson,* and *Kent A. Yalowitz,* Arnold & Porter, of counsel.

*William F. Ryan*, with whom were *David M. Cohen*, Director, *Stuart E. Schiffer*, Deputy Assistant Attorney General, and *Jeanne E. Davidson*, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice for Defendant. *Marc S. Sacks*, Trial Attorney, Commercial Litigation Branch, of counsel.

**OPINION AND ORDER**

**SMITH, Senior Judge:**

Previously, the Court resolved the matter of damages in this *Winstar* related case[1], leaving only the issue of two offset calculations before rendering final judgment on two of Plaintiffs' claims: their "FSLIC Warrant" claim, for the Government's breach of the Warrant Forbearance, and their "FSLIC Note" claim, for the Government's breach of the Note Forbearance. *See Am. Sav. Bank v.*

[1] *See Winstar Corp. v. United States*, 518 U.S. 839 (1996).

*United States*, 62 Fed. Cl. 6 (2004)["*American Savings II*"]. The first offset addresses the $167 million value of the Old American deposit premium that FSLIC promised to contribute to New American as regulatory capital in exchange for the Warrant. The second offset relates to the cost Plaintiffs actually paid in dividends and interest for the $240 million in capital that the Government's breach of the Note Forbearance required Plaintiffs to hold as capital against the $8 billion note from FSLIC.

**PROCEDURAL HISTORY**

In its liability opinion, this Court found the Government liable for breach of contract as a result of the passage of the Financial Institution Reform, Recovery and Enforcement Act of 1989 (hereinafter "FIRREA"), Pub. L. No. 101-73, 103 Stat. 183, and its implementing regulations. *Am. Savings Bank v. United States*, 52 Fed. Cl. 509 (2002) ["*American Savings I*"]. In its damages opinion this Court held that two issues could not be disposed of on summary judgment because: 1) a material dispute of fact remained as to the amount by which the value of the capital in question was diminished in light of the amount Plaintiffs were able to benefit from the capital and that 2) the parties need to provide the Court with some method for valuing the $167 million of regulatory capital that FSLIC failed to contribute to New American in exchange for the warrant. The amount is based on the Old American deposit premium between the years 1988 to 1996.

Subsequently, Plaintiff filed a motion for entry of final judgment on the two claims. Defendant timely responded and additionally filed a motion for summary judgment. Thereafter, the Court held a hearing on the motions, responses and replies. Additionally, several motions to file supplemental authority and responses have been filed by the parties. The Court finds that the supplemental authorities are instructive and, therefore, **GRANTS** the filing of these motions.

**BACKGROUND**

The background provided herein may be helpful as it relates to the damage calculation issues. A full background of this case can be found in *American Savings I & II.*

As discussed in *American Savings II*, Robert Bass and his associates (the Bass Investors) purchased Old American after extensive negotiations with Old American's federal regulator, the Federal Home Loan Bank Board (FHLBB), and FSLIC, Old American's deposit insurer. A plan was proposed by the Bass Investors and accepted by FSLIC and FHLBB to divide Old American into two new thrifts, one of which would be operational and one of which would be liquidated. The operating thrift was known as American Savings Bank, F.A. (New American) and the liquidating thrift was called New West Federal Savings and Loan Association (New West). Thereafter, the Bass Investors formed several partnerships and other subordinate holding companies, ultimately wholly owned by the Partnership for the purpose of acquiring the assets and liabilities of Old

American. One of these partnerships then downstreamed $350 million into New American.

To balance the books of the two banks, New West issued an $8 billion dollar note to New American (the FSLIC Note), which was guaranteed by FSLIC and recorded as an asset on the books of New American and as a liability on the books of New West. The Note had a ten-year term, with interest payments to be made regularly by the FSLIC to New American. This transaction gave FSLIC a 30 percent ownership interest in American Savings. In April 1988, when the FHLBB first entered into an exclusive negotiating agreement with the Bass Investors, the FSLIC valued the warrant aspect of the deal at $543 million. In addition, FSLIC provided Plaintiffs with a "Note Forbearance" which was written down as capital and amortized over a period of ten years. This of course both caused the regulatory capital to drop by that yearly amount and it became an expense item. It was also agreed that the value of the warrants issued to FSLIC would be included as regulatory capital, pursuant to which FSLIC issued a "Warrant Forbearance" for the first ten years after the Transaction (which was the expected term of the FSLIC Note).

In August of 1989, Congress enacted the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183. As discussed in *American Savings I*, the result of this legislation, in part, was that American Savings could no longer rely on the Note Forbearance and the Warrant Forbearance when calculating the required amount of regulatory capital, and thus had to increase its regulatory capital from other sources. One response was to "reverse" its push-down accounting for the warrants. The warrants provided FSLIC with an ownership interest in American Savings' holding company, rather than a direct interest in American Savings. Prior to FIRREA, the holding company had to "push down" the value of the warrants to American Savings in order for the warrants to have been recorded as regulatory capital . As long as the Warrant entry remained on the books of American Savings, the bank had $167 million as regulatory capital. This unique kind of capital would amortize over time, which would create an expense item as well as reducing regulatory capital. To avoid these expenses on the remaining "real" capital or post-FIRREA capital, American Savings received approval from the newly-created Office of Thrift Supervision ("OTS") to reverse this push-down accounting.

In 1996 Plaintiffs entered into an agreement to sell American Savings to Washington Mutual. Pursuant to its warrants, the FDIC as FSLIC's successor, would have been entitled to receive approximately 30 percent of the sales price in the Washington Mutual transaction. However, the FDIC and Bass Group negotiated a modification of their prior agreements under which the FDIC agreed to accept 14 million shares of Washington Mutual stock, with the Bass Group receiving 26 million shares, a 65 percent/35 percent split. In January 1997, the FDIC sold its Washington Mutual shares for a net amount of $651.7 million.

## DISCUSSION

Recovery of damages will not be precluded where there is uncertainty, if a reasonable probability of damage can be clearly established. *Glendale Federal Bank, FSB v. United States*, 378

F.3d 1308, 1313 (Fed. Cir. 2004), *Bluebonnet Sav. Bank, FSB v. United States,* 266 F.3d 1348, 1356-57 (Fed. Cir. 2001), *Locke v. United States*, 283 F.2d 521 (Ct. Cl. 1960). Additionally, "when damages are hard to estimate, the burden of imprecision does not fall on the innocent party." *LaSalle Talman Bank, FSB v. United States*, 317 F.3d 1363, 1374 (Fed. Cir . 2003).

The purpose of restitution is to restore the plaintiff to its status quo ante, thus the award to the plaintiff must be "reduced by the value of any benefits that it received from the defendant under the contract, so that only the actual, or net, loss is compensated. *Landmark Land Co. v. FDIC*, 256 F.3d 1365, 1373 (Fed. Cir. 2001). However, "offset is only proper where the benefits at issue were received directly from the breaching party." *Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297, 1315-16 (Fed. Cir. 2004); *accord Landmark,* 256 F.3d at 1373-74. Thus, an offset methodology should account for the value of benefits that plaintiffs received directly from the government; but may not account for the value created by plaintiffs themselves in managing the entity, expressed either as dividends or in the sales price for the institution.

Because this Court did not know, with reasonable certainty, by what amount Plaintiffs requested damages should be offset with regard to the benefits gained from the breach of the Warrant Forbearance and Note Forbearance, the Court requested additional facts. To determine the offsets, Plaintiffs rely on a model that calculates the benefit that the Plaintiffs received from "cash" versus the same amount of "forbearance capital" by computing interest on the cash at a risk-free rate for the relevant period of time. Pl. Reply Br. 3. This model has been adopted and affirmed in this Circuit in *Home Savings of America*, *FSB v. United States*, 399 F.3d 1341 (Fed. Cir. 2005). The Court finds that by following the methodology adopted in *Home Savings* the goal of providing a fair means to measure the value of the cash replacement of the Forbearances is achieved.

**A. <u>FSLIC Warrant</u>**

In *American Savings II*, this Court held that immediately upon the government's breach of the Warrant Forbearance and its abrogation of the regulatory capital that was consideration for the Warrant, the Government lost its entitlement to retain the Warrant. The Plaintiffs sought the recovery of the Warrant and offered to pay the government more than the $167 million value of the Old American deposit premium that FSLIC had foregone at the outset of the deal. Since the Government should have restored the Warrant to the Plaintiffs but did not, the Plaintiffs were forced to treat the Government as a proper equity owner of New American, when it was not. If the Government had responded to Plaintiffs' efforts and unwound the Warrant transaction after breaching the Warrant Forbearance, Plaintiffs assert that they would have agreed to pay the Government the $167 million deposit premium with a note bearing interest at the same rate as the FSLIC note. Pl. Br. 16. Thus, the Government would then have earned interest on the $167 million, not at the rate of short term Treasuries, as it would have as required by law, but at the higher rate the Government was obliged to pay Plaintiffs on the FSLIC Note. *Id*. Following the breach, however, the Government was entitled to a $167 million credit as well as interest on the $167 million for the eight-year period ending when the bank was sold to Washington Mutual. The Court agrees with Plaintiffs that it is fair to offset the credit against the debt, thus to credit the government

with interest on the $167 million for the eight year period, 1988 to 1996, at the rate of the FSLIC Note. This is actually more generous to the Government than other reasonable alternatives.[2]

To calculate the offset, Plaintiffs suggest that the Court apply the interest rate of the FSLIC Note and the Court agrees. Thus, in applying eight years of compounding interest to the $167 million, the result would be $138,194,000 in interest. By adding the $167 million together with the interest amount of $138,194,000, Plaintiffs calculate an offset in the amount of $305,194,000. This amount must then be subtracted from the $651.7 sale price to Washington Mutual in 1996, and the total award becomes $346,506,000. Plaintiffs argue that this is the best way to calculate the damages, because it is the most generous to the Government and the FSLIC note interest rate is a rate the Government actually paid. *Id.* Further, Plaintiffs compare statutory interest rates which would result in a higher payout for them. But Plaintiffs are satisfied using the FSLIC note rate.[3] *Id.* at 16-18.

Defendant argues that the Plaintiffs did not account for any increase in the value of the benefits they received. Defendant argues that by Plaintiffs using the $167 million, Old American base benefit and then by multiplying this benefit by interest rates, the amount is "grossed up". Def. Br. 17-18. Defendant asserts that the cases relied upon by Plaintiffs did not stand for offsets but only interest rates and, therefore, were cited only to mislead the Court. *Id.* at 19. Instead of the interest rate rationale, Defendant relies heavily on the Declaration of Dr. Hamm, to provide the proper calculations. Dr. Hamm calculates that the Plaintiffs received a $664 million dollar benefit from the divisible contract. Therefore, Defendant asserts that the total benefits Plaintiffs enjoyed from the Old American deposit base exceeded the Government's benefits so there can be no award of restitution. *Id*. at 22-25.

The Government raises several alternative arguments as well. The Government advances that because the only part of the agreement that was not fully performed was the portion that would have allowed Plaintiffs to utilize fully the warrant accounting forbearance, this did not result in total loss. Instead, the Government argues that because of the $167 million, Plaintiffs were able to recapture $74 million immediately by reversing the use of push-down accounting. *Id.* at 25. In addition, the Government advances a new value for Old American's deposit base as between $214 and $218 million rather than the $167 million. By using this new value, the Government argues that if the warrants were traded in fair exchange for the Old American deposit base and the warrant accounting forbearance, the warrant accounting forbearance would have been worth negative $47

---

[2] *See, e.g.*, 31 U.S.C. §3717(average investment rate of annual Treasury tax and loan accounts); 28 U.S.C. §1961(a) (interest rate used to calculate post-judgment interest payable on judgments in the Governments favor); 31 U.S.C. §3902(a)( interest rate payable by the Government under the CDA).

[3] The Court agrees with the second option provided by the Plaintiffs in order to calculate damages rather than the first option of using the low-interest short- term treasury rates which would increase Plaintiffs recovery by decreasing the offset.

million.[4] *Id.* at 26. However, the Government's new argument for a $214 deposit premium is foreclosed by the Government's earlier agreement that the deposit premium was $167 million. Earlier, the Government stated "plaintiffs acknowledge, as they must, that the initial value of the warrants was tied to the deposit franchise, which the parties agreed was worth$167 million in 1988. Def. Br. 5 (August 26, 2002). Further, the Government stated "the parties agreed that the warrants and the American Savings franchise were of equal value. *Id.* at 38. Therefore, this argument must fail. And finally, the Government relies on the affidavits of Professors Black and Zwieble to explain and demonstrate that Plaintiffs could have raised additional debt capital. Moreover, the Government contends that if any amount is to be paid on the loss of the forbearance, the correct amount to be paid is $6.6 million. *Id.* at 31.

The Court agrees with the Plaintiffs that an interest factor is the correct way to value the $167 million in 1996 dollars to account for the eight-year gap between the Plaintiffs' 1988 benefit and the Defendant's 1996 benefit. The Court agrees that the by applying a "safe" rate of interest, that rate adequately represents New American's use of the $167 million as cash when, because of the breach, the $167 million had no regulatory value between 1988 and 1996. Thus, the Court agrees that the Plaintiffs are entitled to recover $346,506,000.

### B. FSLIC Note

Next, the Court turns to the question as to the amount by which the value of the capital in question was diminished. As the Court found in *American Savings II*, the $240 million used to meet regulatory capital requirements was greatly restricted, and could not be leveraged as Plaintiffs would have been entitled to do, but for the breach, but this Court was not convinced that its value was reduced to zero. Therefore, this Court held that Plaintiff's damages should be offset by the amount Plaintiffs were able to benefit from this capital.

Plaintiffs advance that "it is not possible physically to trace any of New American's $240 million capital dollars into particular interest earning assets and thereby determine the offset against the cost to Plaintiffs of those dollars." Pl. Br. 22. Plaintiffs, therefore, argue that to determine the offset, the Court must determine the amount " that reduces the award from the cost Plaintiffs actually paid for the $240 million in capital to the lesser amount that is the cost Plaintiffs actually paid for the capital less some fair measure of the value of that capital as tangible capital, separate and apart from its value as regulatory capital." *Id.* at 23.

Thus the calculation is: cost of capital to Plaintiffs *minus* benefits gained from "real" assets (as opposed to government forbearances).

---

[4] In opposition to this calculation, Plaintiffs' reply that Dr. Hamm's calculations are incorrect because the calculations do not take into consideration the limited useful life of the deposit base. Pl. Reply 13.

Because it is impossible to trace the $240 million to particular assets, the Court must use an approximation. *See Home Savings of America, FSB v. United States,* 57 Fed. Cl. 694, 728 (2003). The question, therefore, is what income is properly associated with the capital for offset purposes when the capital cannot be traced into particular earnings assets. Plaintiffs contend that "the combination of the FSLIC Note, plus the cost of the $240 million used to support the Note, offset by the income from short-term Treasuries, would most closely re-create the risk-free nature of the Note Transaction as the parties originally agreed." *Id.* at 24. It is clear that the Government never tried to remedy the effects of the breach. As such, a breaching party may not take advantage of uncertainties that its own breach created. *See*, *e.g.*, *Glendale*, *Locke*, *Bluebonnet*. Thus, in order to determine the amount of the offset, Plaintiffs request that the Court use the interest the Government paid to them on the FSLIC Note. *Id.* at 25. Plaintiffs advance that this is a fair measure of the offset and that the offset is based on the historic, actual rate of interest the Government paid Plaintiffs on the FSLIC Note. The Court agrees. By using this, the resulting offset calculates to the amount of $123,822,000. *See* Ramirez Dec. Tables VI - A and VI - B. As set forth in their first damages motion, Plaintiffs assert that the cost of capital from Plaintiffs' inventory of capital that the breach required Plaintiffs to hold against the Note was in the amount of $178,850,000.[5] Pl. Br. 29. Reducing this by the interest paid, Plaintiffs' calculate an award in the amount of $55,028,000 in costs, due to the Government's breach of the Note Forbearance. The Court is not persuaded by the Government's contention that the economic and accounting profit of the Note capital exceeded the costs of the capital. Def. Br. 36. The Court finds that the affidavits of Professors Black and Zweible are unpersuasive. Therefore, the Court finds that the Plaintiffs' damages for the Government's breach of the Note Forbearance are $55,028,000.

## CONCLUSION

For the reasons stated above, the Court hereby **GRANTS** Plaintiffs' Motion for Summary Judgment awarding Damages of $346,506,000 on Plaintiffs' FSLIC Warrant Claim and $55,028,000 on Plaintiffs' FSLIC Note Claim for a total award of $401,534,000. The Clerk is directed to enter judgment accordingly.

**It is so ORDERED**.

s/Loren A. Smith
LOREN A. SMITH,
Senior Judge

[5] This amount does not appear to be challenged by the Government.