## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |  |
|---|---|---|
| AMERICAN SAVINGS BANK, F.A., *et al*, | ) ) ) | |
| | ) | Case No. 92-872 C |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | (Senior Judge Loren A. Smith) |
| | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## PLAINTIFFS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

March 18, 2009

Kent A. Yalowitz
ARNOLD & PORTER, LLP
399 Park Avenue
New York, N.Y. 10022
Tel:  (212) 715-1000
Fax:  (212) 715-1399

*Of Counsel*:

*Attorney of Record for Plaintiffs*
  *American Savings Bank, F.A., et al.*

Melvin C. Garbow
Howard N. Cayne
David B. Bergman
Michael A. F. Johnson
Joshua P. Wilson
Michael R. Hartman
Alexea R. Juliano
ARNOLD & PORTER, LLP
555 Twelfth Street, N.W.
Washington, D.C.  20004
Tel:  (202) 942-5000
Fax:  (202) 942-5999

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...............................................................................................1

ISSUE TO BE DECIDED BY THE COURT...........................................................5

CONTENTIONS OF FACT ..................................................................................6

I.  THE GOVERNMENT PROMISED VALUABLE REGULATORY CAPITAL
    FORBEARANCES TO INDUCE OUTSIDE INVESTORS TO RESOLVE A
    MASSIVE CRISIS IN THE SAVINGS-AND-LOAN SECTOR ......................................6

II. PLAINTIFFS' ACQUISITION OF AMERICAN SAVINGS SAVED THE
    GOVERNMENT BILLIONS, AND WAS STRUCTURED TO PROVIDE FOR
    AMERICAN'S GROWTH AND PROFITABILITY ..........................................................6

    A.  The Government Negotiated an Ownership Interest in ASB,
        Providing the Government a Stake in ASB's Expected Growth and
        Success ..................................................................................................9

    B.  The Government Secured a $214 Million Distribution Preference
        In Exchange for the Warrant Forbearance Promise ................................12

    C.  With a Sizeable Stake in ASB's Operations, the Government
        Expected Plaintiffs Would  Leverage ASB's Regulatory Capital to
        Grow Profitably ...................................................................................18

III. AMERICAN SAVINGS ESTABLISHED A TRACK RECORD OF GROWTH
     AND PROFIT PRIOR TO THE BREACH ..................................................................20

IV.  THE GOVERNMENT BREACHED ITS CONTRACT WITH PLAINTIFFS BY
     EXCLUDING THE WARRANT FROM ASB'S REGULATORY CAPITAL................21

V.   THE BREACH IMPAIRED ASB'S GROWTH AND COST PLAINTIFFS
     SCORES OF MILLIONS OF DOLLARS IN LOST PROFITS .......................................22

    A.  Absent the Breach, ASB Could Have Retained More Than $1
        Billion of Adjustable-Rate Mortgages It Sold in Late 1990 To
        Improve Its Regulatory Capital Position.................................................23

    B.  Absent the Breach, ASB Could Have Retained Nearly $500
        Million of High-Yield Bonds It Sold In Response To Government
        Concerns About ASB's Regulatory Capital .............................................23

    C.  Absent the Breach, ASB Could Have Grown Through
        Acquisitions, As It Had Planned..............................................................24

i

D.    Despite the Breach, ASB Operated Profitably and Successfully..........................25

E.    Absent the Breach, ASB Would Have Been Even More Profitable and Successful .........................................................................................26

VI.   THE BREACH FORCED PLAINTIFFS TO DEPLOY $167 MILLION OF COSTLY TANGIBLE CAPITAL IN PLACE OF THE WARRANT CAPITAL ...........29

VII.  IN RELIANCE UPON THE GOVERNMENT'S WARRANT FORBEARANCE PROMISE, PLAINTIFFS CONVEYED TO THE GOVERNMENT THE RIGHT TO RECEIVE $149.8 MILLION ........................................................................32

CONTENTIONS OF LAW ...........................................................................................35

I.    GENERAL DAMAGES PROPOSITIONS.........................................................35

II.   LEGAL STANDARDS APPLICABLE TO PLAINTIFFS' RELIANCE CLAIM..........37

III.  LEGAL STANDARDS APPLICABLE TO PLAINTIFFS' EXPECTANCY CLAIMS ...........................................................................................................39

      A.    Foreseeability..........................................................................................39

            1.    To Establish Foreseeability, A Plaintiff Need Only To Show That The General Kind of Injury Claim Was Reasonably Foreseeable...........................................................39

            2.    Plaintiffs' Lost Profits Damages Were Reasonably Foreseeable ........................................................................41

            3.    Plaintiffs' Cost of Capital Damages Were Reasonably Foreseeable ........................................................................42

      B.    Causation.................................................................................................42

            1.    The "Substantial Factor" Standard Governs the Causation Analysis...........................................................................42

            2.    The Breach Caused the Damages Plaintiffs Claim ...................43

      C.    Reasonable Certainty .............................................................................44

            1.    Plaintiffs Computed Their Lost Profits with Reasonable Certainty..........................................................................45

            2.    Plaintiffs Computed Their Cost of Capital Damages with Reasonable Certainty .......................................................46

IV.   THE COURT MAY AWARD "JURY VERDICT" DAMAGES .....................................47

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*American Capital Corp. v. FDIC,*
    472 F.3d 859 (Fed. Cir. 2007)...................................................................................37, 38

*American Capital Corp. v. FDIC,*
    66 Fed. Cl. 315 (2005), *aff'd in part, rev'd in part,*
    472 F.3d 859 (Fed. Cir. 2007)...............................................................................................38

*American Sav. Bank, F.A. v. United States,*
    519 F.3d 1316 (Fed. Cir. 2008).........................................................................................35, 46

*American Sav. Bank, F.A. v. United States,*
    52 Fed. Cl 509 (2002), *aff'd in relevant part,*
    519 F.3d 1316 (Fed. Cir. 2008)...................................................................................10, 22, 35

*Bluebonnet Sav. Bank, F.S.B. v. United States,*
    339 F.3d 1341 (Fed. Cir 2003)...............................................................................................47

*Bluebonnet Savings Bank, F.S.B. v. United States,*
    266 F.3d 1348 (Fed. Cir. 2001).......................................................................................*passim*

*Brand Inv. Co. v. United States,*
    58 F.Supp. 749 (Ct. Cl. 1944)...........................................................................................36, 47

*California Fed. Bank, F.S.B. v. United States,*
    395 F.3d 1263 (Fed. Cir. 2005)...................................................................................35, 36, 39

*California Fed. Bank, F.S.B. v. United States,*
    245 F.3d 1342 (Fed. Cir. 2001)..........................................................................................6, 44

*California Fed. Bank, F.S.B. v. United States,*
    43 Fed. Cl. 445 (1999) ...........................................................................................................43

*Chain Belt Co. v. United States,*
    115 F. Supp. 701 (Ct. Cl. 1953).......................................................................................40, 44

*Citizens Fin. Servs. v. United States,*
    64 Fed. Cl. 498 (2005) ...........................................................................................................41

*Citizens Fed. Bank, F.S.B. v. United States,*
    474 F.3d 1314 (Fed. Cir. 2007) ......................................................................................*passim*

*Citizens Federal Bank, F.S.B. v. United States,*
   59 Fed. Cl. 507 (2004) ........................................................................................41

*Coast Fed. Bank, F.S.B. v. United States,*
   48 Fed. Cl. 402 (2000), *aff'd in part, rev'd in part,*
   472 F.3d 859 (Fed. Cir. 2003).............................................................................40

*Commercial Fed. Bank, F.S.B. v. United States,*
   59 Fed. Cl. 338 (2004) ...........................................................................35, 45, 46

*Confederated Tribes v. United States,*
   248 F.3d 1365 (Fed. Cir. 2001).............................................................................4

*Energy Capital Corp. v. United States,*
   47 Fed. Cl. 382 (2000), *aff'd in relevant part,*
   302 F.3d 1314 (Fed. Cir. 2002)....................................................................... 42-43

*Energy Capital Corp. v. United States,*
   302 F.3d 1314 (Fed. Cir. 2002).............................................................................43

*First Fed. Sav. and Loan Ass'n of Rochester v. United States,*
   76 Fed. Cl. 106 (2007), *aff'd,*
   290 Fed. Appx. 349 (Fed. Cir. 2008)...................................................36, 45, 46

*Gardner Displays Co. v. United States,*
   346 F.2d 585 (Ct. Cl. 1965) ................................................................................40

*Glendale Fed. Bank, F.S.B. v. United States,*
   43 Fed. Cl. 390 (1999), *aff'd in part, vacated in part,*
   239 F.3d. 1374 (Fed. Cir. 2001)..........................................................................40

*Glendale Fed. Bank, F.S.B. v. United States,*
   239 F.3d 1374 (Fed. Cir. 2001)...............................................6, 35, 37, 38

*Glendale Fed. Bank, FSB v. United States,*
   378 F.3d 1308 (Fed. Cir. 2004)..................................................................36, 39

*Globe Sav. Bank v. United States,*
   65 Fed. Cl. 330 (2005), *aff'd in relevant part,*
   189 Fed. Appx. 964 (Fed. Cir. 2006)........................................................35, 45

*Holland v. United States,*
   75 Fed. Cl.483 (2007) .........................................................................................42

*Home Sav. of Am., F.S.B. v. United States,*
   399 F.3d 1341 (Fed. Cir. 2005)........................................................35, 42, 46

*Indiana Mich. Power Co. v. United States,*
    422 F.3d 1369 (Fed. Cir. 2005)..................................................................................39, 42

*Landmark Land Co. v. FDIC,*
    256 F.3d 1365 (Fed. Cir. 2001)......................................................................................6, 37

*LaSalle Talman Bank, F.S.B. v. United States,*
    317 F.3d 1363 (Fed. Cir. 2003)....................................................................................36, 44

*LaSalle Talman Bank, F.S.B. v. United States,*
    462 F.3d 1331 (Fed. Cir. 2006).........................................................................................35

*Locke v. United States,*
    283 F.2d 521 (Ct. Cl. 1960) ....................................................................................... *passim*

*Northern Helex Co. v. United States,*
    634 F.2d 557 (Ct. Cl. 1980) .............................................................................................35

*National Austl. Bank v. United States,*
    452 F.3d 1321 (Fed. Cir. 2006) ........................................................................................44

*Seaboard Lumber Co. v. United States,*
    308 F.3d 1283 (Fed. Cir. 2002) ........................................................................................44

*Staples v. United States,*
    511 U.S. 600 (1994) .........................................................................................................39

*Story Parchment Co. v. Paterson Parchment Paper Co.,*
    282 U.S. 555 (1931) ....................................................................................................44, 45

*Suess v. United States,*
    52 Fed. Cl. 221 (2002), *vacated on other grounds,*
    535 F.3d 1348 (Fed. Cir. 2008).........................................................................................47

*Thompson v. Haynes,*
    305 F.3d 1369 (Fed. Cir. 2002) ........................................................................................45

*United States v. Winstar Corp.,*
    518 U.S. 839 (1996) ...........................................................................................................6

*Wells Fargo Bank, N.A. v. United States,*
    88 F.3d 1012, 1033 (Fed. Cir. 1996) .................................................................................41

*Westfed Holdings, Inc. v. United States,*
    407 F.3d 1352 (Fed. Cir. 2005)....................................................................................37, 38

## STATUTES, RULES AND REGULATIONS

12 C.F.R. §§ 561, 563, 567 (1990) ............................................21

Regulatory Capital, 54 Fed. Reg. 466845 (1990) ...........................21

## MISCELLANEOUS

11 Arthur R. Corbin, *Corbin on Contracts* § 56.7 (2005 rev. ed.) ...............................40

11 Arthur L. Corbin, *Corbin on Contracts* § 008 (1964 & Supp.1996) ........................38

5 Arthur R. Corbin, *Corbin on Contracts* § 999 (1944 & Supp. 1996) ........................43

Restatement (Second) of Contracts § 344(a) (1981) .......................35

Restatement (Second) of Contracts § 347 (1981) ...............................35, 36

Restatement (Second) of Contracts § 349 (1981) ...............................37, 38

Restatement (Second) of Contracts § 351 (1981) ............................39

Williston on Contracts § 64.2 ....................................................37, 38

E. Allan Farnsworth, Contracts § 12.1 (4th ed. 2004) ..........................37, 38

.

## INTRODUCTION

Plaintiffs seek monetary damages for the government's breach of a *Winstar*-type contract, a breach for which the government has already been held liable.  Pursuant to the contract, Plaintiffs acquired American Savings Bank ("ASB"), a $15 billion institution for which the government bore insurance liability, in a transaction that closed on December 28, 1988. Plaintiffs thereby resolved what was then the largest thrift failure in our nation's history.

In the transaction, which involved Plaintiffs' acceptance of an $8 billion Note from the then-insolvent Federal Savings and Loan Insurance Corporation ("FSLIC"), the government promised Plaintiffs certain favorable regulatory treatment.  Of particular relevance here, the government promised Plaintiffs a "Warrant Forbearance" — *i.e.*, the right to treat as regulatory capital the $167 million "fair value" of certain Warrants Plaintiffs issued to the government. That promise had value and significance because a provision of Generally Accepted Accounting Principles ("GAAP") required the Warrants' value to be deducted from ASB's *GAAP* capital so long as the FSLIC note ASB accepted ("FSLIC Note") as part of the transaction remained outstanding.  The government promised Plaintiffs a forbearance from that GAAP rule for *regulatory* purposes, thereby augmenting ASB's regulatory capital by the $167 million fair value of the Warrants.  The government agreed to provide the Warrant Forbearance in exchange for a $214 million distribution preference (the "Second Preference") that ultimately cost Plaintiffs $149.8 million.

The government knew and expected that Plaintiffs would rely on the contractual Warrant capital not only to meet ASB's then-current regulatory capital requirements but also to support further growth by acquisitions and internal expansion.  Similarly, the government understood

that because the contractual Warrant capital would function as regulatory capital, Plaintiffs would need to deploy other capital in its place were the Warrant capital to be eliminated.

Following the acquisition, Plaintiffs operated ASB consistently with its growth-oriented business strategy, and created a track record of strong profitability.  But following the enactment of FIRREA, the government breached the contract, refusing to honor the Warrant Forbearance and thereby depriving Plaintiffs of the promised $167 million of regulatory capital.  The government's breach caused Plaintiffs to take extraordinary measures in a desperate, and ultimately successful, effort to keep ASB from falling out of regulatory capital compliance. Instead of leveraging surplus regulatory capital to support additional profitable assets, the breach forced Plaintiffs to shed profitable assets already on ASB's books.  Similarly, regulators — citing regulatory capital concerns and applying higher capital requirements for acquiring institutions — squelched Plaintiffs' plans to make profitable acquisitions.  The breach, moreover, forced Plaintiffs to redeploy costly tangible capital to serve the purposes the contracted-for Warrant capital should have served.

Despite the havoc the breach wreaked upon ASB, Plaintiffs continued to manage ASB prudently, to operate it profitably, and even to grow the bank — albeit at only a much more moderate rate than would have been the case absent the breach.  Accordingly, although absent the government's breach ASB may well have been a leading acquirer in the consolidation that characterized the thrift industry in the 1990s, given the breach ASB became an attractive acquisition candidate and in 1996 was purchased by a larger institution, Washington Mutual.  In the course of the Washington Mutual transaction, the government pressed its contractual right to collect proceeds from the sale in accordance with the Second Preference — which the

government negotiated in exchange for the Warrant Forbearance — despite the fact the government had breached its Warrant Forbearance promise.

Plaintiffs present four alternative claims for damages the government's breach caused them.

*First*, Plaintiffs claim $149.8 million as reliance damages.  In performance of the contract, Plaintiffs honored the Second Preference, ceding to the government a portion of ASB's sale proceeds $149.8 million greater than it would have had the government's Warrant Forbearance promise never been made (and, correspondingly, had the Second Preference never been granted).  Under governing law, Plaintiffs are entitled to that $149.8 million as "essential reliance" damages — amounts paid in performance of the contract and in reliance upon the government's breached promise.

*Second*, Plaintiffs claim $83.318 million in lost profits.  The government's breach of the Warrant Forbearance promise caused American Savings Bank both to (1) take costly actions it would not have taken but for the breach, such as divesting profitable assets in order to meet regulatory capital targets, and (2) refrain from taking profitable actions it would have taken but for the breach, such as growing its balance sheet with other profitable investments.  Thus, the government's breach caused Plaintiffs to lose at least $83.318 million of profits.

*Third*, Plaintiffs claim the $106.805 million cost of the tangible capital the breach forced Plaintiffs to redeploy in place of the contracted-for Warrant capital, thereby precluding Plaintiffs from using the redeployed tangible capital for any other purpose.  Because the government's breach left Plaintiffs with the cost of the redeployed tangible capital but deprived them of its benefits, the government is liable to Plaintiffs for the cost of that capital.  Based on the actual net

cost of the tangible capital Plaintiffs deployed in place of the promised Warrant capital, Plaintiffs are entitled to recover at least $106.805 million.

Plaintiffs have computed these three alternative damages claims with reasonable certainty. Plaintiffs base the Second Preference claim on the *actual* amount paid to the government in performance of the contract in an *actual* sale of the bank. Plaintiffs base the lost profits claim on *actual*, historical financial data — ASB's *actual* leverage and its *actual* returns. Plaintiffs base the cost of capital claim on the *actual* amount of tangible capital that Plaintiffs redeployed in place of the promised Warrant capital, and the *actual* costs of that capital. But even if the Court opts not to accept any of the three calculations entirely, Plaintiffs would still be entitled to a recovery — the breach deprived ASB of economically valuable rights, as even the government's expert witnesses acknowledge.

Thus, *fourth and finally,* Plaintiffs request a "jury verdict" award in an amount the Court deems fair and just in the event that the Court declines to base an award on any of the specific calculations Plaintiffs present. Such an award is appropriate where, as here, "a reasonable probability of damage can be clearly established." *Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1356-57 (Fed. Cir. 2001) (internal quotations omitted) (*quoting Locke v. United States*, 283 F.2d 521, 524 (Ct. Cl. 1960)). Under such circumstances, "uncertainty as to the amount will not preclude recovery, and the court's duty is to make a fair and reasonable approximation of the damages." *Id*. at 1357 (internal quotation marks omitted) (*quoting Locke*, 283 F.2d at 524). Accordingly, should the Court deem a "jury verdict" award necessary to make Plaintiffs whole, such an award would be fair and just.

## <u>ISSUE TO BE DECIDED BY THE COURT</u>

The Court must decide only a single issue — the quantum of damages to which Plaintiffs are entitled to compensate them for the government's breach of its promise to recognize the $167 million "fair value" of the Warrants as regulatory capital.  In doing so, the Court must determine whether the claimed damages were reasonably foreseeable, whether the breach was a substantial factor in causing the damages, and whether the damages have been measured with reasonable certainty.  The Court must apply these requirements separately to Plaintiffs' $149.8 million reliance claim, their $83.318 million lost-profits claim, and their $106.805 million cost-of-capital claim.  Finally, should the Court deem a "jury verdict" award necessary to make Plaintiffs whole, such an award would be fair and just.

## CONTENTIONS OF FACT

**I.    THE GOVERNMENT PROMISED VALUABLE REGULATORY CAPITAL FORBEARANCES TO INDUCE OUTSIDE INVESTORS TO RESOLVE A MASSIVE CRISIS IN THE SAVINGS-AND-LOAN SECTOR**

1.      By 1988, when Plaintiffs acquired ASB, literally hundreds of savings and loans throughout the country had failed.  FSLIC "was itself insolvent by over $50 billion."  *United States v. Winstar*, 518 U.S. 839, 847 (1996).

2.      In response to the crisis, "FSLIC encouraged private investors . . . to purchase struggling thrifts so that it would not be necessary to liquidate the thrifts using FSLIC funds to reimburse depositors.  The primary inducement that the FSLIC offered potential purchasers was a partial forbearance from regulatory capital requirements. . . .  This made the thrift far more attractive to potential purchasers, at no cost to the FSLIC."  *Landmark Land Co. v. FDIC*, 256 F.3d 1365, 1370 (Fed. Cir. 2001).

3.      FSLIC's regulatory capital promises had "substantial value" to acquirers.  *See Cal. Fed. Bank, F.S.B. v. United States*, 245 F.3d 1342, 1351 (Fed. Cir. 2001); *Glendale Fed. Bank, F.S.B. v. United States*, 239 F.3d 1374, 1381-82 (Fed. Cir. 2001).

**II.   PLAINTIFFS' ACQUISITION OF ASB SAVED THE GOVERNMENT BILLIONS, AND WAS STRUCTURED TO PROVIDE FOR ASB'S GROWTH AND PROFITABILITY**

4.      By early 1988, the old American Savings Bank ("Old American") had become insolvent and was operating at a loss.

5.      Old American had accumulated a significant amount of net operating losses ("NOLs"), which (if transferred to the acquirer) could be used to reduce the taxes due on the acquired institution's future profits.

6.      FSLIC sought potential acquirers for Old American, but attracted few if any prospective acquirers other than Plaintiffs.  Indeed, the government described the only other bidder, Ford Motor Company, as presenting an unduly complicated proposal with unacceptably high interest rate risk.  In discussing "the volatility of the cost [of the Ford proposal] with regards to interest rate risk," Office of Regulatory Policy, Oversight and Supervision ("ORPOS") Executive Director Darrel Dochow stated, "I just don't believe . . . that we can stand large run-ups in interest rates throughout this industry . . . without doing everything we can to protect the FSLIC and the capital base of the industry.  So, I do view the Bass proposal very preferential over the Ford proposal. . . ."  PX 1086, April 14, 1988 Minutes of Federal Home Loan Bank Board Special Meeting at WOR120 0224-25.  The government also criticized the Ford proposal as too complex and costly.  *Id*. at WOR120 0225 (The Ford proposal would "be a much more difficult assistance agreement to have to administer, and, therefore, . . . much more costly, both in human capital and financial capital on the part of the FSLIC.").  Moreover, the Ford proposal would not result in *new* capital entering the thrift industry.  *Id*. ("Ford is already in the business, and if you consider getting new capital into the business . . . the Robert M. Bass Group is new capital; it's new to the savings and loan business.").

7.      Plaintiffs brought exceptionally strong business reputations and a history of extraordinary financial success to the ASB acquisition.

8.      Numerous internal government memoranda indicate the high regard with which the Federal Home Loan Bank Board ("FHLBB") viewed the Bass Group investors.  In a December 28, 1988 Press Release, FHLBB Chairman Danny Wall praised the Bass Group, noting that the acquisition "not only is bringing important new capital into the industry, but also is [bringing in] a worthy competitor that will help enhance the integrity of the thrift industry in

California . . . ."  PX 1309, Dec. 28, 1988 FHLBB Press Release at USA0095334.  FHLBB

Board Member Roger Martin lauded the Bass Group-led acquisition as "a decidedly positive

factor in our industry."  *Id*.  Board Member Lawrence White stated that "sell[ing] this institution

to a group so financially strong and businesslike is a solid achievement for the Bank Board."  *Id*.

at 2-3.  Jack Reid, Director of FSLIC's Analysis and Evaluation Division, stated "[W]e have a

potential for very, very impressive gains out of ownership of the thrift . . . .  These guys have . . .

been extraordinarily successful in purchasing places and making lots of money . . . . I think that

they have the knack for hiring good managers and letting them manage the places."  PX 1086,

April 14, 1988 Minutes of the FHLBB Special Meeting at WOR120 0207.  FSLIC Executive

Director Stuart Root and ORPOS Executive Director Darrel Dochow noted that "[the Bass

Group] has a tremendous track record of profitability in other transactions, suggesting a high

probability of success with this acquisition — a success in which FSLIC will share."  PX 1079,

April 5, 1988 Mem. from Root and Dochow to Wall, Martin and White at WOR466 0484.

  9.  The government recognized the value that Plaintiffs and their capital would bring

to the savings and loan industry.

  10.  In March 1988, Plaintiffs submitted a term sheet describing the structure by which

they proposed to acquire ASB.  PX 1077, March 28, 1988 Term Sheet.  In April 1988, the

government agreed to negotiate exclusively with Plaintiffs.  PX 1083, April 14, 1988 Agreement

Between Robert M. Bass Group, Inc. and FHLBB; PX 1089, April 21, 1988 FHLBB Press

Release.

**A.      The Government Negotiated an Ownership Interest in ASB, Providing the Government a Stake in ASB's Expected Growth and Success**

11.      In negotiating terms to recapitalize ASB, the parties agreed to divide ownership of the institution (through a corporate structure) between the Bass Investors (who would hold a 70% interest) and the government (which would hold a 30% interest).  The Bass Investors would put up 100% of the cash to capitalize ASB — up to $500 million — but would issue Warrants to FSLIC representing a 30% ownership interest in the new thrift.  PX 1077, March 28, 1988 Term Sheet at PAS177 0151; PX 1079, April 5, 1988 Mem. from Root and Dochow to Wall, White and Martin at WOR466 0484; PX 1096, April 29, 1988 Letter from Raiden to Carl, Furer, Haje, and Goldstein at USA0002918.

12.      Generally, the Warrants entitled FSLIC to 30% of the proceeds of any sale of ASB.  PX 1079, April 5, 1988 Mem. from Root and Dochow to Wall, White and Martin at WOR466 0484; PX 1115, June 22, 1988 Letter from Carl to Duhl; PX 1118, June 28, 1988 Letter from Carl to Dochow; PX 1866, Undated 1988 Mem. from Dochow to Wall, White and Martin.

13.      FSLIC was very much aware that the Bass Group proposal carried with it enormous upside potential for FSLIC; FSLIC expected American Savings to succeed and experience profitability.

> The idea of the ownership interest, taking 30 percent.  I think history has shown that some other highly publicized transactions involving other regulators have been severely criticized, because 'we didn't take any of the up side,' or they 'didn't take any of the upside.'  I like the Bass proposal; it gives us an opportunity to do just that, and it does that while they're bringing capital to the table. So, I view that very positively.

PX 1086, April 14, 1988 Minutes of the FHLBB Special Meeting at WOR120 0227 (Statement of Darrel Dochow).  FHLBB Chairman Danny Wall stated during FHLBB's consideration of the

9

Bass proposal:  "[P]lenty has been said, and appropriately, about their [the Bass Investors'] track record — as investors, as managers, as assessors and appraisers of the value in corporate America."  *Id*. at WOR120 0234.  Jack T. Reid, Director of FSLIC's Analysis & Evaluation Division, shared this view as well: "[W]e have a potential for very, very impressive gains out of our ownership of the thrift too.  These guys have . . . been extraordinarily successful in purchasing places and making lots of money. . . .  I think that they have the knack for hiring good managers and letting them manage the places." *Id*. at WOR120 0207.  Furthermore, two of the government's chief negotiators, FSLIC Executive Director Stuart Root and ORPOS Executive Director Darrel Dochow, with the concurrence of FSLIC and FHLBB General Counsel Jordan Luke, advised FHLBB that "the [Bass] group has a tremendous track record of profitability in other transactions, suggesting a high probability of success with this acquisition — a success in which FSLIC will share."  PX 1079, April 5, 1988 Mem. from Root and Dochow to Wall, White and Martin at WOR466 0484.

14.     The parties also agreed that, in exchange for issuing the Warrants to the government, Plaintiffs would be entitled to treat the full value of that capital instrument as regulatory capital.  *Am. Sav. Bank, F.A. v. United States*, 52 Fed. Cl. 509, 513 (2002), *aff'd in relevant part*, 518 F.3d 1316, 1321 (Fed. Cir. 2008); PX 1096, April 29, 1988 Letter from Raiden to Carl, Furer, Haje, and Goldstein at USA0002918; PX 1076, May 6, 1988 Deloitte, Haskins & Sells Opinion Letter Regarding Accounting for FSLIC Warrants; PX 1100, May 10, 1988 Mem. from Smuzynski to FHLBSF.

15.     The government believed that it was "entirely suitable and appropriate, as an economic matter to allow for . . . regulatory capital to be recognized" as a result of the Warrants.  PX 1128, July 18, 1988 Mem. from Root to FHLBB at USA0029942.

16.     The government deemed the Warrants to reflect the claimed value of Old American's deposit base, which FSLIC understood it was putting into the deal as a capital contribution.  PX 1866, Undated 1988 Mem. from Dochow to Wall, White and Martin at WOT935 0079 (stating ORPOS/FSLIC's position that "the value of the warrants was negotiated and it was agreed that they represent the current franchise value of the branch system and therefore have real value."); PX 1118, June 28, 1988 Letter from Carl to Dochow.

17.     Thus, unlike goodwill or other forms of intangible assistance that the government provided to thrift acquirers in other transactions, the Warrants represented actual bargained-for capital in ASB, and "provid[ed] protection to the FSLIC."  PX 1866, Undated 1988 Mem. from Dochow to Wall, White and Martin at WOT935 0079; PX 1128, July 18, 1988 Mem. from Root to FHLBB at USA0029941 (explaining that "the 'bargained-for' economic contribution deemed to have been made by FSLIC in the capital account of NA would be recognized as a nod to economic reality").

18.     Even though they settled upon a 70-30 ownership split, the parties agreed that the Bass Investors would receive a "first out" in the event of ASB's future sale or liquidation. Specifically, the parties agreed that the first $500 million realized from a sale of ASB (net of certain dividend payments to the Bass Investors prior to the sale) would go to the Bass Investors. PX 1077, March 28, 1988 Term Sheet at PAS177 0151; PX 1079, April 5, 1988 Mem. from Root and Dochow to Wall, White and Martin at WOR466 0484.

19.     Thus, the term sheet governing the deal provided that the Bass Investors would receive 100% of the first $500 million in proceeds from a sale of ASB before they and FSLIC would split the remaining proceeds of sale 70-30 in accordance with their respective ownership percentages.  Some, but not all, common stock dividends paid to the Bass Investors prior to a

sale of the bank would count against this $500 million.  PX 1077, March 28, 1988 Term Sheet at

PAS177 0151; PX 1079, April 5, 1988 Mem. from Root and Dochow to Wall, White and Martin

at WOR466 0484 ("The acquirer would have a liquidation preference in the amount of its 500

million capital infusion.").

     20.     The Summary Term Sheet of May 12, 1988 restated the parties' agreement:

> FSLIC will receive a warrant convertible into 30% of the stock of
> [ASB] (non-voting) no earlier than six years after the closing.  *The
> terms of the warrant will permit Bass to recover its entire capital
> contribution to [ASB] before FSLIC is entitled to any dividends or
> other participation in [ASB's] profits or asset appreciation.*

PX 1102, May 12, 1988 Summary Term Sheet at PAS177 0239 (emphasis added).

     21.     At the same time, the FSLIC Warrant assured FSLIC that all proceeds *beyond* the

first $500 million would be split 70-30 with 70% to the Bass Investors and 30% to FSLIC.  *Id.*

    **B.**    **The Government Secured a $214 Million Distribution Preference in
Exchange for the Warrant Forbearance Promise**

     22.     In May 1988, after the parties had settled upon the basic economics of the deal, it

appeared that, despite the parties' contrary intentions, a certain GAAP accounting rule might

prevent ASB from recording the Warrant on its books as capital.  The threat of the GAAP rule

arose as an unintended consequence of Plaintiffs both accepting the FSLIC Note and granting

FSLIC the Warrants.  PX 1076, May 6, 1988 Deloitte, Haskins & Sells Opinion Letter Regarding

Accounting for FSLIC Warrants at USA0091318; PX 1113, June 20, 1988 Letter from Carl to

Root at USA0005779-80.

     23.     The GAAP rule applied where a corporation *sold* a capital instrument, such as

common stock or a Warrant, and took payment in the form of a note.  The rule barred such a

corporation from adding the value of a promissory note to its assets account while

simultaneously adding the value of the capital instrument to its capital account.  PX 1076,

May 6, 1988 Deloitte, Haskins & Sells Opinion Letter regarding Accounting for FSLIC Warrants

at  USA0091318; PX 1868, Undated Mem. from Grimditch to Robinson at USA0254698

("GAAP would argue that if an entity holds an equity interest (*e.g.*, FSLIC warrants) in the same

company as it owes money to (e.g. FSLIC assistance to the bad bank), the ownership interest

should be offset by the amount borrowed.  Therefore GAAP would require that the value of the

FSLIC warrants be offset against the intercompany note, which has been construed as a FSLIC

obligation."); PX 1113, June 20, 1988 Letter from Carl to Root at USA0005779-80.

24.      Here, Plaintiffs did *not* sell the Warrants to FSLIC for the FSLIC Note.

Nevertheless, the parties were concerned that the possible application of the GAAP rule would

defeat their agreement regarding regulatory capital.  PX 1128, July 18, 1988 Mem. from Root to

FHLBB at USA0029942 ("[T]he assertion that NA and the Collecting Bank be linked for

purposes of making the decision to disallow regulatory capital is fallacious."); PX 1113, June 20,

1988 Letter from Carl to Root at USA0005779 ("It is only because the warrant is granted and

Note due *both* to FSLIC, that such netting is required.  If FSLIC assistance were cash rather than

in the form of a Note, the $200 million warrant value would be capital for GAAP

[purposes] . . . .").

25.      Accordingly, Plaintiffs sought reassurances that, the GAAP rule notwithstanding,

FSLIC and FHLBB would authorize ASB to count the Warrants' value as capital for *regulatory*

purposes.  PX 1113, June 20, 1988 Letter from Carl to Root at USA0005779-80 ("It seems unfair

for an acquirer of a troubled thrift to be prejudiced so severely for accepting a FSLIC Note rather

than demanding cash assistance.  Such prejudice is particularly troubling when it stems from

regulatory accounting decisions solely within the discretion of the FHLBB."); PX 1118, June 28,

13

1988 Letter from Carl to Dochow at PAS177 0186 ("You indicated a reluctance to accept the $218 million value of the FSLIC warrant as regulatory capital.  However, FSLIC has been adamant that this value is real.").

26.     FSLIC was willing to grant Plaintiffs a forbearance from the operation of GAAP, but only if Plaintiffs made the Warrants more valuable to the government by adding a distinct "second out" cash distribution preference for FSLIC.  PX 1811, Defendant's June 25, 2002 Proposed Findings of Uncontroverted Fact ¶ 23 ("Ultimately, the sides reached a compromise [regarding Plaintiffs' request that FSLIC override the GAAP rule], under which American Savings would receive a forbearance (the 'Warrant Accounting Forbearance'), allowing it to count the 'fair value' of the warrants as regulatory capital for 'certain limited purposes,' and FSLIC would receive a $200 million 'second preference' upon sale of the bank."); PX 1115, June 22, 1988 Letter from Carl to Duhl at PAS177 0111; PX 1118, June 28, 1988 Letter from Carl to Dochow at PAS177 0187; PX 1212, Nov. 14, 1988 Initial Comments on Nov. 10 Draft Forbearance Letter at WOQ561 0765.

27.     In return for a Warrant Forbearance that would trump the GAAP rule for regulatory purposes and assure that ASB could indeed recognize and count the fair value of the Warrants as regulatory capital, the government demanded a second distribution priority that would provide FSLIC exclusively with $214 million in proceeds available for distribution after the Bass Investors had recovered their initial investment commitment.  PX 1811, Defendant's June 25, 2002 Proposed Findings of Uncontroverted Fact ¶ 23; PX 1115, June 22, 1988 Letter from Carl to Duhl at PAS177 0111; PX 1118, June 28, 1988 Letter from Carl to Dochow at PAS177 0187; PX 1212, Nov. 14, 1988 Initial Comments on Nov. 10 Draft Forbearance Letter

at WOQ561 0765; PX 1272, Dec. 22, 1988 Restated Certificate of Incorporation for New

American Holdings, Inc. at TM 01862.

28.     From the time of the initial term sheet at the outset of the negotiations, FSLIC had

always agreed that, upon the sale of ASB, the Bass Investors would receive a "first out," or

preference, of 100% of the sales proceeds (net of dividends paid prior to the sale) up to an

amount equal to Plaintiffs' entire commitment to invest *cash* in the bank – then estimated to be

$500 million.  At that point FSLIC would receive its 30% of the remaining sales proceeds

(reflecting its 30% ownership interest via the Warrant).  PX 1102, May 12, 1988 Summary Term

Sheet at PAS177 0239.

29.     But in exchange for the Warrant Forbearance FSLIC demanded that, after the

Bass Investors recovered their $500 million, FSLIC would receive a distribution preference:

100% of the next $214 million of sales proceeds.  The $214 million represented FSLIC's

estimated value of its purported capital contribution to ASB.  The parties referred to this second

out distribution preferrence to FSLIC of $214 million as the "Second Preference" or the "FSLIC

Preference."  *Compare* PX 1079, April 5, 1988 Mem. from Root and Dochow to Wall, White

and Martin at WOR466 0484 *and* PX 1102, May 12, 1988 Summary Term Sheet at PAS177

0239 *with* PX 1115, June 22, 1988 Letter from Carl to Duhl at PAS177 0111 *and* PX 1118, June

28, 1988 Letter from Carl to Dochow re: American Savings at PAS177 0187 *and* PX 1212, Nov.

14, 1988 Initial Comments on Nov. 10 Draft Forbearance Letter at WOQ561 0765 *and* PX 1272,

Dec. 22, 1988 Restated Certificate of Incorporation for New American Holdings, Inc. at

TM 1862.

30.     Under this revised distribution scheme, only after the sequential distribution of

$500 million to Plaintiffs *and* $214 million to FSLIC (totaling the first $714 million of sales

proceeds), would the cash received by each of the parties reflect the 70-30 ratio of the parties'

ownership interests.  Thus, following payment of the two distribution priorities, the parties'

shares of further sale proceeds would revert to a straight 70%/30%, pursuant to the original

Warrant agreement, with distributions simultaneously and *pari passu* to both parties.  PX 1115,

June 22, 1988 Letter from Carl to Duhl at PAS177 0111; PX 1272, Dec. 22, 1988 Restated

Certificate of Incorporation for New American Holdings, Inc. at TM 01862; PX 1753, Jun. 14,

1996 Mem. From Patelunas and Kroener to the FDIC Board of Directors, at FAS011 0031-32.

31.    As the government acknowledges, the parties specifically paired the Warrant

Forbearance, reassuring Plaintiffs' right to treat the Warrants as capital, with the FSLIC

Preference for $214 million of sales proceeds.  PX 1115, June 22, 1988 Letter from Carl to Duhl

at PAS177 0111; PX 1128, July 18, 1988 Mem. from Root to FHLBB at USA00 29942;

PX 1811, Defendant's June 25, 2002 Proposed Findings of Uncontroverted Fact ¶ 23.

32.    The Plaintiffs relied upon the government's promise of a Warrant Forbearance in

agreeing to grant the government a Second Preference of $214 million upon the sale or

liquidation of ASB.  PX 1115, June 22, 1988 Letter from Carl to Duhl at PAS177 0111 ("This

compromise assumes that ORPOS will agree that this $200 million value is recognized for

regulatory capital purposes."); PX 1118, June 28, 1988 Letter from Carl to Dochow at

PAS177 0187; PX 1212, Nov. 14, 1988 Initial Comments on Nov. 10 Draft Forbearance Letter

at WOQ561 0765.

33.    The parties implemented their exchange of the FSLIC Preference and the Warrant

Forbearance by establishing two classes of common stock.  The "class A" stock, issued to the

Bass Investors, acknowledged their right to 100% of the first $500 million in proceeds available

for distribution, and the "class B" stock, to be issued to FSLIC upon exercise of the Warrant,

acknowledged FSLIC's right to 100% of the next $214 million in such proceeds, and 30% of all amounts above the combined preferences of $714 million. Technically, the Bass preference was an attribute of the class A stock, and the FSLIC Preference was an attribute of the class B stock. PX 1272, Dec. 22, 1988 Restated Certificate of Incorporation for New American Holdings, Inc. at TM 01857-72.

34.     In December 1988, shortly before closing the transaction, the parties agreed that the Bass Investors would make their $500 million cash contribution to ASB's capital in two parts – $350 million on December 28, 1988, the date of the Transaction, and $150 million as subsequently needed. The change entitled FSLIC to receive its priority distribution of proceeds from the sale of ASB after the Bass Investors recovered only the $350 million they first contributed (plus any subsequent capital investment above $350 million, and less dividends already paid). PX 1272, Dec. 22, 1988 Restated Certificate of Incorporation for New American Holdings, Inc. at TM 01864-65.

35.     Thus, under the deal's final terms, the Bass Investors would recover 100% of the first $350 million in proceeds. FSLIC would recover 100% of the next $214 million. The Bass Investors would recover 100% of the next $150 million. Then the parties would split the balance 70-30, with 70% to the Plaintiffs and 30% to FSLIC. PX 1272, Dec. 22, 1988 Restated Certificate of Incorporation for New American Holdings, Inc. at TM 01864-65.

36.     Shortly after the Transaction, the parties agreed that the fair value of the FSLIC Warrant was only $167 million, less than the $214 million on which the parties had earlier agreed. This reduced to $167 million (based on an independent assessment), the regulatory capital Plaintiffs obtained from the Warrant Forbearance. Nevertheless, the parties did not reduce the preference to 100% of $167 million; they left the FSLIC Preference at 100% of $214

million.  *Compare* PX 0064, Feb 28, 1989 American Savings Bank, F.A. and Subsidiaries

Financial Statements/Directors' Report at PAS064 0279, line 29 (Warrant Capital of $167,000)

*with* PX 1272, Dec. 22, 1988 Restated Certificate of Incorporation for New American Holdings,

Inc. at TM 01864-65 (describing FSLIC's $214,000,000 liquidation preference).

> **C.      With a Sizeable Stake in ASB's Operations, the Government Expected
> Plaintiffs To Leverage ASB's Regulatory Capital and To Grow Profitably**

37.      On December 28, 1988, Plaintiffs, FHLBB, and FSLIC entered into several inter-

related agreements, including an Acquisition Agreement, an Assistance Agreement, a Capital

Maintenance Agreement, and a Warrant Agreement, to effect the transaction.  As part of the

contractual arrangement, FHLBB issued a forbearance letter stating that the government would

recognize the fair value of the Warrants in computing ASB's regulatory capital notwithstanding

a GAAP provision that would otherwise have required the Warrant capital's exclusion.

38.      Specifically, the forbearance letter provided, among other things, that Plaintiffs

"may use push down accounting to record . . . the 'fair value' . . . of [FSLIC's] warrants . . .

notwithstanding the accounting offset that GAAP requires due to the existence of the [FSLIC]

Note."  PX 1891, Undated Forbearance Letter at 5.

39.      It was reasonably foreseeable at the time of contracting that a government breach

of the Warrant Forbearance promise would force Plaintiffs to curtail ASB's growth and to lose

profits, and/or to deploy costly tangible capital in place of the contracted-for Warrant capital.

40.      Plaintiffs reasonably expected ASB to grow and to increase its profits following

the proposed acquisition, in large part because ASB could leverage the government-promised

regulatory capital in essentially the same manner that it could leverage cash capital.

41.     Because Plaintiffs expected ASB to be profitable in the years following the acquisition, Plaintiffs negotiated to retain Old American's NOLs, and negotiated a Closing Agreement to that effect with the Internal Revenue Service.

42.     The government shared the belief that ASB would be profitable in the years following the acquisition, as evidenced by the fact that the government sought and received two specific claims on the "upside" of the transaction.

43.     First, the government negotiated for a 75% share of the tax savings Plaintiffs would achieve through the application of the acquired institution's NOLs to ASB's post-acquisition profits.  PX 1305, Dec. 28, 1988 Assistance Agreement § 9.

44.     Second, the government negotiated for an ownership interest in ASB's fourth-tier holding company, effectively taking a 30% ownership interest in ASB.  PX 1387, Dec. 28, 1988 Warrant Agreement.

45.     The government recognized that its forbearance promises were essential to ASB's ability to grow and to generate the profits Plaintiffs and the government expected.

46.     In a "Supplemental Memorandum" submitted to the FHLBB on December 27, 1988 in connection with the proposed transaction, the Executive Director of the FHLBB's Office of Regulatory Activities, Darrel Dochow, noted that "in negotiating some [of] the key forbearances," Plaintiffs had "recognized" that the "key to [ASB's] future prospects is management's ability to make the institution profitable."  PX 1292, Dec. 27, 1988 Supplemental Mem. at 7.

47.     In addition, in "Press Talking Points" disseminated on the day of closing, FHLBB staff stated that the regulatory capital forbearances included in the transaction would "free" the

additional capital Plaintiffs invested into ASB "for other profitable uses." PX 1310, Dec. 28, 1988 Press Talking Points at 3.

48.     Plaintiffs intended to increase ASB's assets and profits partly through internal growth, *i.e.*, by deploying retained earnings as capital that would support additional assets and liabilities generated through the existing ASB branch structure.

49.     As the government acknowledged at closing, Plaintiffs also intended to grow through the acquisition of other thrifts or branches of other thrifts. Indeed, Plaintiffs and the government structured the transaction "to facilitate the future acquisition of a healthy savings and loan" outside California. PX 1276, Dec. 23, 1988 Draft News Release at USA0095288. *See also* PX 1285, FHLBB Resolution No. 88-1418 at 30-31; PX 1290, General Memorandum from Root to Dochow at TM 00181-83.

50.     Moreover, in 1989 the Office of Thrift Supervision ("OTS") examiners responsible for ASB recognized that ASB's management intended to "utiliz[e] any surplus capital above the minimum for acquisitions." PX 0312, OTS Report of Examination for ASB as of Oct. 16, 1989, at 10.

## III.    ASB ESTABLISHED A TRACK RECORD OF GROWTH AND PROFIT PRIOR TO THE BREACH

51.     As of December 28, 1988, the time of the transaction, ASB held $15.409 billion of assets. PX 1303, Dec. 28, 1988 ASB Consolidated Statement of Financial Condition at 2.

52.     By year-end 1989, ASB had grown to an asset size of $16.294 billion, an increase of 5.74%. PX 0001, 1989 ASB Annual Report at 3.

53.     Over the year 1989, ASB earned $214.212 million of profits, generating an annual return on average assets of 1.35% or 135 basis points. PX 0001, 1989 ASB Annual Report at 4.

54.     Indeed, in its Report of an Examination that took place in October 1989, the OTS specifically described ASB as a "thriving institution," and stated that "management is to be commended for the significant strides made in restructuring and improving the profitability of the institution."  PX 0312, OTS Report of Examination for ASB as of Oct. 16, 1989, at 3.  The examiners also noted that "[ASB] is a profitable institution," and that "[m]anagement's overall performance to date has demonstrated sound policy and strategy implementation."  *Id.* at 1.  The examiners added that ASB's "net interest income . . . significantly exceed[ed] the peer group average . . . because of the institution's superior yield . . . on its earning assets."  *Id.* at 15.

55.     The FDIC, which examined ASB concurrently with the OTS, reported similarly positive findings.  The FDIC examiners noted that "ASB is one of the most profitable institutions in the Eleventh District," and noted that its "earnings are well above the peer group . . . ."  PX 0313, FDIC Report of Examination of ASB as of Oct. 16, 1989, at 1, 1a1.

## IV.     THE GOVERNMENT BREACHED ITS CONTRACT WITH PLAINTIFFS BY EXCLUDING THE WARRANT FROM ASB'S REGULATORY CAPITAL

56.     On August 9, 1989, then-President George H. W. Bush signed into law FIRREA, a comprehensive thrift reform package.

57.     The relevant portions of the FIRREA legislation required, among other things, three different measures of capital for thrift institutions: (1) "core capital"; (2) "tangible capital"; and (3) "risk-based capital."  Regulatory Capital, 54 Fed. Reg. 466845, 466846-47 (Nov. 8, 1989) (to be codified at 12 C.F.R. §§ 561, 563 and 567 (1990)).  The OTS, which succeeded the FHLBB as a result of FIRREA, issued implementing regulations for the new legislation on November 8, 1989, with an effective date of December 7, 1989.  Regulatory Capital, 54 Fed. Reg. 466845 (Nov. 8, 1989); 12 C.F.R. § 567 (1990).

21

58.     The government interpreted FIRREA and its implementing regulations to require the exclusion of the Warrants from ASB's regulatory capital, and enforced that interpretation against Plaintiffs notwithstanding their objections.  PX 0003, 1991 ASB Annual Report at 11.

59.     The government breached Plaintiffs' contract when it prohibited ASB from continuing to treat the Warrants as a full-fledged component of regulatory capital as the government had promised.  *Am. Sav.*, 52 Fed. Cl. at 509.

60.     The government's breach of the contract excluded $167 million in Warrant capital from ASB's regulatory capital.  *Id.*

## V.     THE BREACH IMPAIRED ASB'S GROWTH AND COST PLAINTIFFS SCORES OF MILLIONS OF DOLLARS IN LOST PROFITS

61.     By slashing ASB's regulatory capital, the government caused ASB to lose substantial and reasonably foreseeable profits.

62.     Absent the breach, ASB would have had a comfortable regulatory capital surplus in 1990 and would have added substantial assets through leveraging its regulatory capital.

63.     The government's breach caused Plaintiffs to take extraordinary measures in a desperate, and ultimately successful, effort to keep ASB from falling out of regulatory capital compliance.  Instead of leveraging surplus regulatory capital to support additional profitable assets, the breach forced Plaintiffs to reduce their leverage in order to build capital, and to shed profitable assets already on ASB's books.  Similarly, regulators — citing regulatory capital concerns — squelched Plaintiffs' plans to make profitable acquisitions.

A.     **Absent the Breach, ASB Could Have Retained More Than $1 Billion of Adjustable-Rate Mortgages It Sold in Late 1990 To Improve Its Regulatory Capital Position**

64.     ASB's basic business strategy was to hold Adjustable Rate Mortgages ("ARMs") with interest rates keyed to the Eleventh District Cost of Funds Index ("COFI-ARMs") funded with liabilities that mimicked COFI.

65.     Indeed, ASB's "1990 business plan anticipate[d] $2 billion in asset growth primarily through the retention of ARMs."  PX 0313, FDIC Report of Examination of ASB as of Oct. 16, 1989, at 4b1.

66.     But in direct contravention of ASB's pre-breach plans to retain ARM loans and to grow, ASB divested itself of more than $1 billion of profitable ARM loans in the fourth quarter of 1990 in order to meet its regulatory capital targets.  *See* PX 0263, Dec. 31, 1990 ASB Secondary Marketing Sales at ASDOJ-BAXTER-1393-94.  *See also* PX 0016, Dec. 31, 1990 New American Capital, Inc. Annual Report at AS1046 0384, 0342 ("In 1990, American sold $1.9 billion of acquired and originated loans . . . . Of these loans, $1.4 billion were sold in the fourth quarter of 1990 . . . ."); PX 1922, Oct. 1991 New American Capital, Inc.  Private Placement Memorandum at WOQ570 1761-62 ("$1.4 billion of assets were sold in the fourth quarter of 1990").

B.     **Absent the Breach, ASB Could Have Retained Nearly $500 Million of High-Yield Bonds It Sold in Response to Government Concerns About ASB's Regulatory Capital**

67.     ASB acquired a substantial portfolio of high-yield corporate bonds in 1989.  After the breach eliminated the Warrant capital from ASB's books, the regulators criticized ASB's post-breach capital position as "too low, particularly in light of the $493.6 million investment in high-yield securities."  PX 0312, OTS Report of Examination for ASB as of Oct. 16, 1989, at 1.

68.     Because of the regulators' criticism of ASB's high-yield portfolio in relation to ASB's breach-impaired capital, ASB divested itself of the high-yield bond portfolio precipitously in late 1989 and early 1990, in particularly unfavorable market conditions, and at a loss of approximately $112.3 million.  PX 0002, 1990 ASB Annual Report at 20.

69.     Had the government not breached, ASB would have had ample capital to absorb any volatility in the value of the high-yield bond portfolio, and could have held the bonds until the market recovered, which it did within only a few months.  Had ASB held the high-yield bond portfolio longer into 1990 or beyond, it would have avoided some or all of the losses it took on the bonds, and would therefore have earned increased profits.

### C.     Absent the Breach, ASB Could Have Grown Through Acquisitions, As It Had Planned

70.     In addition, the loss of the Warrant capital impaired ASB's ability to grow through acquisitions.

71.     For example, in its Report of a June 1991 Examination of ASB, the FDIC noted that ASB's "primary focus for growth will be through the acquisition of entire thrift franchises or branches when economically advantageous," and that "management is considering the acquisition of thrifts from the RTC both to improve branch economics and to increase market share."  PX 0317, FDIC Report of Examination as of June 30, 1991, at 3-1.

72.     But in the September 1991 letter conveying that Examination Report, the FDIC advised ASB that "we are not prepared to recommend approval of additional RTC acquisitions so long as you are at the minimum core capital level of 4% . . . .  Your efforts should be directed toward restoring core capital to the 4.3% goal."  PX 0317, FDIC June 30, 1991 Report of Examination Cover Letter.

### D.     Despite the Breach, ASB Operated Profitably and Successfully

73.     Having been forced by the breach to curtail its plans for growth and divest itself

of profitable assets, ASB grew only nominally from year-end 1989 to year-end 1990, increasing

its total assets from $16.294 billion to $16.493 billion, a change of only $199 million (or 1.2%)

— far less than the amount of interest ASB paid its depositors.  *Compare* PX 0001, 1989 ASB

Annual Report *with* PX 0002, 1990 ASB Annual Report.

74.     Notwithstanding the breach, government regulators continually praised ASB as a

well-run and highly profitable institution.

75.     For example, in the October 7, 1992 letter conveying the Report of its July 1992

Examination of ASB, the OTS stated, "Our examination revealed that American Savings Bank is

generally a fundamentally sound and well-managed institution."  PX 0321, OTS July 7, 1992

Report of Examination Cover Letter.

76.     The July 1992 Examination Report similarly stated the OTS's "conclusion . . .

that the overall financial condition of [ASB] is good," and noted that "the institution's

management team is effective and has operated [ASB] in a safe and sound manner" while

observing that "[o]perating results remain strong . . . ."  PX 0321, OTS Report of Examination

for ASB as of July 7, 1992, at 1.  The examiners specifically praised "[ASB's] good core

profitability."  *Id*. at 11.

77.     Despite their praise for ASB's management and their recognition of ASB's

superior operating results, the regulators often criticized ASB's level of regulatory capital.  For

example, in the 1992 OTS Report of Examination, the regulators stated that "[ASB's] tangible

and core ratios are significantly below those of the three large institutions it considers its peers,"

and noted "potential concern regarding future capital adequacy."  PX 0321, OTS Report of

Examination for ASB as of July 7, 1992, at 10-11.

> ### E.   Absent the Breach, ASB Would Have Been Even More Profitable and Successful

78.     But for the breach, ASB would have had substantial additional regulatory capital

— nearly $100 million of it— with which to grow and earn substantial returns.

79.     The loss of the promised Warrant capital caused ASB to lose profits.  Indeed, in

an Examination Report prepared shortly after FIRREA, the FDIC acknowledged that "a change

in the assistance agreements could have a material effect on ASB," and specifically stated that

"elimination of the capital forbearances is one example . . . ."  PX 0313, FDIC Report of

Examination of ASB as of Oct. 16, 1989, at A-1.

80.     A former ASB officer, Antonio Ramirez, Jr., has computed the amount of ASB's

lost profits.  Mr. Ramirez computed the lost profits by determining, on a quarterly basis, the

amount of additional assets ASB would likely have held had the government not eliminated the

contractual Warrant capital, and applying the return on assets ASB's actual portfolio generated

over each quarter.  *See* PX 1820, Oct. 17, 2008 Letter from Yalowitz to Todor with Attached

Schedules; PX 1830, Summary of Data Inputs Incorporated into Plaintiffs' Lost Profits and Cost

of Capital Calculations.

81.     Generally, Mr. Ramirez computed the size of the incremental portfolio by

applying ASB's actual leverage to the additional amount of regulatory capital that would have

been available to ASB absent the breach.  For periods in 1990, however, Mr. Ramirez applied an

even more conservative leverage factor — thereby significantly reducing the amount of lost

profits.  Mr. Ramirez did so to reflect the fact that, at that time, ASB was seeking to build capital

to 4% — 1% more than the bare regulatory minimum of 3% — both as a prudent buffer and also in anticipation of an expected increase in the required minimum (which materialized a few months later). *Id.*

82. Mr. Ramirez's calculations incorporate payment of dividends out of the computed profits at the same rate at which ASB paid net dividends out of its profits in its actual operations, and reflect the use of retained earnings (profits less dividends) as capital available for leverage.

83. Mr. Ramirez applied ASB's actual average return on assets, which incorporates overhead expenses, despite the fact that ASB could have achieved the growth reflected in his model without proportionately increasing its overhead (as, for example, by retaining profitable assets the breach forced ASB to sell).

84. Mr. Ramirez's calculations apply the following structure quarter by quarter from 1990 through 1998 (the first two quarters are described):

    a. At the beginning of the first quarter of 1990, ASB reported adjusted tangible assets of $16.294 billion with a core capital ratio of 3.006%. PX 1830, Summary of Data Inputs Incorporated into Plaintiffs' Lost Profits and Cost of Capital Calculations. Had the government not breached, ASB would have had at least $93.500 million in additional core capital available during the quarter, which, if leveraged comparably (albeit to a lesser degree as described *supra*) to ASB's actual core capital, would have supported at least $278.589 million in additional assets. Over the quarter, those incremental assets, had they generated returns comparable to ASB's actual assets, would have created an additional $0.758 million of profits. Had ASB paid dividends out of those profits at the same rate at which it paid net dividends out of its actual income, ASB would have paid $0.185 million out as dividends while retaining the remaining

$0.573 million as retained earnings, which would have been included in ASB's core capital during the next quarter. ASB would also have charged $4.701 million in amortization expense against certain pushed-down assets, which would have reduced ASB's core capital correspondingly.

      b.      At the beginning of the second quarter of 1990, ASB reported adjusted tangible assets of $16.034 billion with a core capital ratio of 3.287%. PX 1830, Summary of Data Inputs Incorporated into Plaintiffs' Lost Profits and Cost of Capital Calculations. Had the government not breached, ASB would have had at least $89.371 million in additional core capital available during the quarter, which, if leveraged comparably (albeit to a lesser degree as described *supra*) to ASB's actual core capital, would have supported at least $767.220 million in additional assets, an increase of $488.631 million over the previous quarter. Over the quarter, those incremental assets, had they generated returns comparable to ASB's actual assets, would have created an additional $3.222 million of profits. Had ASB paid dividends out of those profits at the same rate at which it paid net dividends out of its actual income, ASB would have paid $0.788 million out as dividends while retaining the remaining $2.434 million as retained earnings, which would have been included in ASB's core capital during the next quarter. ASB would also have charged $4.701 million in amortization expense against certain pushed-down assets, which would have reduced ASB's core capital correspondingly.

85.      Following the same mechanics described *supra* (as set forth more fully in PX 1820, Oct. 17, 2008 Letter from Yalowitz to Todor with Attached Schedules) and applying the reported values set forth in PX 1830, Summary of Data Inputs Incorporated into Plaintiffs' Lost Profits and Cost of Capital Calculations, ASB's incremental portfolio would have grown to

just under $2 billion by year-end 1990 before receding, and ASB would have realized total incremental profits of $83.318 million from the beginning of 1990 through December 28, 1998.

## VI.   THE BREACH FORCED PLAINTIFFS TO DEPLOY $167 MILLION OF COSTLY TANGIBLE CAPITAL IN PLACE OF THE WARRANT CAPITAL

86.     Alternatively, Plaintiffs' damages can also be measured by the cost of deploying Plaintiffs' tangible capital in place of the contracted-for regulatory capital.

87.     The breach eliminated from ASB's regulatory capital account the entire $167 million "fair value" ascribed to the Warrants.  Accordingly, the breach forced Plaintiffs to deploy $167 million of their own capital — consisting of some of the capital they had invested in the 1988 transaction and some of the retained earnings ASB had accumulated before the breach — to serve the functions the Warrant capital would have fulfilled had the government not breached its contract.

88.     The cost of the tangible capital Plaintiffs deployed in the place of contracted-for regulatory capital can be computed, over the contracted-for life of the regulatory capital, as the difference between (1) the incremental cost of the tangible capital relative to the contract capital, and (2) the incremental benefit, if any, associated with redeploying the tangible capital in place of the contracted-for Warrant capital.

89.     Plaintiffs' net cost for each period can be computed as the weighted average cost of contributed capital times the amount of tangible capital deployed in place of the contracted-for Warrant capital in that period, less an offset based on a Treasury yield times the same amount of tangible capital.

90.     In connection with the 1988 acquisition, Plaintiffs raised capital for ASB through New American Capital, Inc. ("NAC"), a corporate entity two layers above ASB in the ownership

structure.  NAC issued a variety of securities, including debt and preferred equity securities.

NAC's debt securities included $250 million of variable-rate senior notes (subsequently

increased and then redeemed in part), and $40 million in variable-rate subordinated debentures

(subsequently redeemed in part).  In addition, NAC issued $169 million in fixed-rate senior notes

in 1992, in part to fund the redemption of $139 million of the variable-rate senior notes issued in

1988.  It is possible to determine the weighted-average pre-tax cost of debt by dividing NAC's

quarterly interest expense for a given period by the amount of NAC debt outstanding during that

period.

91.     NAC's preferred equity securities included $80 million of preferred stock with an

after-tax dividend rate of 17.25%.  It is possible to determine the pre-tax cost of that preferred

equity by dividing the 17.25% after-tax dividend rate by [1 - 0.28], since ASB effectively paid

28% of its pre-tax income over to the government in lieu of taxes.

92.     It is possible to determine the weighted average pre-tax cost of NAC's debt and

preferred equity for each quarter by adding (1) the product of the balance of debt outstanding

times the pre-tax cost of debt, plus (2) the product of the balance of preferred equity outstanding

times the pre-tax cost of the preferred, then (3) dividing the sum of (1) and (2) by the total

principal amount of the outstanding securities (*i.e.*, dividing the sum of (1) and (2) by the sum of

the outstanding debt and preferred stock).

93.     It is appropriate to omit common stock from this calculation for at least two

reasons.  *First*, unlike debt or preferred equity securities, common stock is a residual claim with

no contractual coupon entitlement, and it is therefore difficult to observe the cost of common

equity directly.  *Second*, common equity is typically considered more costly than other forms of

financing, and therefore omitting the cost of common equity from the calculation will tend to underestimate the true cost of the Plaintiffs' contributed capital.

94.     Calculated as described *supra*, the gross cost of the $167 million in capital Plaintiffs redeployed in place of the Warrant capital is computed for each quarter from the beginning of 1990 through the end of 1998 in PX 1820, Oct. 17, 2008 Letter from Yalowitz to Todor with Attached Schedules.

95.     In cases where an institution procures an infusion of outside capital to replace breach-eliminated regulatory capital, that institution arguably receives a benefit it would not have gotten from the contracted-for capital — direct investment earnings on the new tangible capital.  Here, however, Plaintiffs received no such benefit — ASB redeployed existing tangible capital and therefore had no additional capital to invest.  Accordingly, ASB received no direct investment earnings on the redeployed tangible capital that it would not have received absent the breach.

96.     Nevertheless, one can compute an offset by multiplying the before-tax yield on U.S. Treasury securities (one-year Notes) for each year of the contract term times the $167 million amount of Warrant capital that would have been available each year under the contract.  The before-tax yield on one-year Treasury securities is a matter of historical record, and is reflected in PX 1820, Oct. 17, 2008 Letter from Yalowitz to Todor with Attached Schedules.

97.     So calculated, the offset corresponding to the $167 million in capital Plaintiffs redeployed in place of the Warrant capital is computed for each quarter from the beginning of 1990 through the end of 1998 in PX 1820, Oct. 17, 2008 Letter from Yalowitz to Todor with Attached Schedules.

98.     Netting the gross cost for each quarter against the offset for each quarter, and summing the results over the entire period from the beginning of 1990 through the end of 1998, the net cost of the $167 million in capital Plaintiffs redeployed in place of the Warrant capital is $106.805 million.  PX 1820, Oct. 17, 2008 Letter from Yalowitz to Todor with Attached Schedules.

## VII.    IN RELIANCE UPON THE GOVERNMENT'S WARRANT FORBEARANCE PROMISE, PLAINTIFFS CONVEYED TO THE GOVERNMENT THE RIGHT TO RECEIVE $149.8 MILLION

99.     In the years following the closing of the transaction and the breach, entirely through their own industry and capital, Plaintiffs salvaged the bank and turned it into a valuable enterprise.  *See supra* ¶¶ 51-55, 73-77.

100.    On July 21, 1996, the Bass Investors, acting through plaintiff Keystone Holdings Partners, L.P. (the "Partnership"), and the FDIC, as successor to FSLIC, agreed to sell ASB to Washington Mutual, Inc. ("WAMU").  PX 1756, Merger Agreement at FAS013 0869-0982.

101.    Notwithstanding its breach of the Warrant Forbearance, the government insisted upon its contractual right to cash in the Second Preference as part of the WAMU transaction.  PX 1753, Jun. 14, 1996 Mem. From Patelunas and Kroener to the FDIC Board of Directors, at FAS011 0022-0083.

102.    To obtain 100% ownership of ASB, WAMU agreed to pay immediately a total of 40 million shares of WAMU common stock worth some $1.6 billion to Plaintiffs and the FDIC according to their relative ownership interest in ASB.  PX 1756, Merger Agreement at FAS013 0887-0889.

103.    The WAMU stock was of a value sufficient to pay all preferences and to produce additional recovery by the parties.  PX 1753, Jun. 14, 1996 Mem. From Patelunas and Kroener to the FDIC Board of Directors, at FAS011 0022-0083.

104.    At the closing, WAMU paid 14 million shares of those 40 million shares to the FDIC (35% of the shares), and 26 million shares to the Partnership (65% of the shares). PX 1756, Merger Agreement at FAS013 0888.

105.    The FDIC acknowledged at the time that the FDIC accepted the 14 million shares from WAMU as "fair and appropriate consideration for the Warrants," which included *both* the Second Preference and the FDIC's residual 30% interest in the proceeds of sale in excess of $714 million.  PX 1753, Jun. 14, 1996 Mem. From Patelunas and Kroener to the FDIC Board of Directors, at FAS011 0078 (Ex. 8).

106.    When the FDIC accepted the 14 million shares of WAMU stock as compensation for all of its Warrants interest, the FDIC assured itself that it was receiving full compensation in stock for the $214 million Second Preference.  PX 1753, Jun. 14, 1996 Mem. From Patelunas and Kroener to the FDIC Board of Directors, at FAS011 0054 (Ex. 1).

107.    But for the exchange of the Warrant Forbearance for the Second Preference, FDIC would not have been entitled to that $214 million distribution.  Instead, under the terms of the parties' agreement prior to FSLIC's exchange of the Warrant Forbearance for the FSLIC Preference, Plaintiffs would have been entitled *both* to 100% of the first $500 million, *and* to 70% of *everything* above that amount – including 70% of the next $214 million.  PX 1102, May 12, 1988 Summary Term Sheet at PAS177 0239.

108.    Thus, absent the agreed exchange of the Warrant Forbearance for the FSLIC Preference, the FDIC would have been entitled to only 30% of the $214 million Second

Preference distribution, *i.e.*, $64.2 million.  May 12, 1988 Summary Term Sheet at PAS177 0239.

109.     In reliance upon the government's Warrant Forbearance promise, and in performance of the Second Preference element of the contract, Plaintiffs caused the government to collect an additional $149.8 million.  PX 1272, Dec. 22, 1988 Restated Certificate of Incorporation for New American Holdings, Inc. at TM 01864-65 (describing FSLIC's $214,000,000 liquidation preference); PX 1753, Jun. 14, 1996 Mem. From Patelunas and Kroener to the FDIC Board of Directors, at FAS011 0022-0083; PX 1756, Merger Agreement at FAS013 0869-0982.

**CONTENTIONS OF LAW**

## I.   GENERAL DAMAGES PROPOSITIONS

1.   This Court's judgment that the government is liable to Plaintiffs for the breach of the Warrant Forbearance has been affirmed and is final.  *Am. Sav.*, 52 Fed. Cl. at 513.  All that remains for this Court to determine is the quantum of damages that the government's breach caused Plaintiffs.  *Am. Sav. Bank, F.A. v. United States*, 519 F.3d 1316, 1328 (Fed Cir. 2008).

2.   "Contract remedies are designed to make the non-breaching party whole."  *Cal. Fed. Bank v. United States*, 395 F.3d 1263, 1267 (Fed. Cir. 2005).

3.   "One way the law makes the non-breaching party whole is to give him the benefits he expected to receive had the breach not occurred."  *Glendale*, 239 F.3d at 1380; *see also* Restatement (Second) of Contracts § 344(a) (1981).  By this expectation measure, the party injured by the government's breach is entitled to recover the full benefit of its bargain with the government.  *See N. Helex Co. v. United States*, 634 F.2d 557, 563 (Ct. Cl. 1980).

4.   This Court has wide latitude in crafting an appropriate expectation damages award; its methodology for measuring damages is reviewed only for abuse of discretion.  *See LaSalle Talman Bank, F.S.B. v. United States*, 462 F.3d 1331, 1336 (Fed. Cir. 2006); *Home Savings of Am., F.S.B. v. United States*, 399 F.3d 1341, 1347 (Fed. Cir. 2005).

5.   Expectations damages can include lost profits.  *Globe Sav. Bank, F.S.B. v. United States*, 65 Fed. Cl. 330, 345, 352-57 (2005), *aff'd in relevant part*, 189 Fed.Appx. 964 (Fed. Cir. 2006).  *See also Commercial Fed. Bank, F.S.B. v. United States*, 59 Fed. Cl. 338, 350 (2004); *First Fed. Sav. and Loan Ass'n of Rochester v. United States*, 76 Fed. Cl. 106, 116-22 (2007), *aff'd*, 290 Fed. Appx. 349 (Fed. Cir. 2008); Restatement (Second) of Contracts § 347.

6.      In addition, a breach victim is entitled to recover the costs of mitigating the breach.  *Citizens Fed. Bank v. United States*, 474 F.3d 1314, 1321 (Fed. Cir. 2007); *see also* Restatement (Second) of Contracts § 347 (expectation damages restore to a breach victim the benefit of its bargain plus compensation for "any other loss, including incidental or consequential loss, caused by the breach"); *id.* comment *c* ("incidental losses include costs incurred in a reasonable effort, whether successful or not, to avoid loss").

7.      The Federal Circuit has recognized the cost of existing capital deployed in place of breached regulatory capital as a reliable measure of damages in the *Winstar* cases.  *American Sav. Bank v. United States, F.A.*, 519 F.3d 1316, 1322-24 (Fed. Cir. 2008).  *See also LaSalle Talman Bank, F.S.B.*, 317 F.3d 1363, 1375 (Fed. Cir. 2003) (explaining that "[a]ll capital raised by a corporation has a cost" and that "the cost of capital does not depend on whether payment is made as debt, or out of anticipated future earnings"); *Home Sav.*, 399 F.3d at 1354.

8.      Where a government breach precludes a plaintiff from using its capital or equipment as it desires, the plaintiff is entitled to the fair rental value of the capital or equipment regardless of whether the plaintiff can prove exactly how the capital or equipment would have been utilized in the absence of the breach or even whether the plaintiff could have used the capital or equipment profitably.  *See*, *e.g.*, *Brand Inv. Co. v. United States*, 58 F.Supp. 749, 751 (Ct.Cl. 1944).

9.      Uncertainty as to the amount of damages will not preclude recovery where a plaintiff can establish "a reasonable probability of damage."  *Cal. Fed.*, 395 F.3d at 1267 (quoting *Glendale Fed. Bank, FSB v. United States*, 378 F.3d 1308, 1313 (Fed. Cir. 2004); *Locke*, 283 F.2d at 524).

## II.     LEGAL STANDARDS APPLICABLE TO PLAINTIFFS' RELIANCE CLAIM

10.     The Federal Circuit has held that a *Winstar* plaintiff may claim reliance damages "including expenditures made in preparation for performance or in performance" of the contract. *Westfed Holdings, Inc. v. United States*, 407 F.3d 1352, 1368 (Fed. Cir. 2005) ("Westfed is entitled to that amount it actually expended to acquire Old Western in reliance on the forbearance promise, which the government repudiated."); *accord Am. Capital Corp. v. FDIC*, 472 F.3d 859, 868 (Fed. Cir. 2007); Williston on Contracts § 64.2 ("Reliance damages … reimburse [the plaintiff for] expenditures the plaintiff made in performing or preparing to perform its part of the contract."); Restatement (Second) of Contracts § 349 ("the injured party has a right to damages based on his reliance interest, including expenditures made in preparation for performance or in performance"); E. Allen Farnsworth, *Contracts* § 12.1 at 732-33 (4th ed. 2004) (A party's reliance interest "includes, whatever is, in a sense, the 'price' that a party must pay for what it is to receive under the contract.").

11.     "In order to recover reliance damages, the 'plaintiff's loss must have been foreseeable to the party in breach at the time of contract formation.'" *Am. Capital Corp. v. FDIC*, 472 F.3d 859, 867 (Fed. Cir. 2007) (*quoting Landmark*, 256 F.3d at 1378).

12.     Amounts paid by the non-breaching party in performance or part performance of a breached contract are considered "essential" reliance payments, and are necessarily foreseeable to the breaching party.  Restatement (Second) of Contracts § 349 cmt. a. (1981); E. Allen Farnsworth, *Contracts* § 12.1 at 732-33 (4th ed. 2004).

13.     Expenditures made both before and after a breach of contract are compensable as reliance damages, provided that the expenditures were made pursuant to the contract.  *Glendale*, 239 F.3d at 1383.

14.     "The amount of the 'reliance interest' is fixed at the time when an expenditure is made." *Am. Capital Corp. v. FDIC*, 66 Fed. Cl. 315, 332 (2005), *aff'd in part, rev'd in part*, 472 F.3d 859 (Fed. Cir. 2007) (citing 11 Arthur L. Corbin, *Corbin on Contracts* § 008 at 64 (1964 & Supp.1996)).

15.     Here, the $214 million Second Preference Plaintiffs conveyed to the government in exchange for the Warrant Forbearance provides a reliable and foreseeable measure of Plaintiffs' costs in performing its contractual obligations.  *See* Fact Contentions, ¶¶ 11-50.

16.     The Second Preference guaranteed to the government that instead of receiving only a 30% share of the proceeds of the eventual sale of ASB, as the deal had been negotiated previously, the government would first receive a $214 million distribution, and then 30% of distributions to follow — an increase in consideration paid to Defendant under the contract of $149.8 million.

17.     Notwithstanding the government's breach, Plaintiffs performed their Second Preference promise upon the sale of ASB in 1996.  *See* Fact Contentions, ¶¶ 99-109.

18.     The $149.8 million in increased consideration that Plaintiffs paid to Defendant upon ASB's sale — promised in reliance on the Warrant Forbearance, and paid in performance of Plaintiffs' contract obligations — constitutes essential reliance damages, and is an appropriate measure of the harm caused to Plaintiffs by the breach of the Warrant Forbearance.  *See Westfed*, 407 F.3d 1352 at 1368; *Am. Capital*, 472 F.3d at 868; Williston on Contracts § 64.2; Restatement (Second) of Contracts § 349; *Glendale*, 239 F.3d at 1383; 11 Arthur R. Corbin, *Corbin on Contracts* § 008 at 64 (1964 & Supp.1996); E. Allan Farnsworth, *Contracts* § 12.1 at 732-33 (4th ed. 2004).

## III.   LEGAL STANDARDS APPLICABLE TO PLAINTIFFS' EXPECTATIONS CLAIMS

19.    In order to establish an expectations damages claim, a plaintiff need only prove by a preponderance of the evidence that (1) its "damages were reasonably foreseeable by the breaching party at the time of contracting," *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005); (2) the government's breach was a substantial factor in causing the damages, *Citizens Fed*, 474 F.3d at 1317-19; and (3) "the measure[s] of damages [are] reasonably certain." *Cal. Fed.*, 395 F.3d at 1267 (*quoting Glendale*, 378 F.3d at 1313).

### A.    Foreseeability

#### 1.    To Establish Foreseeability, a Plaintiff Need Only Show That the General Kind of Injury Claimed Was Reasonably Foreseeable

20.    A party establishes "foreseeability" by demonstrating that the damages claimed were reasonably foreseeable by the breaching party at the time of contract formation.  *See Citizens Fed.*, 474 F.3d at 1321; *Bluebonnet*, 266 F.3d at 1355; Restatement (Second) of Contracts § 351 (1981).

21.    A plaintiff may show that the consequences of a breach were foreseeable "in the ordinary course of events," even if the defendant did not actually foresee them.  Restatement (Second) of Contracts § 351 & cmt. a.

22.    "'[T]he test is an objective one based on what [the defendant] had reason to foresee.'" *Citizens Fed. Bank, F.S.B. v. United States*, 59 Fed. Cl. 507, 519 (2003) (*quoting* Restatement (Second) of Contracts § 351).  *Accord Chain Belt Co. v. United States*, 115 F. Supp. 701, 714 (Ct. Cl. 1953); *cf. Staples v. United States*, 511 U.S. 600, 615 n.11 (1994) (As with any question of knowledge, the defendant's actual foresight "can be inferred from circumstantial evidence.").

23.     A plaintiff need not show that the defendant foresaw (or reasonably should have foreseen) the plaintiff's *specific* injury; rather, the defendant need only have foreseen the general kind of injury: "What is required is merely that the injury actually suffered must be one of a kind that the defendant had reason to foresee and of an amount that is not beyond the bounds of reasonable prediction.  The rule does not require that anything should have been foreseeable to a dead certainty; seldom can anything be predicted with such assurance as that.  *It is merely that the injury that occurs must be one of such a kind and amount as a prudent man would have realized to be a probable result of [the] breach.*"  11 *Corbin on Contracts* § 56.7 at 108 (2005 rev. ed.) ("Foreseeability of the Specific Injury and Its Exact Amount Not Required") (emphasis added).  *See also Citizens Fed.,* 474 F.3d at 1314, 1321.

24.     Moreover, "[t]he party in breach need not have made a 'tacit agreement' to be liable for the loss.  Nor must he have had the loss in mind when making the contract, for the test is an objective one based on what he had reason to foresee."  Restatement (Second) of Contracts § 351 cmt. a; *Citizens Fed.*, 59 Fed. Cl. at 519 (quoting same).

25.     Neither does the breaching party need to have foreseen the precise amount of damages for those damages to be awarded.  *See, e.g., Coast Fed. Bank, F.S.B. v. United States*, 48 Fed. Cl. 402, 423 (2000), *aff'd in part, rev'd in part*, 472 F.3d 859 (Fed. Cir. 2003) (citing *Gardner Displays Co. v. United States*, 346 F.2d 585, 589 (Ct. Cl. 1965)).

26.     Foreseeability is closely interrelated to the underlying purpose of the contract; if the purpose of a contract is for something to occur, then that occurrence is generally foreseeable. *See, e.g., Glendale Fed. Bank, F.S.B. v. United States*, 43 Fed. Cl. 390, 398 (1999), *aff'd in part, vacated in part*, 239 F.3d 1374 (Fed. Cir. 2001) ("Critical to this issue [of foreseeability] is the purpose of the contract."); *see also Wells Fargo Bank, N.A. v. United States,* 88 F.3d 1012, 1023

(Fed. Cir. 1996) (holding that lost profits are foreseeable where the "purpose of the contract . . . was for the plaintiff to make profits on the subject of the contract").

### 2.  Plaintiffs' Lost Profits Damages Were Reasonably Foreseeable

27.     In the *Winstar* cases, "[the Government] had reason to know that if [a plaintiff's] supervisory goodwill and capital credit[s] were taken away that [the plaintiff] would lose potential profits from leveraging that capital." *Citizens Fin. Servs. v. United States*, 64 Fed. Cl. 498, 504 (2005); *Globe*, 65 Fed. Cl. at 330.

28.     Because the government knew or should have known that Plaintiffs intended to leverage ASB's contracted-for Warrant capital to grow and make profits, damages arising from the loss of that capital are foreseeable here. *See* ¶¶ 6-13, 37-55 (Facts), *supra*.

29.     Specifically, the government regulators at the time of contracting with ASB had reason to foresee (1) that ASB's anticipated growth could generate millions of dollars of profits, and (2) that shrinkage and/or forgone growth would cause a reduction in ASB's profits. *See* ¶¶ 6-13, 37-55 (Facts), *supra*.

30.     Thus, it was reasonably foreseeable to the government at the time of contracting with Plaintiffs that a breach eliminating ASB's contracted-for Warrant capital could cause ASB to lose substantial profits. *Id.*

### 3.      Plaintiffs' Cost of Capital Damages Were Reasonably Foreseeable

31.      Likewise, it was reasonably foreseeable to the government at the time of contracting that a breach eliminating ASB's contracted-for Warrant capital would cause Plaintiffs to deploy their costly existing capital in place of the contracted-for but breach-eliminated Warrant capital.  *See* ¶¶ 86-98 (Facts), *supra*.

32.      As the Federal Circuit held in *Home Savings*, "regulators undoubtedly would have understood when they promised [regulatory capital to acquirers] that taking away this inducement would cause [the resulting institution] to re-evaluate its capital ratio and take on replacement capital."  399 F.3d at 1355 (internal quotation marks, brackets, and citations omitted).  *See also Bluebonnet*, 266 F.3d at 1355 ("The government is not persuasive when it asserts that it was unforeseeable at the time of contract execution that the breach of the forbearances would lead to increased financing costs for Fail and CFSB.").

33.      Here, the government's contemporaneous acknowledgement that the regulatory capital forbearances promises it made would leave the tangible capital Plaintiffs invested into ASB "free for other profitable uses" establishes that the government understood perfectly well that eliminating the forbearance capital would force Plaintiffs to redeploy their tangible capital in its place.  *See* PX 1310, Dec. 28, 1988 Press Talking Points at 3.

### B.      Causation

### 1.      The "Substantial Factor" Standard Governs the Causation Analysis

34.      In order to establish causation, Plaintiffs must show only that the breach was a "substantial factor" in causing the damages.  *Holland v. United States*, 75 Fed. Cl. 483, 489 (2007) (citing *Citizens Fed.* 474 F.3d at 1317-19).  *Accord Ind. Mich.*, 422 F.3d at 1373; *Energy Capital Corp.*, 302 F.3d 1314, 1325 (Fed. Cir. 2002); *Bluebonnet*, 266 F.3d at 1356.

35.     Plaintiffs need not prove that their losses were an "inevitabl[e]" result of the breach, nor that the breach was their sole cause.  *Citizens Fed.*, 474 F.3d at 1317-20; *Bluebonnet*, 266 F.3d at 1356.

36.     Rather, Plaintiffs must prove by a preponderance of the evidence only that the government's breach was a substantial factor, perhaps among others, in causing ASB to lose profits, causing Plaintiffs to incur the cost of deploying their capital in place of the Warrant capital, or in causing Plaintiffs to lose the proceeds the government reaped via the distribution preference it exchanged for the Warrant Forbearance promise then retained despite its breach of that promise.  *See Energy Capital Corp. v. United States*, 47 Fed. Cl. 382, 395 (2000), *aff'd in relevant part*, 302 F.3d 1314 ("Because often many factors combine to produce the result complained of, the causation prong requires the injured party to demonstrate that the defendant's breach was a substantial factor in causing the injury.") (internal quotations omitted) (*quoting Cal. Fed.*, 43 Fed. Cl. 445, 451 (1999); 5 Arthur L. Corbin, Corbin on Contracts § 999 at 25 (1964)).

### 2.     The Breach Caused the Damages Plaintiffs Claim

37.     The breach was a substantial factor in causing all of the damages Plaintiffs claim. Indeed, notwithstanding that Plaintiffs need not prove "but-for" causation, all of the damages Plaintiffs claim were the but-for result of the government's contract capital breach.  *See* ¶¶ 56-63 (Facts), *supra*.

38.     Had the government not breached, ASB would have grown larger than it was in the actual world, without a material reduction in its rate of profitability as measured by return on average assets.  Indeed, there is reason to believe ASB's profitability would have increased.  For example, had ASB retained the $1.1 billion portfolio of ARM loans it sold in late 1990, ASB

would have increased its interest spread income without a commensurate increase in its general and administrative expense.

39. Had the government not breached, Plaintiffs would not have had to redeploy their costly tangible capital to do the job the contracted-for Warrant capital would have done in the absence of the breach.

### C.    Reasonable Certainty

40. "'Where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision:  It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation.'" *Nat'l Austl. Bank v. United States*, 452 F.3d 1321, 1327 (Fed. Cir. 2006) (quoting *Bluebonnet*, 266 F.3d at 1355).  *See also*, *LaSalle Talman*, 317 F.3d at 1374 ("[w]hen damages are hard to estimate, the burden of imprecision does not fall on the innocent party"); *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1302 (Fed. Cir. 2002) ("If a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery.") (internal quotations omitted) (*quoting Ace-Federal Reporters, Inc. v. Barnam*, 226 F.3d 1329, 1333 (Fed. Cir. 2000)); *Confederated Tribes v. United States*, 248 F.3d 1365, 1372 (Fed. Cir. 2001) ("a reasonable degree of approximation . . . is sufficient to support an award"); *Cal. Fed. Bank, F.S.B. v. United States*, 245 F.3d 1342, 1350 (Fed. Cir. 2001) ("If a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery.") (*quoting Locke*, 283 F.2d at 524) (internal quotations omitted); *Chain Belt Co. v. United States*, 115 F. Supp. 701, 714 (Ct. Cl. 1953) (citing *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555 (1931)); *Thompson v. Haynes*, 305 F.3d 1369, 1382 (Fed. Cir. 2002) ("The Supreme Court . . .  [has] draw[n] a distinction between proof of the fact of

damages, which must be established with at least reasonable certainty, and the amount of

damages, which may be estimated, provided it is not merely speculative.") (citing *Story*

*Parchment*, 282 U.S. at 563-64).

41.     As the Court of Claims held in *Locke*:

> The defendant who has wrongfully broken a contract should not be
> permitted to reap advantage from his own wrong by insisting on
> proof which by reason of his breach is unobtainable. . . .  Any other
> rule would enable the wrongdoer to profit by his wrongdoing at the
> expense of his victim.  It would be an inducement to make
> wrongdoing so effective and complete in every case as to preclude
> any recovery by rendering the measure of damages uncertain.
> Failure to apply (this rule) would mean that the more grievous the
> wrong done, the less likelihood there would be of a recovery.  The
> most elementary conceptions of justice and public policy require
> that the wrongdoer shall bear the risk of the uncertainty which his
> own wrong has created.

283 F.2d at 524 (citations and internal quotations omitted).

### 1.     Plaintiffs Computed Their Lost Profits with Reasonable Certainty

42.     Specifically with regard to lost profits, a plaintiff need not establish exactly which

assets it would have acquired nor show exactly what liabilities would have funded those assets in

order to justify an award.  Rather, a plaintiff may use reasonable assumptions in computing the

profits it would have earned but for the breach.  *See, e.g., Globe*, 65 Fed. Cl. at 352-57.  *See also*

*Commercial Fed.*, 59 Fed. Cl. at 350-51; *First Fed.*, 76 Fed. Cl. at 116-22.

43.     Here, the profits the breach caused ASB to forgo are readily quantifiable and

Plaintiffs' lost-profits claim is reasonably certain.  *See* ¶¶ 78-85 (Facts), *supra.  See also Globe*,

65 Fed. Cl.at 352-57; *Commercial Fed. Bank v. United States*, 59 Fed. Cl. at 350-51; *First Fed.*,

76 Fed. Cl. at 116-22.

44.     As in *Globe*, *Commercial Federal*, and *First Federal*, Plaintiffs' claim is based on ASB's actual strategies and operations, albeit as reflected in reasonable simplifying assumptions incorporated into the calculations.  Indeed, Plaintiffs have identified several specific assets they could have retained rather than divested absent the breach, and have identified specific, pre-breach business strategies that they could profitably have executed absent the breach.

**2.      Plaintiffs Computed Their Cost of Capital Damages with Reasonable Certainty**

45.     Similarly, the cost to Plaintiffs of the capital they redeployed in place of the contracted-for Warrant capital is readily quantifiable and Plaintiffs' cost-of-capital claim is reasonably certain.  *See* ¶¶ 86-98 (Facts), *supra*.

46.     Mr. Ramirez's analysis of the gross cost Plaintiffs incurred in deploying Plaintiffs' costly tangible capital as a replacement for the contractual regulatory capital that the government's breach eliminated is fully consistent with the Federal Circuit's decision in the Note portion of this case.  *See Am. Sav.*, 519 F.3d at 1322-24.

47.     The Federal Circuit has also held that it is appropriate to rely upon U.S. Treasury bond rates to calculate an offset from the costs of replacing intangible contract capital with earnings generated by the investment of tangible replacement capital.  *See Home Sav.*, 399 F.3d at 1354 ("We agree with the Court of Federal Claims that this safe rate offset [based on a Treasury bond] 'account[s] for the difference between what was lost and what was substituted.'").

48.     Plaintiffs need not incorporate into their cost of capital calculations any amortization of pushed-down assets that may have taken place had the government not breached in order for those calculations to be reasonably certain because collateral circumstances that may

have arisen absent the breach are not relevant to such a calculation.  As the Court of Claims'

decision in *Brand Investment* shows, Plaintiffs are entitled to recover the rental value of capital

without accounting for secondary effects (such as expenses that may have been incurred or

revenues that may have been generated) that could have materialized had they been able to

deploy the capital as they chose.  *Compare Brand Inv. Co.*, 58 F. Supp. at 751 (majority opinion)

*with id.* at 753 (dissenting opinion).

## IV.    THE COURT MAY AWARD "JURY VERDICT" DAMAGES

49.    The Federal Circuit urges trial courts to award a "jury verdict" of fair and

reasonable damages where "a reasonable probability of damages can be clearly established" and

"the claimant can demonstrate a justifiable inability to substantiate the amount of his resultant

injury by direct and specific proof."  *Bluebonnet*, 266 F.3d at 1356-58 (internal quotations

omitted) (citing *Locke*, 283 F.2d at 524).  *See also Bluebonnet Sav. Bank v. United States*, 339

F.3d 1341, 1346 (Fed. Cir 2003) ("reiterat[ing] the point . . . that, at a minimum, jury verdict

damages would be appropriate in this case"); *Suess v. United States*, 52 Fed. Cl. 221, 226 (2002),

*vacated on other grounds*, 535 F.3d 1348 (Fed. Cir. 2008) (*Locke* supports award of jury verdict

damages even where lost profits held speculative).

50.    Here, even the government's experts admit that the government's breach of the

Warrant Forbearance harmed Plaintiffs.  One reason FSLIC's regulatory capital promises had

"substantial value" to acquirers is that lower effective capital requirements increase the value of

the deposit insurance the government provided.  Regulatory capital promises of the sort

presented here and in other *Winstar* cases increase the value of the acquirer's deposit insurance

because such promises allocate to the government certain financial risks that would otherwise

have been borne by the acquirer.  *See, e.g.*, PX 1931, Greenbaum and Thakor, Contemporary

Financial Intermediation (2d ed. 2007) at 423.  The government's experts acknowledge that the government's breach had the effect of reallocating to Plaintiffs the risk that the government agreed to bear, thereby diminishing the value of ASB's deposit insurance, and thereby reducing the economic value of the bank itself.

51.     Accordingly, a reasonable probability of damages has been clearly established, and even if the Court opts not to accept Plaintiffs' calculations in their entirety, the Court may properly award "jury verdict" damages.

Respectfully submitted,

March 18, 2009

_____/s/ Kent A. Yalowitz_____

*Of Counsel*:

Kent A. Yalowitz
ARNOLD & PORTER, LLP
399 Park Avenue
New York, N.Y. 10022
Tel:  (212) 715-1000
Fax:  (212) 715-1399

Melvin C. Garbow
Howard N. Cayne
David B. Bergman
Michael A. F. Johnson
Joshua P. Wilson
Michael R. Hartman
Alexea R. Juliano
ARNOLD & PORTER, LLP
555 Twelfth Street, N.W.
Washington, D.C.  20004
Tel:  (202) 942-5000
Fax:  (202) 942-5999

*Attorney of Record for Plaintiffs*
  *American Savings Bank, F.A., et al.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 18th day of March 2009, I caused the foregoing PLAINTIFFS'

MEMORANDUM OF CONTENTIONS OF FACT AND LAW to be filed electronically.  I

understand that notice of this filing will be sent to all parties by operation of the Court's

electronic filing system.


Dated:  March18, 2009                          <u>        /s/ Alexea Ringo Juliano        </u>
                                                              Alexea Ringo Juliano