No. 92-872C
(Senior Judge Smith)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

AMERICAN SAVINGS BANK, F.A., et al.,

Plaintiffs,

v.

UNITED STATES,

Defendant.

---

DEFENDANT'S CONTENTIONS OF FACT AND LAW

---

Respectfully submitted,

MICHAEL F. HERTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

KENNETH M. DINTZER
Assistant Director

OF COUNSEL:
SCOTT D. AUSTIN
Senior Trial Counsel
WILLIAM G. KANELLIS
VINCENT D. PHILLIPS
JACOB A. SCHUNK
SAMEER YERAWADEKAR
Trial Attorneys
Civil Division
Department of Justice

April 17, 2009

JOHN J. TODOR
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn:  Classification Unit, 8th Floor
Washington, D.C. 20530
Tele:  (202) 616-2382
Fax:   (202) 514-8640

Attorneys for Defendant

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF ISSUES TO BE DECIDED BY THE COURT. . . . . . . . . . . . . . . . . . . . . 4

CONTENTIONS OF FACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    I.    Relevant Negotiating History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        A.    Initial Negotiations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        B.    Negotiations Concerning Regulatory Capital. . . . . . . . . . . . . . . . . . . . . . 7

        C.    Compromise Concerning Warrant Forbearance. . . . . . . . . . . . . . . . . . . . 8

        D.    Final Deal Structure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    II.    The Bass Group's Benefits From The Acquisition And
        Sale To Washington Mutual. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    III.    Relevant Litigation History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    IV.    Plaintiffs' Damages Claims Upon Remand. . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        A.    Plaintiffs' Cost Of Capital Calculation. . . . . . . . . . . . . . . . . . . . . . . . . . 19

            1.    The Amortization And Depreciation Of Assets
                That Were "Pushed Down" With The Warrants
                Decreased The Actual Capital Value Of The
                Warrants From Their Face Value. . . . . . . . . . . . . . . . . . . . . . . . . 19

            2.    After FIRREA, Plaintiffs Mitigated For The
                Loss Of The Warrant Forbearance Through
                The Reversal Of "Push Down" Accounting. . . . . . . . . . . . . . . . . 20

            3.    The Court Has Already Adopted A Calculation
                For Valuing The Same Alleged Replacement Capital. . . . . . . . . . 21

4. Plaintiffs' Current Calculations Contradict Their Earlier Calculations And The Realities Of The Warrant Forbearance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

B. Plaintiffs' Lost Profits Calculation. . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

1. Mr. Ramirez's Lost Profits Calculation Assumes Profitable Growth Without Any Analysis Of The Foregone Assets Or Liabilities.. . . . . . . . . . . . . . . . . . . . . . . . . . 26

2. American Savings Faced A Lack Of Profitable Investment Opportunities Following The Breach. . . . . . . . . . . . 27

CONTENTIONS OF LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

I. Plaintiffs' Second Preference Claim Is Barred As A Matter Of Law. . . . . . . . . 29

A. Legal Standards Applicable To Reliance Claims.. . . . . . . . . . . . . . . . . . 30

B. The "Second Preference" Claim Is A Recasting Of Plaintiffs' Unsuccessful Partial Restitution Claim And Is Therefore Legally Barred. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

1. Res Judicata. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

2. Law Of The Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

3. Waiver Rule. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

4. Judicial Estoppel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

C. Plaintiffs' "Second Preference" Claim Contradicts The Facts Of The Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

1. The Parol Evidence Rule Bars Examination Of The Negotiations.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

2. The Second Preference Was Consistent With The 30 Percent Equity Stake For FSLIC Contemplated In The March 28, 1988 Term Sheet. . . . . . . . . . . . . . . . . . . . . . 37

ii

3. The "Second Preference" Arose Within An Overall Compromise Concerning Warrant Capital That Changed Over Time. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

4. The Payment Of The Second Preference Was Not Caused By Reliance Upon The Contract. . . . . . . . . . . . . . . 39

5. The "Second Preference" Was Never Utilized. . . . . . . . . . . . . . 40

D. Plaintiffs Are Not Entitled To Any Restitutionary Remedy. . . . . . . . . . . 40

E. Plaintiffs' Omission Of Any Offset Renders Their Calculations Unreliable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

F. To The Extent Plaintiffs Calculate Damages Based Upon An Alleged Earlier Contract, Plaintiffs' Theory Is Legally Barred. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

II. Plaintiffs' Cost Of Capital Calculation Is Factually And Legally Unsupported. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

A. Plaintiffs Overstate The Amount And Duration Of Capital. . . . . . . . . . 44

B. Plaintiffs Overstate The Cost Of Capital. . . . . . . . . . . . . . . . . . . . . . . . . 45

C. Plaintiffs' Proposed Offset Rate Is Erroneous. . . . . . . . . . . . . . . . . . . . . 45

D. Judicial Estoppel And The Law Of The Case Bar Plaintiffs' Repudiation of Their Original Calculation. . . . . . . . . . . . . . . 47

1. Judicial Estoppel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

2. Law Of The Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

III. Plaintiffs' Lost Profits Calculations Are Factually And Legally Unsupported. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

A. Legal Standards Applicable To Expectancy Claims. . . . . . . . . . . . . . . . 49

B. American Savings's Alleged Lost Profits Were Not Reasonably Foreseeable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

C. By Their Own Admission, Plaintiffs Replaced The Lost Warrant Forbearance Capital, And Had Additional Capital Raising Opportunities. . . . . . . . . . . . . . . . . . . . . . . . 51

D. Plaintiffs ARM Portfolio and Junk Bond Portfolio Claims Are Legally Barred. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

    1. ARM Portfolio. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

    2. Junk Bond Portfolio. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

E. American Savings's Hypothetical Lost Profits Are Not Reasonably Certain. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

IV. Plaintiffs' Unspecified "Jury Verdict" Claim Is Unsupported. . . . . . . . . . . . . . . 56

## TABLE OF AUTHORITIES

### CASES

**Page(s)**

A.C. Aukerman Co. v. R.L. Chaides Const. Co.,
960 F.2d 1020 (Fed. Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Am. Sav. Bank v. United States, 62 Fed. Cl. 6 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Am. Sav. Bank v. United States, 74 Fed. Cl. 756 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Am. Sav. Bank v. United States, 519 F.3d 1316 (Fed. Cir. 2008). . . . . . . . . . . . . . . . . . . . *passim*

Biomedical Patent Mgmt. Corp. v. Cal. Dept. of Health Servs.,
505 F.3d 1328 (Fed. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 47

Bluebonnet Sav. Bank, F.S.B. v. United States,
266 F.3d 1348 (Fed. Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 57

Bohac v. Dep't of Agriculture, 239 F.3d 1334 (Fed. Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . 50

Bonzel v. Pfizer, Inc., 439 F.3d 1358 (Fed. Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 47

Cal. Fed. Bank v. United States, 245 F.3d 1342 (Fed. Cir. 2001). . . . . . . . . . . . . . . . . . . . . . 54

Cal. Fed. Bank v. United States, 395 F.3d 1263 (Fed. Cir. 2005). . . . . . . . . . . . . . . . . . . . 50, 51

Citizens Fin. Serv., F.S.B. v. United States, 64 Fed. Cl. 498 (2005). . . . . . . . . . . . . . . 55, 56, 57

Columbia First Bank, F.S.B. v. United States, 60 Fed. Cl. 97 (2004). . . . . . . . . . . . . . . . *passim*

Data Gen. Corp. v. Johnson, 78 F.3d 1556 (Fed. Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . 34

Dawco Construction, Inc. v. United States, 930 F.2d 872 (Fed. Cir.1991). . . . . . . . . . . . . . . 57

Energy Capital Corp. v. United States, 302 F.3d 1314 (Fed. Cir. 2002). . . . . . . . . . . . . . . 49, 54

Engel Indus., Inc. v. Lockformer Co., 166 F.3d 1379 (Fed. Cir. 1999). . . . . . . . . . . . . . . . . . 34

Fifth Third Bank of W. Ohio v. United States, 55 Fed. Cl. 223 (2003),
aff'd in relevant part, 402 F.3d 1221 (Fed. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 56

v

<u>Glendale Fed. Bank v. United States</u>, 239 F.3d 1374 (Fed. Cir. 2001). . . . . . . . . . . . . . . . *passim*

<u>Glendale Fed. Bank v. United States</u>, 378 F.3d 1308 (Fed. Cir. 2004). . . . . . . . . . . . . . . . 55, 56

<u>Gould, Inc. v. United States</u>, 67 F.3d 925 (Fed. Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . 33, 48

<u>Granite Mgmt. Corp. v. United States</u>, 416 F.3d 1373 (Fed. Cir. 2005). . . . . . . . . . . . . . . . . 33

<u>Hansen Bancorp, Inc. v. United States</u>, 367 F.3d 1297 (Fed. Cir. 2004) . . . . . . . . . . . . . . . 31, 41

<u>Home Sav. of Am. v. United States</u>, 399 F.3d 1341 (Fed. Cir. 2005). . . . . . . . . . . . . . . . . . . . . 46

<u>Jamesbury Corp. v. Litton Indus. Prods., Inc.</u>, 839 F.2d 1544 (Fed. Cir. 1998). . . . . . . . . . 32, 48

<u>Landmark Land Co. v. United States</u>, 256 F.3d 1365 (Fed. Cir. 2001). . . . . . . . . . . . . . . . *passim*

<u>LaSalle Talman Bank v. United States</u>, 317 F.3d 1363 (Fed. Cir. 2003). . . . . . . . . . . . . . . . 31, 44

<u>LaSalle Talman Bank v. United States</u>, 64 Fed. Cl. 90 (2005),
aff'd, 462 F.3d 1331 (Fed. Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

<u>La Van v. United States</u>, 382 F.3d 1340 (Fed. Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

<u>Marathon Oil Co. v. United States</u>, 236 F.3d 1313 (Fed. Cir. 2000). . . . . . . . . . . . . . . . . . . . . . 41

<u>Northern Helex Co. v. United States</u>, 524 F.3d 707 (Ct. Cl. 1975). . . . . . . . . . . . . . . . . . . . . . . 44

<u>Odetics, Inc. v. Storage Tech. Corp.</u>, 185 F.3d 1259 (Fed. Cir. 1999). . . . . . . . . . . . . . . . . . . . 34

<u>Old Stone Corp. v. United States</u>, 450 F.3d 1360 (Fed. Cir. 2006). . . . . . . . . . . . . . . . 41, 50, 51

<u>Pegram v. Herdich</u>, 530 U.S. 211 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 47

<u>Reflectone, Inc. v. Dalton</u>, 60 F.3d 1572 (Fed. Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

<u>Roseburg Lumber Co. v. Madigan</u>, 978 F.2d 660 (Fed. Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . 54

<u>Rumsfeld v. Applied Cos. Inc.</u>, 325 F.3d 1328 (Fed. Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . 54

<u>S. Nat'l Corp. v. United States</u>, 57 Fed. Cl. 294 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

<u>S. Pac. Comm'n Co. v. American Tel. & Tel. Co.</u>,
556 F. Supp. 825 (D.D.C. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

San Carlos Irrigation & Drainage Dist. v. United States,
111 F.3d 1557 (Fed. Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

So. Cal. Fed. Sav. & Loan Ass'n v. United States,
57 Fed. Cl. 598 (2003), aff'd in part, rev'd in part, & remanded,
422 F.3d 1319 (Fed. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Stone Forest Indus., Inc. v. United States, 973 F.2d 1548 (Fed. Cir. 1992). . . . . . . . . . . . . . . . 36

Vitaline Corp. v. Gen. Mills, Inc., 891 F.2d 273 (Fed. Cir. 1989).. . . . . . . . . . . . . . . . . . . . . . 32

Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012 (Fed. Cir. 1996). . . . . . . . . . . . . . . . 55

Westfed Holdings, Inc. v. United States, 407 F.3d 1352 (Fed. Cir. 2005). . . . . . . . . . . 31, 41, 43

## FEDERAL STATUTES AND RULES

Financial Institutions Reform, Recovery and Enforcement Act of 1989
("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## MISCELLANEOUS

5  Arthur Corbin, Corbin on Contracts, § 1012 (1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

John D. Calamari & Joseph M. Perillo, The Law of Contracts § 14.9 (4th ed. 1998). . . . . . . . . 31

Dobbs, Law of Remedies, § 12.3(1), at 51-52. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Restatement (Second) of Contracts § 344(a) (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 49

Restatement (Second) of Contracts § 344(b) (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Restatement (Second) of Contracts § 347. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Restatement (Second) of Contracts § 351(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Restatement (Second) of Contracts § 351, cmt. a. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Restatement (Second) of Contracts § 352 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Restatement (Second) of Contracts § 373(1) (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| AMERICAN SAVINGS BANK, F.A., | ) | |
| et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 92-872C |
| v. | ) | |
| | ) | Senior Judge Smith |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S CONTENTIONS OF FACT AND LAW**

Pursuant to Paragraph 14(b) of Appendix A to the Rules of the Court of Federal Claims ("RCFC"), defendant, the United States, respectfully submits its contentions of fact and law.

**INTRODUCTION**

This is one of the approximately 12 remaining "Winstar-related" cases. This case arises out of the 1988 acquisition of American Savings and Loan Association of Stockton, California ("Old American"), by Texas businessman Robert M. Bass and his associates (the "Bass Group"). As part of the transaction, the Government (1) provided substantial assistance pursuant to an Assistance Agreement, (2) received warrants in American Savings's holding company, and (3) granted to American Savings two regulatory forbearances (the "Note Forbearance" and the "Warrant Forbearance") that permitted inclusion in regulatory capital of amounts that would ordinarily have been excluded. These forbearances ended after the passage of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183 (1989), and its implementing regulations. Plaintiffs filed suit in this Court in 1992, seeking damages for the breach of the two forbearances.

1

At summary judgment, this Court granted plaintiffs $55.028 million for breach of the Note Forbearance.  The Court's award was based upon plaintiffs' calculation of the net cost of capital of the $350 million that plaintiffs originally invested into the thrift in 1988, which plaintiffs stated that they used to replace the Note Forbearance capital.  These calculations were prepared by Mr. Antonio Ramirez, a fact witness and former officer with American Savings.

Also at summary judgment, this Court granted plaintiffs $346.5 million as partial restitution for the breach of the Warrant Forbearance.  The Court's ruling was based upon the Court's finding that the contract resulting from the 1988 Assistance Agreement was divisible. The Court thus awarded partial restitution based upon plaintiffs' claim that the warrant could be paired with Warrant Forbearance and unwound from the remainder of the transaction.

At summary judgment, plaintiffs also advanced a "lesser included" partial restitution claim, which alleged that the Warrant Forbearance could be paired with a $214 million "second preference" that the Government was entitled to receive upon liquidation of the thrift.  Because the Court granted plaintiffs' main partial restitution claim, the Court denied the "second preference" claim as moot.  Plaintiffs did not appeal the denial of this "second preference" claim.

Upon appeal, the United States Court of Appeals for the Federal Circuit affirmed the cost of capital award for the Note Forbearance, but reversed and remanded the partial restitution award for the Warrant Forbearance.  For the Note Forbearance, the Federal Circuit accepted plaintiffs' representation that Mr. Ramirez's calculation represented the actual costs paid to the thrift's capital providers.  For the Warrant Forbearance, the Federal Circuit reversed the partial restitution award, holding that the Assistance Agreement was not a divisible contract, and remanded to determine whether damages, as opposed to partial restitution, are appropriate.

2

Upon remand, plaintiffs introduced three damages claims they intend to pursue at trial. First, plaintiffs intend to recast their "second preference" partial restitution claim as a reliance claim. Because this claim contradicts the Federal Circuit's ruling that the contract is not divisible, the "second preference" claim is barred by law. Moreover, we will demonstrate at trial that the "second preference" claim contradicts the facts of this case because (1) the contract term at issue only arose in the context of a larger compromise regarding regulatory capital, (2) the compromise itself underwent numerous changes, and (3) the parties never utilized the second preference.

Second, plaintiffs intend to present a calculation for the cost of the capital they allegedly used to replace the Warrant Forbearance. This calculation, also prepared by Mr. Ramirez, purports to measure the cost of the same $350 million that was the basis of plaintiffs' cost of capital claim for the breach of the Note Forbearance. Plaintiffs' current calculation, however, (1) assigns a higher net cost to the same capital than Mr. Ramirez calculated for the Note Forbearance claim, and (2) overstates the capital's amount and duration. Because of these errors, Mr. Ramirez's calculations grossly overstate damages.

Third, plaintiffs intend to present a lost profits claim, prepared by Mr. Ramirez, based upon the assumption that plaintiffs did not replace the Warrant Forbearance capital, but instead had to forego profitable assets. Plaintiffs' representation that they replaced the lost capital logically forecloses this claim. Moreover, Mr. Ramirez's calculations provide no detail as to the assets in the foregone portfolio, or the liabilities used to fund them. Mr. Ramirez also ignores the thrift's real-world difficulties finding profitable investment opportunities and opportunities to raise outside capital. Plaintiffs' lost profits calculation is thus speculative and unreliable.

3

## STATEMENT OF ISSUES TO BE DECIDED BY THE COURT

1.      Whether plaintiffs' reliance claim, which relies upon the same basis as plaintiffs' partial restitution claim that was reversed as a matter of law, is also barred as a matter of law.

2.      Whether plaintiffs' cost of capital claim, which contradicts plaintiffs' earlier representations by assigning a higher net cost of capital to the same $350 million that was the basis for the Note Forbearance award, is legally or factually supportable.

3.      Whether plaintiffs' lost profits claim, which proceeds from the premise that plaintiffs did not replace the Warrant Forbearance capital despite their representations that they did so, and is based upon a foregone portfolio of unspecified assets funded by unspecified liabilities, is factually or legally supportable.

## CONTENTIONS OF FACT

### I.      Relevant Negotiating History

This case arises out of the 1988 acquisition of Old American by the Bass Group. Negotiations between the Bass Group and the Government for the acquisition of Old American began in February 1988, and the transaction ultimately closed on December 28, 1988.  At the time of the acquisition, Old American was the largest failed thrift in the country, and was in receivership.

### A.      Initial Negotiations

The Bass Group's negotiations with the Federal Savings and Loan Insurance Corporation ("FSLIC") for the purchase of Old American lasted the better part of a year, but the basic structure of the transaction was established at an early stage.  The Bass Group explained these terms in a March 28, 1998 "Term Sheet:"

4

(1)     Old American would be split into two new associations, both of which the Bass Group would own; one new association was known colloquially as the "Good Bank," and ultimately became American Savings Bank (the "Good Bank" or "American Savings"); the other association was known colloquially as the "Bad Bank," and ultimately became New West Federal Savings and Loan Association (the "Bad Bank" or "New West"); PX 1077 (Mar. 28, 1988 Term Sheet) at PAS177 0145, 0148;

(2)     The Good Bank would inherit Old American's 185 retail branches, $14.9 billion in retail deposits, and $8 billion in performing loans; id. at PAS177 0145;

(3)     The Bad Bank would inherit $1.7 billion of wholesale deposits, all of Old American's problem loans, and Old American's underwater securities portfolio; the Bass Group would manage the Bad Bank's self-liquidation; id.;

(4)     FSLIC would provide assistance in the amount of all capital losses incurred by the Bad Bank in disposing of Old American's problem loans and underwater securities portfolio; id. at PAS177 0147-48;

(5)     To balance the ledgers of each, the Bad Bank, which was assuming more assets (albeit troubled ones) than liabilities, would execute a multi-billion dollar note in favor of the Good Bank, which was assuming more liabilities than assets; id. at PAS177 0148-49;

(6)     FSLIC would provide sufficient assistance to the Bad Bank to ensure that it had funds to make payment on the Bad Bank's multi-billion dollar note to the Good Bank; id.;

(7)     The Bass Group and the FSLIC would share certain tax benefits arising from the transaction; id. at PAS177 0149-51;

(8)     The Bass Group would contribute capital to the Good Bank; under the initial proposal, the Bass Group would have contributed $500 million in capital to the bank; id. at PAS177 0145; ultimately, however the Bass Group contributed $350 million, nearly three quarters of which was in the form of borrowed funds, PX 1409 (Mar. 20, 1989 New American Capital, Inc. Private Placement Memorandum ("PPM") at ASDOJ-NY-23-0015); and

(9)     FSLIC would receive warrants for the potential purchase of stock in American Savings' holding company; PX 1077 at PAS177 0151.

The Term Sheet noted that "the amount of the warrants [thirty percent ownership interest] is tied to American's retail deposit base[.]" Id. Numerous documents confirm that the Bass Group placed significant value upon this deposit franchise. See PX 1102 at PAS177 0239 (May 12, 1988 Term Sheet); PX 1073 at PAS187 0045 (Mar. 21, 1988 Draft Term Sheet); PX 1075 at PAS187 0056 (Mar. 24, 1988 Draft Term Sheet); PX 1898 at PAS187 0039 (later undated Term Sheet); PX 1084 at WOR466 0040 (Apr. 14, 1988 Comparison of Ford and Bass Proposals); PX 1112 at WOQ473 0749 (June 20, 1988 letter from Bernard Carl to Stuart Root, FSLIC); PX 1118 at PAS177 0184 (June 28, 1988 letter from Bernard Carl to Darrel Dochow, Office of Regulatory Policy, Oversight and Supervision ("ORPOS"), Federal Home Loan Bank Board ("FHLBB" or the "Bank Board")); DX 86 at WOR810 0226 (Dec. 27, 1988 memorandum from FHLBB Corporate and Securities Division, Office of General Counsel, to Bank Board); PX 1409 at ASDOJ-NY-23-0016.

FSLIC was weighing competing proposals from the Bass Group and Ford Motor Company in 1988. Despite the economic equivalence of Ford's and the Bass Group's proposals, on April 19, 1988, the FHLBB opted to enter into a 75-day exclusive negotiating agreement with the Bass Group. PX 1083 at USA0029003. This was due, in great part, to the warrant feature of the Bass proposal. DX 20 at WOR120 0206, 0218, 0227, 0234 (FHLBB Special Meeting Minutes); PX 1080 at TM 00038-43 (April 6, 1988 Memorandum from Jack Reid, FSLIC, to Stuart Root, FSLIC). FSLIC was satisfied with the financial structure of the Term Sheet on the assumption that it received a 30 percent equity share. DX 15 at WOR466 0484, 0490 (April 5, 1988 Memorandum from Darrel Dochow, ORPOS, and Stuart Root, FSLIC, to FHLBB).

B.      **Negotiations Concerning Regulatory Capital**

After the Bass Group proposed the basic outline of its proposal, more specific discussions

ensued.  One such discussion concerned "regulatory capital."  In 1988, thrifts were generally

required to maintain regulatory capital at least equal to three percent of the thrift's liabilities.  PX

1409 at ASDOJ-NY-23-0013.  In the spring of 1988, the Bass Group requested that, in

calculating its regulatory capital, American Savings be allowed to subtract from its total

liabilities an amount equal to the multi-billion dollar note from the Bad Bank (the "Note

Forbearance").  PX 1077 at PAS177 0152.  This adjustment would have the effect of reducing

the thrift's regulatory capital requirement.

In the summer of 1988, the Bass Group supplemented this request, asking that FSLIC also

permit American Savings to include the value of FSLIC's warrants as regulatory capital.  The

Bass Group acknowledged that this requested forbearance "was not the subject of specific

negotiations with FSLIC" at the time of the March 28, 1988 Term Sheet.  PX 1112 at WOQ473

0749.

The Bass Group's new request was, in reality, two requests.  Because FSLIC's warrants

were for stock in American Savings's holding company, the Bass Group's first request was that it

be permitted, for accounting purposes, to "push[] down" the warrants from the holding company

to American Savings.  PX 1270 at WOP610 0158 (Dec. 22, 1988 memorandum from W.

Barefoot Bankhead to Darrel Dochow, ORPOS).  Second, the Bass Group sought to avoid a

Generally Accepted Accounting Principles ("GAAP") rule that would have precluded American

Savings from counting the warrants as regulatory capital.  Specifically, GAAP prohibited a

company that issued a security from counting that security as capital, if the purchaser of the

7

security had an outstanding debt to the company.  In this case, because FSLIC would be providing the Bad Bank with sufficient assistance to meet its obligations under the multi-billion dollar note to the Good Bank, FSLIC would be considered to have had an outstanding debt to the Good Bank.  Id. at WOP610 0159.  The requested forbearance permitted the thrift to count the value of the warrant as capital, notwithstanding this GAAP rule.

## C.   Compromise Concerning Warrant Forbearance

Initially, FHLBB/FSLIC representatives, particularly those directly responsible for the supervision of thrifts, resisted this new request from the Bass Group.  PX 1866 at WOT935 0079 (Memorandum from Darrel Dochow, ORPOS, to FHLBB Re: Forbearance Issues); PX 1118 at PAS177 0186-87.  Ultimately, the sides reached a compromise, under which American Savings would receive a forbearance (the "Warrant Forbearance"), allowing it to count the "fair value" of the warrants as regulatory capital "for certain limited purposes," and FSLIC would receive a $200 million "second preference" upon the sale of the bank (although this amount ultimately increased to $214 million).  PX 1115 at WOQ488 2085 (June 22, 1988 memorandum from Bernard Carl to Michael Duhl); see also PX 1409 at ASDOJ-NY-23-0033 ($214 million second preference).

The compromise, however, involved several elements: (1) $500 million first preference for dividends or on a capital transaction; (2) the $200 million second preference on a capital transaction for FSLIC; (3) a 70-30 split after the first $500 million; (4) the definition of capital transaction; and (5) the allowance of a 4-to-1 debt to equity ratio in the Bass Group's initial capital contribution.  PX 1115 at WOQ488 2085.  The document only "assumes that ORPOS will

agree that this $200 million value is recognized for regulatory capital purposes[,]" id., and accordingly could not constitute an agreement respecting any forbearance.

The Bass Group wrote, in a description of this compromise, that, "FSLIC will receive Warrants for shares of Class B holding company stock representing a 30% equity interest in the NA and CB, but be junior in liquidation preference to a $500 million Class A common." See PX 1115 at WOQ488 2089.  Moreover, the compromise only assumed that ORPOS would agree to recognize $200 million – the number the memorandum ascribes to the second preference, not the value of the Old American deposit base – in regulatory capital.  Id. at WOQ488 2085.  It further indicated that FSLIC and ORPOS would permit the Bass Investors to capitalize the bank with debt in a 4:1 ratio with equity, rather than all equity as in the March 28, 1988 Term Sheet.  Id.

The terms of this "compromise" underwent significant changes in further negotiations.  First, the amount of the warrant value, and thus of the second preference, changed over time.  See PX 1115 at WOQ488 2085 ($200 million); PX 1118 at PAS177 0186-87; PX 1126 at WOR466 0007 (July 18, 1988 Stuart Root, FSLIC, memorandum to FHLBB) ($218 million).

Second, the Bass Group proposed using the Warrant Forbearance capital to count only "as restricted capital at least to support the Collecting Bank Note principal amounts, 'normal' deposit growth (of up to ten percent per year) and indexed increases in regulatory capital ratios, but not as tangible capital for calculating equity risk investment or as contingency component capital."  PX 1118 at PAS177 0187.  The Bass Group thus did not propose that the Warrant Forbearance capital could be used, without limit, to support leverage-based growth in assets.

Third, the amount of the Bass Group's initial capitalization of the bank, and the extent to which it was made up of debt, changed significantly, along with the Bass Group's first

liquidation preference.  See, e.g., PX 1118 at PAS177 0187, 0189 (discussing "New American's initial base investment requirement of approximately $350 million," discussing "negotiations with FSLIC" but not ORPOS regarding the debt to equity ratio of the initial contribution); PX 1889 at WOR466 0231 (Memorandum re: Changes in Bass Deal Since Labor Day").

Fourth, the parties continued to discuss the propriety of requiring contingency component capital for New American's investment in its service corporation, a merchant bank.  See, e.g., PX 1862 at WOR466 0019 (Draft Memorandum from Darrel Dochow, ORPOS, to FHLBB) (discussing "excluding the investment in the Service Corporation in the contingency factor," among other issues pertaining to the service corporation's regulation).

Language in the communications between the parties confirmed that the compromise was tentative because ORPOS had not yet agreed to include the warrant value in regulatory capital. See, e.g., PX 1118 at PAS177 0186-87 ("tentative agreement with FSLIC"); PX 1126 at WOR466 0007 ("An issue of critical importance has continued to be also one of great uncertainty over the last 4-6 weeks," describing the $218 million proposed forbearance).

The Bass Group also described the origin of the "second preference" as deriving from an "ambiguity" in the March 28, 1988 Term Sheet rather than a new condition arising in the negotiations at a later time, and conditioned the offer of the "second preference" only "in part" upon the grant of a regulatory capital forbearance.  PX 1132 at PAS177 0168 (July 26, 1988 Bass Group Pending Issues Fax).  The description does not state that the second preference creates $149.8 million in value for FSLIC, only that the Bass Group wanted a forbearance "to be treated equally with other similarly situated acquirers in the California market."  Id.

10

Under the terms of the final preference system incorporated into the contract as of December 28, 1988, if the bank was sold, the Bass Group would receive the first $350 million of proceeds from the sale, FSLIC would receive the next $214 million of proceeds from the sale, and the remainder of any proceeds would be split 70 percent – 30 percent in favor of the Bass Group. See, e.g., PX 1272 at TM 01864 (December 22, 1988 Restated Certificate of Incorporation – N.A. Capital Holdings); DX 743 at FAS012 0492-93 (Mar. 16, 1995 New American Capital, Inc. Offering Circular) (explaining preferences); PX 1290 at TM 00176 (Dec. 27, 1988 Suart Root, FSLIC, to Darrel Dochow, ORPOS, General Memorandum).

Any dividends either party had received prior to the bank's sale would reduce that party's respective preferences. In addition to the "liquidation preference" described in the text, the Bass Group also had a dividend preference, under which it was entitled to the bank's first $500 million in dividends. Any subsequent would be split between the Bass Group and FSLIC under a 70-30 ratio in favor of the Bass Group. DX 743 at FAS012 0492-93.

### D.     Final Deal Structure

The complicated negotiations for the sale of Old American to the Bass Group drew to a closed on December 28, 1988, when the parties completed the transaction. In the end, the transaction's basic outline was similar to the proposal laid out in the March 28, 1988 Term Sheet. The final deal did not entirely track the March 28, 1988 Term Sheet, however. Two major departures from and additions to the Term Sheet are relevant here.

First, as discussed above, the Bass Group's initial capital contribution to the bank was reduced from the $500 million figure set out in the Term Sheet to $350 million, with the option to contribute an additional $150 million later. PX 1753 at FAS011 0029, 0054 (June 14, 1996

11

Gail Patelunas Memorandum to Federal Deposit Insurance Corp. ("FDIC") Board).  And of that

$350 million, only $110 million came in the form of an equity contribution from the Bass Group;

the remaining $290 million was debt.  PX 1409 at ASDOJ-NY-23-0015; PX 1649 at PAS039

0559 (May 17, 1991 internal Bass Group memorandum).

Second, the FHLBB and the FSLIC granted American Savings a limited Warrant

Forbearance, permitting the bank to count the fair value of the FSLIC warrants as regulatory

capital "for certain limited purposes."  PX 1409 at ASDOJ-NY-23-0031; PX 1891 at WOF046

0063-64 (Forbearance Letter).

In March 1990, a third party, SNL Securities, placed the warrants' "fair market value" at

$167.2 million.  PX 1406 at ASDOJ-NY-98-0134 (Mar. 17, 1989 SNL Securities letter to

Andrew Furer).  In April 1990, SNL determined that its earlier valuation had not accounted for

all factors, and retroactively determined a "range of possible values for the warrant from a low

value not distinguishable from zero to a high value of $265.6 million[.]"  DX 1022 at PAS053

0783, 0785 (April 10, 1990 letter from Reid Nagle, SNL Securities, to Andrew Furer).

## II.   **The Bass Group's Benefits From The Acquisition And Sale To Washington Mutual**

American Savings was immediately successful, recording net income of $214.2 million in

1989.  PX 1 at WOQ553 1391 (December 31, 1989 American Savings Annual Report), and over

$900 million from 1989-96.  PX 1820 (Ramirez Warrant Forbearance Calculations) (Oct. 17,

2008) at Exh. B, Sch. 1.  From 1989 until the bank's sale, the Government provided American

Savings $5.8 billion in assistance.  PX 1753 at FAS011 0028.  After the acquisition, members of

the Bass Group commented that the transaction was heavily weighted in their favor:

12

> I fear our press treatment and our "good guy" image in the
> regulatory community would be harder to maintain were the veil to
> be lifted and it become [sic] clear that the government's warrant is
> not really for 30% of American Savings, but for barely 20%; that
> the government's 75% share of tax savings really is not; that the
> unrecorded premium value of the New West Note may be twice
> our total capital infusion; and that our return on investment is
> closer to 130% annually than to the 30% that has appeared in the
> press.

PX 1649 at PAS039 0551.

In fact, the Bass Group's lead negotiator in the American Savings transaction, Bernard

Carl, cautioned against refinancing too quickly, because, in doing so, the Bass Group would be

required to reveal publicly the transaction's details.  PX 1408 at PAS070 0863 (Mar. 20, 1989

Bernard Carl memorandum to David Bonderman).  The Bass Group principals specifically noted

that FSLIC's "second preference" on liquidation was not really worth $214 million, given that

New American had the option not to pay the "second preference" by not selling the bank, but

instead paying dividends.  PX 1638 at CP 1800-01 (Mar. 4, 1991 Andrew Furer Draft

Memorandum Re: Warrant Negotiations).

FDIC ultimately recognized that the warrant value would be less than 30 percent given

the Bass Group dividend preference and the tax sharing agreement, and that by paying dividends

instead of selling the bank, the Bass Group could have diminished the value of FSLIC's second

preference on liquidation.  PX 1753 at FAS011 0029, 0031.

In 1996, plaintiffs sought to sell American Savings to Washington Mutual, Inc.

("Washington Mutual").  Pursuant to its warrants, the Federal Deposit Insurance Corporation

FDIC, as successor to FSLIC, would have been entitled to approximately 30 percent of the sales

price in the Washington Mutual transaction, to be paid in cash.  Payment of FDIC's entitlement

13

in cash, however, would have precluded Washington Mutual from accounting for the acquisition

in the manner it desired.  Accordingly, the FDIC and the Bass Group negotiated a modification of

their prior agreements, under which the FDIC agreed to accept 14 million shares of Washington

Mutual stock, to be executed "in front of the investor group," with the Bass Group receiving 26

million shares, a 65 to 35 percent split in favor of the Bass Group.  PX 1753 at FAS011 0023-

0026;  PX 1756 at FAS013 0887-0889 (July 21, 1996 American Savings – Washington Mutual

Merger Agreement).

**III.**     **Relevant Litigation History**

Plaintiffs filed suit against the United States, alleging breach of the Note and Warrant

Forbearances.  After motion practice resulted in a determination of liability against the

Government, we filed a motion for summary judgment on all of plaintiffs' recovery theories.  See

Def. Mot. Summ. J. (June 25, 2002).

At summary judgment, plaintiffs advanced, among other theories, a "partial restitution"

theory for an alleged exchange of the warrants for both the Warrant Forbearance and the Old

American deposit base.  See Pl. Mot. Summ. J. II: FSLIC Warrant (July 26, 2002), at 12 (quoting

Def. Prop. Findings of Uncontroverted Fact (Sept. 14, 1999) ("Def. PFUF") ¶¶ 2, 3, 6).

After setting out their claim for partial restitution premised upon the alleged warrant-for-

forbearance-and-deposits exchange, plaintiffs presented an alternative, partial restitution theory

that shares the same factual basis as their current claim.  Plaintiffs called this alternative, "By An

Alternative Formulation Of The Warrant Capital Events, The Government Acknowledges That

Plaintiffs Gave Up Value Of At Least $214 Million In Exchange For The Warrant Forbearance."

See Pl. Mot. Summ. J. V: FSLIC Preference (Feb. 20, 2004), at 2 (describing partial restitution

for second preference as "lesser included" claim).  Plaintiffs purported to base this claim for

summary judgment upon the following alleged admission in the Government's June 25, 2002

summary judgment motion, and accompanying proposed findings of uncontroverted fact:

> Ultimately the sides reached a compromise, . . . under which
> American Savings would receive a forbearance (the "Warrant
> Accounting Forbearance"), allowing it to count the "fair value" of
> the warrants as regulatory capital for "certain limited purposes,"
> and FSLIC would receive a $200 million "second preference" upon
> the sale of the bank.

Def. PFUF (June 25, 2002) at ¶ 23; see also Def. Mot. Summ. J. (June 25, 2002) at 13; Pl. Mot.

Summ. J. V: FSLIC Preference (Feb. 20, 2004) at 2.

Plaintiffs did not mention the succeeding paragraphs of our proposed findings that made

clear that the liquidation preferences changed over time, were negotiated as part of a larger

package of issues, and did not become final until the contract's December 28, 1988 closing date.

Def. PFUF (June 25, 2002), at ¶¶ 24-26.  Nor did plaintiffs mention our proposed finding

respecting the renegotiation of the preferences in the warrant transaction with Washington

Mutual.  Id. at ¶ 43.  Finally, plaintiffs did not mention that they disagreed with our alleged

admission in responding to our proposed finding, insisting that no quid pro quo existed between

the warrant and the second preference:

> Plaintiffs agree with Proposed Finding of Fact No. 23 to the extent
> that the agreement asserts that the Bass Investors received the
> Warrant Forbearance partly in exchange for granting to FSLIC the
> "second preference," but disagree that the "second preference" was
> the sole benefit the Bass Investors provided in exchange for
> receiving the Warrant Forbearance.  The Bass Investors issued the
> Warrant only because the government promised them it would
> count as regulatory capital. . . . Moreover, the document cited at
> page 243 of the government's appendix [in support of the proposed
> finding] was created June 22, 1988 – a full six months before the

15

> parties executed the Transaction.  The parties later amended the
> amount of the "second preference" to be $214 million as is
> documented in the Patelunas memorandum at page 10, government
> appendix page 403.

Pl. Resp. To Def. PFUF (July 26, 2002), at ¶ 23 (internal citations omitted).

In our opposition to plaintiffs' restitution claim, we explained that (1) no admission existed respecting any warrant-for-forbearance-and-deposits quid pro quo; (2) that the warrant was provided in return for all of FSLIC's assistance; and (3) that the parties determined the warrant's value by reference to the deposit base.  Def. Opp. Pl. Mot. Sum. J. II: FSLIC Warrant (Aug. 26, 2002), at 2, 30.   In response to plaintiffs' "alternative" formulation, we explained that FSLIC's second preference arose out of a multi-factor compromise that included changes to several aspects of the transaction, which themselves changed over time, and that the FDIC never received the second preference because of the renegotiation of the payment for the warrants instigated by Washington Mutual.  Id. at 39; see also Def. Mot. Strike Pl. Mot. Summ. J. V (Feb. 25, 2004), at 4-6.

In its first summary judgment opinion, the Court held that plaintiffs were entitled to partial restitution for an exchange involving the warrants for the Warrant Forbearance and Old American's deposit base, and to cost-of-replacement capital damages for using existing capital to replace the Note Forbearance capital.  Am. Sav. Bank v. United States, 62 Fed. Cl. 6 (2004).  The Court further recognized that the final contract was evidence of the terms of the agreement, and that intermediate steps in the negotiations were not evidence of separate agreements.  Id. at 17. The Court then denied plaintiffs' "alternative" partial restitution claim as moot because it was a "lesser included" claim that was "wholly subsumed" by the partial restitution award.  Id. at 27.

16

The Court later awarded plaintiffs $55.028 million for breach of the Note Forbearance, based upon a cost-of-replacement-capital calculation for the cost of the $350 million the Bass Group initially invested into the thrift, with an offset based upon the rate paid upon the FSLIC Note.  Am. Sav. Bank v. United States, 74 Fed. Cl. 756, 762 (2006).  The Court also awarded $346.5 million in "partial restitution," based upon the alleged exchange of the warrant for the Warrant Forbearance and the Old American deposit base.  Id. at 761.

On appeal, the Federal Circuit affirmed this Court's award of cost-of-replacement capital damages for the Note Forbearance, but reversed the larger partial restitution claim upon the grounds that the contract was not divisible.  See Am. Sav. Bank v. United States, 519 F.3d 1316 (Fed. Cir. 2008).  The Federal Circuit also held that awarding partial restitution after awarding damages for loss of the Note Forbearance would constitute an "unfair windfall."  Id. at 1327.  The Federal Circuit found that remedies for breach, under the terms of the contract, should "correspond to the magnitude of the breach-caused loss," and that this standard would not be met by "dividing the agreement into separate portions to allow a claim of partial restitution."  Id. at 1326.  The Court noted that a claim "based on amounts Plaintiffs expended under the contract (the value of the Warrants)" represented a "partial restitution" claim.  Id. at 1327 n.3.  Finally, the Court remanded the case:

> Because the Court of Federal Claims incorrectly found the contract divisible and awarded partial restitution on that basis, we reverse the trial court's award of partial restitution relating to the Warrant Forbearance and remand for the trial court to determine if damages, as opposed to partial restitution, are proper under another theory.

Id. at 1328.

17

**IV.**     <u>**Plaintiffs' Damages Claims Upon Remand**</u>

Upon remand, plaintiffs raise three damages theories in the alternative, which they disclosed on October 17, 2008.  PX 1820; Pl. Damages Disclosures (Oct. 17, 2008); <u>see</u> <u>also</u> Pl. Mem. of Contentions of Fact and Law (Mar. 18, 2009) ("Pl. App. A"), at 3-4.  In addition to these theories, plaintiffs also raise an unspecified "jury verdict" claim, but attach no dollar figure, damages theory, or legal basis for this request.

First, plaintiffs recast their "alternative" partial restitution theory, mislabeling it as a claim for "reliance" damages.  They request $149.8 million (representing 70 percent of the $214 million second preference) in "reliance" damages based upon, "the exchange of the Warrant Forbearance for a Second Preference on the proceeds of any sale of the bank . . . . $149.8 million corresponding to the Second Preference constitutes a payment made in reliance on the parties' exchange of the Second Preference for the Warrant Forbearance[.]"  Pl. Damages Disclosures (Oct. 17, 2008).  Plaintiffs' second preference claim is barred as a matter of law.  At trial, moreover, we will also demonstrate that it is inconsistent with the facts of the case.

Plaintiffs also present, through Mr. Ramirez's calculations, two alternative measures of damages:  a $106.8 million calculation for the capital plaintiffs allege they used to replace the Warrant Forbearance capital; and an $83.3 million lost profits calculation, based upon the contradictory assumption that plaintiffs did not replace the Warrant Forbearance.  PX 1820.  At trial, we will illustrate the conceptual and methodological flaws in both sets of calculations.  Facts pertinent to the cost of capital and lost profits claims are summarized below.

A.      **Plaintiffs' Cost Of Capital Calculation**

Plaintiffs proffer a calculation by Mr. Ramirez, which purports to measure the plaintiffs'

cost of replacing the Warrant Forbearance capital with the $350 million that the plaintiffs

initially invested into the thrift.  In measuring the damages for the Note Forbearance award, of

course, Mr. Ramirez valued the cost of this same $350 million.  Mr. Ramirez, however, has now

adopted radical new assumptions that cause his calculations to drastically overstate plaintiffs'

damages.  Mr. Terry Musika, an accounting expert, will discuss the opinions in his report relating

to the errors in Mr. Ramirez's accounting assumptions.  PX 1827 (Supp. Expert Report of Terry

L. Musika) (Jan. 16, 2009)).  Dr. Anjan Thakor, an expert on economics and finance, will discuss

the opinions in his report relating to the errors in Mr. Ramirez's calculations of the net cost of

capital.  PX 1826 (Expert Report of Dr. Anjan V. Thakor (Jan. 16, 2009)).

1.      **The Amortization And Depreciation Of Assets That Were "Pushed Down" With The Warrants Decreased The Actual Capital Value Of The Warrants From Their Face Value**

FSLIC owned the $167 million in warrants in the bank's holding company and not in the

bank itself.  PX 1 at WOQ553 1401-02.  To be able to count the value of the holding company

warrants for capital requirements, GAAP required plaintiffs to push down the value of the

warrants from the holding company to the bank.  GAAP simultaneously required, along with the

push down of the warrants, that plaintiffs write up the cost basis of intangible and tangible assets

in an amount equaling the value of the warrants.  PX 1 at WOQ553 1401-02; DX 487 at PAS136

0066 (American Savings Push-Down Accounting Summary, Dec. 31, 1989); PX 1827 at ¶ 11.

GAAP further required the bank to amortize/depreciate the value of the written up assets

over time.  DX 487 at PAS136 0066.  The amortization and depreciation expenses would

19

decrease the bank's annual earnings, causing an identical decrease in the bank's regulatory

capital, because every dollar of annual earnings would have counted toward regulatory capital

requirements.  PX 1827 at ¶ 11.

The decrease in allocable income would have decreased the actual capital value of the

warrants from their face value, as the bank would have benefitted from being able to count the

$167 million as capital but would have been simultaneously hampered by the decrease in

earnings due to the written up assets' amortization and depreciation expenses.  PX 1820 at Exh.

B, Sch. 1; PX 1827 at ¶ 11.

Ultimately, the amortization and depreciation expenses were expected to cumulate and

negate the entire value of the warrant as capital.  In the but-for world, the written-up assets'

amortization/depreciation expense would have totaled $167 million as of December 1996, thus

negating any value the warrants had as capital at that time.  PX 1827 at Exh. D.  Plaintiffs

recognize this in their lost profits calculation.  PX 1820 at Exh. B. Sch. 1.

### 2.      After FIRREA, Plaintiffs Mitigated For The Loss Of The Warrant Forbearance Through The Reversal Of "Push Down" Accounting

After FIRREA caused plaintiffs to no longer count the value of the warrants as

capital, plaintiffs reversed the use of push-down accounting.  PX 1 at WOQ553 1395, 1401-02;

PX 1827 at ¶ 11.  Along with pushing the value of the warrants back to the holding company, the

reversal of push-down accounting resulted in a $167 million reduction in the cost basis of the

assets that were previously written up.  PX 1 at WOQ553 1401-02.  The reduction in the cost

basis allowed plaintiffs to eliminate the additional depreciation and amortization expenses

associated with these assets.  The bank, therefore, no longer incurred the

amortization/depreciation expenses, substantially increasing the bank's net income compared to

what the bank would have reported had the Warrant Forbearance remained intact.  PX 1 at

WOQ553 1401; PX 1827 at ¶ 11.

In 1989 alone, and as set forth in the bank's annual report for that year, the "elimination

of the $167 million [of warrant capital] increased net income for 1989 by $73.5 million over

what would have been reported because the cost of certain assets acquired were reduced[.]"  PX

1 at WOQ553 1402; PX 1495 at PAS068 0221-22.  The plaintiffs continued to benefit by the

reversal of push down accounting through December 1996, when the cumulative

amortization/depreciation expenses would have equaled and therefore negated the entire $167

million value of the warrants.  PX 1827 at Exh. D.

### 3.    The Court Has Already Adopted A Calculation For Valuing The Same Alleged Replacement Capital

In 2006, following the parties' motions for summary judgment, and additional briefing

upon proper offset amounts, this Court awarded plaintiffs $55.028 million for breach of the Note

Forbearance.  Am. Sav., 74 Fed. Cl. at 762.  The $55.028 million figure was based upon the net

cost of capital plaintiffs incurred for the $400 million raised to finance the thrift and the amount

of that capital used to replace the Note Forbearance.  Am. Sav., 62 Fed. Cl. at 11.  Of the $400

million raised, plaintiffs downstreamed $350 million to the bank level.  PX 1820 at Exh. A, Sch.

1.  The Federal Circuit subsequently affirmed this award and its underlying methodology.  Am.

Sav., 519 F.3d at 1323 (affirming "the trial court's award of the actual costs paid to capital

providers [for breach of the Note Forbearance]") (emphasis added).

The Court assessed these damages based upon calculations performed by Mr. Ramirez,

and submitted by plaintiffs.  Those calculations were titled, "Actual Cost of the $400 Million in

Capital NA Capital Raised In order To Contribute $350mm In Capital To New American -

21

Assuming Common Stock Costs 0%." See Pl. Mot. Sum. J. I ("FSLIC Note") (July 26, 2002) at

Table I.  In relevant part, Mr. Ramirez made the following assumptions in this Note Forbearance

calculation:

- Plaintiffs paid 17.25 percent for $80 million in preferred stock;
- Plaintiffs paid 0 percent for $30 million in common stock;
- Plaintiffs paid between 12.62 percent and 9.05 percent for $290 million debt;
- The resulting average cost of capital ranged between 12.6 percent in December 1989 and 9.04 percent in December 1998;
- The Government made the final payment upon the FSLIC Note in October 1995, and plaintiffs incurred no damages for "posting" of capital after 1995;[1]
- The offset rate, calculated in 2005 pursuant to the Court's order, was made equivalent to the interest rate upon the FSLIC note.

Ramirez Decl. (Jan. 3, 2005) at Table VI-A; Ramirez Decl. (July 19, 2002) at Table I, IV.

The Court accepted Mr. Ramirez's 2002 and 2005 calculations as reflecting plaintiffs'

cost of capital, and awarded $55.028 million for the breach of the Warrant Forbearance, which

was affirmed upon appeal.  Am. Sav., 519 F.3d at 1321-24.  Plaintiffs represented that an award

based upon these findings and assumptions would "accurately" compensate them, Pl. Mot. Sum.

J. I ("FSLIC Note") (July 26, 2002) at 2-3, and was the "reliable" means of computing damages,

id. at 16, because the "dollar amounts plaintiff NA Capital actually paid to the various capital

providers are indisputable."  Id. at 18.

Plaintiffs further described all of these calculations as "summariz[ing] the evidence" and

offered them as "summaries of undisputed facts contained in business records."  See Pl. Mot.

Sum. J. I ("FSLIC Note") at 18 n. 19.  Plaintiffs further asserted that it "made sense" to calculate

an award using these figures because it would "recover the rent they paid for the (greenbacks)

---

[1]  A portion of the damages extended to 1998 based upon a provision in the note forbearance extending that forbearance to any amounts prepaid by the Government upon the note, but Mr. Ramirez did not attribute these damages to "posting" of capital.  See Ramirez Decl. (Jan. 3, 2005) at Table VI-B.

capital that the government's breach required plaintiffs to post in support of the Note." Pl. Reply Mot. Sum. J. I (Sept. 9, 2002) at 2-3.

After obtaining summary judgment with respect to the Note Forbearance, subject to additional briefing concerning offset rates, plaintiffs submitted another declaration for Mr. Ramirez. See Pl. Mot. Final J. (Jan. 4, 2005); Ramirez Decl. (Jan. 3, 2005). As part of that declaration, Mr. Ramirez stated that, "I hereby reiterate and incorporate by reference herein the statements I made" in his earlier declarations, including the 2002 declaration. Ramirez Decl. (Jan. 3, 2005) at ¶ 6. The 2005 declaration thus repeated the same cost of capital from the 2002 declaration.

Pursuant to the Court's instructions, Mr. Ramirez's 2005 calculations also contained an offset calculation based upon the payments made by the Government to plaintiffs under the FSLIC Note, which plaintiffs represented as ranging between 10.42 percent in March 1990 to 6.66 percent in December 1998. Ramirez Decl. (Jan. 3, 2005) at Table VI-A, VI-B. Based upon Mr. Ramirez's calculations. the Court awarded plaintiffs $55.028 million for the breach of the Note Forbearance, which was affirmed upon appeal. Am. Sav., 519 F.3d at 1322-24.

### 4.    Plaintiffs' Current Calculations Contradict Their Earlier Calculations And The Realities Of The Warrant Forbearance

Plaintiffs' current calculations contradict their earlier calculations, which were the basis for the Court's award, and ignore the realities of the Warrant Forbearance. Although plaintiffs calculate damages based upon the cost of the same $350 million in capital, plaintiffs now propose a much higher net cost for the same capital. Compare PX 1820 at Exh. A. Sch. 1, with Ramirez Decl. (July 19, 2002) at Table I. Among other changes, plaintiffs increase the average

23

cost of preferred stock by adding a tax "gross-up," and exclude any consideration of the cost of the $30 million in common stock for the new calculation.  PX 1820.

Plaintiffs then use the new average cost of capital to calculate damages based upon the premise that FIRREA deprived plaintiffs of the net loss of the warrants' entire $167 million face value through December 28, 1998.  PX 1820 at Exh. A. Sch. 1.  Plaintiffs also calculate an offset based upon the one-year constant-maturity Treasury ("CMT") rate, rather than the FSLIC Note rate.  PX 1820 at Exh. A. Sch. 2.

Plaintiffs' current calculations of the net cost of the $350 million contradicts their prior representations for the cost of the same $350 million.  This disparity is even more striking due to the fact that Mr. Ramirez prepared both calculations.  The primary differences are:

|  | 2002 and 2005 | 2008 |
|---|---|---|
| **Cost of Common Stock** | 0% | Excluded |
| **Cost of Preferred Stock** | 17.25% | 17.25% |
| **Pretax Cost of Preferred Stock** | Absent | 23.96% |
| **Date of Last Note Payment** | 1995 | 1998 |
| **Resulting Cost of Capital** | 12.6%-9.04% | 15.06%-11.35% |
| **Offset Rate** | 10.9%-6.7% | 7.76%-5.5% |

Ramirez Decl. (July 19, 2002); Ramirez Decl. (Jan. 3, 2005); PX 1820 at Exh. A.

Furthermore, Mr. Ramirez's calculations are based upon the assumption that the warrant would have continued to provide plaintiffs with a net benefit to capital of $167 million through 1998.  PX 1820 at Exh. A ,Sch. 1.  As discussed above, the Warrant Forbearance in the but-for world would not have provided plaintiffs with a net benefit of $167 million in capital through 1998 due to amortization/depreciation of balancing assets, the payoff of the FSLIC Note in 1995,

24

and the sale to Washington Mutual.  PX 1827 at ¶¶ 13-14.  Moreover, as discussed above, in the

real world, plaintiffs were able to mitigate the loss of capital by the reversal of push-down

accounting following FIRREA, thereby decreasing the actual loss of capital by $73.5 million.

PX 1827 at ¶ 22.  Mr. Ramirez concedes these facts in his lost profits calculation, but does not do

so for the cost-of-capital calculation.  PX 1820 at Exh. A, Sch. 1; Exh. B, Sch. 1.

>    B.    **Plaintiffs' Lost Profits Calculation**

As an alternative to their cost-of-capital calculation, plaintiffs set forth a lost profits

calculation purporting to measure the lost profits American Savings would have earned absent

the breach of the Warrant Forbearance.  Plaintiffs' model, presented by Mr. Ramirez, a fact

witness, applies American Savings's historical leverage ratio and return on average assets for the

years 1990 to 1998 to the amount of Warrant Forbearance capital, thus generating $83.3 million

in alleged lost profits.  Mr. Ramirez provides no information regarding what assets American

Savings would have held, or the liabilities it would have used to fund these hypothetical assets.

Moreover, Mr. Ramirez's calculations ignore American Savings's lack of profitable investment

opportunities, caused in large part by the adverse economic conditions in California during the

years following the breach.

At trial, we will demonstrate the factual and methodological deficiencies in Mr.

Ramirez's calculations.  Dr. Thakor will discuss the opinions in his report relating to the

conceptual and methodological flaws in Mr. Ramirez's lost profits calculations.  PX 1826.  Dr.

William Hamm, an expert in economics and thrift management, will discuss the opinions in his

report relating to the faulty assumptions in Mr. Ramirez's lost profits calculations.  PX 1828

(Supp. Expert Report of Dr. William G. Hamm (Jan. 16, 2009)).

### 1. Mr. Ramirez's Lost Profits Calculation Assumes Profitable Growth Without Any Analysis Of The Foregone Assets Or Liabilities

Mr. Ramirez prepared the calculations advanced by plaintiffs that purport to calculate lost profits from 1990 through 1998.  PX 1820 at Exh. B.  Mr. Ramirez was not the officer in charge of investment decisions at American Savings, and is not an expert witness.  His calculations, moreover, provide no detail as to the assets or liabilities he alleges the thrift would have acquired absent the breach.  Notwithstanding this lack of analysis, Mr. Ramirez's calculations assume that American Savings could have, and would have, fully levered the Warrant Forbearance capital at the same level of profitability as its actual portfolio.

Mr. Ramirez's computations are based upon the concept of foregone assets.  PX 1828 at ¶ 92.  Mr. Ramirez uses two important assumptions in performing his calculation.  The first is that in the absence of the breach the foregone regulatory capital associated with the Warrant Forbearance would have been fully levered with profitable assets, at the same level as American Savings's historical leverage ratio for the given year.  PX 1826 at ¶¶ 56-58; PX 1828 at ¶ 214.  Mr. Ramirez also assumes in his calculations that any incremental assets American Savings might have obtained in a but-for world would have earned the exact same average return as the actual assets held by American Savings in the real world.  See PX 1826 at ¶ 71; PX 1828 at ¶ 214.

Although Mr. Ramirez projects $83.3 million in lost profits through this procedure, he provides no information regarding what assets American Savings would have held absent the breach, nor how American Savings would have identified or funded these assets.  Mr. Ramirez also calculates that American Savings continued to experience lost profits through 1998, even after the FSLIC note was paid off on October 24, 1995, which eliminated the basis for the

Warrant Forbearance, and after American Savings was acquired by Washington Mutual on December 20, 1996.  See PX 1828 at ¶¶ 86-89.  Mr. Ramirez does not support the assumption that American Savings's lost profits continued after these events.

Mr. Ramirez also makes incorrect assumptions regarding the thrift's dividend payout ratios, which in turn affect the amount of foregone assets by overstating the amount of capital available for leverage.  Mr. Ramirez adds any profits not paid out as dividends to the thrift's parent (the dividend payout ratio) to the thrift's but-for capital, and then leverages that amount in the next quarter.  Mr. Ramirez computes American Savings's payout ratio of dividends by netting the dividends that American Savings paid to its parent corporation with the capital infusions the parent corporation paid into the thrift.  The effect of this netting understates the thrift's actual dividend payout ratio, and thus overstates damages, by reducing the amount of the lost profits the thrift would have paid out as dividends.  PX 1826 at ¶ 74.

### 2.    American Savings Faced A Lack Of Profitable Investment Opportunities Following The Breach

Contrary to Mr. Ramirez's assumptions, American Savings did not have unlimited growth opportunities after the breach, and any additional assets and liabilities on American Savings balance sheet would have been obtained under intense competition.  PX 1828 at ¶ 109. American Savings would have competed for these assets and liabilities, which would have reduced the profitability of additional leverage.  PX 1828 at ¶ 115.

American Savings's growth opportunities after the breach were limited by the California economy, which faced a recession between 1990 and 1993.  PX 1828 at ¶ 138-45.  The recession caused total assets in California thrifts to fall from $395 billion in 1988 to $244 billion by 1995. PX 1828 at ¶ 146.  American Savings was particularly affected by the economic downturn as a

result of its dependence upon the California economy.  PX 1828 at ¶ 150.  In 1990, 91 percent of

the loans held by American Savings were for California properties.  PX 2 at FAS012 1237

(American Savings Bank, F.A. and Subsidiaries, Annual Report, 1990).  By 1995, that figure had

increased to almost 100 percent.  PX 7 at PAS159 1665 (American Savings Bank, F.A. and

Subsidiaries, Annual Report, 1995).

Indeed, American Savings's management repeatedly reported difficulties in achieving

growth due to the adverse economic conditions.  See, e.g., DX 239 at PAS066 0367 (Memo from

Robertson to Antoci, Jan. 22, 1990); PX 317 at ASDOJ-SEASUP-9-0864 (FDIC Report of

Examination, June 30, 1991).  As a result of its lack of profitable investment opportunities,

American Savings paid dividends to its parent holding companies rather than retain capital to

support new investments.  From 1989 through 1996, American Savings paid $179 million in

common dividends and approximately $480 million in tax sharing dividends.  PX 1828 at ¶ 174.

Moreover, Mr. Ramirez's assumption that American Savings could have increased its

asset base by $2 billion while simultaneously maintaining the same level of profitability is

unsupported by American Savings's actual experience, or the experience of its peers.  PX 1826 at

¶¶ 68-70; PX 1828 at ¶¶ 208-210.  American Savings's return on average tangible assets

decreased between 1991 and 1995, even as the thrift's assets increased by over $3 billion.  PX

1826 at ¶ 69, ex. 8A.  Similarly, comparable institutions in the Eleventh District that grew by

more than 10 percent between 1991 and 1995 reported a reduction in their returns on assets.  PX

1826 at ¶ 70.

American Savings also had opportunities to raise capital during the alleged damages

period.  See DX 321 at PAS136 0876 (June 13, 1990 memorandum to Andrew Furer from Mark

Maron of First Boston Corp.) ("Andy, we remain very enthusiastic about the prospect of raising additional senior debt for New American Capital."). Further, American Savings did successfully raise $60 million in 1995 from a capital raising effort. See PX 21 at PAS171 0574 (New American Capital, Inc. Annual Report, December 31, 1995). American Savings's failure to raise capital until 1995 confirms its lack of profitable growth opportunities before that date.

Mr. Ramirez's calculations also ignore the real-world changes to the thrift's capital structure, and later sale. The FSLIC note was fully paid off on October 24, 1995. PX 21 at PAS171 0566. Pursuant to the terms of the Warrant Forbearance, there was no need for the Warrant Forbearance once the note was paid off. Moreover, on July 21, 1996, the Bass Group and the FDIC agreed to sell American Savings to Washington Mutual, Inc.; the deal was completed in December, 1996. PX 1756 at FAS013 0869-82; PX 1828 at ¶¶ 87-89. Notwithstanding these real-world events, Mr. Ramirez extends damages to 1998, two years after American Savings ceased to exist.

## CONTENTIONS OF LAW

### I.    Plaintiffs' Second Preference Claim Is Barred As A Matter Of Law

Plaintiffs' "second preference" claim proceeds from the same assertion as its partial restitution claim from the earlier proceeding in this Court: "The government agreed to provide the Warrant Forbearance in exchange for a $214 million distribution preference (the "Second Preference") that ultimately cost Plaintiffs $149.8 million." Pl. App. A at 1. As with that claim, plaintiffs argue that the Government should disgorge the benefit of the second preference. Id. at 3. Plaintiffs premise their claim upon the parties having reached an agreement pursuant to the March 28, 1988 Term Sheet that, upon liquidation or sale of the thrift, the Bass Investors would

29

receive have a "first out," or preference, to receive the first $500 million in proceeds, and that the

parties would split the remaining proceeds 70 percent to 30 percent in favor of the Bass Group.

Id. at 15.  Plaintiffs then claim that this alleged earlier agreement was modified, on June 22,

1988, by the addition of a $214 million "second preference" on liquidation for FSLIC,

"specifically paired [with] the Warrant Forbearance[.]"  Id. at 16.

As we will demonstrate at trial, plaintiffs' "second preference" claim contradicts both the

facts of the negotiations and procedural history of this case.  Just as plaintiffs' partial restitution

theory was reversed as a matter of law by the Federal Circuit, plaintiffs' recasting of the same

claim as a reliance claim is also barred.  Even if the Court were to reach the merits, plaintiffs'

claim contradicts the negotiating history, which confirms that the "second preference" was part

of a larger compromise that underwent numerous changes prior to the final agreement.

Moreover, plaintiffs' method of calculating damages contradicts the principles of reliance

damages and is therefore unreliable as a matter of law.

A.      **Legal Standards Applicable To Reliance Claims**

"The purpose of reliance damages is to compensate the plaintiff 'for loss caused by

reliance on the contract.'"  Landmark Land Co. v. United States, 256 F.3d 1365, 1378 (Fed. Cir.

2001) (quoting Restatement (Second) of Contracts § 344(b) (1981)).  Reliance damages are

intended to place the non-breaching party "'in as good a position as he would have been in had

the contract not been made.'"  Glendale Fed. Bank v. United States, 239 F.3d 1374, 1382-83

(Fed. Cir. 2001) (quoting Restatement (Second) of Contracts § 373(1) (1981)).

Accordingly, the non-breaching party may recover as reliance damages "expenses of preparation

of part performance, as well as other foreseeable expenses incurred in reliance upon the

30

contract."  Hansen Bancorp, Inc. v. United States, 367 F.3d 1297, 1309 (Fed. Cir. 2004) (quoting

John D. Calamari & Joseph M. Perillo, THE LAW OF CONTRACTS § 14.9 (4th ed. 1998).

"Reliance damages are awarded for the cost of performance on a required part of a contract."

Am. Sav., 62 Fed. Cl. at 20-21.

Given that the purpose of reliance damages is to restore to the non-breaching party to its

position prior to entering into the contract, the Federal Circuit has long recognized that a claim

for reliance damages is limited to those costs actually realized by the non-breaching party.  "The

underlying principle in reliance damages is that a party who relies on another party's promise

made binding through contract is entitled to damages for any losses actually sustained as a result

of the breach of that promise."  Glendale, 239 F.3d at 1382; Landmark, 256 F.3d at 1373 (only

"actual" loss should be awarded).[2]

**B.      The "Second Preference" Claim Is A Recasting Of Plaintiffs' Unsuccessful
         Partial Restitution Claim And Is Therefore Legally Barred**

Plaintiffs' second preference claim recasts as a reliance theory their previous "alternative"

partial restitution theory, namely, that an alleged Government admission established a separate

quid pro quo between the parties in which the Warrant Forbearance was exchanged for FSLIC's

$214 million "second preference."  PX 1820 at 1; Pl. Damages Disclosures (Oct. 17, 2008); see

also Pl. App. A, at 3-4; 32-34; 38.

Plaintiffs' claim shares the same factual and legal basis as their previous theory, which

the Federal Circuit reversed.  The only modification to plaintiffs' theory is that plaintiffs now

---

[2]  Compare LaSalle Talman Bank v. United States, 317 F.3d 1363, 1375 (Fed. Cir. 2003)
(rejecting cost of mitigation claim that did not reflect plaintiff's "actual experience"); Westfed
Holdings, Inc. v. United States, 407 F.3d 1352, 1371 (Fed. Cir. 2005) (rejecting award because
plaintiff had "not paid anything out of its pocket").

seek $149.8 million (70 percent of $214 million), instead of $227,903,385.  On appeal, the

Federal Circuit reversed this Court's determination that the contract was legally divisible, thus

barring any claim based upon divisibility of the contract.  Plaintiffs' current "second preference"

claim, like their previous partial restitution claim, relies upon a claimed divisibility of the

contract, and is thus barred by res judicata, the law of the case, the waiver rule, and judicial

estoppel.

### 1.      Res Judicata

First, the claim is barred under the doctrine of res judicata.  This doctrine bars re-

litigation of claims already decided by the courts.  See Vitaline Corp. v. Gen. Mills, Inc., 891

F.2d 273, 274-75 (Fed. Cir. 1989) (no successive litigation based upon same operative facts

under different legal theory).  Here, plaintiffs have litigated the same claim, premised upon

exactly the same nucleus of operative facts, been denied relief, and have not appealed from that

denial.  Moreover, the legal basis of its claim – that the contract was legally divisible – was

specifically barred by the Federal Circuit.  Am. Sav., 519 F.3d at 1325 (plaintiffs "did not show

that the contract was divisible").  Accordingly, plaintiffs' "second preference" claim is invalid.

### 2.      Law Of The Case

Second, plaintiffs' theory is barred by the "mandate rule" under the "law of the case"

doctrine.  "The law of the case is a judicially created doctrine, the purposes of which are to

prevent the relitigation of issues that have been decided and to ensure that trial courts follow the

decisions of appellate courts."  Jamesbury Corp. v. Litton Indus. Prods., Inc., 839 F.2d 1544,

1550 (Fed. Cir. 1988), rev'd on other grounds, A.C. Aukerman Co. v. R.L. Chaides Const. Co.,

960 F.2d 1020 (Fed. Cir. 1992); see also Gould, Inc. v. United States, 67 F.3d 925, 930 (Fed. Cir. 1995).

Here, the Federal Circuit's opinion bars plaintiffs' claim. The Court ordered that, "[b]ecause the Court of Federal Claims incorrectly found the contract divisible and awarded partial restitution on that basis, we reverse the trial court's award of partial restitution relating to the Warrant Forbearance and remand for the trial court to determine if damages, as opposed to partial restitution, are proper under another theory." Am. Sav. 519 F.3d at 1328. The Federal Circuit explained that, "unless otherwise stated" by its terms, a final contract is not divisible. Id. at 1324 (quotation omitted). Plaintiffs have identified no such statement in the final contract documents in describing their claim, and could not persuade the Federal Circuit that any general terms within the contract documents permitted divisibility. The Federal Circuit accordingly held that, "awarding partial restitution for the value of the Warrants in addition to awarding damages for the elimination of the Note Forbearance would amount to an unfair windfall." Id. at 1327. Plaintiffs' current "second preference" claim, like their earlier claim, relies upon divisibility of the contract, and is therefore barred by the law of the case.

### 3.    Waiver Rule

Third, plaintiffs' failure to raise their "alternative" theory on appeal renders it barred by the waiver rule. Under Federal Circuit precedent, a party that prevailed in the trial court but which seeks to modify the judgment on appeal must cross-appeal. See Granite Mgmt. Corp. v. United States, 416 F.3d 1373, 1378-80 (Fed. Cir. 2005). At the time of the appeal, plaintiffs apparently agreed that their "second preference" claim was subsumed by their larger partial restitution claim, but if they wished to preserve it by presenting it to the Federal Circuit as an

"alternative," as they did to this Court, they were required to do so or risk waiving it on remand. "An issue that falls within the scope of the judgment appealed from but is not raised by the appellant in its opening brief on appeal is necessarily waived."  Engel Indus., Inc. v. Lockformer Co., 166 F.3d 1379, 1383 (Fed. Cir. 1999); see also Odetics, Inc. v. Storage Tech. Corp., 185 F.3d 1259, 1275 (Fed. Cir. 1999) (no litigation permitted on remand of issue plaintiffs chose not to cross-appeal).

### 4.      **Judicial Estoppel**

Finally, plaintiffs are generally barred by the doctrine of judicial estoppel from claiming any damages for the loss of the Warrant Forbearance that are inconsistent with the Federal Circuit's endorsement of the cost-of-replacement capital damages methodology regarding the Note Forbearance.  The doctrine of judicial estoppel "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."  Pegram v. Herdich, 530 U.S. 211, 227 n.8 (2000); see also Bonzel v. Pfizer, Inc., 439 F.3d 1358, 1362 (Fed. Cir. 2006) ("'Judicial estoppel' applies when a party takes a later position that is inconsistent with a former position in the same dispute, on which the party had been successful and had prevailed based on the former position."); Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1565 (Fed. Cir. 1996) ("Judicial estoppel is designed to prevent the perversion of the judicial process and, as such, is intended to protect the courts[.]").

Courts look generally at three elements to determine whether a party's present assertion is prohibited by judicial estoppel:  (1) whether the new position is clearly inconsistent with an earlier position, (2) whether the party previously prevailed in persuading a court to adopt the earlier position, and (3) whether a party would obtain an unfair advantage or impose an unfair

detriment on the other party if not estopped from asserting its new position.  Biomedical Patent

Mgmt. Corp. v. Cal. Dept. of Health Servs., 505 F.3d 1328, 1341 (Fed. Cir. 2007).

Plaintiffs' second preference claim contradicts their earlier position regarding the measure

of damages for loss of the Note Forbearance.  Plaintiffs argued that it "made sense" for them to

"recover the rent they paid for the (greenbacks) capital that the government's breach required

plaintiffs to post in support of the Note."  Pl. Reply in Support of Mot. Summ. J. Damages Mot. I

(Sept. 9, 2002), at 2-3.  Plaintiffs also stated that this was a "reliable" way of calculating damages

because the "dollar amounts plaintiff NA Capital actually paid to the various capital providers

are indisputable."  Pl. Mot. Summ. J. Damages I (July 26, 2002), at 18.  Upon remand, plaintiffs

also assert that the cost "incurred in using their own inventory capital to serve the purposes the

promised $167 million of warrant capital could would have fulfilled . . . ," is an appropriate

measure of damages for the Warrant Forbearance.  PX 1820 at 1.

Having prevailed before this Court and the Federal Circuit for the Note Forbearance

based upon the cost of capital theory, and having failed to appeal from the denial of any

alternative theory, plaintiffs are judicially estopped from contradicting this theory upon remand.

## C.   Plaintiffs' "Second Preference" Claim Contradicts The Facts Of The Case

Even assuming that plaintiffs' "second preference" claim is not legally barred, the claim

fails because it contradicts the facts of the case.  The negotiating history of the transaction

demonstrates that the "second preference" only arose in the context of a much broader

compromise regarding regulatory capital.  Moreover, the compromise itself underwent numerous

changes between the June 22, 1988 memorandum and the December 28, 1988 Assistance

Agreement, and underwent further changes afterward.  Indeed, the second preference itself was

never utilized because the warrants were restructured as part of Washington Mutual's acquisition of the thrift.  Lastly, even if the Court were to consider a damages award, plaintiffs' method of calculating damages contradicts this Court's, and the Federal Circuit's, rulings.

**1.     The Parol Evidence Rule Bars Examination Of The Negotiations**

Examination of materials beyond the four corners of the contract documents to determine whether the contract is divisible is legally barred under Federal Circuit precedent.  See Stone Forest Indus., Inc. v. United States, 973 F.2d 1548, 1552 (Fed. Cir. 1992) (looking to contract terms to ascertain divisibility).  Although, in this case, the Federal Circuit examined the parties' negotiating history in reversing this Court's divisibility determination, the Federal Circuit did not deny our argument that such an examination was barred by the parol evidence rule.  Am. Sav., 519 F.3d at 1326-27.  In light of the Federal Circuit's ruling that the contract was not divisible, the Court should apply the parol evidence rule to bar plaintiffs' arguments that a quid pro quo was established as of a middle date during the negotiations.

The Assistance Agreement itself expressly bars an examination of the negotiating history to determine the existence of separate agreement:

> This agreement, together with the other Transaction Related Documents . . . (i) constitutes the entire agreement among the parties in connection with such transactions and (ii) supersedes all prior agreements and understandings of the parties . . .

PX 1305 at 92-872 P 0188, § 26 (Assistance Agreement).  In addition, plaintiffs have stated in their pleadings and regulated statements to the public that the contract in this case was "integra[ted]" and "unitary."  Compl. at ¶ 14; PX 1409 at ASDOJ-NY-23-0038.

Given that the parol evidence rule and the terms of the contract both bar looking beyond the contract documents for evidence of divisibility, the Court is confined to looking at the

36

contract documents for such evidence.  None of the final contract documents, however, pair the second preference with the Warrant Forbearance.  See generally PX 1305 (Assistance Agreement); PX 1787 (Warrant Agreement); PX 1891 (Forbearance Letter).

> **2.     The Second Preference Was Consistent With The 30 Percent Equity Stake For FSLIC Contemplated In The March 28, 1988 Term Sheet**

Even if plaintiffs can rely upon the negotiating history to establish the divisibility of the contract at issue here, they cannot overcome the evidence demonstrating that the $214 million second preference merely reflected a portion of the 30 percent equity stake FSLIC was proposed to receive in the March 28, 1988 Term Sheet.  The Bass Group received a first preference at liquidation of $500 million in the initial Term Sheet.  For FSLIC to receive a 30 percent share, it would need to have a $214 million preference on liquidation, thus receiving 30 percent of the total preferences and a true 30 percent share ($214 million = 0.30 x $714 million).

Indeed, the Bass Group itself described the origin of the "second preference" as deriving from an "ambiguity" in the March 28, 1988 Term Sheet rather than a new condition arising in the negotiations at a later time.  PX 1132 at PAS177 0168.  The second preference accordingly cannot be viewed as a $149.8 million change in the terms of the deal as it was being negotiated. Indeed, the total assistance paid by the Government to American Savings through December 31, 1995 was $5.8 billion.  See PX 1753 at FAS011 0028.  Given the magnitude of the Government's assistance, its 30 percent stake in American Savings was economically appropriate as relates to the entire transaction, not just the Warrant Forbearance.

###### 3.      The "Second Preference" Arose Within An Overall Compromise Concerning Warrant Capital That Changed Over Time

Similarly, even if the Court were to consider the negotiating history, that history made explicit that the Warrant Forbearance arose within the context of a much broader compromise concerning warrant capital.  See PX 1112 at WOQ473 0749-0750.

The June 22, 1988 letter that plaintiffs purport to evidence the separate quid pro quo actually delineates a compromise of five different terms, including the $500 million first preference for dividends or on a capital transaction, the $200 million second preference on a capital transaction for FSLIC, a 70-30 split thereafter, the definition of capital transaction, and the allowance of a 4-to-1 debt to equity ratio in the Bass Group's initial capital contribution.  PX 1115 at WOQ488 2085.  The document only "assumes that ORPOS will agree that this $200 million value is recognized for regulatory capital purposes[,]" id., and accordingly could not constitute an agreement respecting any forbearance.

Moreover, as discussed above, the five-part compromise that the June 22 letter actually delineated underwent significant changes in further negotiations, demonstrating that it could not have represented a final agreement, and that it was not in place by the time FIRREA was enacted:

- •      First, the second preference value, pegged in the June 22 letter to the warrant value, changed over time between $218 and $100 million.  Compare PX 1118 at PAS177 0186 ($218 million), with PX 1889 at WOR466 0231  (Memorandum re "Changes in Bass Deal Since Labor Day") (warrant value as low as $100 million);

- •      Second, the Bass Group proposed using the warrant forbearance capital to count only "as restricted capital at least to support the Collecting Bank Note principal amounts, 'normal' deposit growth (of up to ten percent per year) and indexed increases in regulatory capital ratios, but not as tangible capital for calculating equity risk investment or as contingency component capital."  PX 1118 at PAS177 0187 (emphasis in original);

38

- Third, the amount of the Bass Group's initial capitalization of the bank, and the extent to which it was made up of debt, changed significantly, along with the Bass Group's first liquidation preference. <u>See</u> PX 1118 at PAS177 0187-90; PX 1889 at WOR466 0231.

When the transaction finally closed on December 28, 1988, it included both the Warrant Forbearance and FSLIC's "second preference," although no contractual document pairs the two. The fiction that the "second preference" was pegged to the deemed value of the warrants is not reflected anywhere in those documents.   The value of the warrant was later was downgraded to $167.2 million, but the "second preference" remained at $214 million.  PX 1406 at PAS113 0133.

### 4.    The Payment Of The Second Preference Was Not Caused By Reliance Upon The Contract

Even if the Court finds that the "second preference" and Warrant Forbearance constituted a divisible portion of the contract, the facts of the case show that plaintiffs did not pay the second preference in reliance upon the contract.  Plaintiffs had the option of paying dividends, which were not subject to the second preference, rather than selling the bank, which triggered the second preference.  The second preference thus did not cause plaintiffs to incur any expenses in reliance upon the contract.  "Reliance damages are awarded for the cost of performance on a required part of a contract." <u>Am. Sav.</u>, 62 Fed. Cl. at 20-21.

Members of the Bass Group stated after the transaction closed that they believed the FSLIC warrant was not worth 30 percent of the bank, and the "second preference" was worth less than $214 million.  PX 1649 at PAS039 0551; PX 1408 at PAS070 0862-63.  Moreover, after the transaction, SNL securities assigned the warrant a value of only $167.2 million, but the amount of the second preference did not change.  PX 1406 at PAS113 0133.

39

Plaintiffs plainly did not pay the second preference in reliance upon the contract, because they had the choice to prevent FDIC from ever being able to exercise it.  And plaintiffs certainly never believed that exercise of the "second preference" cost them $149.8 million, given that they believed the warrant was much less than 30 percent of the institution.

### 5. The "Second Preference" Was Never Utilized

When Washington Mutual sought to re-negotiate the terms of the warrant so it could be paid in Washington Mutual shares, the terms of the warrant, including its liquidation preference structure, were completely altered.  FDIC received 35 percent, not 30 percent, of the equity payout.  PX 1753 at FAS011 0023-24; see also PX 1760 at FAS013 0724 (July 21, 1996 Warrant Exchange Agreement).  After fees and other expenses, FDIC received 29.55 percent of the total stock value.  PX 1753 at FAS011 0054.  And FDIC took distribution of its shares "in front of the investor group."  Id. at FAS011 0026.

The "second preference" thus was never paid, and plaintiffs cannot be said to have expended any funds in reliance upon any divisible contract, because its terms were renegotiated. Indeed, the fact that the payments were ultimately renegotiated demonstrates that all terms of the agreement were subject to renegotiation until the bank was sold.

### D. Plaintiffs Are Not Entitled To Any Restitutionary Remedy

Because plaintiffs' "second preference" reliance claim is merely a recasting of its earlier partial restitution claim proceeding upon the same theory, plaintiffs' claim must satisfy the law of restitution.  Plaintiffs' claim fails to do so because plaintiffs gained a benefit from the contract as a whole, and continued to perform rather than treating the breach as a total breach.

40

Restitution may not be awarded where plaintiffs enjoyed a net benefit from the contract as a whole.  See, e.g., Landmark, 256 F.3d at 1373; Glendale, 239 F.3d at 1380; Marathon Oil Co. v. United States, 236 F.3d 1313, 1315 (Fed. Cir. 2000).  The purpose of restitution is to restore the non-breaching party to its pre-contract position.  See, e.g., Hansen, 367 F.3d at 1315.  Where plaintiffs profited from the contract as a whole, as here, unwinding the contract makes no legal or economic sense, unless the plaintiffs would like to pay the Government for breaching the contract.

Moreover, plaintiffs may not seek restitution because they elected to continue performance rather than treating the breach as a total breach.  See Old Stone Corp. v. United States, 450 F.3d 1360, 1372-73 (Fed. Cir. 2006) (where the plaintiff continued to receive contractual benefits after the breach instead of repudiating the contract and suing, it had elected to forego restitution).  The Federal Circuit explicitly stated it did not reach this issue upon appeal.  Am. Sav., 519 F.3d at 1325.  Plaintiffs only sued in 1992, and continued performing and receiving benefits from the contract until the sale of the thrift in 1996.  Any claim to unwind the "second preference," regardless of their description as reliance, thus fails to meet these restitutionary principles.

### E.  Plaintiffs' Omission Of Any Offset Renders Their Calculations Unreliable

Even assuming their flawed "reliance" claim could proceed, plaintiffs' measure of damages is flawed because they fail to reduce their claim by any benefits they have received under the contract.  The law of reliance damages requires plaintiffs to reduce their claim any benefit the plaintiff retained from its expenditure in reliance of the breached agreement.  See Westfed, 407 F.3d at 1370; Glendale, 239 F.3d at 1382-83; Dobbs, Law of Remedies, § 12.3(1), at 51-52.  Plaintiffs made over $900 million in earnings from 1989-96, plus the proceeds from the

41

Washington Mutual stock they received from the sale to Washington Mutual, vastly outweighing the $149.8 million they claim here.  PX 1820 at Exh. B, Sch. 1.

Even if plaintiffs can demonstrate a divisible contract, their method of calculating the damages is barred as a matter of law.  Section 32 of the Assistance Agreement directs that "any forfeiture . . . for breach . . . shall correspond to the magnitude of the loss caused thereby."  See Pl. Mot. Summ. J. V: FSLIC Preference (Feb. 20, 2004), at 36.  In considering this clause, the Federal Circuit held that, "an award of damages based on Plaintiffs' loss related to the elimination of the Warrant Forbearance would appear to more closely correspond to the 'magnitude of the economic loss caused' to Plaintiffs than the trial court's award of partial restitution based on the value of the Warrants."  Am. Sav., 519 F.3d at 1326.

Moreover, even if the Court were to award reliance damages as a recasting of the partial restitution claim, the Court has recognized that partial restitution claims require the calculation of an offset to account for the benefits plaintiffs received from their portion of the divisible contract.  Am. Sav., 62 Fed. Cl. at 27; Am. Sav., 74 Fed. Cl. at 761-62.  If plaintiffs wish to unwind the quid pro quo they identify, they would have to unwind the benefits of the Warrant Forbearance.  Plaintiffs had the benefit of the Warrant Forbearance in 1989.  Moreover, plaintiffs now claim that the loss of the Warrant Forbearance cost them either $83.8 million in lost profits or $106.8 million in cost of replacement capital.  Plaintiffs' failure to calculate any offset, however, renders their damages calculation incomplete and unreliable on its face.

### F.    To The Extent Plaintiffs Calculate Damages Based Upon An Alleged Earlier Contract, Plaintiffs' Theory Is Legally Barred

Plaintiffs acknowledge that their reliance claim is not based upon costs actually paid out or events that actually occurred.  Instead, plaintiffs expressly concede that their damage claim turns

upon what they contend they "would have" received if a different, hypothetical contract had been

entered into, and if American Savings had been sold for an identical price pursuant to the terms of

that hypothetical contract.  Pl. App. A at 3.  "But for the exchange of the Warrant Forbearance for

the Second Preference, FDIC would not have been entitled to that $214 distribution.  Instead,

under the terms of the parties' agreement prior to FSLIC's exchange of the Warrant Forbearance

for the FSLIC Preference, Plaintiffs would have been entitled both to 100% of the first $500

million, and to 70% of everything above that amount – including 70% of the next $214 million."

Pl. App. A at 33 (emphasis added).

Plaintiffs' claim is thus not based upon actual costs, but instead is based upon the fiction

that plaintiffs and the Government would have entered into a different contract under different

terms.  To the extent that plaintiffs rely upon this measure of damages, such a theory is akin to

expectancy damages, which are intended to provide the non-breaching party the benefit of the

bargain, rather than reliance damages.  See Glendale, 239 F.3d at 1380 (citing RESTATEMENT

(SECOND) OF CONTRACTS § 344(a) (1981)).

American Savings's "second preference" theory is structurally flawed, because it seeks to

give the "benefit of the bargain" for a contract that never existed.  Such a claim, which is more

akin to a claim for expectancy damages than reliance damages, is foreclosed by this Court's ruling

that any contract was formed by the final agreement, not any interim steps in the negotiations.  See

Am. Sav., 62 Fed. Cl. at 17 ("It is that final agreement, the final contract, that the Court must

focus upon.").  In short, "the amount claimed is not an actual loss because [plaintiffs have] not

paid anything out of [their] pocket."  Westfed, 407 F.3d at 1371 (emphasis supplied).  For this

reason as well, plaintiffs' claim for "reliance damages" cannot be sustained.

II.   **Plaintiffs' Cost Of Capital Calculation Is Factually And Legally Unsupported**

In this case, the Federal Circuit found cost of capital damages to be a reasonable and foreseeable measure of damages where plaintiffs recover "the actual costs paid to capital providers, in the form of interest and dividend payments, for the pre-existing assets [used to cover for the capital lost] less the benefit that [plaintiffs] obtained from the restricted use of these assets after the enactment of FIRREA."  Am. Sav., 519 F.3d at 1322; see also LaSalle Talman, 317 F.3d at 1374 (Fed. Cir. 2003) (affirming trial court's finding that "the cost of replacement capital can serve as a valid theory for measuring expectancy damages in the Winstar context").

This is in accord with the general principle of contract law that the aim of damages for a breach of contract is to place the nonbreaching party "in as good a position pecuniarily as (it) would have been if the contract had been completely performed."  Northern Helex Co. v. United States, 524 F.3d 707, 713 (Ct. Cl. 1975).  Plaintiffs' cost of capital calculation violates these basic contract principles and the law of this case because plaintiffs seek damages based upon erroneous and contradictory assumptions.

A.   **Plaintiffs Overstate The Amount And Duration Of Capital**

As explained above, Mr. Ramirez's current calculations overstate the duration and amount of capital the thrift would have had absent the breach.  Mr. Ramirez: (1) does not reduce the initial $167 million by the amount of amortization/depreciation for the balancing assets; (2) ignores the reversal of push-down accounting, which increased plaintiffs' 1989 earnings by $73.5 million; and, (3) calculates cost of capital damages through December 1998 even though the warrants would have had no value as capital after December 1996.  PX 1820 at Exh. A.  Mr. Musika, an accounting expert, will discuss the opinions in his report relating to the errors in Mr. Ramirez's

44

accounting calculations.  PX 1827.  All of these errors serve to inflate the amount and duration of capital lost after the breach.  Any award based upon this faulty analysis would thus result in a windfall to plaintiffs.

**B.**      **Plaintiffs Overstate The Cost Of Capital**

Because plaintiffs' cost of capital calculation both overlaps with and contradicts their earlier calculations, it overstates the cost plaintiffs paid for the same $350 million in capital.  Mr. Ramirez includes a tax "gross-up" for the preferred stock that he did not include in the cost of the same preferred stock in his earlier calculations.  He also excludes the common stock from his calculations, compared to including the common stock at a $0 cost in his earlier calculations.

Plaintiffs' computation of the amount used to finance the debt is also erroneous.  Plaintiffs seek damages for the cost of redeployed debt by using the amount actually paid to debt holders. Plaintiffs ignore, however, that such payments were tax-deductible.  PX 1826 at ¶ 60. Accordingly, plaintiffs' calculations should be adjusted to reflect that payments made to debt holders act as a tax shield, reducing the amount of corporate tax payments made in a given year. This calculation can be made by multiplying the pre-tax cost of the debt by [1 - tax rate].  PX 1826 at ¶ 60.

**C.**      **Plaintiffs' Proposed Offset Rate Is Erroneous**

Plaintiffs' calculation of the offset is erroneous and ignores the actual facts of this case. Plaintiffs assert that the Court can compute the proper amount of the offset by using the pre-tax yield for one-year CMT securities.  PX 1820 at Exh. A.  This contradicts their earlier claim that the FSLIC Note rate should be used as the offset.

Plaintiffs' proposal also conflicts with precedent from other <u>Winstar</u>-related cases.  The Federal Circuit has affirmed use of the higher intermediate Treasury rate instead of the one-year rate to calculate an offset.  <u>Home Sav. of Am. v. United States</u>, 399 F.3d 1341, 1354 (Fed. Cir. 2005).  This Court has also used the actual earnings on assets as the proper offset.  <u>LaSalle Talman Bank v. United States</u>, 64 Fed. Cl. 90, 113 (2005), <u>aff'd</u>, 462 F.3d 1331 (Fed. Cir. 2006).  Plaintiffs' proposal of the one-year CMT thus contradicts this Court's and the Federal Circuit's precedent.  Considering that it is possible to calculate plaintiffs' actual yield on earning assets, this is the appropriate rate at which to calculate the offset.  PX 1826 at ¶ 63, Exh. 12B.

Moreover, plaintiffs have not allowed the Government to conduct discovery into the basis for the one-year CMT rate.  At the recent deposition for Mr. Ramirez, the Government sought to inquire as to the basis for using the one-year Treasury rate and counsel for plaintiffs limited the questioning upon the basis of the attorney-client privilege.  <u>See</u> Ramirez Dep. (Dec. 8, 2008) at 201.  It would thus be inequitable for this Court to adopt the one-year CMT rate when the Government has had no opportunity to inquire as to the factual or legal basis for that rate.

In his report, Dr. Thakor explains that, taking into consideration only (1) the amortization/depreciation expenses avoided as a result of the reversal of push down accounting; (2) the tax shield created by payments on debt; (3) the actual amount of preferred stock payments; (4) common stock payments using the dividend payments actually made; and (5) an offset calculated at the after-tax yield on earning assets, plaintiffs would be entitled to an actual cost of capital of $23.906 million, less an offset of $16.092 million, resulting in a total net cost of capital of $7.815 million.  PX 1826 at ¶ 82, Exh. 12B.

46

**D.** **Judicial Estoppel And The Law Of The Case Bar Plaintiffs' Repudiation Of Their Original Calculation**

Even if principles of economics and the facts of this case support plaintiffs' new analysis – a position with which we disagree – judicial estoppel and the law of the case doctrine bar plaintiff from proceeding upon the proposed calculation.

When plaintiffs moved for judgment as to damages for breach of the Note Forbearance, plaintiffs represented that their cost of capital calculation, what plaintiffs termed the "rent" paid to capital providers, was the most accurate and reliable means of calculating the cost of capital.  Pl. Mot. Sum. J. I ("FSLIC Note") (July 26, 2002) at 2-3**.**  Specifically, they claimed that, "dollar amounts plaintiff NA Capital actually paid to the various capital providers are indisputable." Id. at 18.  These original calculations, according to plaintiffs, were "summaries of undisputed facts contained in business records."  See id. at 18 n.19.  Plaintiffs' new analysis, which they also title "Actual Cost of Capital," PX 1820 at Exh. A, Sch. 1, contradicts their earlier representations, and are thus prohibited by judicial estoppel and the law of the case.

**1.** **Judicial Estoppel**

As noted above, the doctrine of judicial estoppel "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." Pegram, 530 U.S. at 227 n. 8 (2000); see also Bonzel, 439 F.3d at 1362.  Courts look generally at three elements to determine whether a party's present assertion is prohibited by judicial estoppel:  (1) whether the new position is clearly inconsistent with an earlier position; (2) whether the party previously prevailed in persuading a court to adopt the earlier position; and (3) whether a party would obtain an unfair advantage or impose an unfair detriment on the other party if not estopped from asserting its new position.  Biomedical Patent Mgmt. Corp., 505 F.3d at

47

1341.  Plaintiffs' attempt to revise their original calculation with a new, inconsistent analysis meets each prong of the judicial estoppel test.

This Court held, and the Federal Circuit affirmed, that plaintiffs' calculations for the Note Forbearance represented the "actual costs paid to capital providers."  Am. Sav., 519 F.3d at 1323. Plaintiffs labeled this formula as the "reliable" way of calculating damages because the "dollar amounts plaintiff NA Capital actually paid to the various capital providers are indisputable."  Pl. Mot. Summ. J. Damages I (July 26, 2002), at 18.  Plaintiffs' new analysis contradicts their original calculations and representations, thus grossly inflating the claimed net cost of the same $350 million.  PX 1820 at Exh. A. Sch. 1.

Because, plaintiffs' newfound position has put the Government to the enormous and unnecessary expense of demonstrating the inadequacies of the new analysis, plaintiffs' new calculations contradict their earlier position to the Government's detriment, and are thus barred by judicial estoppel.

### 2.    Law Of The Case

As discussed above, the law of the case doctrine aims to "prevent the relitigation of issues that have been decided and to ensure that trial courts follow the decisions of appellate courts." Jamesbury Corp., 839 F.2d at 1550; see also Gould, Inc., 67 F.3d at 930.

As set forth above, the Federal Circuit affirmed an award of the "actual costs paid to capital providers" as measured by plaintiffs' original calculation.  Am. Sav., 519 F.3d at 1323. Plaintiffs' new analysis contradicts the law of the case by proposing a higher net cost for the same capital.

48

**III.**   **Plaintiffs' Lost Profits Calculations Are Factually And Legally Unsupported**

Plaintiffs' $83.3 million lost profits claim is methodologically unsound and contradicted by American Savings's actual experience after the breach.  Mr. Ramirez's calculations assume, contrary to American Savings's actual experience and economic logic, that American Savings could have fully levered the Warrant Forbearance capital and earned precisely the same rate of return as American Savings did on its actual assets.  Mr. Ramirez provides no basis for these assumptions, nor does he demonstrate what assets or liabilities American Savings would have held absent the breach.  Mr. Ramirez's calculations are therefore speculative as a matter of law.

**A.**   **Legal Standards Applicable To Expectancy Claims**

"One way the law makes the non-breaching party whole is to give him the benefits he expected to receive had the breach not occurred."  Glendale, 239 F.3d at 1380 (citing RESTATEMENT (SECOND) OF CONTRACTS § 344(a) (1981)); see also Energy Capital Corp. v. United States, 302 F.3d 1314, 1324 (Fed. Cir. 2002).  American Savings's interest is the "interest in having the benefit of [its] bargain by being put in as good a position as [it] would have been in had the contract been performed."  RESTATEMENT (SECOND) OF CONTRACTS § 344(a) (1981); see also Bluebonnet Sav. Bank, F.S.B. v. United States, 266 F.3d 1348, 1355 (Fed. Cir. 2001).  Expectancy damages are often equated with "lost profits."  Glendale, 239 F.3d at 1379 (citing RESTATEMENT (SECOND) OF CONTRACTS § 347); see also Energy Capital, 302 F.3d at 1324.

To recover expectancy damages, including lost profits, a plaintiff must prove:  (1) the lost profits were within the contemplation of the parties because the loss was foreseeable; (2) there would have been a profit but for the breach; and (3) the measure of damages must be reasonably

49

certain.  Cal. Fed. Bank v. United States, 395 F.3d 1263, 1267 (Fed. Cir. 2005).  Plaintiffs cannot

properly establish these elements.

### B.        American Savings's Alleged Lost Profits Were Not Reasonably Foreseeable

Plaintiffs cannot establish that their alleged lost profits damages were reasonably

foreseeable.  The question whether plaintiff's alleged lost profits were foreseeable entails a two-

part test:  "'Loss may be foreseeable as a probable result of a breach because it follows from the

breach (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the

ordinary course of events, that the party in breach had reason to know.'"  Landmark, 256 F.3d at

1378 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 351(2)).  Plaintiffs bear the burden of

proving "both the magnitude and the type of damages were foreseeable."  Landmark, 256 F.3d at

1378.  The court examines whether the alleged loss was foreseeable at the time of contracting, not

the time of breach.  Bohac v. Dep't of Agriculture, 239 F.3d 1334, 1340 (Fed. Cir. 2001).

In order for damages to be foreseeable, "the injury that occurs must be one of such a kind

and amount as a prudent man would have realized to be a probable result of his breach.'"

Landmark, 256 F.3d at 1378 (quoting 5 ARTHUR CORBIN, CORBIN ON CONTRACTS, § 1012 at 88

(1964)).  "'The mere circumstance that some loss was foreseeable, or even that some loss of the

same general kind was foreseeable, will not suffice if the loss that actually occurred was not

foreseeable.'"  Id. (quoting RESTATEMENT (SECOND) OF CONTRACTS, § 351, cmt. a); see also Old

Stone, 450 F.3d at 1376 (same).

Neither the magnitude, nor type, of plaintiffs' alleged lost profits were reasonably

foreseeable to the Government at the time of contracting.  First, the Government could not have

foreseen the magnitude of the damages calculated by Mr. Ramirez.  Plaintiffs claim that American

Savings would have fully leveraged the remaining amount of warrant capital each quarter, and that the foregone assets would have earned the thrift's actual return on average assets. This assumption contradicts the fundamental economic principle of diminishing returns, which states that an institution's asset base grows, its return on average assets decreases at the margin. The Government thus could not have foreseen the magnitude of alleged lost profits.

Nor could the Government have foreseen the type of damages plaintiffs now claim. Mr. Ramirez presents neither the assets nor liabilities in his hypothetical portfolio, making it impossible to determine the type of damages. Plaintiffs thus cannot establish that the type of damages was foreseeable at the time of contracting. See Old Stone, 450 F.3d at 1376 (rejecting damages for failure to show that the loss the actually occurred was foreseeable).

**C.    By Their Own Admission, Plaintiffs Replaced The Lost Warrant Forbearance Capital, And Had Additional Capital Raising Opportunities**

Mr. Ramirez's lost profits computations do not meet the causation standards set forth by the Federal Circuit and this Court. With respect to causation, "the causal connection between the breach and the loss of profits must be 'definitely established.'" Cal. Fed., 395 F.3d at 1268 (quoting La Van v. United States, 382 F.3d 1340, 1351 (Fed. Cir. 2004)). In Cal. Fed., the Federal Circuit clarified that plaintiffs must do more than demonstrate that the breach was a "substantial factor" leading to the damages claimed. See id. at 1267-68. "The inability to prove by a preponderance of the evidence that profits would have been made but for the breach will therefore preclude recovery on a lost profits theory." Id. at 1268.

In this case, any claim of causation is barred by plaintiffs' admission that American Savings replaced the lost warrant capital with real tangible capital, thus preventing the possibility that any lost profits could have been incurred. See PX 1828 at ¶ 98; PX 1826 at ¶ 42; PX 1820 at

51

1; Pl. Damages Disclosures (Oct. 17, 2008) (costs "incurred in using their own inventory capital

to serve the purposes the promised $167 million of warrant capital could would have fulfilled . . .

."). Indeed, plaintiffs have not shown that American Savings was capital-constrained during the

alleged damage period.   Lastly, plaintiffs contend that they could have retained American

Savings's adjustable-rate mortgage loan ("ARM") portfolio and junk bond portfolio, contrary to

the law of the case.

Additionally, American Savings was not capital-constrained during the alleged damages

period because it could have raised capital in the open market.  DX 321 at PAS136 0876 (First

Boston "remain[s] very enthusiastic about the prospect of raising additional senior debt for New

American Capital.").  Furthermore, in 1995, American Savings successfully raised $60 million in

outside capital.  PX 21 at PAS171 0574.

### D.      Plaintiffs ARM Portfolio and Junk Bond Portfolio Claims Are Legally Barred

Plaintiffs belatedly identify three categories of assets that the thrift could have held in its

foregone portfolio absent the breach: an ARM portfolio, a junk bond portfolio, and unnamed RTC

acquisitions.  See Pl. App. A at 23-24.  Mr. Ramirez made no assumptions regarding whether any

of these assets were part of the foregone portfolio, and did no analysis of the real-world

performance of these assets.  PX 1820 at Exh. B.  Plaintiffs' belated identification of these assets

does not rescue Mr. Ramirez's speculative assumptions.

Moreover, plaintiffs' inclusion of the ARM portfolio and junk bond portfolio are barred as

a matter of law because plaintiffs raised the same claims prior to appeal with respect to the breach

of the Note Forbearance.  Pl. Mot. Sum. J. III ("Junk Bonds") (July 26, 2002); Pl. Mot. Sum. J. IV

("Loan Sales") (July 26, 2002).  The Court rejected plaintiffs' alleged forced sale of the junk bond

portfolio at summary judgment.  Am. Sav., 62 Fed. Cl. at 21.  Although the Court held at summary judgment that plaintiffs had the opportunity to take their ARM portfolio claim to trial, id. at 24, plaintiffs abandoned the ARM portfolio claim prior to appeal.  Am. Sav., 74 Fed. Cl. at 762.  Indeed, the inclusion of these assets as potential components of the foregone asset portfolio renders the entire lost profits analysis speculative.

### 1.    **ARM Portfolio**

Plaintiffs' claim that the breach prevented American Savings from holding a $1 billion ARM portfolio.  See Pl. App. A at 23.  Plaintiffs previously alleged that the breach of the Note Forbearance forced American Savings to sell the same ARM portfolio.  See Pl. Mot. Sum. J. IV ("Loan Sales") (July 26, 2002).  The Court denied plaintiffs summary judgment for this claim, but permitted plaintiffs to take the claim to trial.  Am. Sav., 62 Fed. Cl. at 24.  Rather than going to trial, plaintiffs filed a motion for final judgment for the damages awarded upon summary judgment, which this Court granted.  Am. Sav., 74 Fed. Cl. at 762.

Plaintiffs thus abandoned this claim before appeal, and may not reintroduce it now. Because plaintiffs abandoned the ARM portfolio claim, its inclusion in the potential foregone asset portfolio renders the entire lost profits analysis speculative.  Moreover, even if the Court were to reconsider the ARM portfolio, Mr. Ramirez did no analysis of its profitability, making any profit projection speculative.  PX 1820 at Exh. B.

### 2.    **Junk Bond Portfolio**

Plaintiffs also now seek to include the junk bond portolio in the foregone assets for their lost profits claim.  Pl. App. A at 23-24.  Plaintiffs moved for damages at summary judgment with respect to the allegedly forced sale of the same junk bond portfolio.  See Pl. Mot. Sum. J. III

("Junk Bonds") (July 26, 2002).  At summary judgment, this Court held that plaintiffs' sale of the junk bonds was not caused by the breach, and accordingly rejected plaintiffs' claim.  Am. Sav., 62 Fed. Cl. at 21 ("Certainly it appears that regulators required American Savings to sell its junk bonds in a shorter time-frame than FIRREA would have allowed.  Yet this still does not constitute a contractual breach on behalf of the Government.").

Plaintiffs' failure to appeal this ruling makes the Court's rejection of plaintiffs' junk bond portfolio claim res judicata.  The Court's ruling thus prohibits any lost profits claim for the sale of the same junk bond portfolio.  Moreover, as with the ARM portfolio, Mr. Ramirez performed no analysis of the real-world performance of this junk bond portfolio after its sale by plaintiffs.  PX 1820 at Exh. B.

### E.    American Savings's Hypothetical Lost Profits Are Not Reasonably Certain

Plaintiffs cannot establish that their alleged lost profits are reasonably certain.  Plaintiffs must prove both the fact and amount of lost profits with reasonable certainty.  "[I]n order to recover anticipatory profits, it must be 'definitely established' that without the government's breach there would have been a profit."  Rumsfeld v. Applied Cos. Inc., 325 F.3d 1328, 1340 (Fed. Cir. 2003) (quoting Cal. Fed. Bank v. United States, 245 F.3d 1342, 1349 (Fed. Cir. 2001)); see also Energy Capital., 302 F.3d at 1325; RESTATEMENT (SECOND) OF CONTRACTS § 352 (1981).

Alleged lost profits may not be recovered if they emerge from an unreliable lost profits model.  San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997); Roseburg Lumber Co. v. Madigan, 978 F.2d 660, 667 (Fed. Cir. 1992).  The Federal Circuit has cautioned that "the proof problems [for expectancy claims] can in some cases prove to be insurmountable."  Glendale, 239 F.3d at 1380.  Because American Savings's expectancy

models are based upon a number of "critical assumptions, . . . [t]he failure to establish the reasonableness of these assumptions is fatal not only to the damages claim, but to plaintiffs' entire case." S. Pac. Comm'n Co. v. Am. Tel. & Tel. Co., 556 F. Supp. 825, 1076 (D.D.C. 1982).

In nearly every instance in which this Court or the Federal Circuit has considered a lost profits claim, the claim has been rejected.[3]  The Federal Circuit, after surveying the expectancy damage claims in Winstar-related litigation, has observed that the models upon which these claims rest have been "inherently unreliable," and that, although lost profits models have not been barred as a matter of law, such models are largely a "waste of time and effort."  Glendale Fed. Bank v. United States, 378 F.3d 1308, 1313 (Fed. Cir. 2004); see also Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1023 (Fed. Cir. 1996) (lost profits based on leverage capacity are "too uncertain and remote").

Mr. Ramirez has failed to identify the assets and liabilities in the foregone portfolio,  and has performed no analysis of the profitability of these unnamed assets.  Mr. Ramirez also projects that all of the foregone assets would have been equally profitable, thus ignoring the principle of diminishing returns.  Mr. Ramirez also fails to address the real-world factors, such as the California recession, that negatively impacted American Savings's ability to grow profitably.  Mr. Ramirez's model thus fails the requirements of reasonable certainty.  See Glendale, 378 F.3d at 1313 ("waste of time and effort" to advance hypothetical lost profits projections); Wells Fargo, 88 F.3d at 1023 (lost profits based on hypothetical leverage capacity are "too uncertain and remote").

---

[3]  See, e.g., Citizens Fin. Serv., F.S.B. v. United States, 64 Fed. Cl. 498, 514-15 (2005); Fifth Third Bank of W. Ohio v. United States, 55 Fed. Cl. 223, 242 (2003), aff'd in relevant part, 402 F.3d 1221 (Fed. Cir. 2005); So. Cal. Fed. Sav. & Loan Ass'n v. United States, 57 Fed. Cl. 598, 622 (2003), aff'd in part, rev'd in part, & remanded, 422 F.3d 1319 (Fed. Cir. 2005); S. Nat'l Corp. v. United States, 57 Fed. Cl. 294, 306 (2003); Columbia First Bank v. United States, 60 Fed. Cl. 97, 125-26 (2004).

This Court has uniformly rejected expectancy damage claims in <u>Winstar</u>-related cases where the plaintiffs' expert failed to identify with specificity the investments the thrift would have made in the "but-for" world. <u>See</u>, <u>e.g.</u>, <u>Citizens Fin.</u>, 64 Fed. Cl. at 514 ("absent proof of specific investments that would have been held in the world absent FIRREA, a lost profits claim is too speculative"); <u>Fifth Third</u>, 55 Fed. Cl. at 242 ("the court cannot presume proof of missing elements, to wit, what investments plaintiff would have made or activities in which it would have engaged . . ."). This Court has recognized that the "[l]oss of leverage capacity for an investment that plaintiff has not shown it would have made absent the breach is not sufficient support for a lost profits damages claim." <u>Columbia First</u>, 60 Fed. Cl. at 112. Mr. Ramirez's failure to establish the but-for assets or liabilities thus makes his calculation speculative.

## IV.    **Plaintiffs' Unspecified "Jury Verdict" Claim Is Unsupported**

Finally, plaintiffs contend that, even if they are incapable of proving damages to a reasonable certainty, they should still receive damages under a "jury verdict" theory. Pl. App. A at 47-48. Contrary to plaintiffs' representations, we are not arguing that plaintiffs must calculate damages with "mathematical precision." <u>Id.</u> at 44. Instead, the law of this Circuit requires that plaintiffs to prove the existence and amount of those damages to a reasonable certainty.

A plaintiff's failure to prove expectancy damages to a reasonable certainty does not entitle it to "jury verdict" damages; instead, the proper response is to dismiss such unsupported claims. <u>See</u> <u>Glendale</u>, 378 F.3d at 1313. Decisions from this Court have confirmed the rarity of this "jury verdict" theory. In <u>Columbia First</u>, in rejecting the plaintiff's claims, this Court explained that the "jury verdict method" has several prerequisites:

> Before adopting the "jury verdict method," the court must first
> determine three things: (1) that clear proof of injury exists; (2) that

> there is no more reliable method for computing damages; and (3)
> that the evidence is sufficient for a court to make a fair and
> reasonable approximation of damages.

Columbia First, 60 Fed. Cl. at 108 (citing Dawco Construction, Inc. v. United States, 930 F.2d

872, 880 (Fed. Cir.1991), overruled on other grounds by Reflectone, Inc. v. Dalton, 60 F.3d 1572

(Fed. Cir.1995)); accord Bluebonnet, 266 F.3d at 1357.

Plaintiffs have failed to meet the standards required in this Circuit for the "jury verdict

method." Plaintiffs have failed to establish "clear proof of injury" because it has not met the

element of causation of damages. "A jury verdict is not utilized until 'clear proof of injury exists'.

. . . Where, as here, [plaintiffs] failed to prove an injury, the jury verdict method is not

appropriate." Citizens Fin., 64 Fed. Cl. at 514 n. 17 (internal citations omitted).

Plaintiffs also bear the burden of proving that "no more reliable method for computing

damages" exists, which requires plaintiffs to "justify [their] inability to substantiate the amount of

[their] lost profits damages." Columbia First, 60 Fed. Cl. at 108. Plaintiffs cannot do so because

this Court has already found a "reliable method for computing damages" in this case. Id. This

Court has awarded cost of replacement capital damages for the breach of the Note Forbearance,

and the Federal Circuit has affirmed that award. Am. Sav., 519 F.3d at 1323 (affirming "the trial

court's award of the actual costs paid to capital providers [for breach of the Note Forbearance]").

Although plaintiffs' new cost of capital analysis is legally barred because it contradicts

plaintiffs' original calculation for the Note Forbearance, the Court still may calculate damages by

reference to plaintiffs' original calculation. As discussed above, and Dr. Thakor explains in his

report, taking into consideration only (1) the amortization/depreciation expenses avoided as a

result of the reversal of push down accounting; (2) the tax shield created by payments on debt; (3)

the actual amount of preferred stock payments; (4) common stock payments using the dividend payments actually made; and (5) an offset calculated at the after-tax yield on earning assets, plaintiffs would be entitled to an actual cost of capital of $23.906 million, less an offset of $16.092 million, resulting in a total net cost of capital of $7.815 million.  PX 1826 at ¶ 82, Exh. 12B.  Plaintiffs thus cannot establish that "no more reliable method for computing damages" exists, and thus the jury verdict method is not appropriate.  <u>Columbia First</u>, 60 Fed. Cl. at 108.

Respectfully submitted,

MICHAEL F. HERTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director


s/ Kenneth M. Dintzer
KENNETH M. DINTZER
Assistant Director


s/ John J. Todor
OF COUNSEL:                          JOHN J. TODOR
SCOTT D. AUSTIN                      Trial Attorney
Senior Trial Counsel                Commercial Litigation Branch
WILLIAM G. KANELLIS                  Civil Division
VINCENT D. PHILLIPS                  Department of Justice
JACOB A. SCHUNK                      1100 L Street, N.W.
SAMEER YERAWADEKAR                   Attn:  Classification Unit, 8th Floor
Trial Attorneys                     Washington, D.C. 20530
Civil Division                      Tele:  (202) 616-2382
Department of Justice               Fax:   (202) 514-8640

April 17, 2009                      Attorneys for Defendant

## <u>**CERTIFICATE OF SERVICE**</u>

I certify that on this 17th day of April, 2009, I caused the foregoing **"DEFENDANT'S CONTENTIONS OF FACT AND LAW"** to be filed electronically.  I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.


<u>s/ John J. Todor</u>