# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| AMERICAN SAVINGS BANK, F.A., *et al*, | ) | |
| | ) | Case No. 92-872 C |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | (Senior Judge Loren A. Smith) |
| | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## PLAINTIFFS' OPENING POST-TRIAL BRIEF

September 22, 2009

Kent A. Yalowitz
ARNOLD & PORTER, LLP
399 Park Avenue
New York, N.Y. 10022
Tel:  (212) 715-1000
Fax:  (212) 715-1399

*Of Counsel*:

*Attorney of Record for Plaintiffs*
  *American Savings Bank*, *F.A.*, *et al.*

Melvin C. Garbow
Michael A. F. Johnson
Joshua P. Wilson
Michael R. Hartman
Alexea R. Juliano
James K. Rideout
Nellie C. Wigfall
ARNOLD & PORTER, LLP
555 Twelfth Street, N.W.
Washington, D.C.  20004
Tel:  (202) 942-5000
Fax:  (202) 942-5999

**TABLE OF CONTENTS**

Page

INTRODUCTION .................................................................................................................1

PLAINTIFFS' STATEMENT OF FACTS PROVED AT TRIAL....................................................3

I.   Plaintiffs' Acquisition of ASB Saved the Government Billions, and Was
     Structured To Provide for ASB's Growth and Profitability .................................3

     A.   The Government Was Impressed by the Bass Investors' Bid for ASB ..................4

     B.   The Government Negotiated an Ownership Interest in ASB, Providing the
          Government With a Stake in ASB's Expected Growth and Success......................4

     C.   The Government Secured a $214 Million Distribution Preference in
          Exchange for the Warrant Forbearance Promise ......................................5

II.  With a Sizeable Stake in ASB's Operations, the Government Expected Plaintiffs
     To Leverage ASB's Regulatory Capital and To Grow Profitably......................................9

III. ASB Established a Track Record Of Growth and Profit Prior to the Breach ...................13

     A.   ASB Was the Nation's Best Earning Thrift in 1989, Meeting and
          Exceeding its Projected Targets for Growth and Profitability..............................13

     B.   At Year-End 1989, With the Benefit of the Warrant Capital, ASB Was
          Well-Capitalized, Lean and Profitable, and Well-Positioned to Begin
          Evaluating and Completing Acquisitions of Other California Savings and
          Loans.........................................................................................17

     C.   ASB Built Its High-Yield Bond Portfolio Throughout 1989, in Accordance
          With Its Government-Approved Business Plan ....................................................18

     D.   ASB's Pre-Breach 1990 Business Plan Projected Even More Impressive
          Growth and Profits...............................................................................19

IV.  The Government Breached the Warrant Forbearance Promise .........................................20

V.   The Breach Impaired ASB's Growth and Cost Plaintiffs Tens of Millions of
     Dollars in Lost Profits...........................................................................................21

     A.   Absent the Breach, ASB Could Have Retained More Than $1 Billion of
          Adjustable-Rate Mortgages That It Sold in Late 1990 To Improve Its
          Regulatory Capital Position .................................................................................23

i

B.     Absent the Breach, ASB Could Have Retained Nearly $500 Million of High-Yield Bonds That It Sold in Response to Government Concerns About ASB's Regulatory Capital..........................................................25

C.     Absent the Breach, ASB Could Have Grown Through Acquisitions, as It Had Planned................................................................................................28

D.     In Contrast to ASB's Experience in the Years Following the Breach, ASB's Well-Capitalized Peer, World Savings & Loan of Oakland, Grew Aggressively and Profitably.................................................................33

VI.    Despite the Breach, ASB Operated Profitably and Successfully, But at a Smaller Scale Than it Would Have Achieved Had the Government Not Breached ......................35

VII.   In Reliance Upon the Government's Warrant Forbearance Promise, in Selling ASB to Washington Mutual Plaintiffs Conveyed to the Government the Right To Receive $149.8 Million...........................................................................................36

PLAINTIFFS' LEGAL ARGUMENT ........................................................................38

I.     Plaintiffs Proved That Absent the Breach, ASB Would Have Been Even More Profitable and Successful, And That the Breach Caused Plaintiffs at Least $83.318 Million in Lost Profits..........................................................................38

A.     Foreseeability..............................................................................39

1.   To Establish Foreseeability, a Plaintiff Need Only Show That the General Kind of Injury Claimed Was Reasonably Foreseeable ..................................39

2.   Plaintiffs' Lost Profits Damages Were Reasonably Foreseeable ..................39

B.     Causation....................................................................................40

1.   The "Substantial Factor" Standard Governs the Causation Analysis ............40

2.   The Breach Caused the Damages Plaintiffs Claim ........................................41

C.     Reasonable Certainty ...................................................................43

1.   Plaintiffs Computed Their Lost Profits with Reasonable Certainty ..............43

D.     The Trial Testimony and Analysis of Defendant's Expert, Anjan Thakor, Provides a Check on Mr. Ramirez's Calculations, and Supports the Reasonableness of Plaintiffs' Lost Profits Claim ...................................48

II.    Plaintiffs Have Proved Reliance Damages of $149.8 Million...........................................49

III.    As an Alternative to Lost Profits, Plaintiffs' Damages Can Also Be Measured by
        the Cost of Deploying Plaintiffs' Tangible Capital in Place of the Contracted-For
        Regulatory Capital ............................................................................................52

IV.     The Court May Award "Jury Verdict" Damages.............................................59

CONCLUSION.......................................................................................................59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ace-Fed. Reporters, Inc. v. Barram*,
    226 F.3d 1329 (Fed. Cir. 2000) ............................................................................ 43

*American Capital Corp. v. FDIC*,
    472 F.3d 859 (Fed. Cir. 2006) ....................................................................... 49, 51

*American Capital Corp. v. FDIC*,
    59 Fed. Cl. 563 (2004) ........................................................................................ 50

*American Capital Corp. v. FDIC*,
    66 Fed. Cl. 315 (2005) ........................................................................................ 50

*American Sav. Bank, F.A. v. United States*,
    519 F.3d 1316 (Fed. Cir. 2008) ............................................................................ 3

*American Sav. Bank, F.A. v. United States*,
    52 Fed. Cl. 509 (2002) ........................................................................................ 21

*Bluebonnet Sav. Bank, F.S.B. v. United States*,
    266 F.3d 1348 (Fed. Cir. 2001) ........................................................... 39, 41, 43, 59

*Brand Inv. Co. v. United States*,
    58 F. Supp. 749 (Ct. Cl. 1944) ........................................................................... 58

*Cal. Fed. Bank, F.S.B. v. United States*,
    245 F.3d 1342 (Fed. Cir. 2001) .......................................................................... 43

*Cal. Fed. Bank, F.S.B. v. United States*,
    43 Fed. Cl. 445 (1999) ........................................................................................ 41

*California Fed. Bank v. United States*,
    395 F.3d 1263 (Fed. Cir. 2005) .......................................................................... 39

*Chain Belt Co. v. United States*,
    115 F. Supp. 701 (Ct. Cl. 1953) ......................................................................... 39

*Citizens Fed. Bank v. United States*,
    474 F.3d 1314 (Fed. Cir. 2007) ..................................................................... 39, 41

*Citizens Fed. Bank, F.S.B. v. United States*,
    59 Fed. Cl. 507 (2003) ........................................................................................ 39

iv

*Citizens Fin. Servs. v. United States,*
   64 Fed. Cl. 498 (2005) ........................................................................... 40

*Commercial Fed. Bank, F.S.B. v. United States,*
   59 Fed. Cl. 338 (2004) ........................................................................... 43

*Confederated Tribes v. United States,*
   248 F.3d 1365 (Fed. Cir. 2001) .............................................................. 43

*Energy Capital Corp. v. United States,*
   302 F.3d 1314 (Fed. Cir. 2002) .............................................................. 41

*Energy Capital Corp. v. United States,*
   47 Fed. Cl. 382 (2000) ........................................................................... 41

*First Fed. Sav. & Loan Ass'n of Rochester v. United States,*
   76 Fed. Cl. 106 (2007) ........................................................................... 43

*Glendale Fed. Bank, F.S.B. v. United States,*
   239 F.3d 1374 (Fed. Cir. 2001) ......................................................... 50, 51

*Glendale Fed. Bank, F.S.B. v. United States,*
   378 F.3d 1308 (Fed. Cir. 2004) .............................................................. 39

*Globe Sav. Bank, F.S.B. v. United States,*
   65 Fed. Cl. 330 (2005) ....................................................................... 40, 43

*Hadley v. Baxendale,*
   156 Eng. Rep. 145 (1854) ...................................................................... 50

*Holland v. United States,*
   75 Fed. Cl. 483 (2007) ........................................................................... 41

*Home Sav. of Am. v. United States,*
   399 F.3d 1341 (Fed. Cir. 2005) ..................................................... *passim*

*Indiana Mich. Power Co. v. United States,*
   422 F.3d 1369 (Fed. Cir. 2005) ......................................................... 39, 41

*Landmark Land Co. v. FDIC,*
   256 F.3d 1365 (Fed. Cir. 2001) .............................................................. 49

*LaSalle Talman Bank, F.S.B. v. United States,*
   317 F.3d 1363 (Fed. Cir. 2003) ......................................................... 43, 52

*Locke v. United States,*
   283 F.2d 521 (Ct. Cl. 1960) ............................................................... 43, 59

*National Austl. Bank v. United States*,
  452 F.3d 1321 (Fed. Cir. 2006) ........................................................ 43

*Seaboard Lumber Co. v. United States*,
  308 F.3d 1283 (Fed. Cir. 2002) ........................................................ 43

*Staples v. United States*,
  511 U.S. 600 (1994) ........................................................................ 39

*Westfed Holdings, Inc. v. United States*,
  407 F.3d 1352 (Fed. Cir. 2005) ................................................... 49, 51

**<u>Treatises</u>**

11 Arthur L. Corbin, *Corbin on Contracts* § 008 (1964 & Supp.1996) ................................ 50, 51

24 Richard A. Lord, *Williston on Contracts* § 64:2 (4th ed. 2002) ........................................ 49, 51

5 Arthur L. Corbin, *Corbin on Contracts* § 999 (1964) ................................................................ 41

E. Allan Farnsworth, *Farnsworth on Contracts* § 12.1 (3d ed. 2004) .................................... 49, 51

E. Allan Farnsworth, *Farnsworth on Contracts* § 8.15 (3d ed. 2004) ......................................... 51

Restatement (Second) of Contracts § 349 (1981) .................................................................. 49, 51

Restatement (Second) of Contracts § 351 (1981) ........................................................................ 39

## <u>INTRODUCTION</u>

In 1988, Plaintiffs acquired American Savings Bank ("ASB") from the government, investing hundreds of millions of dollars into the deal, staking their sterling business reputations on the new institution's success, and saving the government billions of dollars in liquidation cost. The old American Savings had been the largest failed thrift in history.  Before Plaintiffs came onto the scene, the risk was palpable that its failure would trigger a ruinous run on the bank that could devastate the nation's then-fragile financial system.  To induce Plaintiffs to contribute their capital, character, and capability to the acquisition, the government promised valuable regulatory capital forbearances, including a "Warrant Forbearance" that permitted Plaintiffs to treat as regulatory capital the $167 million fair value of a Warrant that, absent the forbearance, would have been excluded from capital under GAAP.

From the outset, Plaintiffs and the government understood that this forbearance capital was essential to ASB's anticipated growth and expected profits.  And during the year or so that Plaintiffs operated ASB with the benefit of the forbearance, the institution experienced considerable success; ASB grew substantially while earning impressive profits.  ASB's management, ASB's regulators, and ASB's largest creditor all agreed that Plaintiffs had positioned ASB perfectly for further growth, continued profit, and increasing success, even in an environment where other thrifts were expected to face difficult challenges.

But in January 1990 the government breached its promise, destroying the Warrant capital and thrusting ASB out of capital compliance.

As a result, Plaintiffs' strategies for ASB changed immediately and dramatically.  Instead of operating with a comfortable capital surplus, ASB took drastic steps to re-establish bare compliance.  Instead of continuing to grow, ASB shed its best assets and forwent the corresponding profits.  Instead of pursuing acquisitions, ASB eschewed them — during a period

in which ASB's few well-capitalized competitors consummated them with remarkable success. And instead of holding its portfolio of high-yield bonds as planned, ASB — under intense regulatory pressure expressly and unequivocally linked to ASB's regulatory capital position — sold that portfolio precipitously at what everyone recognized to be the worst possible moment, not only forgoing substantial profits but also locking in unnecessary and sickening losses.

Moreover, with the Warrant capital gone, Plaintiffs had no choice but to deploy their own invested capital — which otherwise should and would have been available to support other profitable opportunities — to serve the purposes the government had contractually promised the Warrant capital would fulfill.

Though Plaintiffs persevered in restoring the bank's profitability, the breach left ASB less profitable than it would have been absent the breach, and behind the curve of bank consolidation in the 1990s. Instead of advancing through acquisition, ASB became a target, acquired by Washington Mutual, Inc. in 1996. Plaintiffs honored the second preference despite the government's breach of the very promise it had provided in exchange.

ASB's history is, unquestionably, one of tremendous success — from the ashes of the largest thrift failure ever, Plaintiffs crafted a safe, profitable, and well-respected financial institution that they ultimately sold at a gain. Yet the evidence leaves no doubt that but for the government's breach, ASB would have been significantly more successful, and that Plaintiffs are therefore entitled to recover substantial damages.

*First*, Plaintiffs proved their entitlement to $83.318 million in lost profits. Relying upon ASB's actual leverage ratios and actual return on average assets over the period of the contract, ASB Vice President Antonio Ramirez calculated the profits that the bank would have earned had the government continued to honor its Warrant Forbearance promise. Factual evidence showing

that the breach required Plaintiffs to (1) shed more than $1.2 billion of profitable ARM loans they would have held but for the breach, (2) sell their high-yield bond investments at fire sale prices, and (3) forgo acquisition opportunities, supports the reasonableness of Mr. Ramirez's calculations and demonstrates the real income-earning opportunities the breach forced Plaintiffs to abandon.

*Second*, Plaintiffs proved reliance damages of $149.8 million.  In performance of the contract, Plaintiffs honored the Second Preference, ceding to the government in sale proceeds $149.8 million that Plaintiffs would have kept for themselves had the government's Warrant Forbearance promise never been made instead of having been made and breached.

*Third*, Plaintiffs proved the $106.805 million cost of the tangible capital the breach forced Plaintiffs to redeploy in place of the contracted-for Warrant capital.

*Fourth*, Plaintiffs proved their entitlement to a "jury verdict" award in an amount the Court deems fair and just in the event that the Court declines to base an award on any of the specific calculations Plaintiffs presented.

## PLAINTIFFS' STATEMENT OF FACTS PROVED AT TRIAL

### I.    Plaintiffs' Acquisition of ASB Saved the Government Billions, and Was Structured To Provide for ASB's Growth and Profitability

1.    In 1988, Old American was the largest failed thrift in the United States; the government's best estimate was that it would cost FSLIC more than $3 billion to liquidate it. *Am. Sav. Bank, F.A. v. United States*, 519 F.3d 1316, 1319 (Fed. Cir. 2008).  "[T]here was substantial concern whether there was any way to save this institution."  Trial Tr. 426 (Carl); *see also* DX 1106 (Feb. 22, 1987 Ltr. from Carl to Martin) at PAS177 0173.

2.    FSLIC sought potential acquirers for Old American, but attracted few prospective acquirers other than Plaintiffs.  *See* Trial Tr. 425-26 (Carl); *id.* at 1762-63 (Meyer).

**A.**     **The Government Was Impressed by the Bass Investors' Bid for ASB**

3.      In February 1988, Plaintiffs brought their interest in the transaction to the government's attention.  *See* DX 1106 (2/22/88 Ltr. from Carl to Roger Martin).

4.      As Bass Group principal David Bonderman explained, "most of the significant investors in what we now think of as private equity, though it was called by other names in those days, were families, the leading family being the Bass family."  Trial Tr. 725 (Bonderman).

5.      As ASB director Bernie Carl explained, the government was "well aware of the track record of the [Bass] [G]roup and the fact that . . . when we applied both our human and economic resources to a project, we generally did rather well."  *Id.* at 439 (Carl).

6.      Even the government's witness, James Meyer, agreed that the government viewed Plaintiffs as "[h]ighly capable, highly competent people."  *Id.* at 1851 (Meyer).

7.      In determining to negotiate exclusively with the Bass Group, FHLBB Chairman Danny Wall remarked: "[P]lenty has been said, and appropriately, about their [the Bass Investors'] track record — as investors, as managers, as assessors and appraisers of the value in corporate America."  PX 1086 (4/14/88 FHLBB Special Mtg. Mins.) at WOR120 0234.

**B.**     **The Government Negotiated an Ownership Interest in ASB, Providing the Government With a Stake in ASB's Expected Growth and Success**

8.      The government was so confident ASB would prosper under Plaintiffs' management that it sought an ownership interest in the institution, and cited Plaintiffs' willingness to accede to that request as a decisive factor in choosing the Bass deal over a competing proposal:

> This idea of the ownership interest, taking 30 percent.  I think history has shown that some other highly public transactions involving other regulators have been severely criticized, because we "didn't take any of the up side," or they "didn't take any of the upside."  I like the Bass proposal; it gives us an opportunity to do just that, and it does that while they're bringing capital to the table.  So, I view that very positively.

4

*Id.* at WOR120 0227 (Stmt. of Darrel Dochow).

9.      Under the initial proposed terms of the deal, Plaintiffs would put up 100% of the

cash to capitalize ASB — up to $500 million — but would issue Warrants to FSLIC representing

a 30% ownership interest in the new thrift.  PX 1077 (3/28/88 Term Sheet) at PAS177 0151;

PX 1079 (4/5/88 Mem. from Root and Dochow to Wall, *et al.*) at WOR466 0484.

10.      The initial Term Sheet also provided that, in the event of ASB's sale or

liquidation, the Bass group would first "get [its] capital back, which was the 500-million-dollar

commitment," only after which "there would be a 70/30 split."  Trial Tr. 734 (Bonderman);

PX 1074 (3/23/88 term sheet) at USA 00043407 (discussing Warrant); PX 1079 (4/5/88 Mem.

from Root and Dochow to Wall, *et al.*) at WOR466 0484 ("The acquirer would have a

liquidation preference in the amount of its $500 million capital infusion . . . .").

11.      Accordingly, as initially conceived, the government's ownership interest in ASB

was actually less than 30% and subordinate to Plaintiffs receiving back the amount of their initial

investment.  PX 1074 (3/23/88 Term Sheet) at USA 00043407; *see also* Trial Tr. 448 (Carl)

("[I]f you adopted the theory that the Government got 30 percent of everything, if we had put in our

$500 million in cash and the next day we liquidated the bank for the cash value, that would have

been a $150 million gift to the FSLIC.  And I guarantee you that if I had gone back to the Bass

Group with that proposal, I would have had a very short career.").

### C.      The Government Secured a $214 Million Distribution Preference in Exchange for the Warrant Forbearance Promise

12.      Unlike goodwill or other forms of intangible assistance that the government

provided to thrift acquirers in other transactions, the Warrants represented an actual, "'bargained-

for' economic contribution deemed to have been made by FSLIC in the capital account of NA"

"as a nod to economic reality."  PX 1128 (7/18/88 Mem. from Root to FHLBB) at USA0029941;

*see also* Trial Tr. 441 (Carl) (Plaintiffs did not want goodwill because they wanted the bank to "be perceived broadly as a well-capitalized and safe institution and, therefore, attractive to retail depositors and investors.").

13. For this reason the parties initially assumed that no regulatory forbearance was necessary to allow ASB to count the Warrants as capital. *See* Trial Tr. 449 (Carl) (In March 1988, "we assumed the Warrant['s] . . . fair value would be included as capital in the bank.").

14. In May 1988, after the parties had settled upon the basic economics of the deal, they realized that, despite the parties' contrary intentions, "there was some GAAP regulation . . . which caused the Warrant to be offset" and, that would prevent ASB from recording the Warrant on its books as capital. *Id.* at 735 (Bonderman); *see also* PX 1076 (5/6/88 Deloitte Ltr. Re: Accounting for FSLIC Warrants). Under GAAP, exclusion of the capital arose as an unintended consequence of Plaintiffs both accepting the FSLIC Note and granting FSLIC the Warrants. *See id.*; PX 1113 (6/20/88 Ltr. from Carl to Root) at USA0005779-80.

15. Accordingly, Plaintiffs sought government reassurances that, despite the GAAP rule, FSLIC and FHLBB would authorize ASB to count the Warrants' value as *regulatory* capital. *See* Trial Tr. 468-471 (Carl). Writing to FSLIC Executive Director Stuart Root, Bernie Carl explained, "It seems unfair for an acquiror of a troubled thrift to be prejudiced so severely for accepting a FSLIC Note rather than demanding cash assistance. Such prejudice is particularly troubling when it stems from regulatory accounting decisions solely within the discretion of the FHLBB." PX 1113 (6/20/88 Ltr. from Carl to Root) at USA0005779-80.

16. FSLIC Executive Director Stuart Root "advised [the Bass Group] that Mike Duhl, the lawyer for the Bank Board in the transaction, had been deputized to sit and try and come up with a solution" to the GAAP offset problem. Trial Tr. 471-72 (Carl). Internal government

6

memoranda establish that Mr. Duhl was the "lead negotiator" on the government side. PX 1100

(5/10/88 FHLBB-FSLIC Special Mtg. Mins.) at USA0124156.

17. In a compromise reached between Bernie Carl and Mike Duhl, the negotiators

agreed on a quid pro quo: the Bank Board would issue a Warrant Forbearance that would trump

the GAAP rule for regulatory purposes so that ASB could indeed recognize and count the fair

value of the Warrants as regulatory capital; in exchange, the government was to receive a second

distribution priority that would provide FSLIC exclusively with $214 million in sales proceeds

available for distribution after the Bass Investors had recovered their initial investment

commitment. PX 1115 (6/22/88 Mem. from Carl to Duhl).

18. As Carl explained at trial:

> It was a "fairly intense meeting because everybody was afraid the deal was
> about to crater on a rather small, potentially small issue. . . . I made the
> argument . . . that the offset should not be there because the capital
> represented by the Warrant represented theoretical value, but value in the
> sense that it represented a branch premium of roughly 3 percent of the
> branch network.
>
> And, therefore, it shouldn't be totally excluded from our capital base. Mr.
> Duhl's reaction was basically to say, all right, if it is real value, then why
> don't you pay us for it. And ultimately the conclusion of that set of
> comments was you give us the capital, and we will pay you. . . . And that's
> how the second preference [a]rose.

Trial Tr. 472-73 (Carl).

19. Messrs. Carl and Duhl documented their compromise on the spot:

> We handwrote a page that was what the two of us were proposing to our
> principals. I think I actually wrote it, he edited it. We sent it off to his
> secretary and they typed it up and we agreed that that's — we do it as a
> memo from me to him. He would bring it back to the Bank Board. I
> would bring it back to David Bonderman and my colleagues.

Id. at 473 (Carl) (identifying the memorandum as PX 1115 (6/22/88 Mem. from Carl to Duhl)).

20. The Carl/Duhl compromise memo was presented to the Bank Board members.

DX 49 (8/18/88 Mem. from Barth to Wall, Martin and White) at WOR 466 0121.

21.      At some point over the next several weeks, "[t]he Bass Group was later advised that the Board had agreed to permit the use of this $214 million in RAP capital."  DX 428 (8/17/88 Ltr. from Carl to Bowman) at USA0301559.

22.      Under this revised distribution scheme, only after the sequential distribution of $500 million to Plaintiffs *and* $214 million to FSLIC (totaling the first $714 million of sales proceeds) would the cash received by each of the parties in a capital transaction reflect the 70-30 ratio of the parties' ownership interests.  Thus, following payment of the two distribution priorities, the parties' shares of further sale proceeds would revert to a straight 70%/30%, pursuant to the original Warrant agreement, with distributions simultaneously and *pari passu* to both parties.  PX 1115 (6/22/88 Mem. from Carl to Duhl); PX 1272 (12/22/88 Restated Certificate of Incorporation for N. A. Capital Holdings, Inc.) at TM 01861-62; DX 808 (6/14/96 Mem. from Patelunas to the FDIC Board of Directors ("Patelunas Mem.")) at FAS011 0031.

23.      In December 1988, shortly before closing, the parties agreed that the Bass Investors would make their $500 million cash contribution to ASB's capital in two parts — $350 million at closing (on December 28, 1988) and $150 million as subsequently needed.  The change entitled FSLIC to receive its priority distribution of proceeds from the sale of ASB after the Bass Investors recovered only the $350 million they first contributed (plus any subsequent capital investment above $350 million, and less dividends already paid).  PX 1272 (12/22/88 Restated Certificate of Incorporation for N. A. Capital Holdings, Inc.) at TM 01864-65.

24.      Shortly after the Transaction, the parties agreed that the fair value of the FSLIC Warrant was only $167 million, somewhat less than the $214 million on which the parties had earlier agreed.  This reduced to $167 million (based on an independent assessment), the

regulatory capital that Plaintiffs obtained from the Warrant Forbearance.  Nevertheless, the

parties did not reduce the preference to $167 million:  They left it at $214 million.  PX 1406

(3/17/89 Ltr. from Nagle to Furer) at PAS113 0133 (Warrant's appraised value was

$167.2 million.); PX 1409 (March 1989 PPM) at ASDOJ-NY-23-0014 (describing the

$214 million preference); *id*. at ASDOJ-NY-23-0024 (referring to the "$167 million value

assigned to the FSLIC Warrants"); PX 1272 (12/22/88 Restated Certificate of Incorporation for

N. A. Capital Holdings, Inc.) at TM 01864-65 (describing FSLIC's $214 million preference).

## II.    With a Sizeable Stake in ASB's Operations, the Government Expected Plaintiffs To Leverage ASB's Regulatory Capital and To Grow Profitably

25.     On December 28, 1988, Plaintiffs, FHLBB, and FSLIC entered into several inter-

related agreements, including an Assistance Agreement (PX 1305), a Capital Maintenance

Agreement (PX 1307), and a Warrant Agreement (PX 1787), to effect the transaction.  As part of

the contractual arrangement, FHLBB issued a Forbearance Letter (PX 1891) stating that

Plaintiffs "may use push down accounting to record . . . the 'fair value' . . . of [FSLIC's]

Warrants . . . notwithstanding the accounting offset that GAAP requires . . . due to the existence

of the [FSLIC] Note."  PX 1891 (Forbearance Letter) at 5.

26.     In pursuing the acquisition, Plaintiffs made clear to the government that "[w]e

view our recapitalization of FCA/American as a venture capital investment and expect it to

generate a venture capital return.  Thus, the potential return on investment, or ROE, is clearly a

crucial concern to us."  DX 1106 (2/22/88 Ltr. from Carl to Martin) at ASDOJ-NY-206-0175.

27.     Because Plaintiffs were "implementing a business plan that [wa]s not just a

continuation of [a] business," but instead "a restructured business," Plaintiffs "generally had

what we call a hurdle rate, a minimum return that we looked for of about 30 percent on our

equity investment.  It is internal rate of return, which is a compounded annual return."  Trial

Tr. 434 (Carl).  As Mr. Bonderman testified, "[w]e underwrote the equity portion [of the ASB acquisition] to a 30 percent notional rate of return," to be compounded annually.  Trial Tr. 728-29 (Bonderman).

28.     Plaintiffs' planned ROE was dependent upon the use of the Warrant capital to leverage growth.  "[W]hen we underwrote [the acquisition], we made our assumptions about . . . the capital we were putting in, plus the capital which came by way of forbearance, . . . to offset against a set of assets which you would expect to grow into."  Trial Tr. 738 (Bonderman).

29.     The government shared the belief that ASB would be profitable in the years following the acquisition.  *See*, *e.g.*, PX 1086 (4/14/88 FHLBB Special Mtg. Mins.) at WOR120 0207 (Statement of Jack Reid); PX 1292 (12/27/88 Supp. Mem.); PX 1080 (4/6/88 Mem. from Reid to Root).

30.     In transcripts of a critical FHLBB meeting, government officials discussed the "potential for very, very impressive gains out of [the government's part] ownership of the thrift too.  These guys have[] . . . been extraordinarily successful in purchasing places and making lots of money. . . .  I think that they seem to have the knack for hiring good managers and letting them manage the place."  PX 1086 (4/14/88 FHLBB Special Mtg. Mins.) at WOR120 0207 (Statement of Jack Reid).

31.     Furthermore, the government recognized that its forbearance promises were essential to ASB's ability to grow and to generate the profits Plaintiffs and the government expected, remarking that "[i]ncluding the Warrants as regulatory capital would allow the association to leverage its growth beyond its GAAP capacity," and that "[w]ithout the Warrants, the association would exhaust its excess capital with normal growth within the year."  PX 1862,

10

(Draft Mem. from Dochow to the Bank Board) at WOR466 0018-19.

32.     Indeed, a "Supplemental Memorandum" submitted to the FHLBB on December 27, 1988 in connection with the proposed transaction, the Executive Director of the FHLBB's Office of Regulatory Activities, Darrel Dochow, noted that "in negotiating some [of] the key forbearances," Plaintiffs had "recognized" that the "key to [ASB's] future prospects is management's ability to make the association profitable." PX 1292 (12/27/88 Supp. Mem.) at 7.

33.     In addition, in the "Press Talking Points" disseminated on the day of closing, FHLBB staff stated that the regulatory capital forbearances included in the transaction would "free" the additional capital Plaintiffs invested into ASB "for other profitable uses." PX 1310 (12/28/88 Press Talking Points) at 3.

34.     In its own initial cost projections, the government had predicted that its 30% interest in ASB had a present value of $543 million at ten years, based on the expectation that ASB would "earn[] 100 basis points ROA on an asset base of $12.5 billion, and leverage[] those earnings 20 to 1 for 10 years." PX 1080 (4/6/88 Mem. from Reid to Root) at TM 00038.

35.     In a later cost projection prepared by FSLIC for the Bank Board's review in connection with closing the deal in December 1988, the government estimated the Warrants' present value in five years to be worth $650 million. DX 77 (12/21/88 Mem. from Reid to Wall, *et al.*) at WOR466 0286, 0288. This was a calculation reached, in part, based upon the government's review of the Bass Group's business plan. *Id.* at WOR466 0286.

36.     Based on the business plans that ASB submitted to the government in connection with the acquisition, the government knew that the Bass Group planned to grow ASB, in part, through its COFI/COFI lending strategy. *See* DX 980 (1989 ASB Business Plan) at PAS074 0295-0296 (projecting growth based upon ARM originations, assuming that "60% of all

originations are single-family ARM which are kept in portfolio," and modeling funding "as a function of the 11th District Cost of Fund Index").

37.     "[T]he bank's basic strategy was to be . . . a COFI/COFI lender, which basically means originate . . . assets tied to [the 11th District cost of funds] index, and then . . . manage . . . liabilities tied to that index."  Trial Tr. 21-22 (Barnum); *see also id.* at 22 (Barnum) ("[T]he COFI/COFI strategy was . . . to manage interest rate risk[]" since "[a]ll COFI mortgages were adjustable rate[]" mortgages.); *id.* at 44 (Barnum) (The bank planned to "put [the COFI assets] in a portfolio and earn spread income."); *id.* at 23 (Barnum) (The bank planned to hold the adjustable-rate mortgages ("ARMs") and "generate spread income.").

38.     As the government also understood, Plaintiffs intended to grow through the acquisition of other thrifts or branches of other thrifts:  ASB "w[as] owned by an investor group who was in the deal business" whose "board of directors had probably more experience than any collective group of individuals in the history of the country in dealing with . . . the FSLIC and the RTC . . . ."  Trial Tr. 93 (Barnum).

39.     Before the breach, the Office of Thrift Supervision ("OTS") examiners responsible for ASB recognized that ASB's management intended to "utiliz[e] any surplus capital above the minimum for acquisitions."  PX 312 (10/16/89 OTS Exam Report) at USA 0154013.

40.     As Bonderman testified at trial, "since we had . . . more than twice as much capital as we needed for the set of assets regulatorily, we were on a path to grow the bank dramatically."  Trial Tr. 744 (Bonderman); *see also id.* 737 (Bonderman) (Under the capital regulations, "you can leverage the bank based upon how much capital it has" and "in those days, it was more like 30 times.").

41.     Similarly, ASB President and CFO Barnum explained, "we started with a lot of capital to allow us . . . to grow the balance sheet."  *Id.* at 122 (Barnum).  The forbearance capital provided the "ability to grow assets" and "do acquisitions."  *Id.* at 97 (Barnum).

42.     The government also understood that the Bass Group would seek to grow ASB through investment in high-yield bonds.  PX 1292 (12/27/88 Mem. from Dochow to the FHLBB) at WOR466 0330 ("The Investment Group anticipates that New American's corporate debt portfolio should have a gross annual yield of approximately 14.5%."); Trial Tr. 125-26 (Barnum) ("[P]art of the acquisition deal with the government, part of the business plan of American . . . had the company acquiring,  I think, about a billion and a half dollar position in high-yield securities.").

43.     In fact, the FSLIC favored "utilizing the Bass expertise in the high-yield portfolio, as well as . . . [Stockton Capital] to generate higher than market returns from activities activated by the Bass Group."  Trial Tr. 137 (Barnum).  Thus, "when we did the deal, the FSLIC was giving everybody high fives because they thought our high-yield portfolio would generate more income for them."  *Id.* at 136 (Barnum).

III.     **ASB Established a Track Record Of Growth and Profit Prior to the Breach**

   A.     **ASB Was the Nation's Best Earning Thrift in 1989, Meeting and Exceeding its Projected Targets for Growth and Profitability**

44.     At the December 28, 1988 closing, ASB held $15.409 billion of assets.  *See* PX 1303 (12/28/88 ASB Consolidated Statement of Financial Condition) at WOQ476 1303.

45.     In March 1989, as part of an effort to refinance the bridge loans Plaintiffs had secured in acquiring ASB, Plaintiffs issued a Private Placement Memorandum ("PPM"), which contained projections for the institution's performance over the course of 1989.  PX 1409 (3/20/89 PPM) at ASDOJ-NY-23-0006, 20-21; Trial Tr. 42-45 (Barnum).

46.     The PPM projected that ASB would grow its assets from $15.6 billion in 1989 to $20.8 billion in 1993.  PX 1409 (3/20/89 PPM) at ASDOJ-NY-23-0019.

47.     As CFO Barnum explained, "as the chief financial officer of this company, by this document by itself, this is my representation of my best belief at this time, to the investors who are going to put real money into this company, what I expect this company to deliver to those investors" over the period 1989-1993.  Trial Tr. 51 (Barnum).

48.     As with prior projections, "[t]he Forecast assume[d] that New American's regulatory capital consists of . . . the value attributed to the FSLIC Warrants ($167 million)." PX 1409 (3/20/89 PPM) at ASDOJ-NY-23-0079; Trial Tr. 44-45 (Barnum).

49.     As Plaintiffs explained to investors in the PPM, "the loss of some or all of the forbearances granted in the Forbearance Letter could have a material adverse effect on [ASB]." PX 1409 (3/20/89 PPM) at ASDOJ-NY-23-0013.

50.     As Robert Barnum explained, "if [Plaintiffs] had the regulatory forbearances, we had lots of capital.  If we didn't have the forbearances, not only did we lose the capital, but we put the whole company at risk."  Trial Tr. 46-47 (Barnum).

51.     With the benefit of the Warrant Forbearance during 1989, ASB achieved and, in fact, outpaced the growth projections it provided to investors in the March 1989 PPM.  *Id.* at 56-59 (Barnum).

52.     The PPM predicted that, during 1989, ASB would grow its asset base by $300 million from $15.3 billion to $15.6 billion.  PX 1409 (3/20/89 PPM) at ASDOJ-NY-23-0019.  But ASB actually grew by *$1 billion* instead, ending 1989 with $16.3 billion in assets on its balance sheet.  PX 1 (ASB 1989 Annual Report) at WOQ553 1390; Trial Tr. 58-59 (Barnum).

53.     Indeed, in 1989, Plaintiffs guided ASB to "one of the most profitable years in S&L

14

history."  Trial Tr. 1027-28 (Ramirez); *id.* at 59 (Barnum) (In 1989 ASB was "the best performing

thrift . . . in terms of return on assets and return on equity."); *id.* at 519 (Carl) ("[W]e had by the

end of [1989] become the most profitable bank in our sector."); *id.* at 740 (Bonderman) (In 1989,

ASB "was among the, if not the most[,] profitable thrift[s] in the United States.").

 54. Over the year 1989, ASB earned $214.212 million of profits, generating an annual

return on average assets of 1.31% or 131 basis points.  PX 1 (1989 ASB Annual Report)

at WOQ553 1391.

 55. In its Report of an Examination that took place in October 1989, the OTS

described ASB as a "thriving institution," and stated that "management is to be commended for

the significant strides made in restructuring and improving the profitability of the institution."

PX 312 (10/16/89 OTS Exam Report) at USA 0154006.  The examiners also noted that "[ASB]

is a profitable institution," and that "[m]anagement's overall performance to-date has

demonstrated sound policy and strategy implementation."  *Id.* at USA 0154004.  The examiners

added that ASB's "net interest income . . . significantly exceed[ed] the peer group

average . . . because of the institution's superior yield . . . on its earning assets."  *Id.* at

USA 0154018.

 56. The FDIC, which examined ASB concurrently with the OTS, reported similarly

positive findings, noting that "ASB is one of the most profitable institutions in the Eleventh

District," and that its "earnings are well above the peer group . . . ."  PX 313 (10/16/89 FDIC

Exam Report) at USA 0154142, USA 0154144.

 57. As set forth in the business plans, ASB became "more of an ARM-rate lender"

and thus "earned a . . . dependable spread, and didn't have that ratio risk inherent in having long

assets and short liabilities."  Trial Tr. 516 (Carl); *see also id.* (ASB's new management was

"quite successful at converting the institution from a big interest rate gamble into a real operating spread business.").

58.     Thus, Plaintiffs "convert[ed] a very dangerous, very troubled institution . . . into one that was conservatively run as an institution that operated on a simple spread and provided traditional . . . retail banking services."  *Id.* at 517 (Carl).

59.     Plaintiffs also hired "some really superb executives," improved ASB's operations, and restored consumer confidence in the bank.  *Id.* at 516-18 (Carl).

60.     Among other things, this new management imposed "greater discipline over mortgage underwriting," worked to reduce deposit costs, and decreased administrative expenses.  *Id.* at 514-15, 518 (Carl).

61.     Thus, even as ASB was growing by over $1 billion in asset size, it was *reducing* its average operational costs.  As ASB Director Bernie Carl testified, operating costs in a banking institution are insensitive to scale:

> The incremental dollar cost is not anywhere near the incremental value of an additional dollar of deposits or mortgages.

*     *     *

> You can run a branch and if the branch has $40 million in deposits, it isn't going to cost you a lot less to run the one that has 140 million or 400 million, but the profitability of those branches is massively different. Because as a commodity business, it is so subject to scale, so much of your costs are fixed.

*Id.* at 429, 431 (Carl).

62.     Indeed, ASB's internal business analyses demonstrate that adding assets tends to reduce average administrative cost.  PX 238 (11/28/90 ASB Strategic Planning Summary) at PAS030 2612-2629 (comparing marginal to average returns on various assets).

B.     **At Year-End 1989, With the Benefit of the Warrant Capital, ASB Was Well-Capitalized, Lean and Profitable, and Well-Positioned to Begin Evaluating and Completing Acquisitions of Other California Savings and Loans**

63.     "[A] significant part of [ASB's] business plan was to build the branch system through acquisition and consolidation of other institutions." Trial Tr. 525 (Carl) (explaining that Shearson Lehman Hutton would periodically update ASB on acquisition opportunities); *see also* PX 1427 (8/4/89 Shearson Lehman Hutton presentation on acquisition opportunities).

64.     As Mr. Ramirez testified, ASB was "generally interested in institutions that were . . . mostly located and doing business in California; and, multi-billion-dollar size was sort of our target. We felt that we could accommodate them, number one; but, number two, that those represented the best opportunities for us to take advantage of the capacity we had at American." Trial Tr. 1029-30 (Ramirez).

65.     In particular, ASB wanted "a large acquisition in Southern California" to further its goal "to become one of the two or three significant retail bank institutions in that . . . market." *Id.* at 530 (Carl).

66.     In late 1989 ASB had the surplus capital to acquire institutions "probably in the 1 to 2 and a half billion dollar range," such as Home Fed and Great American. *Id.* at 534-36 (Carl); *see also id.* at 788 (Bonderman) (In 1989, "we had approximately 400 million dollars of excess capital," which Bonderman "expected the bank to use . . . to grow itself."); PX 231 (ASB 1990 Business Plan) at PAS128 2725 (discussing projected capital and potential acquisitions).

67.     The Federal Home Loan Bank of San Francisco (FHLB-SF) agreed that ASB had "adequate capital" and was well-positioned to take advantage of the growing consolidation of the S&L industry in California. DX 150 (10/11/89 FHLB-SF Risk Assessment and Approval Mem.) at WOQ476 1941, 1943.

68.     Specifically, in a memorandum approving a $200,000,000 FHLB advance that ASB

sought in October 1989, the FHLB-SF wrote that

> [ASB was] *well positioned to take advantage of lost market share from marginal shops that are expected to disappear as a result of FIRREA.* Its 180 branch network and 23 loan production offices, coupled with the New West Note that could have a zero-based weighting for regulatory capital purposes, *make growth possible amidst an increasingly competitive environment.*

*Id*. at WOQ476 1943 (emphasis added).

### C.    ASB Built Its High-Yield Bond Portfolio Throughout 1989, in Accordance With Its Government-Approved Business Plan

69.    In 1989, ASB acquired approximately $500 million of high-yield securities. *See* Trial Tr. 31 (Barnum); *id.* at 754 (Bonderman); PX 329 (2/9/89 ASB Bd. Mtg. Mins.) at ASDOJ-SEA-00128 (resolution authorizing $100 million high-yield investments in the first quarter of 1989); DX 117 (2/22/89 ASB Bd. Mtg. Mins.) at WOQ476 0249 (resolution authorizing $250 million high-yield investments in the first quarter of 1989); DX 148 (6/27/88 ASB Bd. Mtg. Mins.) at WOQ476 0151 (authorizing $500 million high-yield investments in the third quarter of 1989); PX 313 (1/22/90 FDIC Exam Report) at USA 0154143.

70.    As David Bonderman testified at trial, the risk-adjusted rate of return for high-yield securities is "worthwhile," if, as was the case pre-breach at ASB, "you have a capital base that will withstand the additional volatility" associated with high-yield investments. Trial Tr. 746.

71.    During 1989, before the breach, ASB's high-yield bond portfolio "was yielding about 15 percent as an interest rate, as opposed to a certificate of deposit which might have been three percent." *Id*. at 746 (Bonderman).

72.    During this period when ASB was ramping up its junk bond portfolio, regulators never criticized ASB for investing in such assets: "[P]art of the acquisition deal with the government, part of the business plan of American, and part of the [PPM] all had the company acquiring, I think, about a billion and a half dollar position in high-yield securities." *Id*.

18

at 125-26 (Barnum).  "[I]t was always part of the deal that that's what we'd be doing."  *Id*. at 754

(Bonderman).  *See also* DX 155 (7/3/89 Mem. from Laursen to Wright) at WOQ476 1992-93

(recounting meeting where FHLB-SF representatives assessed ASB's high-yield investments

favorably and without criticism); PX 1292 (12/27/88 Mem. from Dochow to the FHLBB)

at WOR466 0330 (discussing ASB's planned investments in high-yield bonds and noting "[t]he

Investment Group anticipates that New American's corporate debt portfolio should have a gross

annual yield of approximately 14.5%").

### D.      ASB's Pre-Breach 1990 Business Plan Projected Even More Impressive Growth and Profits

73.      Given the strength of its position just a year into Plaintiffs' acquisition of the

institution, ASB revised its financial forecasts for 1990 to project even greater growth and

success than projected in its March 1989 PPM and 1989 business plans.  *See* PX 231 (1990

Business Plan) at PAS128 2703 (comparing March 1989 PPM and 1990 Business Plan

projections of ASB asset levels at year-end 1990); Trial Tr. 65 (Barnum) (ASB's "forecast for

1990 looked better than it did [even] in early 1989.").

74.      In the 1990 business plan that ASB published during the fourth quarter of 1989,

the bank projected that its 1990 assets would be "18.2 billion," which was "some billion, 4,

higher than" the March 1989 PPM projections.  *Id*. at 64-65 (Barnum); PX 231 (1990 Business

Plan) at PAS128 2703 (March 1989 PPM and 1990 Business Plan projections of ASB asset

levels at year-end 1990).

75.      The 1990 business plan's projections expressly "assume[d] that capital

forbearances granted by the FHLBB in connection with the acquisition on December 28, 1988

will continue to govern."  PX 231 (1990 Business Plan) at PAS128 2686.

**IV.    The Government Breached the Warrant Forbearance Promise**

76.     On January 9, 1990, the OTS issued Thrift Bulletin 38-2 ("TB 38-2").  PX 1470. By this directive, the OTS interpreted FIRREA and its implementing regulations to require the exclusion of the Warrants from ASB's regulatory capital.  PX 3 (1991 ASB Annual Report) at FAS0121263.

77.     "[I]nitially, [ASB] didn't think that [FIRREA] affected [the] forbearances" because FIRREA was aimed at eliminating only "regulatory or supervisory goodwill."  Trial Tr. 520-21 (Carl).  Accordingly, ASB's management argued for a reprieve from TB 38-2, arguing that application of FIRREA to the Warrant Forbearance "was not compelled by the statute, and that it was very poor public policy."  *Id.* at 537 (Carl).

78.     The government entertained this argument seriously, and officials in the OTS and FDIC exchanged formal internal memoranda examining, among other things, how the government's Warrant interest in ASB might be impaired if TB 38-2 was applied to invalidate the Warrant Forbearance.  *See, e.g.*, DX 248 (1/29/90 Mem. from Meyer to Creedon, Stanton and Satterfield); DX 247 (1/29/90 Mem. from Meyer to Wall).

79.     James Meyer, one of the government's witnesses at trial, was the official directly responsible for overseeing the government's Warrant interest in ASB.  Trial Tr. 1764, 1827, 1852, 1859-61 (Meyer).  With the support of his superiors at the FDIC — the Manager of the newly-formed FSLIC Resolution Fund, which was responsible for maximizing the government's financial interest in ASB — Meyer argued to OTS Director Danny Wall that excluding the Warrant from ASB's regulatory capital would cause economic harm to the institution that would reduce the value of the government's ownership interest: "[I]t is still believed the Warrants will carry greater value to Bass, and hence the FSLIC Resolution Fund, as part of American Savings Bank's capital structure."  DX 248 (1/29/90 Mem. from Meyer to Creedon, Stanton and

Satterfield) at FAS013 0998; *see also* Trial Tr. 1874-76 (Meyer) (agreeing that the FDIC sought to exempt ASB from TB 38-2 because "the Warrants would carry greater value to the FSLIC if the Warrant capital were preserved"); DX 247 (1/29/90 Mem. from Meyer to Wall).

80.     On that basis, in January 1990, the FDIC favored "an accommodation . . . that will enable ASB to carry the Warrants on its books for $167.2 million."  DX 247 (1/29/90 Mem. from Meyer to Wall).  As Meyer wrote, "It is our belief that the value of the Warrants to the FSLIC Resolution Fund will be enhanced if they remain a part of ASB's capital structure."  *Id.*

81.     Meyer also warned that the long term value of ASB would be *affirmatively damaged* if the OTS breached the Warrant Forbearance: "If OTS does not grant relief, Bass will restate their financial statements for 1989 which will have the following impact: . . . Long term earnings will decrease thus adversely affecting the value of the Warrants."  PX 1476 (1/18/90 Mem. from Meyer to Creedon, Stanton and Satterfield) at WFZ007 1480.

82.     But neither Meyer nor Plaintiffs could convince OTS to honor the contractual Warrant Forbearance and, on January 22, 1990, the FDIC informed management of ASB that it would not allow ASB to treat the Warrants as a full-fledged component of regulatory capital.  *See* PX 313 (1/22/90 FDIC Exam Report) at USA0154142, USA0154145.

83.     That breach of contract excluded $167 million in Warrant capital from ASB's regulatory capital.  *See id.*; *Am. Sav. Bank, F.A. v. United States*, 52 Fed. Cl. 509 (2002), *aff'd*, 519 F.3d 1316 (Fed. Cir. 2008).

**V.     The Breach Impaired ASB's Growth and Cost Plaintiffs Tens of Millions of Dollars in Lost Profits**

84.     By enforcing TB 38-2 against ASB, "[t]he OTS had evaporated literally hundreds of millions of dollars' worth of capital overnight."  Trial Tr. 537 (Carl).

85.     Absent the government's "elimination of both forbearances," ASB's capital ratio

"would have been significantly in excess of . . . 4 and a half percent." *Id.* at 553-54 (Carl).

86.     Given the breach, however, ASB was left with a capital "cushion" of only 1/100[th] of a percent above the minimum capital level. *See id.* at 699 (Carl); PX 313 (1/22/90 FDIC Exam Report) at USA0154145.

87.     As ASB's CFO and President Bob Barnum testified, the breach caused ASB to go "from offense to defense," with efforts to meet capital requirements becoming "the total focus of the company":

> [T]he company became totally consumed with meeting its capital ratios, jumping from, I mean, how we fix 1989, given that it's already over with, to how do we plan for 1990, given how do we plan for future increases in the capital ratio. So while candidly meeting our capital ratios was not a primary concern to that time, it became the total focus of the company.

Trial Tr. 66 (Barnum).

88.     To avoid regulatory sanction, Plaintiffs scrambled to keep ASB from falling out of capital compliance. *Id.* at 66-67 (Barnum). Instead of leveraging surplus regulatory capital to support the acquisition of additional profitable assets, the breach forced Plaintiffs to reduce their leverage in order to build capital, and to shed profitable assets already on ASB's books: "[O]ur general strategy was to originate mortgages and hold them in a portfolio, we now had a limit on how many mortgages we could keep in our portfolio." *Id.* at 67 (Barnum).

89.     Plaintiffs also redeployed their own contributed capital "to do the work of the warrant capital." Trial Tr. at 1318 (Ramirez).

90.     "[I]n 1990, we basically solved for [what] does this total asset number have to be in order to hit the then four percent capital requirement." *Id.* at 72 (Barnum).

91.     Over that same year, ASB's well-capitalized peer and competitor, World Savings, grew substantially and profitably, as we describe below. *See infra* ¶¶ 143-144, 147-149.

A.     **Absent the Breach, ASB Could Have Retained More Than $1 Billion of Adjustable-Rate Mortgages That It Sold in Late 1990 To Improve Its Regulatory Capital Position**

92.     ASB's basic business strategy was to hold Adjustable Rate Mortgages ("ARMs") with interest rates keyed to the Eleventh District Cost of Funds Index ("COFI-ARMs") funded with liabilities that mimicked COFI. *Id.* at 1018-19 (Ramirez) (COFI ARMS "were . . . part of our core strategy. That was part of our interest rate risk management strategy, most specifically. We felt that that was how we could generate the best returns, given a certain amount of risk we were taking."). *See also supra* ¶¶ 36-37, 57.

93.     ASB's "1990 business plan anticipate[d] $2 billion in asset growth primarily through the retention of ARMs." PX 313 (1/22/90 FDIC Exam Report) at USA 0154159.

94.     But, in direct contravention of ASB's pre-breach plans to retain ARM loans and to grow, ASB divested itself of more than $1 billion of profitable ARM loans in the fourth quarter of 1990 in order to meet its regulatory capital targets. *See* PX 263 (12/31/90 ASB Secondary Marketing Sales) at ASDOJ-BAXTER-1393-94; PX 16 (12/31/90 N. A. Capital, Inc. Annual Report) at AS1046 0342 ("In 1990, American sold $1.9 billion of acquired and originated loans . . . . Of these loans, $1.4 billion were sold in the fourth quarter of 1990 . . . ."); PX 1920 (N. A. Capital, Inc. Reducing Revolving Line of Credit, Jan. 1991) at PAS124 2603 ("American sold $1.4 billion of assets in the fourth quarter of 1990 to shrink its balance sheet and achieve a capital ratio of 4%.").

95.     Whereas ASB's pre-breach Business Plan projected growth of *12% or $2 billion* in assets over the course of 1990, projecting a year-end balance of $18,155,000,000, *see* PX 231 (1990 Business Plan) at PAS128 2676, 2678, because of the breach, the institution instead grew by only *1% or $198.7 million* in assets instead, ending the year with $16,493,309,000 in total assets. *See* PX 2 (1990 ASB Annual Report) at FAS012 1218.

96.     The breach caused this dramatic reversal: "when we lost the forbearances, we had to reduce the asset size of the company."  Trial Tr. 81 (Barnum).

97.     Facing a breach-induced regulatory capital crisis, ASB's management scrambled to determine "how to make the footings of the bank smaller so our percentage of our capital went up."  Trial Tr. 569 (Carl).  "[H]av[ing] less assets" would help the bank "maintain our posture of being a well-capitalized institution."  *Id.* at 570 (Carl); *see also* PX 1611 (10/2/90 Mem. from Barnum) (discussing "HOW TO GET TO 4% BY 12/31/90").

98.     As Bernie Carl testified, the shrinkage in 1990 "became particularly critical because" of the bank's "razor edge of capital," management's expectation "there would be a capital increase across the board," and the bank's desire not "to phase into" the new capital standard.  *Id.* at 569-70 (Carl).

99.     "[T]he ARM portfolio was sold solely to reach the capital levels at that time, which I think was four percent."  *Id.* at 36 (Barnum).

100.    Even though retaining the COFI ARMS it originated remained ASB's core strategy, management concluded that "selling ARMs w[as] less costly than" other options for attaining 4% core capital by year-end 1990.  *Id.* at 82-85 (Barnum); *see also* PX 1611 (10/2/90 Mem. from Barnum).

101.    According to then-CFO Barnum, the 4th Quarter 1990 breach-caused sell-off "was probably the only time we ever sold adjustable rate mortgages."  Trial Tr. 73 (Barnum); *see also* Trial Tr. 1018-19 (Ramirez) (ASB's strategy was to sell fixed rate mortgages and hold adjustable rate mortgages).

102.    Making matters worse, the loans sold in the fourth quarter of 1990 were much more desirable than the rest of ASB's portfolio.  ASB was forced to sell these loans because

"[t]he loans that have the lowest cost of capital by definition are the loans that investors

everything else equal will pay the highest price for."  Trial Tr. 264 (Barnum).  Thus ASB sold

off over $1 billion of its *best performing assets*.

103.    "[B]ut for the loss of the forbearances, we would not have worried about how to

get to four percent [core capital by year-end 1990], we would have been at eight percent" and

thus would not have contemplated the loan sales undertaken in 1990.  *Id*. at 82 (Barnum); *see

also* PX 1611 (10/2/90 Mem. from Barnum).

### B.      Absent the Breach, ASB Could Have Retained Nearly $500 Million of High-Yield Bonds That It Sold in Response to Government Concerns About ASB's Regulatory Capital

104.    In its 1990 business plan, prepared in December 1989, ASB's "portfolio of High-

yield Securities [wa]s forecast to remain constant at $457 million during 1990."  PX 231 (1990

Business Plan) at PAS128 2681 (discussing plan for high-yield investments).  *See also* Trial

Tr. 134 (Barnum) ("[M]anagement's best estimate" in late 1989 was that the bank would

maintain in 1990 its $457 million high-yield portfolio).

105.    Thus, even after the passage of FIRREA, but before the government's breach,

"the institutional strategy was to hold [high-yield] bonds as long as they could be held, subject

to . . . some reason to sell more rapidly."  Trial Tr. 762-63 (Bonderman); *see also id.* at 764

(Bonderman) ("[W]e intended to keep" the high-yield bonds "subject only . . . to sale in the event

of a deteriorating credit."); PX 1440 (10/24/89 High-Yield Portfolio Report to Directors)

at ASDOJ-FWA-1628-29 (recommending ASB maintain the Southland and Federated bonds.).

106.    "FIRREA had no direct impact on . . . . [Plaintiffs'] ability to retain a portfolio of

high-yield securities . . . ."  Trial Tr. 741 (Bonderman).

107.    The legislation simply required ASB to divest its high-yield bonds by a July 1,

1994 statutory deadline, to which Plaintiffs planned to adhere.  *See* PX 339 (9/26/89 ASB Bd.

Mtg. Mins.) at ASDOJ-SEA-00479 (ASB "shall divest of its portfolio of corporate debt securities not of investment grade, as said term is defined in the Federal Deposit Insurance Act, at the earliest time prudently possible, where such disposition does not adversely affect the risk/return characteristics of American's portfolio, but not later than July 1, 1994.").

108.    As ASB explained in its 1990 business plan, "[t]he portfolio of High-yield Securities is forecast to remain constant at $457 million during 1990. . . . The Bank through its investment manager, Rosecliff, Inc. continues to monitor the market to allow for an orderly liquidation of the portfolio."  PX 231 (ASB 1990 Business Plan) at PAS128 2681.

109.    However, after the breach eliminated the Warrant capital from ASB's books, the regulators criticized ASB's post-breach capital position as "low, *particularly in light of the $493.6 million investment in high-yield securities*."  PX 312 (10/16/89 OTS Exam Report) at USA 0154004 (emphasis added).

110.    On January 22, 1990, the FDIC held "a meeting with senior management" of ASB.  PX 313 (2/2/90 FDIC Exam Report) at USA0154145.  At the meeting, ASB management articulated:

> that the regulators not including the $167 million FDIC Warrants as part of capital was grossly unfair and altered substantially our view toward other aspects of ASB.  Specifically, if the Warrants were to offset the securities' classification, then the problem would not be as severe. With respect to capital, if the Warrants were not allowed, ether accounting entries should be made which would result in year-end capital of 3.1 percent, a level management felt was adequate.

*Id.*  But the FDIC disagreed, finding that ASB was operating with a "marginal level of capital," and admonishing ASB to "strive to maintain capital levels in excess of the minimum requirements," "particularly" because ASB had "a high percentage of capital at risk in sub-investment quality assets" — *i.e.*, junk bonds.  *Id.* at USA 0154143.  *See also* Trial Tr. 36 (after the breach "we had lots of consternation with the regulators around the junk bond portfolio,

where they basically said it's too much volatility, you don't have enough capital, get rid of it.") (Barnum).

111.    The next day, on January 23, 1990, ASB's Board met.  PX 342 (1/23/90 ASB Bd. Mtg. Mins.).  Reacting to the FDIC's harsh report, Chairman Mario Antoci "stressed the need to proceed as promptly as market conditions permitted to divest the portfolio in light of the elimination of the capital forbearances."  *Id.* at ASDOJ-SEA-00553; Trial Tr. 772 (Bonderman).

112.    With the Board's approval, Antoci then committed to an aggressive plan for divesting its high-yield bond portfolio, reporting to the FDIC Regional Director, John Sexton in February 1990 that ASB would "dispose of [its] entire portfolio by June of this year."  PX 1498 (2/21/90 Ltr. from Antoci to Sexton); *see also* PX 344 (2/27/90 ASB Bd. Mtg. Mins.) at AS-CA1-000316 (Antoci describing his letter to Sexton about divestment).  The FDIC later approved this plan.  *See* PX 1550 (5/1/90 Ltr. from Stone to ASB Board) (approving divestiture plan with condition that the bank complete liquidation by 6/30/90).

113.    Thus, in direct response to the regulators' criticisms, ASB "dispose[d] of the junk bond portfolio . . . much more rapidly than was required by law, in light of the circumstances in which we found ourselves."  Trial Tr. 774 (Bonderman); Trial Tr. at 161 ("We sold off the junk bonds because we were required to by our regulators.") (Barnum).

114.    The timing could not have been worse, as ASB was forced to purge its high-yield portfolio into a buyers' market, at a loss of approximately $112.3 million.  PX 2 (1990 ASB Annual Report) at FAS012 1235; Trial Tr. 775-76 (Bonderman).

115.    Had the government not breached, ASB would have had ample capital to absorb any volatility in the value of the high-yield bond portfolio, and could have held the bonds until the market recovered, which it did the following year.  *See supra* ¶¶ 69-72 (Facts); PX 1679

(12/31/91 Mem. from Domingo to Barnum, *et al.*) at PAS019 0702.  But, when the forbearances were eliminated, "we didn't have the capital base to support these [high-yield bonds], which had, now, a higher risk weight."  Trial Tr. 768 (Bonderman); *see also id.* at 773 (Bonderman) (Regulators informed ASB the high-yield bond portfolio "was too risky to maintain given our capital structure at the time.").

116.    Had ASB held the high-yield bond portfolio longer into 1990 or beyond, it would have avoided some or all of the losses it took on the bonds, and would therefore have earned increased profits.  *Id.* at 146 (Barnum) ("We lost over a hundred million dollars" with the premature sale of the high-yield securities.); PX 1679 (12/31/91 Mem. from Domingo to Barnum, *et al.*).

117.    Contemporaneous documents show that ASB determined that its investments, if held, would have "improved considerably" during 1991, and that the "improved performance was clearly a function of the recovery of the high-yield bond market."  PX 1679 (12/31/91 Mem. from Domingo to Barnum, *et al.*) at PAS019 0702 (calculating income forgone with the rapid divestment of the high-yield securities).

118.    According to an analysis performed by ASB's treasurer in 1991, had ASB simply held its high-yield bond portfolio through year-end 1991, as it would have been able to do but for the breach, "American [would] have earned about $60 million pre-tax — approximately 470 basis points annualized spread."  *Id.* at PAS019 0703.

## C.    Absent the Breach, ASB Could Have Grown Through Acquisitions, as It Had Planned

119.    As ASB Director Carl explained, the breach "put us out of the acquisition business."  Trial Tr. 546 (Carl).

120.    Instead of pursuing strategic acquisitions to expand ASB's Southern California

operations and to grow its balance sheet, management was forced by the breach to focus on branch trades: small-time deals to improve the existing branch infrastructure but not aimed at significant growth. *See, e.g.*, *id.* at 1825-26 (Meyer) (ASB was "using these [RTC] acquisitions to really strengthen the value of the franchise and improve the value of the bank, which was beneficial to us as well because we were an equity holder in it."); *id.* at 1938-39 (Meyer) (In the 1990s, ASB "did do several RTC acquisitions, . . . to improve and define and fill in their branch network."); *id.* at 556-57 (Carl) (By 1990 "branch trades were more realistic than significant acquisitions.").

121.    As ASB CFO and President Bob Barnum explained, "after the breach . . . [ASB] did do a few acquisitions, but" they "added very little to the asset growth." *Id.* at 110 (Barnum). "Most of the acquisitions were either branch swaps, [or] branches that we consolidated with our existing network . . . and [that did] not . . . grow the asset side of the bank." *Id.*; *see also id.* at 118 (Barnum) (Post-breach, ASB "focused on . . . branch swaps", which "would not add to the overall growth of the institution.").

122.    After 1990, the bank had "some small deposit acquisitions and deposit trades, but unfortunately, it was never in a position to" "roll up other institutions in the state, which is really what we had hoped we would be able to do." *Id.* at 576 (Carl).

123.    "The only significant" ASB acquisition of a failed thrift in 1989 and 1990 was "Columbia Savings, which didn't have much of a deposit base" and the remaining purchases from failing thrifts were "branch trades." *Id.* at 121 (Barnum).

124.    In one instance, ASB "team[ed] up with Security Pacific" in an effort to acquire Great American in San Diego. *Id.* at 37 (Barnum). But, as Bob Barnum testified, "[a]cquisitions with a partner are even more difficult" than acquisitions by a single acquirer, and, ultimately,

29

Security Pacific declined to continue the acquisition effort because it "said this is too complicated." *Id.*

125.    ASB considered acquisition opportunities despite the breach.  For example, in its Report of a June 1991 Examination of ASB, the FDIC noted that ASB's "primary focus for growth will be through the acquisition of entire thrift franchises or branches when economically advantageous," and that "management is considering the acquisition of thrifts from the RTC both to improve branch economics and to increase market share."  PX 317 (6/30/91 FDIC Exam Report) at ADDOJ-SEASUP-9-0869.

126.    But, because of the breach, ASB was simply too capital constrained to grow in the way it had planned and expected at the time of contracting with the government.  Trial Tr. 584 (Carl) (After the breach, "[w]e did not have a source of capital . . . for any significant addition to the bank's . . . portfolios.").

127.    Indeed, in the wake of the breach, OTS, FDIC and RTC all took the position that ASB was too undercapitalized to make major acquisitions.  *See* PX 317 (6/30/90 FDIC Exam Report) at ADDOJ-SEASUP-9-0858; Trial Tr. 789 (Bonderman); PX 350 (5/22/90 ASB Bd. Mtg. Mins.) at ASDOJ-SEA-00755-56.

128.    "[B]ecause of our lack of capital, we had to really look at any acquisition as . . . running a separate bank, [which] . . . means we lost any . . . potential synergies between American and the acquisition . . . ."  Trial Tr. 552-53 (Carl).

129.    As a result, "we couldn't combine branches" or "save any administrative expense."  *Id.* at 553 (Carl); *see also* PX 350 (5/22/90 ASB Bd. Mtg. Mins.) at ASDOJ-SEA-00755-56 (discussing acquisition potential after the breach).

130.    ASB's inability to complete acquisitions in the period immediately following the

breach was certainly not caused by a lack of available institutions: a statistical abstract compiled by the RTC revealed that 315 RTC-owned thrifts were available for acquisition during 1990, and that 232 such institutions were available in 1991. *See* PX 1939 (RTC Statistical Abstract) at 10; Trial Tr. 1110-11 (Ramirez).

131.   Furthermore, many of the RTC resolutions catalogued in the RTC's records were actively considered as possible ASB acquisition targets. *See* Trial Tr. 1116-19 (Ramirez). Specifically, ASB Vice President Tony Ramirez testified that ASB considered acquiring the following institutions which would have allowed ASB to increase its footprint on Southern California: Mercury Savings, Gibraltar Savings, Investment Federal Savings and Loan, Southwest Federal Savings and Loan, Lincoln Savings, City Savings and Loan, Perpetual Savings Association, Great American, County Bank, Malibu Savings Bank, Guardian, Unity Savings & Loan, Beach Savings Bank, Progressive Savings Bank, Home Fed Bank, Western FSB, Imperial FSA, Santa Barbara FS&LA, and Westwood S&LA. Trial Tr. 1116-19 (Ramirez); PX 1939 at 67-68.

132.   The assets of these institutions were often available for acquisition as whole loans, and ASB had experience in purchasing and integrating the whole loans of RTC institutions. *See* Trial Tr. 3219-3223 (Ramirez); PX 49 (6/30/92 Quarterly Financial Report for N. A. Capital, Inc.) at PAS123 1684 (detailing acquisition by ASB of $658.1 million of loans from RTC as receiver for the Valley Federal institution).

133.   Despite these opportunities, however, ASB was too capital constrained by the breach to pursue them. *See* Trial Tr. 1881-82 (Meyer) ("I believe there was a shakeout in the industry" in 1990 that produced numerous opportunities to acquire assets and deposit franchises.); *id.* at 116-17 (Barnum) (The FDIC would not "approve any additional RTC

acquisitions, . . . as long as our core capital level [wa]s at a minimum."); DX 275 (3/19/90 Ltr. from Furer to Meyer) at PAS136 0892 ("[T]he shakeout currently occurring in the savings industry presents a rare opportunity to acquire attractive assets and liabilities . . . ."); PX 317 (6/30/91 FDIC Exam Report) at ASDOJ-SEASUP-9-0858 ("management is considering the acquisition of thrifts from the RTC, both to improve branch economics and to increase market share").

134.    Moreover, the 1990-91 timeframe was doubly advantageous for potential acquirers with ample capital.  First, the RTC was flooding the market with billions in thrift assets.  *See generally* PX 1939 (RTC Statistical Abstract).  Second, many would-be competitors were undercapitalized.  *See* DX 240 (1/23/90 FHLB-SF Internal Mem.) at WOQ553 0879 ("several other shops in [the 11th] District [needed to] earn their way into compliance" in 1990).

135.    Accordingly, the Warrant capital breach caused ASB to forgo numerous opportunities to expand its operations and grow its balance sheet, and thus deprived ASB of substantial and foreseeable profits.  *See*, *e.g.*, Trial Tr. 557-58, 576 (Carl); PX 1558 (5/22/90 Kaplan Smith presentation regarding branch acquisitions) at ASDOJ-NY-147-0019 (discussing withdrawal from San Diego County).

136.    As ASB Director Bernie Carl explained, Plaintiffs "coveted [Home Fed] for a long time" "in order to have a meaningful presence in San Diego County," but after the breach ASB "trad[ed] our San Diego branches back to Home Fed, basically ceding all our ambitions to" be in that market "because we couldn't afford it anymore."  Trial Tr. 558 (Carl).

137.    Absent the breach, "the bank could have been larger, could have been more effective, in terms of its market had it had capital to consolidate other institutions."  *Id.* at 699 (Carl).

32

**D.      In Contrast to ASB's Experience in the Years Following the Breach, ASB's Well-Capitalized Peer, World Savings & Loan of Oakland, Grew Aggressively and Profitably**

138.    At the same time that ASB was shrinking into capital compliance, forgoing acquisitions, and selling off its most profitable loans and investments, its peer institutions with capital were growing aggressively and seizing the opportunities presented by a weakened thrift industry. *See id.* at 3008-28 (Hamm).

139.    Before the breach, ASB and World Savings & Loan of Oakland ("World") were very similar institutions: Both thrifts carried between $15-20 billion in total assets, operated in the same California markets, and pursued similar business strategies — a focus on ARM lending and growth through targeted acquisitions. *Compare* Trial Tr. 3010 (Hamm) (World Savings with $19.5 billion in assets at year end 1989) *and id.* at 3133 (Hamm) (World Savings originated primarily adjustable rate COFI loans in California), *id.* at 3024-26, 3011 (Hamm) (World Savings grew by acquisition) *with supra* ¶ 52 (Facts) (ASB with $16.3 billion in assets at year end 1989) *and* ¶¶ 36-37 (Facts) (ASB primarily a COFI ARM lender) *and* ¶¶ 119-137 (ASB grew by acquisition prior to the breach and but for the breach planned continued acquisition growth).

140.    After the breach, however, ASB and World differed in one single material respect: While World carried a capital surplus of $500 million, the breach slashed ASB's capital cushion to less than $1 million. *See* Trial Tr. 3005, 3009 (Hamm).

141.    In 1990 and 1991, while ASB was reeling from the government's breach of contract, World grew by more than $4 billion and consummated more than half a dozen acquisitions. *See id.* at 3028 (Hamm).

142.    Specifically, in 1990, while ASB strained to build its capital reserves and grew by only 1.2%, World Savings grew by 15%, adding $3 billion in assets all while *improving* its

33

overall return on average assets.  *See id.* at 3013-15 (Hamm).

143.    And in 1991, World Savings grew by another $1.7 billion and improved its

ROAA even more, achieving the company's "best performance ever."  *Id.* at 3021, 3036

(Hamm).

144.    The government's expert witness, Dr. William Hamm, an executive at World

Savings in the late 1980s and early 1990s, agreed that in 1991, "as other institutions downsized,

[World] w[as] able to purchase $302 million in high quality residential mortgages, bringing total

new loans, originations plus purchases, to $5.2 billion, the highest in [World's] history."  *Id.*

at 2851, 3026-27 (Hamm).

145.    Tellingly, World Savings' own executives, including Dr. Hamm, attributed

World's success to its "strong capital position."  *Id.* at 3027-28 (Hamm).

146.    At trial, Dr. Hamm agreed with several statements in World Savings' 1990 and

1991 annual reports that World's success was strongly tied to its surplus capital position,

enabling World savings to raise even more capital and to grow by acquiring and consolidating

the operations of smaller thrifts.  *Id.* at 3016-28 (Hamm).

147.    Specifically, Dr. Hamm agreed that "capital was an important contributor to

[World's] success," that "without" "capital adequacy" "there is no company," and that "the fact

that [World] [wa]s well-endowed [with capital]" "set [it] apart from companies which

[we]ren't."  *Id.* at 3017, 3022-24 (Hamm).

148.    Dr. Hamm also agreed that "government regulators scrutinize capital levels to

determine which institutions will go out of business, which will shrink, and which will be

allowed to grow.  And companies with copious capital are given the green light to expand and

also encouraged to make acquisitions."  *Id.* at 3023 (Hamm).

149.    In 1989, ASB, like World Savings, was a well-capitalized institution favored by government regulators, and encouraged to make acquisitions.  *See supra* ¶¶ 63-68; DX 150 (10/11/89 FHLB-SF Risk Assessment and Approval Mem.) at WOQ476 1940-44.

150.    After the breach, however, ASB fell from government favor, and was forced out of the acquisition business.  *See supra* ¶¶ 119-137; Trial Tr. 116-17 (Barnum) (the FDIC would not "approve any additional RTC acquisitions, . . . as long as our core capital level [wa]s at a minimum").

## VI.    Despite the Breach, ASB Operated Profitably and Successfully, But at a Smaller Scale Than it Would Have Achieved Had the Government Not Breached

151.    Having been forced by the breach to curtail its plans for growth and to divest itself of profitable assets, ASB grew only nominally from year-end 1989 to year-end 1990, increasing its total assets from $16.294 billion to $16.493 billion, a change of only $199 million (or 1.2%) — far less than the amount of interest ASB paid its depositors.  *Compare* PX 1 (1989 ASB Annual Report) at WOQ553 1390 *with* PX 2 (1990 ASB Annual Report) at FAS012 1218.

152.    Notwithstanding the breach, government regulators continually praised ASB as a well-run and highly profitable institution.  A 1992 OTS "examination revealed that American Savings Bank is generally a fundamentally sound and well-managed institution."  PX 321 (Cover Ltr. to 7/7/92 OTS Exam Report).

153.    The July 1992 Examination Report similarly stated the OTS's "conclusion . . . that the overall financial condition of [ASB] is good," and noted that "[t]he institution's management team is effective and has operated [ASB] in a safe and sound manner" while observing that "[o]perating results remain strong . . . ."  PX 321 (7/7/92 OTS Exam Report) at ASDOJ-SEASUP-9-1691.

154.    OTS examiners in 1992 specifically praised "[ASB's] good core profitability."

*Id.* at ASDOJ-SEASUP-9-1701.

155.    Still, the OTS criticized ASB's breach-diminished capital levels during 1992, finding that "[ASB's] tangible and core ratios are significantly below those of the three large institutions it considers its peers," and noted "potential concern regarding future capital adequacy."  *Id.* at ASDOJ-SEASUP-9-1700-01.

156.    From 1992 to 1996, ASB "remained profitable" and "enjoyed modest growth." Trial Tr. 575-76 (Carl).

157.    Despite the breach, and the restraints it imposed upon ASB's growth, the institution "was substantially valuable because [Plaintiffs] had built a real franchise out of it with real earnings."  *Id.* at 698 (Carl).

158.    By 1996, ASB was "again, the best earning thrift" in the country.  *Id.* at 30 (Barnum).

159.    "[I]f you talk to most people that worked at American at the time, . . . people felt very proud of it.  They . . . took an institution from the ashes and resurrected it and ended up with a very successful conclusion."  *Id.* at 152 (Barnum).

## VII.    In Reliance Upon the Government's Warrant Forbearance Promise, in Selling ASB to Washington Mutual Plaintiffs Conveyed to the Government the Right To Receive $149.8 Million

160.    By 1996, Plaintiffs "had to make decisions about the future of the bank" and ASB "really had a choice of either buying or selling because [it] had not gotten to the critical mass [it] needed. . . . because [it] w[as] hindered for nearly three years by . . . the Government [which] had removed . . . capital . . . intended to be used for that purpose."  Trial Tr. 699-700 (Carl).

161.    On July 21, 1996, the Bass Investors, acting through plaintiff Keystone Holdings Partners, L.P. (the "Partnership"), and the FDIC, as manager of the FRF, the successor to FSLIC, agreed to sell ASB to Washington Mutual, Inc. ("WAMU").  *See* PX 1756 (Merger Agreement)

at FAS013 0869-0982; PX 1760 (Warrant Exchange Agreement).

162.    Notwithstanding its breach of the Warrant Forbearance, the government insisted upon its contractual right to cash in the Second Preference as part of the WAMU transaction. *See* DX 808 (Patelunas Mem.) at FAS011 0022-0083; Trial Tr. 1963-65 (Meyer).

163.    The Plaintiffs discussed whether the elimination of the Warrant Forbearance "would terminate the preference and whether we ought to insist on that." Trial Tr. 579 (Carl). But Plaintiffs ultimately concluded that "we needed to get a transaction done," and decided "to honor the side of the transaction that was our obligation and go to the courts for redress" for breach of "the Government's obligation." *Id.* at 579 (Carl).

164.    To obtain 100% ownership of ASB, WAMU agreed to pay immediately a total of 40 million shares of WAMU common stock worth some $1.2 billion to Plaintiffs and the FDIC according to their relative ownership interest in ASB. *See* PX 1756 (Merger Agreement) at FAS013 0887-0889, 0975.

165.    At the closing, WAMU paid 14 million shares of those 40 million shares to the FDIC (35% of the shares), and 26 million shares to the Partnership (65% of the shares). *See id.* at FAS013 0888.

166.    The FDIC acknowledged at the time that the FDIC accepted the 14 million shares from WAMU as "fair and appropriate consideration for the Warrants," which included *both* the Second Preference and the FDIC's residual 30% interest in the proceeds of sale in excess of $714 million. DX 808 (Patelunas Mem.) at FAS011 0078 (Ex. 8); Trial Tr. 1963-65 (Meyer); *id.* at 579 (Carl).

167.    James Meyer, the principal government agent responsible for negotiating the FDIC/FRF's Warrant interest in ASB, testified as a government witness at trial that the

government's "liquidation preference was factored into and used in the negotiations," and that "[t]he second preference[] [was] fully considered in the valuation of the Warrant" that the parties reached in the sale of ASB to WaMu. Trial Tr. 1832, 1964-65 (Meyer); *see also id.* at 577-78 (Carl) (The second preference "was always part of the calculations" of "the economic value [the FDIC] expected from the [Washington Mutual] transaction.").

168.    But for the exchange of the Warrant Forbearance for the Second Preference, FDIC would not have been entitled to that $214 million distribution. Instead, under the terms of the parties' agreement prior to FSLIC's exchange of the Warrant Forbearance for the FSLIC Preference, Plaintiffs would have been entitled *both* to 100% of the first $500 million, *and* to 70% of *everything* above that amount – including 70% of the next $214 million. PX 1074 (March 23, 1988 Term Sheet) at USA 00043407. Thus, absent the agreed exchange of the Warrant Forbearance for the FSLIC Preference, the FDIC would have been entitled to only 30% of the $214 million Second Preference distribution, *i.e.*, $64.2 million. *Id.*

## PLAINTIFFS' LEGAL ARGUMENT

**I.    Plaintiffs Proved That Absent the Breach, ASB Would Have Been Even More Profitable and Successful, And That the Breach Caused Plaintiffs at Least $83.318 Million in Lost Profits**

1.    But for the breach, ASB would have had substantial additional regulatory capital with which to grow and earn substantial returns. *See* PX 231 (1990 Business Plan) at 35.

2.    Instead, as the government itself predicted, the loss of the promised Warrant capital caused ASB's "long term earnings [to] decrease." DX 1467 (1/18/90 Mem. from Meyer to Creedon) at WFZ007 1480.

3.    At trial, Plaintiffs quantified those damages, proving that the breach caused ASB to forgo at least $83.318 million in lost profits. In accordance with the law of this Circuit, Plaintiffs proved by a preponderance of the evidence that (1) their "damages were reasonably

38

foreseeable by the breaching party at the time of contracting," *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005); (2) the government's breach was a "substantial factor" in causing the damages, *Citizens Fed. Bank v. United States*, 474 F.3d 1314, 1318-19 (Fed. Cir. 2007); and (3) "the measure[s] of damages [are] reasonably certain." *Cal. Fed. Bank v. United States*, 395 F.3d 1263, 1267 (Fed. Cir. 2005) (*quoting Glendale Fed. Bank, F.S.B. v. United States*, 378 F.3d 1308, 1313 (Fed. Cir. 2004)).

### A.    Foreseeability

#### 1.    To Establish Foreseeability, a Plaintiff Need Only Show That the General Kind of Injury Claimed Was Reasonably Foreseeable

4.    A party establishes "foreseeability" by demonstrating that the damages claimed were reasonably foreseeable by the breaching party at the time of contract formation.  *See Citizens Fed.*, 474 F.3d at 1321; *Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001); Restatement (Second) of Contracts § 351 (1981).

5.    "'[T]he test is an objective one based on what [the defendant] had reason to foresee.'"  *Citizens Fed. Bank, F.S.B. v. United States*, 59 Fed. Cl. 507, 519 (2003) (*quoting* Restatement (Second) of Contracts § 351); *accord Chain Belt Co. v. United States*, 115 F. Supp. 701, 714 (Ct. Cl. 1953); *cf. Staples v. United States*, 511 U.S. 600, 615 n.11 (1994) (As with any question of knowledge, actual foresight "can be inferred from circumstantial evidence.").

6.    "[T]he party in breach need not have made a 'tacit agreement' to be liable for the loss.  Nor must he have had the loss in mind when making the contract, for the test is an objective one based on what he had reason to foresee."  Restatement (Second) of Contracts § 351 cmt. a; *Citizens Fed.*, 59 Fed. Cl. at 519 (quoting same).

#### 2.    Plaintiffs' Lost Profits Damages Were Reasonably Foreseeable

7.    In the *Winstar* cases, "[the Government] had reason to know that if [a plaintiff's]

supervisory goodwill and capital credit[s] were taken away that [the plaintiff] would lose potential profits from leveraging that capital." *Citizens Fin. Servs. v. United States*, 64 Fed. Cl. 498, 504 (2005); *Globe Sav. Bank, F.S.B. v. United States*, 65 Fed. Cl. 330, 348 (2005), *aff'd in relevant part, vacated in part*, 189 Fed. Appx. 964 (Fed. Cir. 2006).

8.    Because the government knew or should have known that Plaintiffs intended to leverage ASB's contracted-for Warrant capital to grow and make profits, damages arising from the loss of that capital are foreseeable here:

- The government granted the Warrant Forbearance, understanding that "including the Warrants as regulatory capital would allow the association to leverage its growth beyond its GAAP capacity." *See supra ¶ 31* (Facts).

- The Warrant Forbearance vested ASB with "more than twice as much capital as [it] needed for the set of assets regulatorily," putting ASB "on a path to grow dramatically." *See supra ¶ 40* (Facts).

- The government banked on the Plaintiffs' success, taking 30% of the equity in ASB based on the "potential for very, very impressive gains out of [the government's part] ownership of the thrift." *See supra ¶ 30* (Facts).

- Based on Plaintiffs' business plans, the government's time of contract cost projections estimated its $167 million Warrants to be worth $650 million. *See supra ¶ 35* (Facts).

- The government understood and intended at the time of contracting that the Warrant capital would be available for "profitable uses." *See supra ¶ 33* (Facts).

9.    Thus, it was reasonably foreseeable to the government at the time of contracting with Plaintiffs that a breach eliminating ASB's contracted-for Warrant capital could cause ASB to lose substantial profits. *See supra ¶¶ 25-43* (Facts).

**B.    Causation**

**1.    The "Substantial Factor" Standard Governs the Causation Analysis**

10.    In order to establish causation, Plaintiffs must show only that the breach was a "substantial factor" in causing the damages. *Holland v. United States*, 75 Fed. Cl. 483, 489

(2007) (citing *Citizens Fed.*, 474 F.3d at 1317-19); *accord Ind. Mich.*, 422 F.3d at 1373; *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1325 (Fed. Cir. 2002); *Bluebonnet*, 266 F.3d at 1356.

11.    Plaintiffs need not prove that their losses were an "inevitabl[e]" result of the breach, nor that the breach was their sole cause.  *See Citizens Fed.*, 474 F.3d at 1317-20; *Bluebonnet*, 266 F.3d at 1356.

12.    Rather, Plaintiffs must prove by a preponderance of the evidence only that the government's breach was a substantial factor, perhaps among others, in causing ASB to lose profits, causing Plaintiffs to incur the cost of deploying their capital in place of the Warrant capital, or in causing Plaintiffs to cede the proceeds that the government reaped via the distribution preference that it exchanged for the Warrant Forbearance promise then retained despite its breach of that promise.  *See Energy Capital Corp. v. United States*, 47 Fed. Cl. 382, 395 (2000), *aff'd in relevant part*, *reversed in part,* 302 F.3d 1314 (Fed. Cir. 2002) ("Because often many factors combine to produce the result complained of, the causation prong requires the injured party to demonstrate that the defendant's breach was a substantial factor in causing the injury.") (internal quotations omitted) (*quoting Cal. Fed. Bank, F.S.B. v. United States*, 43 Fed. Cl. 445, 451 (1999), *aff'd in part*, *vacated in part*, 245 F.3d 1342 (Fed. Cir. 2001); 5 Arthur L. Corbin, *Corbin on Contracts* § 999, at 25 (1964)).

## 2.    The Breach Caused the Damages Plaintiffs Claim

13.    At trial, the government all but conceded causation:  Its witness James Meyer, the FDIC official responsible for managing the government's Warrant interest, reaffirmed his time-of-the-breach assessment that excluding the Warrant from ASB's regulatory capital would cause economic harm to the institution that would reduce the value of the government's ownership interest.  *See supra* ¶¶ 79-81 (Facts); Trial Tr. 1874-76 (Meyer).

41

14.     Certainly, the breach was a substantial factor in causing all of the damages that Plaintiffs claim.  Indeed, notwithstanding that Plaintiffs need not prove "but-for" causation, all of the damages that Plaintiffs claim were the but-for result of the government's contract capital breach.

- The breached caused ASB to sell off $1.1 billion in COFI ARMs.  *See supra* ¶¶ 92-103 (Facts).

- The breach caused ASB to abandon its high-yield bond investment strategy and to sell its portfolio at fire sale prices.  *See supra* ¶¶ 104-118 (Facts).

- The breach put ASB out of the acquisition business.  *See supra* ¶¶ 119-137 (Facts).

15.     Had the government not breached, ASB would have grown larger than it was in the actual world, without a material reduction in its rate of profitability as measured by return on average assets:  Indeed, there is reason to believe ASB's rate of profitability would have increased.

- ASB exceeded its 1989 growth target by 300%, increasing its asset base by *$1 billion* while earning $214 million in profits:  "one of the most profitable years in S&L history."  *See supra* ¶¶ 51-54 (Facts).

- ASB's 1990 business plan projected 1990 growth of more than $2 billion.  *See supra* ¶¶ 73-75 (Facts).

- In late 1989, the FHLB-SF judged that ASB had "adequate capital" and was "well positioned to take advantage of lost market share from marginal shops that are expected to disappear as a result of FIRREA."  *See supra* ¶¶ 67-68 (Facts).

- Had ASB simply retained the $1.1 billion portfolio of ARM loans it sold in late 1990, ASB would have increased its interest spread income without a commensurate increase in its general and administrative expense.  *See supra* ¶¶ 92-103 (Facts).

- In 1990 and 1991, ASB's well-capitalized peer World Savings grew by more than $4 billion and improved its ROAA each year.  *See supra* ¶¶ 91, 138-146 (Facts).

C.      **Reasonable Certainty**

16.      "'[W]here responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision:  It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation.'"  *Nat'l Austl. Bank v. United States*, 452 F.3d 1321, 1327 (Fed. Cir. 2006) (quoting *Bluebonnet*, 266 F.3d at 1355); *see also LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363, 1374 (Fed. Cir. 2003) ("[W]hen damages are hard to estimate, the burden of imprecision does not fall on the innocent party."); *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1302 (Fed. Cir. 2002) ("'If a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery.'") (*quoting Ace-Fed. Reporters, Inc. v. Barram*, 226 F.3d 1329, 1333 (Fed. Cir. 2000); *Locke v. United States*, 283 F.2d 521, 524 (Ct. Cl. 1960)); *Cal. Fed. Bank, F.S.B. v. United States*, 245 F.3d 1342, 1350 (Fed. Cir. 2001) (same); *Confederated Tribes v. United States*, 248 F.3d 1365, 1372 (Fed. Cir. 2001) ("a reasonable degree of approximation . . . is sufficient to support an award").

1.      **Plaintiffs Computed Their Lost Profits with Reasonable Certainty**

17.      Specifically with regard to lost profits, a plaintiff need not establish exactly which assets it would have acquired nor show exactly what liabilities would have funded those assets in order to justify an award.  Rather, a plaintiff may use reasonable assumptions in computing the profits it would have earned but for the breach.  *See*, *e.g.*, *Globe*, 65 Fed. Cl. at 351-57 (awarding lost profits in a *Winstar* case based in part on a proxy calculation); *see also Commercial Fed. Bank, F.S.B. v. United States*, 59 Fed. Cl. 338, 350-51 (2004) (same); *First Fed. Sav. & Loan Ass'n of Rochester v. United States*, 76 Fed. Cl. 106. 116-22 (2007), *aff'd*, 290 Fed. Appx. 349 (Fed. Cir. 2008) (affirming award of lost profits and remanding for revised calculations).

18.      Here, the profits the breach caused ASB to forgo are readily quantifiable and

43

Plaintiffs' lost-profits claim is reasonably certain.

19.     At trial, Antonio Ramirez, Jr., Vice President and financial analyst at ASB from 1984 to 1996, presented a calculation of ASB's lost profits.  *See* Trial Tr. 1132-1263 (Ramirez).

20.     Mr. Ramirez computed the lost profits by determining, on a quarterly basis, the amount of additional assets that ASB would likely have held had the government not eliminated the contractual Warrant capital, and applying the return on assets that ASB's actual portfolio generated over each quarter.  *See* Trial Tr. 1141-1154 (Ramirez); PX 5003.1-5003.12.

21.     Generally, Mr. Ramirez computed the size of the incremental portfolio by applying ASB's actual leverage to the additional amount of regulatory capital that would have been available to ASB absent the breach.  *See* Trial Tr. 1142 (Ramirez) ("Foregone assets is a very simple calculation . . . based on the amount of foregone capital multiplied times a leverage factor . . . ."); *id.* at 1149 ("I took the [ASB]'s actual leverage ratios as historically reported . . . from the books and records, and just used those"); PX 5003.2, PX  5003.8, PX 5003.9.

22.     For periods in 1990, however, Mr. Ramirez applied an even more conservative leverage factor — thereby significantly reducing the amount of lost profits.  Mr. Ramirez did so to reflect the fact that, at that time, ASB was seeking to build capital to 4% — 1% more than the bare regulatory minimum of 3% — both as a prudent buffer and also in anticipation of an expected increase in the required minimum (which materialized a few months later): "In 1990 . . . I show that my leverage ramps up to four percent from an initial starting point of three and half percent. . . . It's based on the fact . . . that capital requirements were going to be increasing . . . ."  Trial Tr. 1149-50 (Ramirez).

23.     Had Mr. Ramirez simply adopted ASB's actual leverage for the 1990 period, instead of ramping it up to 4%, "it would have increased . . . the results of my calculations by

virtue of having created more in the way of foregone assets." *Id.* at 1150 (Ramirez).

24.     Mr. Ramirez's calculations incorporate payment of dividends out of the computed profits at the same rate at which ASB paid net dividends out of its profits in its actual operations, and reflect the use of retained earnings (profits less dividends) as capital available for leverage. *See* Trial Tr. 1146 (Ramirez).

25.     Mr. Ramirez applied ASB's actual average return on assets, which incorporates overhead expenses, despite the fact that ASB could have achieved the growth reflected in his model without proportionately increasing its overhead (as, for example, by retaining profitable assets the breach forced ASB to sell). *See* Trial Tr. 1173 (Ramirez) ("I used the actual bank's return on average assets."). *See also* PX 238 (11/28/90 ASB Strategic Planning Summary).

26.     Accordingly, Mr. Ramirez's lost profits calculation actually *understates the return on assets* available to ASB from a forgone portfolio, because it *overstates the impact of overhead costs* or general and administrative expenses ("G&A") associated with the investments ASB would have made but for the breach:

> [T]he two primary classes of assets that we could have retained on our balance sheet both represented a giving up of spread income that, had we kept it, would not have affected our operating costs whatsoever, would not have affected our credit costs . . . in any significant way
>
> We had gone through the process of analyzing the foregone profitability of [the $1.2 billion of COFI ARMS] . . . sales that we did execute in the fourth quarter [of 1990]  . . .  and we understood at the time that the G&A, or the operating expense component, was very much negligible in those scenarios, or in those calculations.
>
> The junk bond returns, again, we — I could very easily establish, and I believe Mr. Bonderman testified to the fact that we were earning very attractive returns on a risk-adjusted basis.  We had expected to make a very attractive return on those investments.  And, again, they represented no effect on our operating expenses.

\*       \*       \*

> And acquisitions, we did conduct quite a few — or execute quite a few acquisitions. We were well familiar with the economics of those, especially in overlapping markets. We knew what the benefits were of those, so that in building that into calculations, or at least representing that my calculations may have understated those available returns, I had knowledge that those particular acquisitions had indeed turned out favorable for us based on the fact that we could generate operating efficiencies.

Trial Tr. 1175-77 (Ramirez). *See also* PX 238 at PAS030 2612-2629 (confirming that marginal return exceeds average return for relevant asset classes).

27.     Mr. Ramirez's calculations apply the following structure quarter by quarter from 1990 through 1998 (the first two quarters are described):

a.     At the beginning of the first quarter of 1990, ASB reported adjusted tangible assets of $16.294 billion with a core capital ratio of 3.006%. *See* PX 1830 (Summary of Data Inputs Incorporated into Plaintiffs' Lost Profits and Cost of Capital Calculations ("Summary")) at 2. Had the government not breached, ASB would have had at least $93.500 million in additional core capital available during the quarter, which, if leveraged comparably (albeit to a lesser degree, as described *supra*) to ASB's actual core capital, would have supported at least $278.589 million in additional assets. Over the quarter, those incremental assets, had they generated returns comparable to ASB's actual assets, would have created an additional $0.758 million of profits. Had ASB paid dividends out of those profits at the same rate at which it paid net dividends out of its actual income, ASB would have paid $0.185 million out as dividends while retaining the remaining $0.573 million as retained earnings, which would have been included in ASB's core capital during the next quarter. ASB would also have charged $4.701 million in amortization expense against certain assets, which would have reduced ASB's core capital correspondingly.

46

b. At the beginning of the second quarter of 1990, ASB reported adjusted tangible assets of $16.034 billion with a core capital ratio of 3.287%. *See id.* Had the government not breached, ASB would have had at least $89.371 million in additional core capital available during the quarter, which, if leveraged comparably (albeit to a lesser degree, as described *supra*) to ASB's actual core capital, would have supported at least $767.220 million in additional assets, an increase of $488.631 million over the previous quarter. Over the quarter, those incremental assets, had they generated returns comparable to ASB's actual assets, would have created an additional $3.222 million of profits. Had ASB paid dividends out of those profits at the same rate at which it paid net dividends out of its actual income, ASB would have paid $0.788 million out as dividends while retaining the remaining $2.434 million as retained earnings, which would have been included in ASB's core capital during the next quarter. ASB would also have charged $4.701 million in amortization expense against certain pushed-down assets, which would have reduced ASB's core capital correspondingly.

28. Following the same mechanics described *supra* (as set forth more fully in PX 5003.19-5003.21) and applying the reported values set forth in PX 1830 (Summary), ASB's incremental portfolio would have grown to just under $2 billion by year-end 1990 before receding, and ASB would have realized total incremental profits of $83.318 million from the beginning of 1990 through December 28, 1998.

29. As in *Globe*, *Commercial Federal*, and *First Federal*, Plaintiffs' lost profits claim is based on ASB's actual strategies and operations, albeit as reflected in reasonable simplifying assumptions incorporated into the calculations. *See supra* ¶¶ 17-28 (Calculations). Indeed, Plaintiffs have identified several specific assets they could have retained rather than divested

47

absent the breach, and have identified specific, pre-breach business strategies that they could profitably have executed absent the breach.  *See supra ¶¶* 92-137 (Facts).

> **D.      The Trial Testimony and Analysis of Defendant's Expert, Anjan Thakor, Provides a Check on Mr. Ramirez's Calculations, and Supports the Reasonableness of Plaintiffs' Lost Profits Claim**

30.      At trial, Defendant's Expert Anjan Thakor sponsored his own calculation of Plaintiffs' lost profits damages, projecting damages based upon a forgone incremental portfolio of mortgage backed securities ("MBS") funded by certain FHLBB advances and borrowings. *See* Trial Tr. 2481-83 (Thakor).

31.      Dr. Thakor testified that "the correct return for the incremental portfolio" would be "the spread between the MBS yields and a composite of the FHLB advance and other borrowing rates, tax adjusted."  Trial Tr. 2483 (Thakor); *see also* DX 2178 (Thakor demonstrative).

32.      But, as Dr. Thakor admitted at trial, his calculations erred by incorporating into ASB's cost of marginal funds, the costs associated with very costly fixed-rate, fixed-term FHLBB advances that ASB inherited from the old failed American Savings, instead of reflecting the much lower average borrowings costs that ASB actually faced in the years following the breach.  *See* PX 1826 (Expert Report of Anjan V. Thakor) at Ex. 15 (including in the calculation of ASB's cost of marginal funds $1.8 billion of fixed-rate, fixed-term FHLBB advances); PX 798 (10/26/92 ALCO Mtg. materials) at ASDOJ-SEASUPPTWO-2-3128-3148 (showing that fixed-rate, fixed-term FLHBB advances remained on ASB's books at 9.78%); Trial Tr. 2586-87 (Thakor) (agreeing that "if we wanted to know what American Savings Bank's actual marginal cost of funds is, we would need to eliminate the influence of fixed rate, fixed term Home Loan Bank advances that New American inherited from the Old American").

33.      As Plaintiffs demonstrated during Dr. Thakor's cross-examination, if the Court were to substitute ASB's average cost of borrowings in the years following the breach — excluding the

old, expensive fixed-rate FHLBB advances that Dr. Thakor erroneously included — into Dr.

Thakor's model of Plaintiffs' forgone portfolio, the result would yield after-tax lost profits of

$108.544 million:  *$25 million more* in lost profits than Mr. Ramirez calculates in his conservative

model.  *See* Trial Tr. 2587-97 (Thakor); PX 5101 (demonstrative "Recalculation of Dr. Thakor's

Exhibit 16C"); *see also supra* ¶ 34 (Facts) (government predicted that ASB would earn 100 basis

points ROA on an asset base of $12.5 billion, and leverage those earnings 20 to 1 for 10 years).

## II.     Plaintiffs Have Proved Reliance Damages of $149.8 Million

34.     The Federal Circuit has held that a *Winstar* plaintiff may claim reliance damages

"including expenditures made in . . . performance" of the contract.  *Westfed Holdings*, *Inc. v.

United States*, 407 F.3d 1352, 1368 (Fed. Cir. 2005) ("[Plaintiff] is entitled to that amount it

actually expended to acquire [the bank] in reliance on the forbearance promise, which the

government repudiated."); *accord Am. Capital Corp. v. FDIC*, 472 F.3d 859, 867-68 (Fed. Cir.

2006); 24 Richard A. Lord, *Williston on Contracts* § 64:2 (4th ed. 2002) ("Reliance damages

 . . . reimburse [the plaintiff for] expenditures the plaintiff made in performing . . . its part of the

contract."); Restatement (Second) of Contracts § 349 (1981) ("the injured party has a right to

damages based on his reliance interest, including expenditures made . . . in performance"); E.

Allan Farnsworth, *Farnsworth on Contracts* § 12.1 (3d ed. 2004) (A party's reliance interest

"includes, whatever is, in a sense, the 'price' that a party must pay for what it is to receive under

the contract.").

35.     "In order to recover reliance damages, the 'plaintiff's loss must have been

foreseeable to the party in breach at the time of contract formation.'"  *Am. Capital*, 472 F.3d

at 867 (*quoting Landmark Land Co. v. FDIC*, 256 F.3d 1365, 1378 (Fed. Cir. 2001)).

36.     Amounts paid by the non-breaching party in performance or part performance of a

breached contract are considered "essential" reliance payments, and are necessarily foreseeable

to the breaching party.  Restatement (Second) of Contracts § 349 cmt. a.; *Farnsworth on Contracts* § 12.1; *see also Am. Capital Corp. v. FDIC*, 59 Fed. Cl. 563, 573-574 (2004), *aff'd in part, rev'd in part*, 472 F.3d 859 (Fed. Cir. 2006) (*Hadley v Baxendale* rule does not apply to limit essential reliance damages because those expenses are "normally within the contemplation of the parties") (citing *Hadley v. Baxendale*, 156 Eng. Rep. 145 (1854)).

37.    Expenditures made both before and after a breach are compensable provided that the expenditures were made pursuant to the contract.  *See Glendale Fed. Bank, F.S.B. v. United States*, 239 F.3d 1374, 1383 (Fed. Cir. 2001).

38.    "The amount of the 'reliance interest' is fixed at the time when an expenditure is made . . . ."  *Am. Capital Corp. v. FDIC*, 66 Fed. Cl. 315, 332 (2005), *aff'd in part*, *rev'd in part*, 472 F.3d 859 (Fed. Cir. 2007) (citing 11 *Corbin on Contracts* § 008, at 64 (1964 & Supp.1996)).

39.    Here, the $214 million Second Preference that Plaintiffs conveyed to the government in exchange for the Warrant Forbearance provides a reliable and foreseeable measure of Plaintiffs' costs in performing their contractual obligations.  *See supra* ¶¶ 12-24 (Facts).

40.    The Second Preference guaranteed to the government that, instead of receiving only a 30% share of the proceeds of the eventual sale of ASB subject to the Plaintiffs' first preference of $350 million — as the deal had been conceived initially — the government would receive a $214 million distribution and then 30% of distributions to follow: an increase in the consideration that Plaintiffs paid to Defendant under the contract of $149.8 million.

41.    Notwithstanding the government's breach, Plaintiffs performed their Second Preference promise upon the sale of ASB in 1996.  *See supra* ¶¶ 160-168 (Facts).

42.    The $149.8 million in increased consideration that Plaintiffs ceded to Defendant

upon ASB's sale — promised in reliance on the Warrant Forbearance, and delivered in performance of Plaintiffs' contract obligations — constitutes essential reliance damages, and is an appropriate measure of the harm caused to Plaintiffs by the breach of the Warrant Forbearance.  *See Westfed*, 407 F.3d at 1368; *Am. Capital*, 472 F.3d at 867-68; *Williston on Contracts* § 64:2; Restatement (Second) of Contracts § 349; *Glendale*, 239 F.3d at 1383; *Corbin on Contracts* § 008, at 64; *Farnsworth on Contracts* § 12.1.

43.     There is no basis for Defendant's argument that Plaintiffs' reliance damages should be "offset" by the overall profits that Plaintiffs generated by operating ASB under the contract.  Because it eliminated only one part of the consideration the government promised under the contract, the government's Warrant Forbearance breach constitutes a "partial breach." *See* E. Allan Farnsworth, *Farnsworth on Contracts* § 8.15 (3d ed. 2004).  Furthermore, notwithstanding the breach, Plaintiffs continued to perform all of their obligations under the contract.  *See supra* ¶¶ 151-168 (Facts).  In these circumstances, "the injured party has a claim for damages for partial breach, *in addition to its remaining substantive rights under the contract.*"  *Farnsworth on Contracts* § 8.15 (emphasis added).

44.     Damages for partial breach are "calculated on the assumption that both parties will continue to perform in spite of the breach.  They therefore compensate the injured party only for the loss it suffered as the result of the delay or other defect in performance that constituted the breach, not for the loss of the balance of the return performance.  *Since the injured party is not relieved from performing*, there is no savings to it to be subtracted."  *Farnsworth on Contracts* § 8.15 (emphasis added).

45.     Here, any profits or other benefits that Plaintiffs enjoyed through the operation of ASB were earned through Plaintiffs' efforts *despite the government's breach*.  Indeed, as proven

at trial, Plaintiffs succeeded through their own ingenuity and effort to rescue ASB from the near-disaster that the breach imposed, and to restore the bank to impressive profitability *without* the capital the government promised. *See supra* ¶¶ 151-159 (Facts).

46.     Accordingly, Plaintiffs are entitled to reliance damages for the partial breach caused by Defendant's refusal to honor the Warrant Forbearance, and remain entitled to all of the profits Plaintiffs achieved by operating the bank without the promised Warrant capital.

**III.    As an Alternative to Lost Profits, Plaintiffs' Damages Can Also Be Measured by the Cost of Deploying Plaintiffs' Tangible Capital in Place of the Contracted-For Regulatory Capital**

47.     As the Federal Circuit has explained, "the cost of replacement capital can serve as a valid theory for measuring expectancy damages in the *Winstar* context because it provides a measure of compensation based on the cost of substituting real capital for the intangible capital held by plaintiff in the form of supervisory goodwill." *LaSalle Talman*, 317 F.3d at 1374 (internal quotation marks omitted); *accord Home Sav. of Am. v. United States*, 399 F.3d 1341, 1354 (Fed. Cir. 2005).

48.     Here, the breach eliminated from ASB's regulatory capital account the entire $167 million "fair value" ascribed to the Warrants. *See supra* ¶ 83 (Facts).

49.     Accordingly, the breach forced Plaintiffs to re-deploy $167 million of their own capital to serve the functions the Warrant capital would have fulfilled had the government not breached its contract. *See* PX 5003.22-5003.42; Trial Tr. 1319-20 (Ramirez) ("Before the breach, they had . . . surplus capital.  After the breach, they didn't have capital, but they still needed to support the assets that were still outstanding at the bank, so. . . the Plaintiffs[] took their own capital to replace the warrant capital that was at the bank.").

50.     Here, the government's contemporaneous acknowledgement that the regulatory capital forbearances promises it made would leave the tangible capital Plaintiffs invested into

ASB "free for other profitable uses" establishes that the government understood perfectly well that eliminating the forbearance capital would force Plaintiffs to redeploy their tangible capital in its place. *See* PX 1310 (Dec. 28, 1988 Press Talking Points) at 3; *cf. Home Sav.*, 399 F.3d at 1355 ("[T]he damages claimed by [plaintiff] were foreseeable.").

51.     Plaintiffs also proved that the breach caused them to deploy $167 million of their own capital in place of the Warrant capital. *See supra* ¶¶ 89 (Facts); *cf. Home Sav.*, 399 F.3d at 1353 (Plaintiff was "was entitled to raise funds to replace the supervisory goodwill . . . lost as a result of the government's breach.").  Had the government not breached, Plaintiffs would not have had to redeploy their costly tangible capital to do the job the contracted-for Warrant capital would have done in the absence of the breach. *See id*.

52.     The cost to Plaintiffs of the capital they redeployed in place of the contracted-for Warrant capital is readily quantifiable and Plaintiffs' cost-of-capital claim is reasonably certain. *See infra* ¶¶ 53-77 (Calculations).

53.     "The basic idea" of Mr. Ramirez's calculations is to "first calculat[e] a gross cost of the capital that the Plaintiffs redeployed to replace the lost Warrant capital, and [then] offset[] that by a calculation on that same capital that represents the equivalent of a benefit from utilizing that capital at the bank."  Trial Tr. 1264 (Ramirez).

54.     Plaintiffs' net cost for each period can be computed as the weighted average cost of contributed capital times the amount of tangible capital deployed in place of the contracted-for Warrant capital in that period, less an offset based on a Treasury yield times the same amount of tangible capital.  *See* PX5003.25 (Net cost = Gross Cost - Offset).

55.     The gross cost in Mr. Ramirez's cost of capital calculation is "very simply, the redeployed capital . . . multiplied by the pretax capital costs — or a capital cost that disregards

the effect of taxes."  Trial Tr. 1265 (Ramirez); *see also* PX 5003.23 ("Gross Cost = Redeployed Capital * Pretax Capital Cost").

56.     The redeployed capital is "the amount of the fair value of the warrants as reflected in the capital accounts of American Savings when pushdown accounting was first adopted": $167 million.  Trial Tr. 1265 (Ramirez).

57.     The pre-tax capital costs are calculated "from the perspective that the bank had to generate a certain amount of earnings . . . in order for it to make available to its holding company for the payment of obligations on the bonds and on preferred stock."  *Id.* at 1266-67 (Ramirez).

58.     Mr. Ramirez relied on the books and records of New American Capital, Inc. to identify "the costs of the holding company debt and of the preferred dividends that were paid out by New American Capital."  *Id.* at 1267-68 (Ramirez).

59.     Mr. Ramirez determined the weighted-average pre-tax cost of the debt that NAC raised by dividing NAC's quarterly interest expense for a given period by the amount of NAC debt outstanding during that period.  *See* PX 5003.27 ("Actual Cost of Capital New American Savings Inc. Raised in Order to Contribute $350mm in Capital to American Savings"); Trial Tr. 1267 (Ramirez) ("In the books and records, there was a very clear identification of the costs of the holding company debt . . . ."); *id.* at 1273-74 (Ramirez) (describing the mechanics of his cost of debt calculation); *cf. Home Sav.*, 399 F.3d at 1353 ("[T]he Court of Federal Claims justifiably used a weighted average of [plaintiff]'s various types of financing to calculate the replacement cost [plaintiff] incurred.").

60.     NAC's preferred equity securities included $80 million of preferred stock with an after-tax dividend rate of 17.25%.  Mr. Ramirez determined the pre-tax cost of that preferred equity by dividing the 17.25% after-tax dividend rate by [1 - 0.28], since ASB effectively paid

28% of its pre-tax income over to the government in lieu of taxes. *See* PX 5003.27 ("Actual

Cost of Capital New American Savings Inc. Raised in Order to Contribute $350mm in Capital to

American Savings"); Trial Tr. 1268 (Ramirez) ("I took the actual dividend payment as reflected

in the New American capital statements, and I tax effected it by a factor of 28 percent, so it

would be the equivalent of the payment . . . .").

61.     Mr. Ramirez determined the weighted average pre-tax cost of NAC's debt and

preferred equity for each quarter by adding (1) the product of the balance of debt outstanding

times the pre-tax cost of debt and (2) the product of the balance of preferred equity outstanding

times the pre-tax cost of the preferred, and then dividing the sum of by the total principal amount

of the outstanding securities (*i.e.*, dividing the sum of (1) and (2) by the sum of the outstanding

debt and preferred stock). *See* PX 5003.25 ("Pretax Capital Cost = Weighted Avg. of H.C. Debt

Coupon and Preferred Dividends").

62.     The weighted average cost of those instruments is "[w]eighted by [their]

outstanding balance and as applied to their respective rates." Trial Tr. 1275 (Ramirez).

63.     It is appropriate to omit common stock from this calculation for at least two

reasons. First, unlike debt or preferred equity securities, common stock is a residual claim with

no contractual coupon entitlement, and it is therefore difficult to observe the cost of common

equity directly. *See* PX 5003.25 ("Omit H.C. Common: Most Costly Source of Capital; Total

Return Not Directly Observable").

64.     As Mr. Ramirez explained at trial:

> I excluded [the common stock] [from] my calculations . . . because I don't
> believe [it] was directly observable for purposes of this particular Plaintiff,
> Your Honor, and the reason being it wasn't a publicly traded stock, so that
> the capture of just the dividend stream, I don't believe captures the entire
> cost of the stock.
>
> It doesn't reflect the minority interest as represented by the warrants as an

> example.  It doesn't represent — or it doesn't contain some of the
> volatility or the appreciation of the stock, so in that regard, I didn't feel it
> was a fair way to represent the cost of — I couldn't come up with a fair
> way to represent the full cost of the common stock.

Trial Tr. 1268-69 (Ramirez).

65.     Second, common equity is typically considered more costly than other forms of financing, and therefore omitting the cost of common equity from the calculation will tend to underestimate the true cost of the Plaintiffs' contributed capital.  *See* Trial Tr. 1269 (Ramirez) ("[C]ommon stock is your most costly form of capital, and otherwise, companies would issue common stock before they issued any other forms of capital").

66.     Calculated as described *supra*, the gross cost of the $167 million in capital that Plaintiffs redeployed in place of the Warrant capital is computed for each quarter from the beginning of 1990 through the end of 1998 in PX 1820 and amounts to $189,176,000.  *See* Trial Tr. 1276 (Ramirez); PX 5003.28.

67.     In cases where an institution procures an infusion of outside capital to replace breach-eliminated regulatory capital, that institution arguably receives a benefit it would not have gotten from the contracted-for capital — direct investment earnings on the new tangible capital.  *See*, *e.g.*, *Home Sav.* 399 F.3d at 1352.  Here, however, Plaintiffs received no such benefit because ASB redeployed existing tangible capital and therefore had no additional capital to invest.  Accordingly, ASB received no direct investment earnings on the redeployed tangible capital that it would not have received absent the breach.  *See* Trial Tr. 1592 (Ramirez) ("I don't believe" that ASB received "any" additional assets upon redeployment of its preexisting capital to replace the Warrant capital).

68.     Nevertheless, one can compute an offset by multiplying the before-tax yield on U.S. Treasury securities (one-year Notes) for each year of the contract term times the

$167 million amount of Warrant capital that would have been available each year under the contract. PX 5003.26 ("Offset = Yield on One-Year Treasuries"); *id.* at 1270 (Ramirez) ("The offset was calculated based on the yield in one year treasuries.").

69.     Mr. Ramirez chose the 1-year treasury as an offset because "it track[s] the bank's actual yield on short term investments very closely, and secondly, to the extent that the Warrant capital represented a like a credit free instrument or risk free instrument, that I wanted to come up with a comparable instrument upon which to base my calculations." Trial Tr. 1271 (Ramirez).

70.     So calculated, the offset corresponding to the $167 million in capital Plaintiffs redeployed in place of the Warrant capital is computed for each quarter from the beginning of 1990 through the end of 1998. PX 5003.28 ("New American Capital's Cost of the Capital Required to Replace the Warrant Capital Offset by the Yield on 1-year CMT").

71.     The Federal Circuit has held that it is appropriate to rely upon U.S. Treasury bond rates to calculate an offset from the costs of replacing intangible contract capital with earnings generated by the investment of tangible replacement capital. *See Home Sav.*, 399 F.3d at 1354 ("We agree with the Court of Federal Claims that this safe rate offset [based on a Treasury bond] 'account[s] for the difference between what was lost and what was substituted.'").

72.     Netting the gross cost for each quarter against the offset for each quarter, and summing the results over the entire period from the beginning of 1990 through the end of 1998, the net cost of the $167 million in capital Plaintiffs redeployed in place of the Warrant capital is $106.805 million. *See* PX 5003.28 ("New American Capital's Cost of Capital Required To Replace The Warrant Capital, Offset by the Yield on 1-year CMT"); Trial Tr. 1276-77 (Ramirez) (explaining that the $189.176 million is the gross cost minus a $82.341 offset, to get a net cost of capital redeployed to replace the Warrant of $106 million).

73.     It is appropriate to exclude amortization expense from these calculations for at least two reasons.  *See* Trial Tr. 1265-66 (Ramirez).

74.     First, as Defendant concedes, the Warrant capital itself did not amortize and would not have amortized.  *See id.*; PX 5003.24 ("Warrant Capital Did Not Amortize"); Trial Tr. at 2106 (Musika) (it is "literally true" that the Warrant capital "did not amortize").

75.     Second, had ASB had the Warrant capital, it would have leveraged that Warrant capital, resulting in additional earnings.  *See supra* ¶¶ 85-137 (Facts).  And it would be unreasonable to count one certain cost without counting all additional factors.  PX 5003.24 ("Unreasonable to Include Amortization But to Exclude Earnings"); Trial Tr. 1266 (Ramirez) ("[T]o include any amortization against these calculations would be unreasonable because of the fact that you don't also give credit to any earnings that that capital . . . might have accrued.").

76.     As the government's expert Terry Musika acknowledged at trial, "it would be incomplete and inaccurate to ignore the entire economic activity resulting from the entire contract and just pick and choose certain components of the financial results of the contract."  Trial Tr. 2162-63 (Musika).

77.     Furthermore, in calculating cost of capital damages, Plaintiffs need not account for collateral circumstances that may have arisen absent the breach.  As the Court of Claims' decision in *Brand Investment* shows, Plaintiffs are entitled to recover the rental value of capital without accounting for secondary effects (such as expenses that may have been incurred or revenues that may have been generated) that could have materialized had they been able to deploy the capital as they chose.  *Compare Brand Inv. Co. v. United States*, 58 F. Supp. 749, 751 (Ct. Cl. 1944) (majority opinion) *with id.* at 753 (dissenting opinion).

**IV.     The Court May Award "Jury Verdict" Damages**

78.     The Federal Circuit urges trial courts to award a "jury verdict" of fair and reasonable damages where "a reasonable probability of damages can be clearly established" and "the claimant can demonstrate a justifiable inability to substantiate the amount of his resultant injury by direct and specific proof." *Bluebonnet*, 266 F.3d at 1356-58 (internal quotations omitted) (citing *Locke*, 283 F.2d at 524).

79.     Here, even the government's experts admit that the government's breach of the Warrant Forbearance harmed Plaintiffs.  As Dr. Hamm testified, regulatory capital promises of the sort presented here and in other *Winstar* cases increase the value of the acquirer's deposit insurance because such promises allocate to the government certain financial risks that would otherwise have been borne by the acquirer.  Trial Tr. 3010-13 (Hamm).  And Dr. Thakor actually performed a "lost profits computation" leading to an eight-figure result that if corrected for an obvious error grows to more than $100 million.  *See supra* ¶ 33.

80.     Accordingly, a reasonable probability of damages has been clearly established and, even if the Court opts not to accept Plaintiffs' calculations in their entirety, the Court may properly award "jury verdict" damages.

## CONCLUSION

More than 20 years ago, in December 1988, Plaintiffs acquired the failed American Savings Bank from the government and quickly built it into one of the most profitable thrifts in the entire country.  About a year after the acquisition, though — more than 19 years ago — the government breached the regulatory capital forbearance promises it had used to induce Plaintiffs into the acquisition.  This resulting litigation has been pending for more than 17 years.

Notwithstanding the passage of all that time, Plaintiffs compiled extensive and compelling evidence that the government's breach caused enormous economic harm.  At trial,

Plaintiffs put forward detailed and consistent testimony from key principals of the acquiring group and high-level executives of the bank — the people who structured the acquisition, built the institution, and overcame the effects of the breach.  Further, Plaintiffs introduced volumes of ASB's contemporaneous business records that reinforced those witnesses' testimony and that fully support each of Plaintiffs' damages calculations.  The evidence leaves no serious doubt that Plaintiffs are entitled to recover at least $83.318 million, the amount of lost profits Plaintiffs proved at trial based on ASB's *real history* — its *actual* strategies, its *actual* leverage, and its *actual* returns.  Any residual uncertainty about the level of success Plaintiffs would have achieved with the contracted-for Warrant Forbearance results directly from the breach, and cannot undermine Plaintiffs' right to recover.

Even if the Court were to award every penny Plaintiffs seek — which we submit the law requires — Plaintiffs' injury would go largely uncompensated, for the passage of time has severely eroded the value of any recovery that can be awarded now.  For these and all the foregoing reasons, Plaintiffs urge the Court to render promptly a judgment to Plaintiffs of no less than $83.318 million.

September 22, 2009                    Respectfully submitted,


                                     _____/s/_____
                                     Kent A. Yalowitz
                                     ARNOLD & PORTER, LLP
                                     399 Park Avenue
                                     New York, N.Y. 10022
                                     Tel:  (212) 715-1000
                                     Fax:  (212) 715-1399

                                     *Attorney of Record for Plaintiffs*
                                       *American Savings Bank*, *F.A.*, *et al.*

*Of Counsel*:

Melvin C. Garbow
Michael A. F. Johnson
Joshua P. Wilson
Michael R. Hartman
Alexea R. Juliano
James K. Rideout
Nellie C. Wigfall
ARNOLD & PORTER, LLP
555 Twelfth Street, N.W.
Washington, D.C.  20004
Tel:  (202) 942-5000
Fax:  (202) 942-5999

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on this 22nd day of September 2009, I caused the foregoing **PLAINTIFFS'**

**OPENING POST TRIAL BRIEF** to be filed electronically.  I understand that notice of this

filing will be sent to all parties by operation of the Court's electronic filing system.


      /s/ Joshua P. Wilson     
        Joshua P. Wilson