No. 92-872C
(Senior Judge Smith)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

AMERICAN SAVINGS BANK, F.A., et al.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

---

DEFENDANT'S INITIAL POST-TRIAL BRIEF

---

MICHAEL F. HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

KENNETH M. DINTZER
Assistant Director

OF COUNSEL:

SCOTT D. AUSTIN
Senior Trial Counsel
WILLIAM G. KANELLIS
VINCENT D. PHILLIPS
JACOB A. SCHUNK
SAMEER YERAWADEKAR
Trial Attorneys
Civil Division
Department of Justice

September 22, 2009

JOHN J. TODOR
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530
Tele: (202) 616-2382
Fax:  (202) 514-8640

Attorneys for Defendant

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES. .................................................................................. v

INTRODUCTION .............................................................................................. 1

STATEMENT OF ISSUES TO BE DECIDED BY THE COURT. ............................................... 2

ARGUMENT. .................................................................................................. 3

I.     Plaintiffs' "Second Preference" Claim Fails As A Matter Of Law And Fact .................... 3

     A.     The "Second Preference" Claim Merely Recasts Plaintiffs'
           Partial Restitution Claim, Which The Federal Circuit
           Has Already Rejected. ........................................................................... 4

     B.     The "Second Preference" Theory Is Judicially Estopped Because
           Plaintiffs Persuaded The Court To Accept A Different Measure Of
           Damages For The Breach Of The Note Forbearance. ............................................. 6

     C.     Plaintiffs Have Not Established That The Contract Was Divisible,
           And Have Not Met The Other Legal Requirements For A
           Reliance Claim. ................................................................................. 7

     D.     The Record Evidence Conclusively Defeats The "Second Preference"
           Claim. ........................................................................................... 9

          1.     The "Second Preference" Merely Enforced FSLIC's 30
                Percent Equity Stake Contemplated In The March 28, 1988
                Term Sheet. .............................................................................. 10

          2.     The "Second Preference" Arose Within An Overall
                Compromise Concerning Warrant Capital That Changed
                Over Time. ............................................................................... 11

          3.     Any "Second Preference" Payment Was Not In Reliance
                Upon The Alleged Secondary Contract Because Plaintiffs
                Had Control Over Whether And When To Sell The Bank. ...................... 15

          4.     The "Second Preference" Was Never Utilized Because
                 Plaintiffs Voluntarily Restructured The Warrant Upon
                The Bank's Sale. ....................................................................... 16

i

II.   Plaintiffs' Cost Of Capital Calculation Is Legally Precluded And Factually
      Flawed And Unreliable. ................................................................................. 17

      A.   Plaintiffs' Cost Of Replacement Capital Calculation. ........................................ 17

      B.   Plaintiffs' Cost Of Capital Claim Is Legally Barred Because
           The Calculation Contradicts Plaintiffs' Earlier Claims. ..................................... 18

           1.   The Court Has Already Adopted A Calculation For
                Valuing The Same Alleged Replacement Capital Plaintiffs
                Seek To Measure In Their Current Cost Of Capital Calculation. ............. 19

           2.   Plaintiffs' Current Calculations Contradict Their Earlier
                Calculations And Increase The Cost Of Replacement
                Damages Estimate. ................................................................................. 21

                a.   Contradictions In Mr. Ramirez's Weighted
                     Average Cost Of Capital Calculation. .......................................... 21

                b.   Contradictions In Mr. Ramirez's Offset
                     Benefit Calculation. ..................................................................... 23

                c.   Mr. Ramirez's Changes Produce A Higher Alleged
                     Cost For The Same Capital Used In The Note
                     Forbearance Calculation. ............................................................. 24

           3.   Judicial Estoppel And Law Of The Case Accordingly Bar
                Plaintiffs' Cost Of Capital Claim. .......................................................... 25

      C.   Mr. Ramirez's Cost Of Capital Calculation Is Flawed And Unreliable. .............. 26

           1.   Mr. Ramirez Greatly Overstates The Amount Of Capital To Be
                Replaced Because He Erroneously Ignores The Effect Of The
                Avoided Depreciation And Amortization Expenses Associated
                With The Reversal Of Push Down Accounting. ....................................... 27

           2.   Mr. Ramirez Erroneously Extended His Cost Of Replacement
                Capital Calculation Beyond December 31, 1996. ..................................... 31

           3.   Mr. Ramirez Incorrectly Calculates Plaintiffs' Weighted
                Average Cost Of Capital. ....................................................................... 32

           4.   Mr. Ramirez Erroneously Used The One-Year Constant
                Maturity Treasury Rate To Compute The Offset Benefit. ........................ 34

ii

5.       Correction Of Mr. Ramirez's Errors Dramatically Lowers His Cost Of Replacement Capital Estimate. ............................................. 36

III.      Plaintiffs' Lost Profits Calculations Are Factually And Legally Unsupported................. 37

      A.      Legal Standards Applicable To Expectancy Claims. ............................................. 37

      B.      Plaintiffs' Lost Profits Claim Is Barred As A Matter Of Law. ............................. 39

      C.      Plaintiffs' Failed To Establish Causation Of Any Lost Profits. ............................ 39

            1.      Plaintiffs Replaced The Warrant Forbearance Capital............................. 40

            2.      Plaintiffs Were Not Capital-Constrained During The Alleged Damages Period......................................................................... 41

            3.      Plaintiffs Were Opportunity-Constrained Due To The California Recession During The Alleged Damages Period................... 42

            4.      Plaintiffs Voluntarily Paid Dividends To Their Investors With Excess Capital Rather Than Pursuing Additional Investment Opportunities.......................................................... 44

      D.      Plaintiffs' Claimed Lost Profits Were Not Reasonably Foreseeable. .................. 45

      E.      Plaintiffs' Lost Profits Calculations Are Not Reasonably Certain....................... 47

            1.      Plaintiffs' Lost Profits Claim Depends Upon Impermissible Lay Witness Testimony............................................................. 47

            2.      Plaintiffs Failed To Identify The Assets And Liabilities They Would Have Added Absent The Breach......................................... 48

            3.      The Possible Candidates For The Foregone Portfolio Identified By Plaintiffs Do Not Support The Lost Profits Calculations................................................................... 51

            4.      Plaintiffs' Lost Profits Calculations Violate Basic Principles Of Economics And Result In An Impermissible Windfall. ..................... 53

                a.      Plaintiffs' Use Of Historical Return On Average Assets Ignores The Principle Of Diminishing Returns. ........................... 54

b.     Mr. Ramirez's Flawed Dividend Payout Ratio
Overstates The Amount Of Lost Capital......................................... 55

c.     Correcting The Most Obvious Errors In
Mr. Ramirez's Calculations Drastically Lowers
The Lost Profits Estimate.............................................................. 57

F.     Plaintiffs' Unspecified "Jury Verdict" Claim Is Unsupported............................. 58

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,
960 F.2d 1020 (Fed. Cir. 1992)..................................................................................... 5

Am. Cap. Corp. v. F.D.I.C.,
472 F.3d 859 (Fed. Cir. 2006)...................................................................................... 9

Am. Sav. Bank v. United States,
62 Fed. Cl. 6 (2004). .......................................................................................... *passim*

Am. Sav. Bank v. United States,
74 Fed. Cl. 756 (2006). ................................................................................. 7, 23, 51

Am. Sav. Bank v. United States,
519 F.3d 1316 (Fed. Cir. 2008)......................................................................... *passim*

Biomedical Patent Mgmt. Corp. v. Cal. Dep't of Health Servs.,
505 F.3d 1328 (Fed. Cir. 2007)...................................................................... 6, 25, 39

Bluebonnet Sav. Bank v. United States,
266 F.3d 1348 (Fed. Cir. 2001)........................................................................... 37, 58

Bohac v. Dep't of Agriculture,
239 F.3d 1334 (Fed. Cir. 2001)................................................................................. 38

Cal. Fed. Bank v. United States,
245 F.3d 1342 (Fed. Cir. 2001)................................................................................. 38

Cal. Fed. Bank v. United States,
395 F.3d 1263 (Fed. Cir. 2005)................................................................... 37, 38, 57

Caroline Hunt Trust Estate v. United States,
470 F.3d 1044 (Fed. Cir. 2006)................................................................................. 13

Citizens Fin. Serv. v. United States,
64 Fed. Cl. 498 (2005). ...................................................................................... 48, 54

Columbia First Bank v. United States,
60 Fed. Cl. 97 (2004). ....................................................................................... 58, 59

v

Engel Indus., Inc. v. Lockformer Co.,
166 F.3d 1379 (Fed. Cir. 1999)...................................................................... 6

Glendale Fed. Bank v. United States,
239 F.3d 1374 (Fed. Cir. 2001).......................................................... 7, 9, 37

Glendale Fed. Bank v. United States,
378 F.3d 1308 (Fed. Cir. 2004).................................................................... 58

Gould, Inc. v. United States,
67 F.3d 925 (Fed. Cir. 1995)......................................................... 5, 26, 39

Granite Mgmt. Corp. v. United States,
416 F.3d 1373 (Fed. Cir. 2005)...................................................................... 5

Hansen Bancorp, Inc. v. United States,
367 F.3d 1297 (Fed. Cir. 2004)...................................................................... 8

Jamesbury Corp. v. Litton Indus. Prods., Inc.,
839 F.2d 1544 (Fed. Cir. 1988)..................................................... 5, 26, 39

Koby v. United States,
53 Fed. Cl. 493 (2002)................................................................................ 45

Landmark Land Co. v. F.D.I.C.,
256 F.3d 1365 (Fed. Cir. 2001).......................................................... 7, 38, 45

Marathon Oil Co. v. United States,
236 F.3d 1313 (Fed. Cir. 2000)...................................................................... 8

Odetics, Inc. v. Storage Tech. Corp.,
185 F.3d 1259 (Fed. Cir. 1999)...................................................................... 6

Old Stone Corp. v. United States,
450 F.3d 1360 (Fed. Cir. 2006)...................................................................... 7

Roseburg Lumber Co. v. Madigan,
978 F.2d 660 (Fed. Cir. 1992)...................................................................... 38

Rumsfeld v. Applied Cos., Inc.,
325 F.3d 1328 (Fed. Cir. 2003).................................................................... 38

San Carlos Irrigation & Drainage Dist. v. United States,
111 F.3d 1557 (Fed. Cir. 1997).................................................................... 38

<u>Sharp Kabushiki Kaisha v. Thinksharp, Inc.</u>,
448 F.3d 1368 (Fed. Cir. 2006)............................................................................ 5

<u>So. Nat'l Corp. v. United States</u>,
57 Fed. Cl. 294 (2003). ...................................................................................... 54

<u>Stone Forest Indus., Inc. v. United States</u>,
973 F.2d 1548 (Fed. Cir. 1992)............................................................................ 9

<u>United States v. Santos</u>,
201 F.3d 953 (7th Cir. 2000). ............................................................................. 48

<u>Vitaline Corp. v. Gen. Mills, Inc.</u>,
891 F.2d 273 (Fed. Cir. 1989)............................................................................ 52

## STATUTES, RULES AND REGULATIONS

28 U.S.C § 2516(a). ........................................................................................... 56

## MISCELLANEOUS

3 Dan B. Dobbs, <u>Law of Remedies</u>, § 12.3(2) (2d ed. 1993)............................... 8

Fed. R. Evid. 701 Advisory Committee Notes (Dec. 2000). ......................... 47

Restatement (Second) of Contracts § 344(a) (1981).................................... 37

Restatement (Second) of Contracts § 351(2) (1981). ................................. 38

Restatement (Second) of Contracts § 352 (1981). ...................................... 38

Thomas J. Madden, <u>et al.</u>, "2006 Year in Review: Analysis of Significant
Federal Circuit Government Contracts Decisions,"
36 Pub. Cont. L. J. 449, 451 (2007). ............................................................. 47

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

AMERICAN SAVINGS BANK, F.A., )
 et al., )
  ) No. 92-872C
  Plaintiffs, )
  ) Senior Judge Smith
  v. )
  )
UNITED STATES, )
  )
  Defendant. )

## <u>DEFENDANT'S INITIAL POST-TRIAL BRIEF</u>

Pursuant to the Court's order of July 28, 2009, defendant, the United States, respectfully submits its initial post-trial brief.

## <u>INTRODUCTION</u>

Plaintiffs failed to support any of their three damages claims at trial.

<u>First</u>, plaintiffs unsuccessfully recast their "second preference" partial restitution claim, which the United States Court of Appeals for the Federal Circuit rejected upon appeal, as a reliance claim. Because this claim contradicts the Federal Circuit's ruling that the contract is not divisible, the "second preference" claim is barred by law. Moreover, the evidence at trial rebutted this claim because (1) the contract term at issue only arose in the context of a larger compromise regarding regulatory capital, (2) the compromise itself underwent numerous changes, and (3) the parties never utilized the second preference.

<u>Second</u>, plaintiffs' cost of replacement capital calculation, prepared by their lay fact witness, Mr. Ramirez, is barred as a matter of law and unsupported by the evidence at trial. Plaintiffs' cost of replacement capital calculation purports to measure the cost of the same $350 million that was the basis of plaintiffs' cost of replacement claim for the breach of the Note

Forbearance, also prepared by Mr. Ramirez, which this Court accepted and the Federal Circuit affirmed.  Plaintiffs' current calculation, however, (1) assigns a higher net cost to the same capital than for the Note Forbearance claim, and (2) overstates the capital's amount and duration. Mr. Ramirez overstated the amount and duration of capital because he did not account for the amortization and depreciation expenses plaintiffs avoided through the reversal of push down accounting after the breach.  Furthermore, Mr. Ramirez overstated the net cost of the replacement capital by ignoring the cost of common stock and inflating the cost of preferred stock and debt.

<u>Third</u>, plaintiffs' lost profits claim, also prepared by Mr. Ramirez, is also barred as a matter of law and was rebutted by the evidence at trial.  Plaintiffs' representation that they replaced the lost capital as part of their cost of replacement capital claim forecloses this claim as a matter of law.  The evidence at trial also demonstrated that, because of the thrift's opportunities to raise outside capital and difficulties finding profitable investment opportunities, the breach did not cause plaintiffs to forego any profitable growth.  Mr. Ramirez's calculations are also speculative as a matter of economics and finance because Mr. Ramirez did not specify the assets in the foregone portfolio, or the liabilities used to fund them.

<u>**STATEMENT OF ISSUES TO BE DECIDED BY THE COURT**</u>

1.      Whether plaintiffs' "second preference" claim, which relies upon the same basis as plaintiffs' partial restitution claim that was reversed as a matter of law, and which proceeds from the assumption that the Assistance Agreement was divisible despite the lack of any evidence at trial of a separate contract, is legally or factually supportable.

2.      Whether plaintiffs' cost of replacement capital claim, which contradicts plaintiffs' earlier representations by assigning a higher net cost of capital to the same $350 million that was

2

the basis for the Note Forbearance award, and which ignores the real-world accounting of the warrant after the breach, is legally or factually supportable.

      3.      Whether plaintiffs' lost profits claim, which proceeds from the premise that plaintiffs did not replace the Warrant Forbearance capital despite their representations that they did so, and is based upon a foregone portfolio of unspecified assets funded by unspecified liabilities, is factually or legally supportable.

## ARGUMENT

Plaintiffs have failed to establish any of their three damages claims.  Plaintiffs' "second preference" claim is legally barred by the Federal Circuit's decision rejecting plaintiffs' previous restitution claim, and is unsupported by the evidence at trial.  Plaintiffs' cost of replacement capital calculation is legally barred because it is inconsistent with their representation of the cost of the same replacement capital in their Note Forbearance calculation, and because their calculations contradict principles of economics and finance.  Lastly, plaintiffs' lost profits theory collides with plaintiffs' representation that they replaced the Warrant Forbearance capital, and their lost profits calculations are speculative and unreliable.

## I.    Plaintiffs' "Second Preference" Claim Fails As A Matter Of Law And Fact

Plaintiffs' "second preference" theory fails as a matter of law and fact.  Plaintiffs' "second preference" theory posits that, during negotiations, the parties entered into a quid pro quo exchange of the Warrant Forbearance for the Federal Savings and Loan Insurance Corporation ("FSLIC") receiving a $214 million "second preference" upon liquidation.  Plaintiffs claimed prior to trial that this amount was $149.8 million more than FSLIC would have received absent the exchange, and thus constitutes "essential reliance damages" for losing the Warrant

Forbearance.  Plaintiffs also contended prior to trial that, upon the bank's sale to Washington

Mutual, Inc. ("WaMu"), the Government utilized the "second preference" and gained $149.8

million.  See Pl. Damages Disclosures (Oct. 17, 2008).

Binding precedent – including the Federal Circuit's decision in this case – bars plaintiffs'

"second preference" claim.  The "second preference" theory is also judicially estopped because

plaintiffs persuaded the Court to adopt a different measure of damages for the breach of the Note

Forbearance.  The "second preference" claim also fails because plaintiffs have not established

that the contract was divisible, and have not met the other requirements for a reliance claim.  The

evidence at trial also rebuts the "second preference" claim because plaintiffs failed to identify the

contract they rely upon, and did not substantiate their claim that they expended $149.8 million in

reliance upon the contract.

### A.      The "Second Preference" Claim Merely Recasts Plaintiffs' Partial Restitution Claim, Which The Federal Circuit Has Already Rejected

Though labeled "reliance," plaintiffs' "second preference" theory mirrors the "second

preference" partial restitution claim that they presented to this Court at summary judgment.  See

Pl. Mot. Summ. J. II ("FSLIC Warrant") (July 26, 2002), at 23; Pl. Mot. Summ. J. V ("FSLIC

Preference") (Feb. 20, 2004), at 2; Am. Sav. Bank v. United States, 62 Fed. Cl. 6, 14, 18-19, 27

(2004).  The Federal Circuit rejected this claim as a matter of law because the Assistance

Agreement was not divisible, and plaintiffs did not appeal from that decision.  See Am. Sav.

Bank v. United States, 519 F.3d 1316, 1328 (Fed. Cir. 2008).  Accordingly, the "second

preference" claim is barred by the law of the case doctrine, res judicata, and waiver.

First, the mandate rule, part of the "law of the case" doctrine, bars the "second preference" theory because the Federal Circuit explicitly instructed that the case be "remand[ed] for the trial court to determine if damages, as opposed to partial restitution, are proper under another theory." Am. Sav., 519 F.3d at 1328. The Federal Circuit further held that awarding partial restitution along with damages "would amount to an unfair windfall[.]" Id. at 1327. Because the mandate rule "prevent[s] relitigation of issues that have been decided and . . . ensure[s] that trial courts follow the decisions of appellate courts[,]",[1] and the Federal Circuit has clearly instructed this Court not to award partial restitution, plaintiffs' "second preference" theory is barred by that rule.

Second, res judicata bars relitigation of the "second preference" theory where plaintiffs have litigated the same theory, based upon the same facts, have been denied relief, and failed to appeal its denial. The "issue preclusion" aspect of res judicata, barring relitigation of decided issues in subsequent proceedings, bars relitigation of plaintiffs' rejected "second preference" theory. See Sharp Kabushiki Kaisha v. Thinksharp, Inc., 448 F.3d 1368, 1370 (Fed. Cir. 2006).

Third, plaintiffs waived their "second preference" theory by not cross-appealing its denial. The Federal Circuit requires that a party seeking to modify a judgment must cross-appeal. See Granite Mgmt. Corp. v. United States, 416 F.3d 1373, 1378-80 (Fed. Cir. 2005). To

---

[1]  Jamesbury Corp. v. Litton Indus. Prods., Inc., 839 F.2d 1544, 1550 (Fed. Cir. 1988), overruled on other grounds, A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020 (Fed. Cir. 1992); see also Gould, Inc. v. United States, 67 F.3d 925, 930 (Fed. Cir. 1995).

preserve their "second preference" theory, plaintiffs had to present it to the Federal Circuit as an alternative grounds for recovery.[2]

>    **B.      The "Second Preference" Theory Is Judicially Estopped Because Plaintiffs Persuaded The Court To Accept A Different Measure Of Damages For The Breach Of The Note Forbearance**

Plaintiffs' "second preference" theory is also judicially estopped because it is inconsistent with the cost-of-replacement capital theory plaintiffs persuaded the Federal Circuit to accept respecting the Note Forbearance.  A party's position is judicially estopped where (1) the new position is clearly inconsistent with the earlier position, (2) the party previously prevailed in persuading a court to adopt the earlier position, and (3) the party would obtain an unfair advantage or impose an unfair detriment on the other party absent estoppel.  See Biomedical Patent Mgmt. Corp. v. Cal. Dep't of Health Servs., 505 F.3d 1328, 1341 (Fed. Cir. 2007).

Plaintiffs' "second preference" theory meets all of these requirements.  At summary judgment, plaintiffs argued that they were owed "rent" they paid to capital providers of the fungible pre-existing capital they used to cover the regulatory capital they lost.  See Pl. Mot. Summ. J. I ("FSLIC Note") (July 26, 2002), at 2-3.  Indeed, plaintiffs further contended that damages from the loss of the Warrant Forbearance caused the same type and category of harm as did damages relating to the Note Forbearance breach, and could not be distinguished.  See id. at 14-15.  Plaintiffs' expert stated that the replacement capital funds were fungible, and that plaintiffs simply identified additional funds as regulatory capital following elimination of both forbearances.  See Am. Sav., 62 Fed. Cl. at 12.

---

[2]  See Odetics, Inc. v. Storage Tech. Corp., 185 F.3d 1259, 1275 (Fed. Cir. 1999); Engel Indus., Inc. v. Lockformer Co., 166 F.3d 1379, 1382-84 (Fed. Cir. 1999).

6

This Court adopted plaintiffs' calculation and awarded cost-of-replacement capital damages of $55.028 million for the breach of the Note Forbearance, which the Federal Circuit affirmed.  See Am. Sav. Bank v. United States, 74 Fed. Cl. 756, 762 (2006); Am. Sav., 519 F.3d at 1322-24.  In light of their admissions that the Note Forbearance and Warrant Forbearance breaches caused the same type of damage, and that the replacement capital was fungible, plaintiffs are judicially estopped from raising the inconsistent "second preference" theory.

**C.**      **Plaintiffs Have Not Established That The Contract Was Divisible, And Have Not Met The Other Legal Requirements For A Reliance Claim**

Plaintiffs' "second preference" theory suffers from a myriad of legal flaws on the merits. First, it is barred by the Federal Circuit's holding that, "unless otherwise stated" by the contract's terms, a final contract is not divisible.  Am. Sav., 519 F.3d at 1324.  Plaintiffs have identified no statement of divisibility in the final contract documents, and could not persuade the Federal Circuit that the contract was divisible.  Accordingly, the contract is no more divisible under their "second preference" theory than it was under their larger "partial restitution" theory.

Second, plaintiffs elected to forego any restitutionary remedy by continuing to perform the contract after the breach.  Given that the contract is not divisible, plaintiffs' continued performance, receipt of funds, and delay in bringing suit demonstrate that plaintiffs treated the elimination of the Warrant Forbearance as a partial breach, thus barring restitution.  See Old Stone Corp. v. United States, 450 F.3d 1360, 1372-74 (Fed. Cir. 2006).

Third, restitution is unavailable where, as here, there is no dispute that plaintiffs enjoyed a net benefit from the contract as a whole.  See, e.g., Landmark Land Co. v. F.D.I.C., 256 F.3d 1365, 1373 (Fed. Cir. 2001); Glendale Fed. Bank v. United States, 239 F.3d 1374, 1380 (Fed.

Cir. 2001) ("Glendale I"); Marathon Oil Co. v. United States, 236 F.3d 1313, 1315 (Fed. Cir.

2000).  Where plaintiffs benefitted from the contract, unwinding part of it would result in an

unfair windfall.  See Am. Sav., 519 F.3d at 1327; see also Hansen Bancorp, Inc. v. United States,

367 F.3d 1297, 1315 (Fed. Cir. 2004).

Fourth, whether under a "reliance" or "partial restitution" theory, plaintiffs must offset

any recovery with benefits plaintiffs received from the Warrant Forbearance during 1989.  See

Am, Sav., 62 Fed. Cl. at 19; 3 Dan B. Dobbs, Law of Remedies, § 12.3(2) (2d ed. 1993).

Plaintiffs claim that losing the Warrant Forbearance cost them either $83.8 million in lost profits

or $106.8 million in cost of replacement capital, and unwinding the contract should result in

these amounts being part of any offset.  Plaintiffs' failure to calculate any offset bars their claim.

Fifth, to the extent plaintiffs are seeking damages based upon an earlier "but-for"

contract, such a claim is not a proper measure of reliance damages.  Plaintiffs contend that their

"second preference" theory is based upon what they "would have been entitled" to receive under

an alleged "agreement prior to FSLIC's exchange of the Warrant Forbearance for the FSLIC

Preference[.]"  Pl. Contentions of Fact and Law (Mar. 18, 2009), at 33.  Plaintiffs' "second

preference" theory is structurally flawed, because it seeks to give the "benefit of the bargain" for

a contract into which the parties never entered.  Such a claim – more akin to a claim for

expectancy damages – is foreclosed by this Court's ruling that any contract was formed by the

final agreement, not any interim steps in the negotiations. "It is that final agreement, the final

contract, that the Court must focus upon." Am. Sav., 62 Fed. Cl. at 17.[3]

_____

[3]  This Court has already held that "[r]eliance damages are awarded for the cost of
performance on a required part of a contract."  Am. Sav., 62 Fed. Cl. at 20.  The Federal Circuit
has defined "essential reliance damages" to mean "expenditures in preparing for or actually

Sixth, plaintiffs' claim for $149.8 million in alleged "reliance" damages violates the Assistance Agreement's terms as interpreted by the Federal Circuit. Section 32 of the Assistance Agreement requires any remedy for breach to "correspond to the magnitude of the economic loss caused[.]" Am. Sav., 519 F.3d at 1326 (quoting section 32). The Federal Circuit ruled that "an award of damages . . . would appear to more closely correspond" to that measure than this Court's previous award of partial restitution. Id. The same logic applies to plaintiffs' $149.8 million "second preference" claim – which is grossly disproportionate to the damages for the loss of a forbearance that the Federal Circuit affirmed – and bars that claim as a matter of law.

Finally, the parol evidence rule bars plaintiffs' use of the negotiating correspondence to look beyond the contract's terms, especially after the Federal Circuit has examined the general contract terms plaintiffs identified and rejected divisibility. See Stone Forest Indus., Inc. v. United States, 973 F.2d 1548, 1552 (Fed. Cir. 1992) (refusing to look behind contract terms to overcome presumption of non-divisibility). Indeed, the Assistance Agreement states that the Transaction Related Documents constitute an "entire agreement" and "supersede[] all prior agreements and understandings of the parties[.]" PX 1305 at 92-872C P 0188 (section 26).[4] Any evidence concerning the negotiations is accordingly not only barred but irrelevant.

### D.      The Record Evidence Conclusively Defeats The "Second Preference" Claim

Even if the Court examines the record to determine the validity of plaintiffs' "second preference" claim, the Court should reject that claim. Plaintiffs failed at trial to identify any

---

performing the contract[.]"  Am. Cap. Corp. v. F.D.I.C., 472 F.3d 859, 868 n.4 (Fed. Cir. 2006); see also Glendale I, 239 F.3d at 1382-83 (citing treatises).

[4]  See also Tr. 660:21-661:4 (Carl).

single document or transaction from the negotiations to form the contract they rely upon as the

basis for their claim.  Plaintiffs never even substantiated the $149.8 million they claim.  And no

evidence implies that any of the documents or discussions from the negotiations created any

contract respecting the Warrant Forbearance or the "second preference."

The "second preference" claim fails for four principal reasons.  First, the "second

preference" merely enforced FSLIC's 30 percent equity stake, as was contemplated in plaintiffs'

initial March 28, 1988 term sheet.  Second, the "second preference" arose within an overall

compromise concerning warrant capital that changed over time, undercutting plaintiffs' quid pro

quo claim.  Third, any "second preference" payment was not in reliance upon the contract

because plaintiffs had control over whether and when to sell the bank.  Lastly, the "second

preference" was never utilized because plaintiffs voluntarily restructured the warrant and the

preference structure upon sale of the bank.

### 1.  The "Second Preference" Merely Enforced FSLIC's 30 Percent Equity Stake Contemplated In The March 28, 1988 Term Sheet

The $214 million "second preference" merely reflected a portion of the 30 percent equity

stake FSLIC was supposed to receive under the March 28, 1988 Term Sheet in return for the

branch network of the failed thrift ("Old American").  PX 1077 at PAS177 0151; see also PX

1079 at WOR466 0484; Tr. 816:4-13 (Bonderman).  The Bass Group received a $500 million

first preference at liquidation in the initial Term Sheet.  PX 1077 at PAS177 0151.  For FSLIC to

receive a 30 percent share, it would need to have a $214 million preference on liquidation, thus

receiving 30 percent of the total preferences and a true 30 percent share ($214 million = 0.30 x

$714 million).

10

Mr. Barnum testified that he believed granting the Warrant Forbearance was logical from the beginning because the warrant was worth real value.  Tr. 25:17-28:18; 69:1-12 (Barnum); see also Tr. 992:5-7 (Ramirez).  The "second preference" accordingly cannot be viewed as a $149.8 million change in the terms of the deal as it was being negotiated.  Given the magnitude of the Government's assistance, its 30 percent stake was economically appropriate in relation to the entire transaction.

> **2.      The "Second Preference" Arose Within An Overall Compromise Concerning Warrant Capital That Changed Over Time**

To the extent that the "second preference" was discussed during the negotiations, the negotiating history contradicts the notion that the Warrant Forbearance was ever exchanged for the "second preference" alone, and further demonstrates that the terms of the overall proposal changed significantly prior to the final contract.

The June 22, 1988 letter that, prior to trial, plaintiffs claimed evidenced a separate quid pro quo actually delineates a compromise of five different terms, including plaintiffs' $500 million first preference for dividends upon a capital transaction, a $200 million (not $214 million) FSLIC "second preference" upon a capital transaction (not upon liquidation), a 70-30 split thereafter, a definition of a capital transaction, and the allowance of a 4-to-1, debt-to-equity ratio in the Bass Group's initial capital contribution.  PX 1115 at WOQ488 2085.

Because the unsigned document only "assumes that ORPOS [Office of Regulatory Policy, Oversight, and Supervision] will agree that this $200 million value is recognized for regulatory capital purposes[,]" id., the letter could not constitute an agreement respecting any forbearance.  Mr. Carl repeatedly explained that he and the attorney negotiating on behalf of FSLIC only

11

reached the "compromise" in the document as a recommendation: "we would each go back to our respective principals with what we recommend as a compromise[.]" Tr. 472:2-4 (Carl); <u>see also</u> Tr. 473:15-17; 663:3-5; 665:15-19; 666:23-25; 674:20-675:10 (Carl). Later communications confirmed that the compromise was tentative because ORPOS had not yet agreed to include the warrant value in regulatory capital. <u>See</u> PX 1118 at PAS117 0186-87 ("tentative agreement with FSLIC"). Mr. Carl explained that ORPOS continued to resist granting a Warrant Forbearance because there was a "significant difference between [FSLIC and ORPOS] in part because of their perceived different mandates. One had an economic mandate, one had more of an accounting supervision mandate." Tr. 465:11-15 (Carl).

Mr. Carl explained that the "compromise" was merely part of the negotiations respecting all parts of the deal. Tr. 669:24-670:3 (Carl). He further explained that negotiations on this issue continued into the autumn of 1988. Tr. 676:4-8 (Carl). The Warrant Forbearance even disappeared from the parties' term sheets in November. Tr. 688:3-10 (Carl). Testimony received in response to the Court's questioning respecting the interim nature of the June 22, 1988 document discussing the Warrant Forbearance confirmed that the document was a "compromise that they had to bring back to their principals." Tr. 667:10-20 (Carl).

Documents created during the negotiations as well as trial testimony show the unsettled nature of the Warrant Forbearance over time until the final deal was reached.[5] Mr. Carl had previously submitted a declaration with the Court swearing that the Warrant Forbearance was exchanged for the warrant. Tr. 657:25-658:7; 659:9-660:1 (Carl). Mr. Bonderman

---

[5] <u>See</u> PX 1128 at USA0029939; DX 428 at FAS029 0942; Tr. 486:12-17; 668:18-22; 669:2-7 (Carl); Tr. 152:9-12 (Barnum).

acknowledged that he believed the Warrant Forbearance was actually exchanged for the warrant itself.  Tr. 810:13-20 (Bonderman).  Mr. Carl also agreed that neither the "second preference" nor the Warrant Forbearance would have existed absent the final contract.  Tr. 685:21-25; 704:16-22 (Carl).  Accordingly, the contract cannot be unwound.  See Caroline Hunt Trust Estate v. United States, 470 F.3d 1044, 1053 (Fed. Cir. 2006).

Testimony from ORPOS officials confirms that ORPOS had not agreed to any Warrant Forbearance until long after June 22, 1988.  Gloria Grimditch was an ORPOS analyst who dealt with Messrs. Carl and Furer in the American Savings forbearance negotiations.  Tr. 1652:11-21; 1659:22-1662:3; 1674:11-1675:22 (Grimditch).  Charles Brewer was an ORPOS financial analyst who was also involved in the American Savings forbearance negotiations, and drafted the American Savings forbearance letter.  Tr. 2748:5-8; 2755:21-2756:5; 2756:25-2757:8 (Brewer).  They testified that ORPOS was concerned about the safety and soundness of permitting the push-down accounting necessary to permit the Warrant Forbearance,[6] and about the safety and soundness of the merchant bank.  Tr. 1668:24-1672:3 (Grimditch); PX 1103 at USA0072640.  Ms. Grimditch testified that both of these issues took months to resolve.[7]

Both Ms. Grimditch and Mr. Brewer testified that ORPOS – which alone dealt with forbearances – was concerned only about regulations and safety and soundness, and not

---

[6]  Tr. 1663:5-1665:22 (Grimditch); Tr. 2752:25-2753:14 (Brewer); PX 1103 at USA0072640.

[7]  Tr. 1674:11-1676:6; 1698:2-1699:8 (Grimditch); see also PX 1125 at USA0131409; PX 1078 at USA0089340-49; PX 1862 at WOR466 0018; PX 1127 at USA0131391; DX 428 at FAS029 0942-43; PX 1216 at USA0138102; DX 1152 at USA0006798; PX 1108 at USA0005714; PX 1107 at USA0197833.

economics, which was FSLIC's concern.[8]  Mr. Brewer explained that it took a long time to

negotiate respecting the use of an "ascribed" versus a "fair" warrant value in determining the

amount of the Warrant Forbearance.[9]  Ultimately, only the Federal Home Loan Bank Board

("FHLBB") was empowered to grant forbearances.  Tr. 1681:11-24 (Grimditch); Tr. 2760:23-

2761:7 (Brewer).  Both agreed that there was no quid pro quo involving the Warrant

Forbearance.[10]

        In addition, the components of the June 22, 1988, five-part compromise underwent

significant changes in further negotiations, demonstrating that the compromise could not have

represented the final agreement in effect when the forbearances were eliminated.  The "second

preference" dollar amount changed numerous times.[11]  The Bass Group proposed that the

Warrant Forbearance be used as restricted capital for limited purposes only.  PX 1118 at PAS177

1087.  The amount and debt ratio of the Bass Group's initial capitalization changed significantly,

as did the amount of its liquidation preference.[12]  The parties continued discussing the amount of

the "second preference" and grant of the Warrant Forbearance in connection with whether to

require contingency component capital for New American's merchant bank service corporation.

---

    [8]  Tr. 1696:10-1697:25; 1717:16-1720:8 (Grimditch); Tr. 2758:5-12; 2758:19-2759:1; 2760:23-2761:7 (Brewer).

    [9]  Tr. 2768:13-19; 2773:22-2775:17; 2776:1-6 (Brewer).

    [10]  Tr. 1675:24-1680:16; 1681:25-1683:20 (Grimditch); Tr. 2785:6-19 (Brewer).

    [11]  See PX 1115 at WOQ488 2085; see also PX 1118 at PAS177 0186; PX 1128 at USA0029939; Tr. 684:25-685:20 (Carl).

    [12]  See PX 1118 at PAS177 0187, 0189; PX 1409 at ASDOJ-NY-23-0015; PX 1649 at PAS039 0559; Tr. 900:9-19 (Bonderman); Tr. 1945:5-1948:23 (Meyer).

See DX 428 at FAS029 0942.[13]  Mr. Bonderman explained that the negotiations – including those respecting the warrant – were never complete until the final deal was signed.  Tr. 736:11-19.

The final deal structure deviated significantly from the June 22, 1988 document.  Under the final contract, if the bank were sold, the Bass Group would receive the first $350 million of sale proceeds – not $500 million, see Tr. 732:13-16 (Bonderman), FSLIC would receive the next $214 million, and the remainder would be split 70-30 in the Bass Group's favor.  PX 1272 at TM 01864-66.[14]  These preferences would be reduced by dividends paid.  PX 1272 at TM 01864-66.  The Bass Group also had a $500 million first dividend preference, followed by a 70-30 dividend split in the Bass Group's favor.  PX 1272 at TM 01862; PX 1649 at PAS039 0551, 0558.

The final contract no longer pegged the "second preference" amount to the warrant value – instead, it was recorded at $214 million, while the warrants were recorded at $167.2 million.  PX 1406 at ASDOJ-NY-98-0134.  The Warrant Forbearance itself remained under negotiation, and was granted only later for certain limited purposes at $167.2 million.  PX 1409 at ASDOJ-NY-23-0032; PX 1891 at WOF046 0063-64.  Nothing in the contract documents evinces an exchange of the "second preference" for the Warrant Forbearance.

### 3.    Any "Second Preference" Payment Was Not In Reliance Upon The Alleged Secondary Contract Because Plaintiffs Had Control Over Whether And When To Sell The Bank

The evidence shows that plaintiffs did not pay the "second preference" in reliance upon their alleged secondary divisible contract, because, even after the breach, they could have paid up

---

[13]  See also Tr. 479:19-480:4; 674:8-19; 682:3-12 (Carl).

[14]  See also Tr. 731:7-9; 732:17-23 (Bonderman).

15

to $500 million in dividends to the Bass Group instead of selling the bank.  These dividends would have diminished the value of the bank, and, correspondingly, the value of the "second preference" upon liquidation.  Any expenses associated with the "second preference" were accordingly incurred because of plaintiffs' independent business decision to sell the bank instead of keeping the bank and paying dividends.

Bass Group members stated that, after the transaction, the FSLIC warrant was worth less than 30 percent of the bank, and the "second preference" was worth less than $214 million, because the Bass Group could pay dividends rather than sell the bank.[15]  Mr. Carl testified that the "second preference" was, even at the outset, a bargain for plaintiffs.  Tr. 670:7-12.  Plaintiffs accordingly could not have lost $149.8 million in reliance upon the contract.

### 4.    The "Second Preference" Was Never Utilized Because Plaintiffs Voluntarily Restructured The Warrant Upon The Bank's Sale

The evidence demonstrates that any alleged secondary contract was renegotiated at the bank's sale to WaMu, and the "second preference" was never paid.  Mr. Meyer, the Resolution Trust Corporation ("RTC") official responsible for American Savings, and lead negotiator respecting the warrant in the sale to WaMu,[16] testified that the FSLIC Resolution Fund ("FRF"), as successor to FSLIC, modified the security holders agreement to permit its warrant to be paid in stock instead of cash, Tr. 1835:7-1837:23 (Meyer), and that FRF was given first liquidation priority in the WaMu sale.  Tr. 1837:24-1839:22; 1965:4-1968:17 (Meyer).  Instead of 30

---

[15]  See Tr. 613:12-614:2; 695:20-696:1 (Carl); Tr. 1981:2-1982:10 (Meyer); PX 1272 at TM 01861-62; PX 1649 at PAS039 0551-0558; PX 1408 at PAS070 0863.

[16]  Tr. 1756:20-1760:10; 1764:17-1766:14; 1832:7-1833:5 (Meyer).

percent, FRF received 35 percent of the WaMu shares exchanged for the bank.[17]  Because

plaintiffs voluntarily restructured the warrant, and the "second preference" was thus never paid,

the distribution of proceeds to FDIC cannot be considered a reliance cost.

## II.   Plaintiffs' Cost Of Capital Calculation Is Legally Precluded And Factually Flawed And Unreliable

Plaintiffs' cost of capital claim is precluded because of judicial estoppel and the law of

the case.  Even if plaintiffs' cost of capital claim were not legally precluded, plaintiffs' cost of

replacement capital calculation is flawed and unreliable because it:  (1) overstates the amount

and duration of capital to be replaced; and (2) overstates the net cost of replacement capital,

compared both to Mr. Ramirez's Note Forbearance calculations and as a matter of economics and

finance.

### A.   Plaintiffs' Cost Of Replacement Capital Calculation

Mr. Ramirez's cost of capital calculation consists of three primary components.  The first

is the quantity of regulatory capital Mr. Ramirez claims plaintiffs needed to replace as a result of

the breach.  DX 2103.[18]  Mr. Ramirez claims this quantity was $167 million from January 1,

1990, to December 28, 1998.  DX 2103.[19]  The second component of Mr. Ramirez's cost of

capital calculation is a weighted average cost of capital ("WACC"), which he computed on a

quarterly basis, resulting in an average of 12.59 percent over the relevant time period.  Tr.

1265:14-20; Tr. 2227:5-22 (Thakor); DX 2103.  Mr. Ramirez multiplies the first component

---

[17]  Tr. 1844:1-7 (Meyer); PX 1756 at FAS013 0888; PX 1760 at FAS013 0726; DX 808 at FAS011 0023-24, 0054.

[18]  See also PX 5003.24; Tr. 1264:17-23 (Ramirez); Tr. 2226:21-2227:4 (Thakor).

[19]  See also PX 5003.28; Tr. 1266:3-16 (Ramirez); Tr. 2226:9-20 (Thakor).

($167 million) by the second component (12.59 percent), resulting in $189.1 million of replacement capital.[20]

Mr. Ramirez recognized that an offset to the $189.1 million cost of capital calculation is necessary because – unlike the intangible regulatory capital that was purportedly lost –  the replacement tangible capital plaintiffs used to replace the regulatory capital can be directly invested to produce a return.[21]  Mr. Ramirez multiplied the $167 million in purported lost capital by 5.48 percent, the average one-year constant maturity Treasury ("CMT") rate for the applicable period, to compute the offset benefit at $82.3 million.  DX 2103.[22]  Finally, Mr. Ramirez subtracts the $82.3 million offset from his previous calculated figure of $189.1 million, resulting in the $106.8 million figure he claims constitutes the net cost of replacement capital.  DX 2103; PX 5003.28; Tr. 1277:5-7 (Ramirez); Tr. 2230:3-11 (Thakor).

**B.    Plaintiffs' Cost Of Capital Claim Is Legally Barred Because The Calculation Contradicts Plaintiffs' Earlier Claims**

The Court should reject plaintiffs' cost of replacement capital claim because the Court has already adopted a calculation for valuing the same alleged replacement capital.  Further, plaintiffs' current calculations contradict their earlier calculations, and the contradictions all increase the cost of replacement capital damages estimate.  Plaintiffs' inconsistent calculations are thus barred by law of the case and judicial estoppel.

---

[20]  DX 2103; PX 5003.28; Tr. 1276:22-1277:7 (Ramirez); Tr. 2227:23-2228:8 (Thakor).

[21]  DX 2103; Tr. 1269:22-1270:12 (Ramirez); Tr. 2228:9-20; 2325:3-21 (Thakor).

[22]  PX 5003.28; Tr. 1276:4-25 (Ramirez); Tr. 2228:9-2229:20 (Thakor).

1.      **The Court Has Already Adopted A Calculation For Valuing The Same Alleged Replacement Capital Plaintiffs Seek To Measure In Their Current Cost Of Capital Calculation**

This Court previously adopted a calculation for valuing the same initial $350 million capital infusion that plaintiffs seek to value in their current cost of capital calculation, but plaintiffs now claim a higher cost for the same capital.

When plaintiffs moved for summary judgment as to damages for breach of the Note Forbearance, plaintiffs represented to the Court that they used the investors' initial $350 million capital contribution to replace the Note Forbearance capital.  Plaintiffs sought to measure the cost of replacing the capital from the loss of the Note Forbearance based upon calculations performed by Mr. Ramirez, set forth in a 2002 Declaration and later a 2005 Declaration, and submitted to the Court by plaintiffs.  Pl. Mot. Sum. J. I. ("FSLIC Note") (July 26, 2002), at Table I.  Plaintiffs represented that their cost of capital calculation was the most accurate and reliable means of calculating the cost of the replacement capital.  See id. at 3, 16.  Plaintiffs, indeed, claimed that the "dollar amounts plaintiff NA Capital actually paid to the various capital providers are indisputable."  Id. at 18.

Plaintiffs argued that damages from the loss of the Warrant Forbearance caused the same type and category of harm as did damages relating to the Note Forbearance breach, and could not be distinguished.  See id. at 14-15.  Plaintiffs' own experts have stated that the funds used for capitalization were fungible, and that plaintiffs simply identified additional funds as regulatory capital following elimination of both forbearances.  See Am. Sav., 62 Fed. Cl. at 12.  The Court accepted Mr. Ramirez's cost of capital calculation related to the loss of the Note Forbearance as

19

reflecting the plaintiffs' cost of replacement capital and awarded $55.028 million for the breach

of the Note Forbearance, which was affirmed upon appeal.  Am. Sav., 519 F.3d at 1321-24.

Plaintiffs' current cost of capital calculation purports to measure the cost of replacing the

Warrant Forbearance capital, using the same initial $350 million capital infusion plaintiffs used

to replace the Note Forbearance.  The evidence at trial confirmed that plaintiffs viewed the

capital used to replace the Note and Warrant Forbearances as fungible.  Mr. Barnum testified

that, "[w]ell, I know you like to parse capital, and I can't, so to me, you know, our capital was the

350, plus the 167, plus the 240.  That was our total capital, and it's totally fungible, one didn't

count any more than another."  Tr. 97:2-7 (Barnum).[23]  As Mr. Bonderman explained, the

Warrant and Note Forbearances provided the exact same regulatory capital benefits to the bank.

Tr. 797:1-11, 799:7-12.

Because plaintiffs' capital was "totally fungible," Tr. 97:6 (Barnum), there is no logical

basis for the cost of the same $350 million in replacement capital to differ when it is replacing

the Warrant Forbearance as opposed to the Note Forbearance.  As Dr. Thakor explained, Mr.

Ramirez's two sets of calculations measure "a cost of replacement capital for, essentially, the

same pool of capital . . . A dollar of capital is a dollar of capital, and it was part of the total

package of financing the 350 million dollars that was ostensibly sterilized for this purpose."  Tr.

2318:23-2319:6 (Thakor).  This is especially true when using the same methodology for both

calculations.  Tr. 2139:18-22 (Thakor); DX 2129.  As Dr. Thakor explained, when "computing

the cost from the same of pool of capital," it is economically unsound to "use dramatically

---

[23]   See also Tr. 28:24-29:3; 97:11-16; 122:3-6 (Barnum); Tr. 1002:4-6 ("Capital is
capital.  We had intended to use all our capital for profitable uses.") (Ramirez).

different assumptions for the key components of the calculations" that have the effect of increasing the cost of replacement capital estimate.  DX 2129; Tr. 2319:25-2321:2 (Thakor).

>    **2.    Plaintiffs' Current Calculations Contradict Their Earlier Calculations And Increase The Cost Of Replacement Damages Estimate**

Plaintiffs' current calculations contradict their earlier calculations.  Moreover, each contradiction "increases the cost-of-replacement capital damage estimate" to the benefit of plaintiffs and to the detriment of the Government.  Tr. 2320:22-2321:2 (Thakor); DX 2129.  The contradictions between Mr. Ramirez's Note Forbearance and Warrant Forbearance cost of capital calculations relate to the second and third components of his calculation:  (1) the WACC; and, (2) the offset benefit.  Mr. Ramirez inexplicably applies different assumptions to his current cost of capital calculation for the Warrant Forbearance compared to his similar calculation for the Note Forbearance, despite measuring the cost of replacement capital for "essentially, the same pool of capital."  Tr. 2318:24-25 (Thakor).

>    **a.    Contradictions In Mr. Ramirez's Weighted Average Cost of Capital Calculation**

With respect to the WACC, the second component of Mr. Ramirez's current cost of capital calculation, Mr. Ramirez, as noted above, multiplied the WACC by the purported amount of lost regulatory capital to determine the cost of replacement capital, prior to the offset.  Mr. Ramirez contradicted his earlier Note Forbearance calculation by increasing the WACC, which increases the damages calculation compared to what it would have been had Mr. Ramirez simply used the same methodology and inputs as he did in his Note Forbearance calculation.  Tr. 2320:25-2321:2; 2324:13-18 (Thakor); DX 2129.

21

Calculating a thrift's weighted cost of capital requires (1) reviewing all of an institution's multiple sources of financing, (2) identifying the cost associated with each source of financing, and then (3) taking a weighted average of the different sources.  Tr. 2268:14-25 (Thakor). Despite measuring "the same pool of capital for which he's computing the cost of replacement capital," in both instances, Tr. 2318:25-2319:1 (Thakor), Mr. Ramirez calculated the WACC at 12.59 percent when valuing the Warrant Forbearance, yet calculated the WACC at 10.44 percent when valuing the Note Forbearance.  DX 2132; DX 898; Tr. 2324:1-8 (Thakor).  Thus, Mr. Ramirez increased his measurement of the WACC by 20 percent from one calculation to the next.  Tr. 2324:1-8 (Thakor).

Mr. Ramirez turbo-charged plaintiffs' damage claim by making two important deviations from his prior calculation.  First, Mr. Ramirez used different weightings for the sources of funding by ignoring the common stock.  In his Note Forbearance calculation, Mr. Ramirez recognized, correctly, that there are three sources of funding costs:  debt, preferred stock, and common stock.  DX 898; DX 2132; Tr. 2322:11-2324:8 (Thakor).  Mr. Ramirez attributed a 74.05 percent weighting to the debt, an 18.87 percent weighting to the preferred stock, and a 7.08 percent weighting to the common stock.  Id.  In contrast, in his 2008 calculation for the Warrant Forbearance damages, Mr. Ramirez ignored the common stock, and used a 79.68 percent weighting to debt and a 20.32 percent weighting to the preferred stock.  DX 2132; Tr. 2322:11-2324:8 (Thakor).  In his 2005 cost of capital calculation, Mr. Ramirez attributed a 0 percent rate to the cost of common stock.  Tr. 1363:8-14 (Ramirez).[24]  By ignoring the 0 percent cost of the common stock, and allocating the weighting he previously provided to the common stock to the

---

[24]  See also DX 898, DX 2131, DX 2132; Tr. 2323:18-20 (Thakor).

debt and preferred stock, Mr. Ramirez improperly increased the WACC in his Warrant Forbearance calculation.

Second, with respect to the WACC calculation's cost of preferred stock, Mr. Ramirez increased the cost of preferred stock from 17.25 percent in his Note Forbearance calculation to 23.96 percent in his Warrant Forbearance calculation.  DX 898; PX 1820; DX 2132; Tr. 1326:21-1327:1 (Ramirez); Tr. 2323:13-18 (Thakor).  In his current calculation, Mr. Ramirez "gross[ed] up" the 17.25 percent rate that American Savings actually paid to 23.96 percent to obtain what Mr. Ramirez calls a "pretax number."  Tr. 2280:7-12 (Thakor).  Regardless of whether this "gross up" was justified or not, and it is not justified as we explain in Section C.3 below, it is beyond dispute that (1) Mr. Ramirez now contradicts the rate assumptions in his Note Forbearance calculation, and (2) this contradiction inflates the WACC.

### b.      Contradictions In Mr. Ramirez's Offset Benefit Calculation

Mr. Ramirez also contradicted his Note Forbearance calculation in his offset benefit calculation by choosing the one-year CMT rate, a much lower rate than the FSLIC Note rate from his Note Forbearance calculation.  The offset benefit reduces the net cost of replacement capital because it is subtracted from the WACC, so a reduction in the amount of offset benefit increases the net cost of replacement capital, and thus increases damages.  Mr. Ramirez's choice to use the lower, one-year CMT thus increased his damages estimate.

In 2005, Mr. Ramirez presented the Court with a number of different offset rates for the Court to consider, DX 898, and the Court based its damage award for the Note Forbearance on the FSLIC Note rate.  Am. Sav., 519 F.3d at 1323; Am. Sav., 74 Fed. Cl. at 761-62; Tr. 2336:3-9

(Thakor).  In contrast, for the Warrant Forbearance, Mr. Ramirez selected the one-year CMT rate.

DX 2133.[25]

The two rates are significantly different.  The average FSLIC Note rate was 7.25 percent, whereas the average one-year CMT rate was 5.48 percent.  Tr. 2336:17-2337:2 (Thakor); DX 2135.  The effect of this significantly lower offset benefit rate in Mr. Ramirez's current calculation is "to inflate damages because the offset benefit that [Mr. Ramirez] attaches to the replacement capital is smaller."  Tr. 2337:6-8 (Thakor).

> ### c.  Mr. Ramirez's Changes Produce A Higher Alleged Cost For The Same Capital Used In The Note Forbearance Calculation

The changes between Mr. Ramirez's 2005 and 2008 WACC and offset calculations totalled 3.92 percent.  DX 2136.  Thus, Mr. Ramirez's "net spread in 2008 is 3.92 percent higher than his net spread in 2005."  Tr. 2338:3-15 (Thakor); DX 2136.

The impact of the higher spread becomes apparent when the Note Forbearance calculation is compared to the Warrant Forbearance calculation.  For the Note Forbearance, Mr. Ramirez computed a cost of $55,028,000 to replace an average capital amount of $183.316 million, a ratio of *30 percent* of damages to purported lost capital.  Id.  In contrast,  Mr. Ramirez now computes a cost of $106,835,000 to replace $167,000,000 of purported lost capital from the Warrant Forbearance, a ratio of *64 percent* to purported lost capital.  Quite creatively, Mr. Ramirez more than doubles his previous calculation.

---

[25]  See also PX 5003.28; Tr. 1276:4-25 (Ramirez); Tr. 2326:4-5; 2335:25-2336:23 (Thakor).  The one-year CMT rate was not among the alternative rates Mr. Ramirez presented to the Court in his Note Forbearance calculation.  DX 898; Tr. 1386:3-1387:18 (Ramirez).

24

### 3.   Judicial Estoppel And Law Of The Case Accordingly Bar Plaintiffs' Cost Of Capital Claim

The doctrines of judicial estoppel and law of the case bar plaintiffs' enhanced claims. Turning first to judicial estoppel, courts look generally at three elements to determine whether the doctrine bars a party's present assertion: (1) whether the new position is clearly inconsistent with an earlier position; (2) whether the party previously prevailed in persuading a court to adopt the earlier position; and (3) whether a party would obtain an unfair advantage or impose an unfair detriment on the other party if not estopped from asserting its new position. Biomedical Patent Mgmt. Corp., 505 F.3d at 1341. Plaintiffs' attempt to revise their original calculation with a new, inconsistent analysis meets each prong of the judicial estoppel test.

First, there can be no doubt that plaintiffs' new position is inconsistent with their earlier position. Plaintiffs' new cost of capital calculation grossly inflates the claimed net cost of the same amount of capital computed in their earlier calculations by: (1) increasing the WACC through a change in the weighting of their different funding sources, (2) further altering the "weighted cost of capital" by grossing-up the rate for preferred stock; and (3) reducing the offset rate from the FSLIC Note rate to the one-year CMT rate. These contradictions are particularly significant because plaintiffs previously represented to the Court that their Note Forbearance calculations were the most accurate and reliable means of calculating the cost of capital. See Pl. Mot. Summ. J. I ("FSLIC Note") (July 26, 2002), at 3, 16, 18.

Second, the plaintiffs persuaded the Court to accept their earlier position, and plaintiffs received $55.028 million for the loss of the Note Forbearance premised upon the Court's acceptance of plaintiffs' position.

25

Third, plaintiffs' newfound position has put the Government to the enormous and unnecessary expense of responding to plaintiffs' new analysis at trial.  Moreover, if plaintiffs had admitted when they performed their 2005 calculations that they were really just rough estimates, subject to revision, the Court would have likely rejected the Note Forbearance calculation as speculative.  Plaintiffs' new calculation thus contradicts their earlier position to the Government's detriment, and is barred by judicial estoppel.

Finally, the law of the case doctrine aims to "prevent the relitigation of issues that have been decided and to ensure that trial courts follow the decisions of appellate courts."  Jamesbury Corp., 839 F.2d at 1550; see also Gould, 67 F.3d at 930.  Because the Federal Circuit affirmed an award of the "actual costs paid to capital providers," as measured by plaintiffs' original calculation, plaintiffs' new, more aggressive valuation is barred by the law of the case.  Am.Sav., 519 F.3d at 1323.

### C.  Mr. Ramirez's Cost Of Capital Calculation Is Flawed And Unreliable

Assuming plaintiffs' cost of capital calculation is not legally barred because of its contradictions with plaintiffs' earlier cost of capital calculation, this Court should nonetheless reject plaintiffs' cost of capital calculation because it is factually flawed and unreliable.

All three components of Mr. Ramirez's cost of capital calculation – the calculation of the amount of capital plaintiffs needed to replace, the WACC, and the offset benefit – contain serious flaws.  With respect to the first component, Mr. Musika explained that Mr. Ramirez erred by assuming the loss of $167 million of purported lost capital for the entire time period of his calculation.  Mr. Ramirez improperly ignored the effect of the avoided depreciation and

26

amortization expenses associated with the reversal of push down accounting.  Moreover, Mr. Ramirez improperly extended his cost of capital calculation beyond December 31, 1996.

With respect to the second component of his calculation, Dr. Thakor explained that Mr. Ramirez improperly increased the WACC.  Finally, with respect to the third component of his calculation, Dr. Thakor explained that Mr. Ramirez erroneously used the one year CMT to calculate the offset benefit.

### 1. Mr. Ramirez Greatly Overstates The Amount Of Capital To Be Replaced Because He Erroneously Ignores The Effect Of The Avoided Depreciation And Amortization Expenses Associated With The Reversal Of Push Down Accounting

When calculating the amount of capital to be replaced, Mr. Ramirez improperly ignored the avoided depreciation and amortization expenses associated with the reversal of push down accounting.  Tr. 1453:6-9; 1460:12-20 (Ramirez).[26]

As Mr. Musika explained, while Mr. Ramirez claims $167 million of lost capital for each period as a result of the breach, far less capital was actually lost because of the mitigating effect of the reversal of push down accounting.[27]  Mr. Musika explained in detail why far less capital was lost as a result of the breach than the amount claimed by Mr. Ramirez.  Mr. Musika explained that, when the $167 million warrant was "pushed down" to the bank level so that the warrant could count as regulatory capital, generally accepted accounting principles ("GAAP")

---

[26]  See also Tr. 2076:21-2077:5 (Musika); DX 2105; Tr. 2232:23-2233:18 (Thakor); DX 2001; DX 2014; PX 5003.28.

[27]  DX 2007; DX 2008; DX 2009; DX 2010; DX 2014; Tr. 2058:18-2064:7; 2078:9-2079:18 (Musika); see DX 2107, 2108, 2109; Tr. 2235:5-:2240:2 (Thakor) ("the regulatory capital associated with the warrant didn't stay at $167 million.  Immediately after the breach, that amount was 93.5 million dollars; and, then, because of the depreciation and amortization of the push-down assets, that amount declined over time until, by 1996, it was gone.").

27

required that noncurrent assets of $167 million be pushed down to the bank's balance sheet.  Tr. 2040:8-2043:14 (Musika); DX 2002; DX 2003.  It was "not an option" for plaintiffs under GAAP, or regulatory accounting principles, to push down the warrants to the bank level without also pushing down the corresponding noncurrent assets.  Tr. 2047:9-2048:18 (Musika); DX 2003.

The impact of having these noncurrent assets on the balance sheet is that the noncurrent assets must be depreciated and amortized, reducing the bank's income and regulatory capital.  Tr. 2046:2-16 (Musika);  DX 2003.  Accordingly, under push down accounting, although the recording of the warrant increased the bank's regulatory capital by $167 million, the depreciation and amortization of the noncurrent assets *decreased* regulatory capital.  Tr. 2046:17-25 (Musika).  As Mr. Musika explained, pursuant to push down accounting, there was "a trade-off because, over time one reduces the other, but you do get 167 million on day one, but you recognize this, booking the transaction, that that's going to go away over time as your assets depreciate."  Tr. 2048:21-25 (Musika).[28]

After the breach, when plaintiffs could no longer count the warrant toward regulatory capital, plaintiffs permissibly, and wisely, reversed the push down accounting.  Tr. 2065:14-2066:14, 2075:22-2076:6 (Musika).  The reversal of the push down accounting "removed the remaining depreciation and amortization base of the noncurrent assets" at the same time that the $167 million in regulatory capital from the warrant was eliminated.  Tr. 2068:22-25 (Musika); DX 2011.  As a result, just as the benefit from the warrant to regulatory capital was *reduced* by

---

[28]  See also Tr. 2049:11-16 (the warrant "increases capital on day one, when the transaction was booked by 167 million dollars, and over the course of the life of the assets, it decreases capital by 167 million dollars.") (Musika).

28

the requirement to depreciate and amortize the noncurrent assets pursuant to push down accounting, once the push down accounting was reversed, the amount of capital lost as a result of the breach was also *reduced* (i.e., the negative impact from the breach was mitigated) because plaintiffs no longer had to depreciate and amortize the noncurrent assets that had previously been pushed down.  Tr. 2064:8-20, 2067:25-2069:4 (Musika); DX 2001; DX 2011; DX 2012; DX 2014.

Mr. Musika explained the effect of the breach using the date of December 31, 1989, as an example.  As of that date, had there been no breach, plaintiffs' regulatory capital related to the warrant would have been a positive $93.5 million ($167 million from the warrant minus cumulative depreciation and amortization from the non-current assets, as of that time, of $73.5 million).  Tr. 2070:3-15 (Musika); DX 2012.  Had the breach occurred, *and there had been no reversal of push down accounting,* the total loss from the breach would have been $167 million, the difference between regulatory capital from the warrant of $93.5 million without the breach and a loss of $73.5 million in regulatory capital from the depreciation and amortization of the noncurrent assets.  Tr. 2071:2-16 (Musika); DX 2012.  With the reversal of the push down accounting, however, the reduction in regulatory capital from the breach was limited to $93.5 million, the difference between the $93.5 million of regulatory capital that would have existed absent the breach less $0 because of the non-existence of any depreciation and amortization from the noncurrent assets.  Tr. 1460:12-22 (Ramirez); Tr. 2071:17-2073:1 (Musika); DX 2012.

Plaintiffs' audited financial statements recognized the mitigating impact upon the loss of regulatory capital from the elimination of the noncurrent assets as a result of the reversal of the push down accounting.  PX 1 at 1402.[29]

Mr. Musika explained that the amount of lost regulatory capital from the breach could be calculated for each date after December 31, 1989 in the same manner using plaintiffs' financial statements.[30]  Mr. Musika summarized his calculations in a chart setting forth (1) the actual net amount of capital lost because of the breach for each quarter and (2) the difference between that amount and the amount Mr. Ramirez claims was lost because of the breach for that period.[31]

Significantly, although Mr. Ramirez, for purposes of his cost of capital calculation, claimed $167 million was lost for each period, he also prepared a lost profits model in which he utilized estimates for the net amount of unamortized capital that are essentially identical to the amounts of unamortized capital set forth by Mr. Musika.  Tr. 1458:2-6 (Ramirez); Tr. 2079:19-2082:20 (Musika); DX 2015.  By calculating lost profits based upon Mr. Musika's computations of remaining unamortized capital (which are the numbers Mr. Ramirez should have also used for his cost of capital calculation), Mr. Ramirez has "directly contradict[ed] himself," and this contradiction "obviously cause[s] the cost of the replacing [of] that capital to be an inflated and incorrect and higher amount."  Tr. 2081:21-22; 2083:4-6 (Musika).

---

[29]  See DX 2013 ("However, the elimination of the $167 million increased net income for 1989 by $73 million over what would have been reported because the cost of certain assets required were reduced in accordance with Generally Accepted Accounting Principles ("GAAP") related to purchase accounting."); see also Tr. 2073:2-2074:15 (Musika).

[30]  Tr. 2062:2-2063:3; 2077:24-2079:14 (Musika); DX 2008; DX 2009; DX 2014.

[31]  Tr. 2077:24-2079:7 (Musika); DX 2014; see also Tr. 2238:5-2239:22 (Thakor); DX 2108; DX 2109.

Mr. Ramirez, unsuccessfully, attempted to justify his failure to account for the depreciation and amortization of the noncurrent assets in his calculation of the cost of replacement capital by claiming that: (1) the warrant capital did not amortize; and (2) it was unreasonable to include amortization but to exclude earnings.  Tr. 1464:1-9 (Ramirez); PX 5003.24; see Tr. 2106:8-2107:1 (Musika).  Although the warrant capital itself did not amortize, Mr. Musika noted that Mr. Ramirez "doesn't even address the issue of the noncurrent assets reducing capital" and the reversal of push down accounting.  Tr. 2106:15-23 (Musika).  As to Mr. Ramirez's point that it is unreasonable to exclude earnings, Mr. Musika explained that "[t]his is a . . . cost of replacement capital, not a lost profits calculation" and "there is no component of earnings to be included."  Tr. 2107:2-10 (Musika); see 2246:25-2246:8 (Thakor).

## 2.    Mr. Ramirez Erroneously Extended His Cost Of Replacement Capital Calculation Beyond December 31, 1996

In addition to Mr. Ramirez's error in overstating the amount of lost capital for each period, Mr. Ramirez erroneously extended his cost of replacement capital calculation beyond December 31, 1996.  DX 2001; Tr. 2083:6-14 (Musika).

Mr. Musika explained that, absent the breach, through the recognition of amortization and depreciation expenses, all of the capital from the warrant would have been eliminated as of December 31, 1996.  Tr. 2083:17-2084:17 (Musika).[32]  In contrast, Mr. Musika noted, Mr. Ramirez continued his calculation of purported lost capital through December 1998.  Tr. 2086:9-12 (Musika); PX 5003.28; see DX 2015; DX 2016.  Mr. Musika noted that, although the forbearance was scheduled to last through December 1998, "there's no reason to carry out" the

---

[32] See DX 2008; DX 2009; DX 2104; DX 2114; Tr. 2258:18-2259:17 (Thakor); Tr. 2087:24-2088:18 (Musika).

31

lost capital calculation that long because "there's no net capital left.  There's zero.  There's nothing to be replaced after September of 1996."  Tr. 2087:14-22 (Musika); see Tr. 2259:16-17 (Thakor); DX 2104.

An alternative reason why Mr. Ramirez's cost of capital calculation should terminate in 1996 is because, in the real world, Washington Mutual acquired American Savings in 1996.  Tr. 2262:13-16; 2264:6-10 (Thakor).  As of that date, American Savings ceased to be an independent entity, the Government exercised the warrants, and they were therefore gone.  There is also no evidence as to what the purported cost was to Washington Mutual of replacing the regulatory capital.  Tr. 2263:16-2264:20 (Thakor).

Although, at first blush, it might seem that Mr. Ramirez's error in extending his cost of capital calculation beyond December 31, 1996, is of minor mathematical significance because only small amounts of regulatory capital from the warrant would have been remaining as of the end of 1995, it must be remembered that Mr. Ramirez's cost of capital calculation assumes, incorrectly, the existence of $167 million of lost capital for all periods.  PX 5003.28; Tr. 2090:20-2091:13 (Musika).  Mr. Musika demonstrated that correcting Mr. Ramirez's error by terminating the cost of replacement capital as of December 31, 1996 alone would reduce Mr. Ramirez's calculation by $19,166,000.  DX 2016; Tr. 2091:22-2092:25 (Musika).

### 3.    Mr. Ramirez Incorrectly Calculates Plaintiffs' Weighted Average Cost Of Capital

Mr. Ramirez made three significant errors in computing plaintiffs' WACC.  Specifically, (1) Mr. Ramirez incorrectly ignored the tax deductibility of plaintiffs' debt, (2) Mr. Ramirez incorrectly measures that portion of the WACC attributable to the average cost of plaintiffs'

preferred stock, and (3) Mr. Ramirez ignores the cost of plaintiffs' common stock when

calculating the weighted cost of capital.  DX 2127; Tr. 2273:13-19 (Thakor).

First, Mr. Ramirez erred in measuring the average cost of plaintiffs' debt by not taking

into account that the interest on that debt is a tax deductible expense.  Tr. 2273:25-2275:5

(Thakor).  Dr. Thakor explained that Mr. Ramirez "simply ignores the tax adjustment" by

utilizing the nominal cost of the debt in his WACC calculation "when what he should have done

. . . is get the effective after-tax cost of debt."  Tr. 2274:18-24 (Thakor).  By ignoring the tax

deductible nature of the interest on the debt, Mr. Ramirez "violates the basic principles of

finance" about how economists compute the weighted average cost of capital; this error leads to

an exaggerated estimate of damages.  Tr. 2275:2-5 (Thakor).  Dr. Thakor concluded that, had Mr.

Ramirez correctly accounted for the tax deductible nature of plaintiffs' debt, the cost attributable

to the debt would have been 7.00 percent (7.33 percent arithmetic average) rather than the

nominal 9.72 percent interest rate that Mr. Ramirez utilized.  Tr. 2277:12-2278:14 (Thakor); DX

2121; DX 2127.

With respect to the cost of preferred stock, Mr. Ramirez erred by "incorrectly gross[ing]

the cost of preferred stock to a number that doesn't correspond to the way that we would

compute the cost of preferred stock in finance."  Tr. 2279:9-13 (Thakor).  Mr. Ramirez took the

dividend plaintiffs paid on the preferred stock (17.25 percent) and, in order to compute what Mr.

Ramirez described as "a pretax number," divided the 17.25 percent figure by one minus the

presumed tax rate of 28 percent.  DX 2122; Tr. 2280:5-12 (Thakor).  Mr. Ramirez thus computed

a preferred stock cost of 23.96 percent.  PX 5003.27; DX 2122; Tr. 1326:21-1327:1 (Ramirez);

Tr. 2323:13-18 (Thakor).

33

The preferred stock cost figure that Mr. Ramirez utilizes is "simply incorrect and inconsistent with the basic principles of finance." Tr. 2280:23-25 (Thakor). Dr. Thakor explained that, in addition to the fact that Mr. Ramirez is contradicting his own prior opinion, and this Court's opinion, as to the cost of the preferred stock, (1) there is "no economic justification for grossing-up of the preferred stock yield" and (2) thus, the 17.25 percent plaintiffs paid as dividends on its preferred stock should be included within the cost of capital calculation. DX 2122, DX 2123; Tr. 2281:1-2285:11 (Thakor).

Last, in computing the WACC, Mr. Ramirez erred by completely ignoring the cost of plaintiffs' common stock. Tr. 2286:20-2287:10 (Thakor); DX 2124. Dr. Thakor noted that including the common stock within the WACC has two effects: it includes the proper rate for common stock, and affects the weight to be attributed to the remaining debt and preferred stock. Tr. 2289:3-2294:6 (Thakor); DX 2126; DX 2127. Dr. Thakor explained that adjusting the WACC to correctly include plaintiffs' actual cost and weight of common stock, along with the other required changes, reduces the WACC from 12.59 percent to 9.35 percent, or 324 basis points. Tr. 2287:23-2288:3; 2294:24-2295:5; 2313:12-2316:1 (Thakor); DX 2124; DX 2127.

### 4.    Mr. Ramirez Erroneously Used The One-Year Constant Maturity Treasury Rate To Compute The Offset Benefit

Mr. Ramirez erroneously used the one-year CMT rate to compute the offset benefit.

As noted above, Mr. Ramirez recognized that, because the replacement tangible capital can be directly invested to produce a return, it is necessary to compute an offset benefit to the purportedly lost capital.[33] Mr. Ramirez computes the offset benefit to be $82.3 million by

---

[33]    DX 2103; Tr. 1269:22-1270:12 (Ramirez); Tr. 2228:9-20, 2325:3-21 (Thakor).

multiplying the $167 million in purported lost capital by the one-year CMT rate for the applicable period, which averaged 5.48 percent.  PX 5003.28; DX 2103; Tr. 2228:9-2229:20 (Thakor)

Mr. Ramirez testified that he sought to derive an offset benefit rate that "mimicked" the return upon the bank's asset portfolio.  Tr. 1427:20-22 (Ramirez); Tr. 2325:13-20 (Thakor).  Dr. Thakor concluded that Mr. Ramirez erred in using the one-year CMT rate because the bank "wasn't invested in one-year Treasury instruments, so there is no way that this rate represents the rate of return that American Savings was able to get by investing this replacement capital . . . . It is not representative."  Tr. 2326:4-9 (Thakor).  In fact, Dr. Thakor explained, the bank's investments in Treasuries "are fairly small and actually quite insignificant compared to the total size of the balance sheet."  Tr. 2327:3-5 (Thakor); see DX 2134.

Dr. Thakor noted that the Court accepted Mr. Ramirez's use of the FSLIC Note rate for the offset in computing the damage award for the Note Forbearance.  Tr. 2336:3-9 (Thakor).  Had the FSLIC Note rate been used to calculate the offset benefit, the offset rate would have been 7.25 percent rather than 5.48 percent, an almost two-percentage point difference.  DX 2135; Tr. 2336:14-2337:2 (Thakor).  The effect upon Mr. Ramirez's damages calculation from the use of the lower one-year CMT rate "is to inflate damages because the offset benefit that he attaches to the replacement capital is smaller."  Tr. 2337:6-8 (Thakor).

In addition to the FSLIC Note rate, Dr. Thakor also used an alternative rate derived from a computation of American Savings' actual yield on earning assets per quarter, to compute the offset benefit.  PX 1826, Exh. 12B; Tr. 2361:20-2362:25 (Thakor).  Dr. Thakor opined that the

actual yield on earning assets is "the correct assumption" to make in computing the offset benefit, and would reduce damages even further than the FSLIC rate.  Tr. 2362:9-12 (Thakor).

> **5.      Correction Of Mr. Ramirez's Errors Dramatically Lowers His Cost Of Replacement Capital Estimate**

Correcting the errors in Mr. Ramirez's cost of capital calculation dramatically reduces the resulting damages.  Although Dr. Thakor did not present affirmative damage estimates, and did not endorse Mr. Ramirez's calculations, Dr. Thakor prepared two calculations to correct Mr. Ramirez's analysis for the most obvious errors.  Tr. 2354:16-2355:6; 2364:18-2365:9 (Thakor); DX 2139; DX 2140.

These corrections include:  (1) accounting for the relevant depreciation and amortization of the noncurrent assets; (2) terminating damages as of December 31, 1996; (3) calculating the cost of debt on an after-tax basis; (4) eliminating the erroneous tax gross-up for the cost of preferred stock; (5) including the cost of common stock in the cost of capital calculation and adjusting the weight of the different sources of funding accordingly; and (6) using either the FSLIC Note rate or the actual yield on earning assets to compute the offset benefit.  Tr. 2349:24-2350:25; 2353:13-2354:15; 2361:20-2362:12 (Thakor); DX 2139.

The only difference between the two calculations is the rate used for the offset benefit. When the FSLIC Note offset rate is used, the net cost of replacement capital is $8.989 million; when the actual yield on earning assets is used, the net cost of replacement capital is $7.815 million.  Tr. 2365:1-2366:9 (Thakor); DX 2140.

**III.**     **Plaintiffs' Lost Profits Calculations Are Factually And Legally Unsupported**

The Court should conclude that plaintiffs' lost profits claim is invalid as a matter of law and unsupported by the evidence at trial.  First, the Court should hold that plaintiffs' lost profits claim is barred by judicial estoppel, law of the case, and res judicata because it is inconsistent with the method the plaintiffs persuaded the Federal Circuit to adopt in calculating damages for the loss of the fungible Note Forbearance capital.  Even assuming that plaintiffs' lost profits claim is not barred as a matter of law, plaintiffs have failed to establish causation, foreseeability, or reasonable certainty.  Finally, the "jury verdict" method also is not appropriate because plaintiffs have not proven causation, and have not shown that no more reliable method of computing damages exists.  Plaintiffs' lost profits claim thus fails.

**A.**     **Legal Standards Applicable To Expectancy Claims**

"One way the law makes the non-breaching party whole is to give him the benefits he expected to receive had the breach not occurred."  Glendale I, 239 F.3d at 1380.  Plaintiffs' expectation interest is the "interest in having the benefit of [its] bargain by being put in as good a position as [it] would have been in had the contract been performed."  RESTATEMENT (SECOND) OF CONTRACTS § 344(a) (1981); see also Bluebonnet Sav. Bank v. United States, 266 F.3d 1348, 1355 (Fed. Cir. 2001).  To recover expectancy damages based upon a claim of "lost profits," a plaintiff must prove:  (1) the lost profits were within the contemplation of the parties because the loss was foreseeable; (2) these profits would have been realized but for the breach; and (3) the measure of damages must be reasonably certain.  Cal. Fed. Bank v. United States, 395 F.3d 1263, 1267 (Fed. Cir. 2005) ("Cal. Fed. II").

37

In Cal. Fed. II, the Federal Circuit clarified that the "inability to prove by a preponderance of the evidence that profits would have been made but for the breach will therefore preclude recovery on a lost profits theory." Id. at 1268 (emphasis supplied). The "but for" standard is consistent with elementary principles of contract law.

The question whether plaintiff's alleged lost profits were foreseeable entails a two-part test: "'Loss may be foreseeable as a probable result of a breach because it follows from the breach (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know.'" Landmark, 256 F.3d at 1378 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 351(2) (1981)). Plaintiffs bear the burden of proving "both the magnitude and the type of damages were foreseeable." Landmark, 256 F.3d at 1378 (emphasis added). The court examines whether the alleged loss was foreseeable at the time of contracting, not the time of breach. Bohac v. Dep't of Agriculture, 239 F.3d 1334, 1340 (Fed. Cir. 2001).

The final requisite to a recovery of lost profits – and one central to this litigation – is that the amount of lost profits must be established with reasonable certainty. See Rumsfeld v. Applied Cos., Inc., 325 F.3d 1328, 1340 (Fed. Cir. 2003) (quoting Cal. Fed. Bank v. United States, 245 F.3d 1342, 1349 (Fed. Cir. 2001); RESTATEMENT (SECOND) OF CONTRACTS § 352 (1981). Accordingly, lost profits may not be awarded based upon a model that is speculative or unreliable. San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997); Roseburg Lumber Co. v. Madigan, 978 F.2d 660, 667 (Fed. Cir. 1992).

38

### B.      Plaintiffs' Lost Profits Claim Is Barred As A Matter Of Law

Plaintiff's lost profits claim is barred by law of the case, judicial estoppel, and <u>res judicata</u>

because it contradicts the cost of replacement capital method the plaintiffs persuaded the Federal

Circuit to adopt in calculating damages for the Note Forbearance breach.  Plaintiffs' lost profits

claim thus violates the law of the case because the Federal Circuit adopted their previous cost of

replacement capital calculation, and plaintiffs seek to relitigate the question to their pecuniary

benefit.  <u>See Gould</u>, 67 F.3d at 930; <u>Jamesbury</u>, 839 F.2d at 1550.  Their claim is judicially

estopped and barred by <u>res judicata</u> because their new theory contradicts the previous theory the

Federal Circuit adopted, and increases the amount of damages to the Government's unfair

detriment.  <u>See Biomedical Patent Mgmt. Corp.</u>, 505 F.3d at 1341.

Plaintiffs' lost profit calculations also contradict Section 32 of the Assistance Agreement,

which requires any remedy for breach to "correspond to the magnitude of the economic loss

caused[.]"  <u>Am. Sav.</u>, 519 F.3d at 1326 (quoting section 32).  Because plaintiffs request $83.3

million in lost profits for the initial loss of $93.5 million of Warrant Forbearance capital,

compared to $55.028 million for the initial loss of $240 million of Note Forbearance capital,

plaintiffs' lost profits claim is grossly disproportionate to the Note Forbearance award.

Plaintiffs' claim is thus legally barred.

### C.      Plaintiffs Failed To Establish Causation Of Any Lost Profits

Plaintiffs failed to establish causation of any lost profits at trial for several reasons.

Plaintiffs conceded that they replaced the Warrant Forbearance capital, and plaintiffs' witnesses

confirmed that fact.  Plaintiffs were not capital-constrained, pursued available investment

opportunities, and could have raised additional capital.  Instead, plaintiffs were opportunity-

constrained due to the California recession during the alleged damages period.  Plaintiffs also

voluntarily paid dividends rather than pursuing additional investment opportunities.  Plaintiffs

thus failed to establish causation, and any lost profits award would constitute a windfall.

### 1.    Plaintiffs Replaced The Warrant Forbearance Capital

Plaintiffs' lost profits claim is built upon the assumption that if the warrant forbearance

had not been breached, plaintiffs would have deployed the capital associated with that

forbearance to make additional (unnamed) investments.  Tr. 1485:4-21 (lost profits model

assumes bank was unable to replace warrant capital) (Ramirez).  This claim does not withstand

scrutiny, as plaintiffs testified that they immediately replaced this capital after the breach.  Tr.

1266:12-16 (Ramirez).[34]  Plaintiffs' cost of replacement capital claim – and the testimony of their

witnesses that plaintiffs replaced the capital – thus contradict the basis for any lost profits claim

because "once that hole is filled, then there is no loss of profits."  Tr. 2496:7-17 (Thakor).

Plaintiffs also informed the regulators that the loss of both the Note and Warrant

Forbearances would not cause them to forego significant assets.  Tr. 2890:12-2891:8 (Hamm).

Plaintiffs' post-breach revision to their 1990 business plan, which took into account the loss of

both forbearances, projected that plaintiffs would have $18.140 billion in assets at the end of

1990, compared to $18.156 billion in their pre-breach 1990 business plan, a different of only $16

million.  Tr. 2892:12-2893:22 (Hamm); DX 2202; PX 231 at PAS128 2724; PX 1518 at

WOQ553 0700.  Plaintiffs' lost profits calculation, which assumes the loss of almost $2 billion

in assets, is thus unsupported.

---

[34]    See Tr. 1318:18-22 ("I firmly believe that plaintiffs did replace the warrant capital by
replacing – by redeploying their own contributed capital to support the assets that – or to do the
work of the warrant capital") (Ramirez).

### 2.     Plaintiffs Were Not Capital-Constrained During The Alleged Damages Period

Plaintiffs' lost profits claim fails because it assumes that the breach prevented plaintiffs from deploying capital to pursue additional (and profitable) investments.  This is counterfactual for two reasons.  First, plaintiffs had sufficient capital to pursue several investment opportunities, including bidding for acquisitions, during the alleged damages period.  Second, the breach did not prevent plaintiffs from raising outside capital if they perceived such profitable opportunities.

Plaintiffs were not capital-constrained following the breach as evidenced by the fact that they consummated six acquisitions.  Tr. 1118:9-1119:7; 1177:3-9 (Ramirez).  Moreover, plaintiffs pursued several acquisitions as early as 1990, demonstrating their belief that they had sufficient surplus capital, but were outbid.  Tr. 641:24-642:15 (Carl).

Additionally, plaintiffs had opportunities to raise additional capital in the open market during the alleged damages period.  See DX 321 at PAS136 0876 (First Boston "remain[s] very enthusiastic about the prospect of raising additional senior debt for New American Capital" on June 13, 1990); DX 323 at PAS136 0877.  Plaintiffs even discussed the prospect of raising capital with the FDIC, but presented no specific proposal.  Tr. 1766:15-1769:19 (Meyer); DX 275.

Mr. Barnum testified to a strategic reason for the bank not to raise capital that stemmed from the bank's agreed-upon capital structure – raising capital would have given FSLIC a 30 percent "free ride."  Tr. 90:24-92:5; 124:24-125:14; 147:13-22 (Barnum).  Nevertheless, Mr. Bonderman also explained that the investor group could have contributed an additional $150 million of capital to grow the bank, without increasing FSLIC's ownership share, but chose not

to do so.  Tr. 904:11-20; 907:2-18 (Bonderman).  Plaintiffs also successfully raised $60 million

in outside capital in 1995, without changing the bank's capital structure.  Plaintiffs accomplished

this by issuing debt at the holding company level and downstreaming the proceeds as a dividend

to the bank.  Tr. 604:8-10 (Carl); Tr. 1512:24-1513:3; 1516:22-24; 1593:5-24 (Ramirez).  Any

failure to raise capital was due to plaintiffs' independent business decisions, not the breach.

### 3.  Plaintiffs Were Opportunity-Constrained Due To The California Recession During The Alleged Damages Period

Plaintiffs' lost profits claim is based upon the assumption that, absent the breach,

plaintiffs could have added approximately $2 billion in profitable assets to the balance sheet of

American Savings Bank ("ASB").  This claim is undermined by overwhelming evidence that

these profitable opportunities did not exist during the alleged damages period.  "A thrift is

opportunity-constrained when it has sufficient regulatory capital to support additional assets but

there are not profitable opportunities in the market to justify the use of that capital."  Tr. 2907:25-

2908:4 (Hamm).

California experienced a recession during the alleged damages period, and the bank's

dependence on the California market caused dramatic negative effects.  DX 150 at WOQ476

1943; Tr. 850:3-6; 861:3-7 (Bonderman); Tr. 185:3-186:17 (Barnum).  In 1990, 91 percent of the

loans held by the bank were for California properties.  PX 2 at FAS012 1237.  By 1995, that

figure had increased to almost 100 percent.  PX 7 at PAS159 1665.

The California recession lowered ASB's California mortgage volume and home sales,

which caused ASB's earnings to decline between 1991 and 1994.  Tr. 185:20-186:24; 187:18-25

(Barnum); Tr. 863:10-864:14 (Bonderman).  ASB suffered increased loan delinquencies during

this period, and tightened loan requirements because of the increase in delinquencies, thus lowering loan originations and income.[35]   ASB's 1992 earnings declined by $70 million, primarily due to credit losses.  Tr. 228:24-230:3 (Barnum); PX 1800 at FAS012 0457.  ASB's 1993 earnings declined by an additional $34 million, primarily due to lags in interest rate repricing.  Tr. 230:4-230:19 (Barnum); PX 1800 at FAS012 0457; see also PX 1683 at PAS095 0311-12.

Competitive pressures during the recession caused the bank to cut loan rates during the alleged damages period.  Tr. 191:17-192:17 (Barnum); DX 150 at WOQ476 1943.  Declining interest rates in 1993 caused deposit outflows, as the bank refused to pay a premium for deposits. This limited the bank's funding.  Tr. 195:3-22; 199:4-23 (Barnum); PX 414 at ASDOJ-SEA-02171-72.  Difficulty in acquiring deposits and the run on deposits in 1990 required the bank to rely more heavily upon costlier Federal Home Loan Bank ("FHLB") borrowings.  Tr. 832:15-21; 833:14-834:2; 846:2-11 (Bonderman).  Wholesale borrowings did not offer cross-selling opportunities or consumer fees, Tr. 627:5-20 (Carl), and were more expensive than retail deposits.  Tr. 842:8-18 (Bonderman).

"In the real world, American often failed to hit the asset targets that it established for the thrift with full knowledge of the breach of contract."  Tr. 2922:23-2926:4 (Hamm); DX 2210. These "shortfalls are due to the lack of opportunities in the marketplace."  Tr. 2925:8-9 (Hamm). Mr. Bonderman also conceded that, "[m]ost of the people that made those acquisitions ultimately regretted them, but that was the fashion at the time."  Tr. 935:7-936:3 (Bonderman).

---

[35]  PX 94 at PAS111 0611; PX 106 at PAS116 1658; Tr. 869:12-18; 873:20-874:10; 889:20-25; 895:23-896:7 (Bonderman).

### 4.     Plaintiffs Voluntarily Paid Dividends To Their Investors With Excess Capital Rather Than Pursuing Additional Investment Opportunities

Plaintiffs' own conduct undermines their claim that ASB forewent profitable investment opportunities in the early 1990s.  At that time, ASB's policy was to pay dividends up to its holding companies, and eventually to its investors, if profitable growth opportunities were not available.   Tr. 235:11-236:2 (dividends paid when no profitable opportunities) (Barnum); PX 231 at PAS128 2726; Tr. 649:6-18 (Carl).

From 1989 through 1996, the bank paid $179 million in common dividends and approximately $480 million in tax-sharing dividends to its holding companies, reducing capital dollar-for-dollar.  PX 3 at FAS012 1357; PX 6 at WOQ572 1519; PX 7 at ASDOJ-FWE-13-1651; Tr. 241:25-242:3 (Barnum); Tr. 2914:24-2915:17 (Hamm); DX 2208.  Plaintiffs then paid approximately $277 million of these dividends to their investors.  Tr. 2915:18-2918:22 (Hamm); DX 2209.  "[I]f American had had the kind of profitable opportunities that Mr. Ramirez assumes it had, here is the source of capital to take advantage of those opportunities."  Tr. 2917:3-6 (Hamm).  Plaintiffs could have left the money in the bank to take advantage of the opportunities, but "all of that money was paid out from the holding companies."  Tr. 2917:19-20 (Hamm).

ASB paid dividends, rather than make investments in new opportunities, because the California economy was in recession starting in the early 1990s, which limited growth opportunities.  ASB's management repeatedly reported difficulties in achieving growth due to adverse economic conditions.  See, e.g., PX 317 at ASDOJ-SEASUP-9-0864; PX 240 at FAS012 1418.  Mr. Bonderman also testified that he could not predict what dividends the bank would have paid had earnings been greater.  Tr. 868:16-22 (Bonderman).

44

Any profitable opportunities during this period also would have been generated under intense competition, thus reducing the profitability of the additional leverage.  Tr. 636:10-20 (Carl).  Plaintiffs provided no analysis of peer institutions' profitability during this period, nor did they analyze the effect of competition.  Tr. 1566:14-1567:1 (Ramirez).

Conversely, even if the Court determines that ASB possessed profitable investment opportunities, plaintiffs' lost profits claim is still invalid because ASB chose to stream funds up to its shareholders rather than pursue those opportunities.  Plaintiffs thus failed to mitigate these "lost profits."  See Koby v. United States, 53 Fed. Cl. 493, 496-97 (2002) (non-breaching party must take "reasonable non-burdensome steps to avoid its loss.").

### D.      Plaintiffs' Claimed Lost Profits Were Not Reasonably Foreseeable

Neither the magnitude nor type of plaintiffs' alleged lost profits were reasonably foreseeable to the Government at the time of contracting.  First, the Government could not have foreseen the type of damages plaintiffs now claim.  Absent identification of the assets and liabilities in the foregone portfolio, the Government could not have foreseen the type of damages plaintiffs would suffer.  See Landmark, 256 F.3d at 1378.

The Court should also conclude that it was not foreseeable that plaintiffs would have been unable to raise outside capital to pursue favorable investment opportunities.  As a matter of economics, "[i]f profits had been foreseeable, then ownership would have raised additional capital to prevent the loss of profits."  Tr. 2380:15-2381:5 (Thakor).  Plaintiffs' witnesses

admitted that the bank was profitable after the breach, making any claim that the bank could not have raised capital unforeseeable.[36]

Nor was it foreseeable that a decision to shrink the bank as a result of the breach would result in lost profits. Plaintiffs' witnesses agreed that growth does not guarantee profits, and that a bank could make money by shrinking, including by selling branches.[37]

Similarly, the Government could not have foreseen the magnitude of the alleged damages. Plaintiffs claim that the bank would have fully leveraged the Warrant Forbearance capital each quarter, earning its historical return on average assets ("ROAA") on the foregone assets. PX 5003.19-21. Mr. Ramirez admits this assumption contradicts the basic economic principle of diminishing marginal returns, which states that as an institution's asset base grows, its ROAA decreases at the margin. Tr. 1555:25-1566:16; 1558:14-1559:11 (not applying principle of diminishing returns to this case) (Ramirez). Mr. Barnum also conceded that, "you're always adding costs at the margin, particularly if you're adding assets." Tr. 124:8-10; 123:17-25 (Barnum). The Government could not have foreseen that plaintiffs' incremental assets would post earnings that violated a fundamental principle of economics.

---

[36] See Tr. 147:23-148:3 ("'89 was a great year. '90 was a great year. After that were good years. '96 was a great year."); 152:15-22 (Barnum); Tr. 698:21-25 ("we had a significant return") (Carl); Tr. 789:22-791:1 ("bank did reasonably well" from 1992 to 1996) (Bonderman); Tr. 1260:3-24 (Ramirez).

[37] Tr. 225:7-23; 228:6-9 (branch sales increased profitability); 263:22-266:22 ("Old American had a bunch of really lousy branches") (Barnum); Tr. 575:20-24 (bank "remained profitable throughout the period" 1992 to 1996) (Carl); see also PX 1800 at FAS012 0457 (sold 19 branches from 1990 to 1994).

E.      **Plaintiffs' Lost Profits Calculations Are Not Reasonably Certain**

Plaintiffs'"lost profits" calculations are not reasonably certain for several reasons. Plaintiffs' lost profits calculations depend upon the testimony of a lay witness, Mr. Ramirez, who is not qualified to model the thousands of hypothetical transactions necessarily involved in the lost profits calculations.  Plaintiffs fail to identify the investments ASB would have made absent the breach, and plaintiffs admitted that such an attempt would be "speculative."  The three candidates plaintiffs identified as possible components of the foregone portfolio – an adjustable-rate mortgage ("ARM") portfolio, junk bonds, and unnamed RTC acquisitions – do not support plaintiffs' lost profits calculations.  Lastly, plaintiffs' lost profits calculations contradict fundamental principles of economics, and result in an impermissible windfall to plaintiffs.

1.      **Plaintiffs' Lost Profits Claim Depends Upon Impermissible Lay Witness Testimony**

Plaintiffs' attempt to offer their lost profits claim through a lay witness stands in stark contrast to the Federal Rules of Evidence.  As we explained before trial, Winstar-related matters are "arguably the most complex issues in contract law."  Thomas J. Madden, et al., "2006 Year in Review: Analysis of Significant Federal Circuit Government Contracts Decisions," 36 Pub. Cont. L. J. 449, 451 (2007).  The calculations and assumptions that underlie projections of "lost profits" for complex financial institutions do not "result[] from a process of reasoning familiar in everyday life[,]" but rather "result[] from a process of reasoning which can be mastered only by specialists in the field."  Fed. R. Evid. 701 Advisory Committee Notes (Dec. 2000).  In every one of the 29 Winstar-related cases to have introduced a lost profits claim, plaintiffs identified and qualified experts to opine upon this subject matter pursuant to Federal Rule of Evidence 702.

The thousands of compound assumptions and projections that underlie Mr. Ramirez's lost profits calculations are not based upon contemporaneous evidence or Mr. Ramirez's actual perceptions.  Mr. Ramirez assumes that countless, hypothetical transactions would have occurred nine years beyond any event he possibly could have perceived.  The calculations do not qualify, even remotely, as the "inferences" permitted by Rule 701:  "inferences must be tethered to perception, to what the witness saw or heard."  United States v. Santos, 201 F.3d 953, 963 (7th Cir. 2000).  Mr. Ramirez's lost profits calculations relied upon numerous hypothetical assumptions that were beyond the province of lay witness testimony.  "[T]here are many, many instances in which [Mr. Ramirez] made assumptions [in his calculations], and his analysis has violated some basic principles of finance and economics . . . to say there were no assumptions and everything was just an extension of fact, is simply incorrect."  Tr. 2506:6-12 (Thakor).

## 2. Plaintiffs Failed To Identify The Assets And Liabilities They Would Have Added Absent The Breach

This Court has uniformly rejected as speculative expectancy damage claims in Winstar-related cases where the plaintiffs failed to identify the investments the subject thrift would have made in the "but-for" world.  See, e.g., Citizens Fin. Serv. v. United States, 64 Fed. Cl. 498, 514 (2005) ("absent proof of specific investments that would have been held in the world absent FIRREA, a lost profits claim is too speculative").  Plaintiffs' lost profits calculations do not identify any specific assets plaintiffs would have acquired, and do not incorporate a return on specific assets.  See Tr. 1528:4-11 (Ramirez).  This Court should therefore reject plaintiffs' lost profits claim as speculative.

48

Plaintiffs' failure to assess the potential profitability of any potential acquisitions belies

ASB's own business practices.   In the case of deciding whether to pursue an acquisition of

another financial institution, Mr. Carl testified :

> I would need to consider the branch network, how it fit with our
> network, what the demographics of the customers were, what
> alternative acquisitions were available.  At that point in time, what
> assets would have gone with deposits in terms of how we felt about
> the credit quality of those assets.  I would have had to look at what
> the consolidation costs would be of the branches, how many you
> would have to close, how many landlords would have to be paid
> out of their leases.

Tr. 645:6-17 (Carl).  Plaintiffs' other witnesses similarly conceded that they considered

numerous factors in deciding whether to pursue an acquisition.[38]

Similarly, plaintiffs' witnesses consistently testified that any projection of the acquisitions

and investments that underlie their lost profits claim would be inherently speculative.  Mr.

Ramirez testified it was "impossible to know" which acquisitions would have occurred absent

the breach, and "did not include any specific analysis of any asset class or any particular

acquisition or any particular type of loan[.]"  Tr. 1545:19-1546:11; 1548:5-6 (Ramirez).

Moreover, plaintiffs' other witnesses conceded that they could not identify specific acquisitions

or investment opportunities that they would have pursued absent the breach.[39]

---

[38] See Tr. 245:25-247:16 (asset-liability mix, asset quality, location, efficiencies, management, institutional capacity all relevant to determining whether to engage in an acquisition); 249:3-8 (Barnum); Tr. 1015:11-24 (must evaluate branches, customer relationships, overhead, efficiencies in deciding whether to make acquisition) (Ramirez).

[39] See Tr. 644:22-645:21 (identifying prospective acquisitions would be "speculating on whether we would have or not because there are too many variables") (Carl); Tr. 102:1-8 ("can't answer that affirmatively" whether capital would have been used for acquisitions); 251:15-21 (Barnum); Tr. 801:1-10 (could not name specific foregone acquisitions); 807:2-808:1 (Bonderman).

Plaintiffs' failure to identify the but-for assets and liabilities makes their calculations speculative as a matter of economics and finance. Established principles of economics and finance allow for the reasonable estimation of a firm's lost profits through the examination of the firm's assets and liabilities, growth strategy, and risk profile. Tr. 2452:2-12 (Thakor). By developing a hypothetical portfolio that is moored to the business's actual performance and the extant economic realities, one may reasonably assess the various rates of return on different assets, the costs of liabilities, and, accordingly, lost profits. Tr. 2452:13-18 (Thakor).

A reliable lost profits estimate cannot be obtained without precise information about assets. Dr. Hamm testified that "you need to know what types of assets would comprise the foregone assets . . . you need to know how the but-for American would have obtained these assets . . . [y]ou need to know what the expected credit losses from those assets would be . . . and you need to know the term structure . . . [and the] weighted average yield of the hypothetical assets and the basis for that estimate." Tr. 2899:17-2900:14 (Hamm). Mr. Ramirez did not provide this information in his lost profits calculations. Tr. 2897:10-12; 2900:15-17 (Hamm).

Similarly, for liabilities, "the estimator has to identify at least the types of liabilities . . . [as] the interest rate risk properties and cost properties of different types of liabilities can have a dramatic effect on the profitability[.]" Tr. 2901:2-11 (Hamm). You also need to know "how the liabilities would be obtained in the but-for world . . . you need to know the term structure of the liabilities . . . [and] you need to know what the estimated average cost is and the basis for that estimate." Tr. 2901:12-22 (Hamm). Mr. Ramirez did not provide any information on liabilities in his lost profits calculations. Tr. 2901:23-2902:1 (Hamm). Plaintiffs' failure to identify the asset and liabilities they would have held absent the breach renders their calculations speculative.

50

3.    **The Possible Candidates For The Foregone Portfolio Identified By Plaintiffs Do Not Support The Lost Profits Calculations**

Although Mr. Ramirez cited three possible candidates for his hypothetical foregone assets, he did not identify any of them as actual lost opportunities.  Tr. 2928:24-25 (Hamm). Nevertheless, even if the Court were to consider these three potential candidates, none of them supports plaintiffs' lost profits claim.

To the extent plaintiffs identify the ARM portfolio and junk bonds as profitable assets that they sold because of the breach,[40] any lost profits claim premised upon these assets is barred. Plaintiffs previously alleged that they were forced to sell the same ARM portfolio by the Note Forbearance breach.  See Pl. Mot. Summ. J. IV ("Loan Sales") (July 26, 2002).  The Court denied plaintiffs summary judgment for this claim, Am. Sav., 62 Fed. Cl. at 24, but plaintiffs chose not to go to trial, instead filing a motion for final judgment for the summary judgment award, which the Court granted.  Am. Sav., 74 Fed. Cl. at 762.  Plaintiffs did not challenge this denial on appeal, or preserve their right to trial on this issue.  Plaintiffs thus waived this claim.

Plaintiffs also moved for summary judgment for the alleged forced sale of their junk bond portfolio.  See Pl. Mot. Summ. J. III ("Junk Bonds") (July 26, 2002).  In rejecting plaintiffs' junk bond theory, the Court found that the governing regulation respecting thrifts' junk bond ownership granted FDIC regulators "sole discretion" to require divestiture of junk bonds.  Am. Sav., 62 Fed. Cl. at 22.  The FDIC exercised this discretion when requiring the bank to divest its entire portfolio by June 30, 1990.  See PX 1550 at WOQ553 1046.  Accordingly, at summary judgment, this Court held that the breach did not cause the sale of the junk bonds, and rejected

---

[40]    See PX 5003.13; see also Pl. Contentions of Fact and Law (Mar. 18, 2009), at 23-24.

51

the claim.  Am. Sav., 62 Fed. Cl. at 21.  Plaintiffs did not appeal this decision.  Any junk bond

portfolio claim is thus barred by waiver, law of the case, and res judicata.  See Vitaline Corp. v.

Gen. Mills, Inc., 891 F.2d 273, 274-75 (Fed. Cir. 1989) (no successive litigation based upon

same operative facts under different legal theory).

The evidence at trial also rebutted any possible reliance by plaintiffs upon these three

candidates for the foregone portfolio.  With respect to the ARM portfolio, Mr. Ramirez admitted

that the bank booked gains on these sales and included the gains in capital.  Tr. 1090:18-1091:10;

1531:9-23; 1534:7-1535:8 (Ramirez).  Including the sold loans would double-count the loans by

adding them as hypothetical assets while also keeping the gains on sale as part of ASB's capital,

overstating lost profits.  Tr. 2930:17-2932:18 (Hamm).  Further, Mr. Ramirez's calculations did

not track the performance of those loans.  Tr. 2933:25-2934:2 (Hamm).

Regarding the junk bonds, in early 1990, the FDIC "directed all financial institutions to

dispose of their high-yield bonds at the earliest practicable date."  Tr. 2937:7-12 (Hamm).

Plaintiffs' sale of the junk bonds was prompted by a business decision "notwithstanding the legal

position which allowed you to keep them until 1994."  Tr. 767:15-16 (Bonderman).  Mr. Barnum

testified that the bank knew it would have to sell off its junk bond portfolio as it was being

acquired.  Tr. 160:16-20, 161:5-7 (Barnum).  When plaintiffs sold off their junk bonds in the real

world, they lost $110 million and considered their investment a "fiasco."  PX 1649 at PAS039

0559.  Certainly, Mr. Ramirez did not have personal experience buying or selling the junk bond

portfolio, and did not analyze the junk bonds' performance.  Tr. 1019:6-9; 1539:14-1540:23

(Ramirez).  Thus, the Court should conclude that plaintiffs would not have held the junk bonds,

even absent the breach.

Regarding possible RTC acquisitions, "it is pure speculation" to assume that acquisitions could account for any of the foregone assets in Mr. Ramirez's model.  Tr. 2940:25-2941:1 (Hamm).  "The analytical process [for acquiring another bank] is extremely complex, and it looks at such factors as market coverage, demographics, size of branches, staffing ratios, a whole series of things," but Mr. Ramirez did not analyze any of these factors.  Tr. 2941:14-21 (Hamm).  For the one acquisition mentioned specifically, the sale of Gibraltar, Mr. Ramirez testified that he "did not play any role in the eventual sale of the institution."  Tr. 3260:1-3 (Ramirez).

Even if plaintiffs were successful in making RTC acquisitions, those acquisitions would not have added the type of assets that plaintiffs were seeking to add during the alleged damages period, namely ARMs based upon the 11th-District Cost-of-Funds Index ("COFI").  Plaintiffs would not have received COFI ARMs from RTC acquisitions because the RTC did not provide COFI-based assets in acquisitions; instead, the RFC provided cash, which plaintiffs did not want. Tr. 1970:12-1974:12; 1976:21-1979:12 (Meyer); Tr. 2944:5-25 (Hamm).  Thus, the possible candidates for the foregone portfolio cannot support Mr. Ramirez's calculations.

### 4.  Plaintiffs' Lost Profits Calculations Violate Basic Principles Of Economics And Result In An Impermissible Windfall

In addition to the defects explained above, Mr. Ramirez's lost profits calculations suffer from two fundamental economic flaws that render them unreliable.  First, Mr. Ramirez's extrapolation of ASB's historical return to his foregone portfolio ignores the principle of diminishing marginal returns.  Second, Mr. Ramirez's flawed dividend payout ratio overstates the amount of lost capital.  Correcting these two errors vastly reduces the lost profits estimate.

53

a.      **Plaintiffs' Use Of Historical Return On Average Assets Ignores
The Principle Of Diminishing Returns**

Mr. Ramirez calculations are flawed because he assumes ASB would have realized the

same ROAA in the but-for world that it achieved in the actual world.  Tr. 2455:20-24 (Thakor).

This betrays an elementary principle of economics and finance: "marginal return[s] will decrease

as the institution grows larger[,]" because any financial business "will avail itself first of its

highest yielding assets and its lowest costing liabilities."  Tr. 2406:20-2407:3 (Thakor).  This

means that, "as you grow, you're going to invest in assets that have lower returns at the margin

and fund them with liabilities that cost more at the margin."  Tr. 2418:4-8 (Thakor).  Thus, "the

return on average assets that should apply to the incremental portfolio should be lower than what

Mr. Ramirez has used."  Tr. 2418:9-14; 2457:9-20 (Thakor).

Mr. Ramirez conceded that he did not apply the principle of diminishing returns in his

calculations.  Tr. 1555:25-1566:16; 1558:14-1559:11 (Ramirez).  "Mr. Ramirez assumes that the

supply of profitable investment opportunities to American was perfectly elastic."  Tr. 2953:14-17

(Hamm)  "It is absolutely incorrect [for Mr. Ramirez to conclude that diminishing marginal

returns is not relevant] and it is inconsistent with what economists and practitioners believe."  Tr.

2963:23-25 (Hamm).  This Court has rejected damages theories predicated upon this flawed

assumption.  See Citizens Fin., 64 Fed. Cl. at 512-13 (rejecting extrapolation of rate of return on

existing portfolio to incremental portfolio); So. Nat'l Corp. v. United States, 57 Fed. Cl. 294,

303-05 (2003).

By extrapolating ASB's historical ROAA to his foregone portfolio, Mr. Ramirez makes an

economically untenable assumption that ASB would have been able to acquire liabilities at no

54

additional cost.  As. Dr. Thakor explained, ASB was "having trouble financing its incremental growth with retail deposits," and was turning to wholesale borrowings.  Tr. 2423:5-6 (Thakor).  In 1991, the borrowing cost of funds was almost 2 percent higher than the cost of retail deposits, and it was higher every year thereafter.  Tr. 2426:15-22 (Thakor); see DX 2157.  Mr. Ramirez's ROAA assumption thus exaggerates any lost profits.  Tr. 2429:3-2430:15 (Thakor).

Mr. Ramirez also makes no allowance for the impact of the recession through his use of historical ROAA, thus overstating the returns available in the marketplace.  Tr. 2965:19-23 (Hamm).  Moreover, "American's real world ROAA was inflated by the FSLIC note," which accounted for a significant portion of the bank's balance sheet.  Tr. 2981:17-21 (Hamm).  "[I]n the but-for world, American could not have found an asset with the same risk adjusted returns as the FSLIC note . . . therefore its ROAA, other things being equal, would have gone down."  Tr. 2982:7-2983:1 (Hamm); see also Tr. 697:9-13 (Carl).  Plaintiffs' extrapolation of historical ROAA is therefore economically unsound.

### b.      Mr. Ramirez's Flawed Dividend Payout Ratio Overstates The Amount Of Lost Capital

Mr. Ramirez inappropriately compounds the lost profits in his calculations by applying ASB's historical dividend payout ratio to the amount of lost profits for a given quarter, then adding the portion that was not paid in dividends to the amount of lost capital.  "[I]n his lost profits calculations, a portion of the profit in any given quarter is paid out as dividends, and a portion is reinvested; and, that reinvestment augments the but-for bank's capital and gives him larger lost profits in subsequent time periods."  Tr. 2458:10-17 (Thakor); DX 2169.

Dr. Thakor explained that it is incorrect economically to reinvest dividends without also discounting damages to the breach.  Tr. 2463:2-9 (Thakor).  Correcting for Mr. Ramirez's error in including reinvested dividends in the calculations results in a lost profits estimate $37,803,000 lower than what Mr. Ramirez calculated.  Tr. 2469:16-22 (Thakor); DX 2171.  Furthermore, because the regulatory capital associated with the warrant forbearance would be exhausted by 1996, were it not for the reinvestment of earnings, Mr. Ramirez improperly extends his calculations beyond 1996, thus increasing lost profits by $13.119 million for 1997 and 1998 alone.  Tr. 2479:6-2480:22 (Thakor); DX 2176.

In addition to it being improper to compound lost profits at all, Mr. Ramirez's but-for dividend payout ratio is lower than ASB's actual dividend payout ratio, thus increasing the amount of reinvested lost profits and, correspondingly, damages.  Mr. Ramirez nets ASB's actual dividend payout ratio against capital infusions from ASB's parents back into ASB to generate the but-for dividend payout ratio.  Tr. 2470:17-24 (Thakor).[41]  This netting results in a lower dividend payout ratio than ASB's actual dividend payout ratio.  "The impact of the netting is that it inflates [Mr. Ramirez's] calculation of lost profits because his payout ratio now becomes lower than it should be; the retained earnings fraction become bigger; therefore, the but-for capital becomes bigger, the incremental portfolio becomes bigger, and lost profits become bigger."  Tr. 2477:10-13; 2457:24-2458:1; 2478:22-2479:3 (Thakor); DX 2173.

Apart from the economic consequences of Mr. Ramirez's compounding of lost profits, the compounding is also improper because it constitutes the economic equivalent of prejudgment

---

[41]  See also Tr. 2471:3-7 (Thakor); Tr. 868:16-22 (payment of dividends "depended on facts and circumstances at the time") (Bonderman).

interest.  Tr. 2990:18-2991:19 (Hamm).  Because this Court cannot grant prejudgment interest

absent a specific contractual requirement, Mr. Ramirez's calculations are improper.  See 28

U.S.C. § 2516(a); Cal. Fed. II, 395 F.3d at 1273 (denying prejudgment interest in Winstar-related

case).

**c.      Correcting The Most Obvious Errors In Mr. Ramirez's
Calculations Drastically Lowers The Lost Profits Estimate**

The cumulative effect of Mr. Ramirez's errors is to grossly overstate his lost profits

estimate.  Although Dr. Thakor did not present an affirmative damages estimate, and did not

endorse Mr. Ramirez's approach, Dr. Thakor corrected Mr. Ramirez's most obvious errors by:

(1) terminating damages after 12/31/96, (2) computing lost profits on an after tax basis, (3)

excluding the reinvestment of dividends, and (4) using a marginal spread based upon wholesale

assets and liabilities instead of historical ROAA.  Tr. 2481:3-2482:9 (Thakor).  These revisions

lower Mr. Ramirez's lost profits estimate from $83.8 million to $22.7 million.  Tr. 2495:7-13

(Thakor); PX 1826, Exh 16C.

In his revisions, Dr. Thakor replaced Mr. Ramirez's extrapolation of the bank's historical

ROAA with a marginal spread calculation.  For the marginal asset, Dr. Thakor used wholesale

mortgage-backed securities, and, for the marginal liability, used wholesale FHLB advances.  PX

1826, Exh. 15, 16C.  Dr. Thakor explained that the wholesale liabilities were the most appropriate

marginal funding source because, in the real world, ASB was "running out of deposits" and would

need wholesale borrowings to expand its but-for portfolio by the $2 billion called for in Mr.

Ramirez's lost profits calculations.  Tr. 2492:11-25 (Thakor).

57

In rebuttal to Dr. Thakor's testimony regarding the marginal funding source, plaintiffs presented documents from the asset and liability committee ("ALCO") to assert that the bank could have borrowed money from other sources more cheaply than it had in the past.  Tr. 3191:1-3193:23 (Ramirez).  Dr. Thakor, however, explained that ASB's ALCO reports showed "that Federal Home Loan Bank advances, in terms of availability, dwarf what the ALCO thought was available from other sources," and that Mr. Ramirez failed to establish the marginal sources of revenue and funding.  Tr. 3282:20-3283:6; 3285:25-3288:13 (Thakor).  Furthermore, Dr. Thakor explained that many of the ALCO minutes show that, "the funding costs that Mr. Ramirez said were more representative of marginal funding costs, all have higher numbers than what I've used."  Tr. 3272:10-17; 3277:2-11 (Thakor).  Dr. Thakor's revisions demonstrate that any lost profits would be far lower than Mr. Ramirez's estimate.

### F.       Plaintiffs' Unspecified "Jury Verdict" Claim Is Unsupported

The evidence at trial did not support a "jury verdict" theory.  A plaintiff's failure to prove expectancy damages to a reasonable certainty does not entitle it to "jury verdict" damages; instead, the proper response is to dismiss such unsupported claims.  See Glendale Fed. Bank v. United States, 378 F.3d 1308, 1313 (Fed. Cir. 2004).  Decisions from this Court have confirmed the rarity of this "jury verdict" theory.  In Columbia First Bank v. United States, 60 Fed. Cl. 97 (2004), this Court rejected the plaintiff's claims, explaining that the "jury verdict method" requires a plaintiff to establish "(1) that clear proof of injury exists; (2) that there is no more reliable method for computing damages; and (3) that the evidence is sufficient for a court to make a fair and reasonable approximation of damages."  Columbia First, 60 Fed. Cl. at 108; accord Bluebonnet, 266 F.3d at 1357.

58

Plaintiffs have failed to meet the standards required in this Circuit for the "jury verdict" method.  Plaintiffs have failed to establish "clear proof of injury" because they have not proven causation of damages.  Plaintiffs also failed to establish that "no more reliable method for computing damages" exists, which requires plaintiffs to "justify [their] inability to substantiate the amount of [their] lost profits damages."  Columbia First, 60 Fed. Cl. at 108.  Plaintiffs cannot do so because this Court has already found a "reliable method for computing damages" in this case, i.e., the cost of replacement capital for the breach of the Note Forbearance.  Am. Sav., 519 F.3d at 1323 (affirming "the trial court's award of the actual costs paid to capital providers [for breach of the Note Forbearance]").  Thus, the "jury verdict" method is not appropriate.

Respectfully submitted,

MICHAEL F. HERTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director


s/ Kenneth M. Dintzer
KENNETH M. DINTZER
Assistant Director


s/ John J. Todor
OF COUNSEL:                        JOHN J. TODOR
SCOTT D. AUSTIN                    Trial Attorney
Senior Trial Counsel              Commercial Litigation Branch
WILLIAM G. KANELLIS               Civil Division
VINCENT D. PHILLIPS               Department of Justice
JACOB A. SCHUNK                   1100 L Street, N.W.
SAMEER YERAWADEKAR                Attn:  Classification Unit, 8th Floor
Trial Attorneys                   Washington, D.C. 20530
Civil Division                    Tele:  (202) 616-2382
Department of Justice             Fax:   (202) 514-8640

September 22, 2009                Attorneys for Defendant

## **CERTIFICATE OF SERVICE**

I certify that on this 22nd day of September, 2009, I caused the foregoing **"DEFENDANT'S INITIAL POST-TRIAL BRIEF"** to be filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

s/ John J. Todor