# EXHIBIT A

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |
|---|---|
| AMERICAN SAVINGS BANK, F.A., *et al.*, ) <br> ) <br> Plaintiffs, ) <br> ) <br> *vs.* ) <br> ) <br> UNITED STATES, ) <br> ) <br> Defendant. ) | No. 92-872 C <br> (Senior Judge Loren A. Smith) |

**POST-TRIAL BRIEF OF PLAINTIFFS AMERICAN SAVINGS BANK, F.A. AND NEW AMERICAN CAPITAL, INC. RELATING TO DISTRIBUTION OF DAMAGES**

It has been the practice of the Court and the parties in this case to refer generally to "the plaintiffs." It is no longer appropriate to do so, because the plaintiffs no longer share the same unity of economic interest that they did when this case was brought. The expectancy damages claims in this case (lost profits and cost of replacement capital) are now held by JPMorgan Chase Bank, N.A., as successor in interest to plaintiffs American Savings Bank, F.A. and New American Capital, Inc., while the claim for reliance damages based on the "second preference" appears to be held by Washington Mutual Inc. as successor to other plaintiffs. Accordingly, for the reasons set forth more fully below, this Court should direct any award of expectancy damages to JPMorgan Chase Bank.

This post-trial brief is submitted by plaintiffs American Savings Bank and New American Capital, Inc. (or alternatively by their successor in interest JPMorgan Chase Bank as *amicus curiae*). This brief does not address the merits of the underlying damages claims, which are fully

addressed in Plaintiffs' Opening Post-Trial Brief, filed on behalf of all plaintiffs on September 22, 2009.

I.  **THE NAMED PLAINTIFFS, AND THEIR RESPECTIVE SUCCESSORS IN INTEREST, DO NOT SHARE A COMMON INTEREST IN THE DISTRIBUTION OF DAMAGES.**

Three corporate transactions have led to the current line-up of real parties in interest in this case. To begin with, the underlying transaction was the acquisition by the Bass investors of the failed American Savings and Loan Association ("Old American"). To facilitate that acquisition, the Bass investors devised a lengthy corporate structure comprising several entities. This corporate chain is set forth in the chart on the following page, which is excerpted from the 1990 annual report of New American Capital, Inc. (PX 16). Each of the companies in the chain between Keystone Holdings, Inc. and American Savings was a signatory to the Assistance Agreement, and each became a named plaintiff in this suit.



AS1046 0326  CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

- 3 -

WAI-2933274v2

The plaintiff that actually took over the Old American franchise, that continued to operate as a savings & loan, and that was the recipient of the Warrant Forbearance, was American Savings Bank, F.A.. *See* PX 1891 (forbearance letter). American Savings' immediate parent, N.A. Capital Holdings, Inc., was the plaintiff that actually issued the warrants. PX 1787 (Warrant Agreement). N.A. Capital Holdings' immediate parent, New American Capital, Inc., was the plaintiff that raised outside capital to fund the acquisition of Old American.

The other named plaintiffs -- New American Holdings, Inc., Keystone Holdings, Inc., and Keystone Holdings Partners, L.P. -- were above New American Capital in the corporate chain.

In 1996, Keystone Holdings, Inc. and its subsidiaries -- *i.e.*, all the plaintiffs except Keystone Holdings Partners -- were acquired by Washington Mutual, Inc. ("WaMu Inc."). *See* PX 1756 (Merger Agreement) at 12, § 2.1 (FAS013 0887). As part of that and subsequent corporate restructurings, American Savings Bank was renamed Washington Mutual Bank ("WaMu Bank"), and operated as a thrift subsidiary of WaMu Inc. American Savings' two immediate parents, N.A. Capital Holdings and New American Capital, were subsequently liquidated into WaMu Bank. New American Holdings, Inc. and Keystone Holdings, Inc. remained part of WaMu Inc. *See* Declaration of Susan R. Taylor (Dec. 23, 2008) ¶¶ 2-5 (submitted in conjunction with JPMorgan Chase Bank, N.A.'s Motion for Leave to Intervene). Accordingly, after 1996 there were two real parties in interest: WaMu Inc. and WaMu Bank.

As parent and subsidiary, WaMu Inc. and WaMu Bank shared a unified interest in the outcome of this litigation, and in the award of any damages. That unity was sundered, however, in September 2008, when the federal government seized WaMu Bank and appointed the Federal Deposit Insurance Corporation as receiver. The FDIC then executed a "Whole Bank" Purchase and Assumption Agreement with JPMorgan Chase Bank, whereby JPMorgan Chase paid $1.9

billion for substantially all the assets and liabilities of WaMu Bank -- including the claims asserted in this case by American Savings and New American Capital. Declaration of Susan R. Taylor, ¶¶ 6-7.[1] WaMu Inc. subsequently filed for Chapter 11 bankruptcy. Consequently, as shown in the annotated chart set forth on the following page, the two real parties in interest in the case are now JPMorgan Chase and the bankruptcy estate of WaMu Inc.

---

[1] *See also* FDIC Press Release, "JPMorgan Chase Acquires Banking Operations of Washington Mutual" (Sept. 25, 2008), available at http://www.fdic.gov/news/news/press/2008/pr08085.html.

- 6 -



Source: PX16 at AS1046 0326

## II. THE EXPECTANCY DAMAGES CLAIMS ASSERTED IN THIS CASE BELONG TO AMERICAN SAVINGS BANK AND NEW AMERICAN CAPITAL.

Plaintiffs seek damages for breach of the Warrant Forbearance under four different theories:

(1) lost profits;
(2) cost of the capital that was deployed to replace the warrant capital;
(3) reliance damages based on the second preference; and
(4) jury verdict damages.

American Savings is entitled to any award of lost profits, and New American Capital (or alternatively American Savings) is entitled to any award based on the cost of capital. Likewise, should jury verdict damages be awarded based on either of those expectancy theories, those damages should be awarded to either American Savings or New American Capital.

### A. The lost profits proven at trial were incurred by American Savings Bank.

There can be no argument that the lost profits proven at trial were suffered by American Savings, which lost the ability to leverage the warrant capital to earn additional profits as a result of the government's breach. *See*, *e.g.*, Plaintiffs' Opening Post-Trial Brief (Sept. 22, 2009) at 32, ¶ 135 ("the Warrant capital breach … deprived ASB of substantial and foreseeable profits"); *id.* at 38, ¶ 1 ("But for the breach, ASB would have had substantial additional regulatory capital with which to grow and earn substantial profits."); *id.* at 47, ¶ 28 ("ASB would have realized total incremental profits of $83.318 million from the beginning of 1990 through December 28, 1998."). The incremental-assets model advanced at trial was predicated on the leverage ratios and rates of return actually experienced by American Savings. *Id.* at 2 ("Relying upon ASB's actual leverage ratios and actual return on assets …, [Mr. Ramirez] calculated the profits that the bank would have earned[.]"); *id.* 44-45, ¶¶ 19-25 (applying "ASB's actual leverage" and "ASB's actual average return on assets" to calculate lost profits); PX 5003.19, 5003.20 and 5003.21

(calculating lost profits based on American Savings financial reports). *See generally* Tr. 1213-22, 1241-47 (Ramirez) (summarizing his lost profits calculation); *see also id.* 1142-55, 1168-73. Thus, American Savings is the plaintiff that suffered lost profits.

Nor can there be any argument that American Savings, and not any of its parent companies, is the plaintiff to which lost profits must be awarded. In numerous *Winstar* cases, the Federal Circuit and this Court have held that it is "beyond dispute" that lost profits and other expectancy damages are recoverable only by the thrift, not by its shareholders or investors.

> It is beyond dispute that a cause of action arising from an injury to a corporation belongs solely to the corporation, and that shareholders seeking to pursue those damages may do so only on behalf of the corporation, and only if the corporation has failed to do so itself.
> . . .
> [T]he only way plaintiffs may have suffered, if at all, from a loss of profits *by the thrift* is through … foregone dividends from the thrift, which the cases cited above make clear they cannot pursue. In short, plaintiffs' attempt to directly recover [lost profits] … is nothing more than an attempt to ignore the separate corporate existence of the thrift, and take for themselves what, if proven, rightfully belongs to New Hometown.

Hometown Financial, Inc. v. United States, 56 Fed. Cl. 477, 486 (2003), *aff'd*, 409 F.3d 1360 (Fed. Cir. 2005). As put more succinctly in the Castle decision: "The lost profits claim belongs to the bank." Castle v. United States, 48 Fed. Cl. 187, 199 (2000)*, aff'd in part, vacated and rev'd in part on other grounds*, 301 F.3d 1328 (Fed. Cir. 2002). Similarly, the Federal Circuit held in American Capital Corp. v. United States, 472 F.3d 859 (Fed. Cir. 2006), that the thrift's holding company "cannot randomly disregard the corporate form to its own benefit. Transohio's [the thrift's] injuries that resulted in its losses … are properly its own, and therefore its potential breach of contract claims against the government for those injuries must be brought in its name." 472 F.3d at 867. *See also* Caroline Hunt Trust Estate v. United States, 470 F.3d 1044, 1053-54 (Fed. Cir. 2006) ("any claim for the loss of SSA's [the thrift's] equity must be asserted only by

- 8 -

SSA"); Holland v. United States, 59 Fed. Cl. 735, 739 (2004) ("a cause of action arising from an injury to a corporation belongs solely to the corporation"); Statesman Savings Holding Corp. v. United States, 41 Fed. Cl. 1, 16-17 (1998) ("[I]t is axiomatic that in general damages suffered by a corporation are recoverable by the corporation, not by its shareholders. … No question exists that the corporation, and therefore the receiver, is entitled to bring a claim for Statesman Bank's lost profits[.]"); *id.* at 18 ("Private plaintiffs may not recover directly for expectancy damages suffered by Statesman Bank[.]"). *See generally* Gaff v. FDIC, 814 F.2d 311, 315 (6th Cir. 1987).

This is true even where the shareholder plaintiffs were signatories to the underlying contract, and thus had individual standing as plaintiffs. In those cases, the investors have been entitled to restitution or reliance damages, but not expectancy damages. As the Federal Circuit wrote in Southern California Fed. Sav. & Loan Ass'n v. United States, 422 F.3d 1319 (Fed. Cir. 2005) ("SoCal"), "there is no justification for … disregard of the corporate structure invoked by the Individual Plaintiffs in facilitating the acquisition and conversion." 422 F.3d at 1331-32. Thus in American Capital the Federal Circuit allowed the holding company plaintiffs to recover their $42 million infusion into the thrift as reliance damages, but not their loss of equity in the thrift. 472 F.3d at 866-67. Similarly, in Caroline Hunt Trust, the Federal Circuit held that the holding company plaintiff could seek restitution of the value of its subdebt contribution, but not its loss of equity. 470 F.3d at 1053-54.

In every case where investors or shareholders have appeared as plaintiffs alongside the FDIC as receiver, this Court has consistently held that the investors/shareholders could seek restitution damages, but that only the FDIC, standing in the shoes of the thrift, could recover lost profits. Hometown, 56 Fed. Cl. at 484-87; Castle, 48 Fed. Cl. at 199; Statesman, 41 Fed. Cl. at

15-18. JPMorgan Chase is in the same posture as the FDIC in those cases, standing in the shoes of American Savings as its successor in interest.

The courts have expressly rejected arguments that the shareholders should recover directly because they were the signatories to the contract, or otherwise the real parties in interest. Again, as the Federal Circuit wrote in SoCal, "Having chosen to limit their personal liability by adopting a corporate form, we have refused to allow shareholders to rely on their involvement in the negotiation process or their role in funding a transaction to alter their chosen legal status." 422 F.3d at 1332.  *See also* American Capital, 472 F.3d at 866 ("A shareholder's participation in contract negotiations or funding of a particular transaction does not alter its intentional adoption of the corporate form to limit its own liability.").  Thus in Statesman, although the private plaintiffs asserted that they had a "unique status" because they were signatories to the contract, were the sole owners of the bank before the breach, and had litigated the case for several years, this Court disagreed:  "Although the court is sympathetic to private plaintiffs' argument, they cannot cite a single case as authority for the proposition that they are entitled to direct recovery of expectancy damages."  41 Fed. Cl. at 15-16.  *See also* Holland, 59 Fed. Cl. at 741 (fact that shareholder plaintiffs were parties to the breached contract and sole shareholders of the injured thrift did not entitle them to expectancy damages); Hometown, 56 Fed. Cl. at 486 (rejecting plaintiffs' contention that they were "the real party in interest," and that the court should award expectancy damages to them and not the FDIC); Castle, 48 Fed. Cl. at 199 (rejecting the investor plaintiffs' argument that they were entitled to recover lost profits because they were signatories to and third-party beneficiaries of the contract).

Accordingly, American Savings Bank, and not any of its corporate parents, is entitled to any lost profits awarded by this Court.

**B.     The cost of capital proven at trial was incurred by New American Capital, Inc., or alternatively, American Savings Bank.**

For similar reasons, any award of damages based on the cost of capital that was redeployed to replace the warrant capital should be directed to New American Capital (which raised the capital, and made the associated dividend and interest payments), or alternatively to American Savings (which held the capital in its inventory, along with its retained earnings).

As the American Savings corporate chart (above at page 3) demonstrates, the capital raised by the plaintiffs to fund American Savings was raised by New American Capital. *See* Plaintiffs' Memorandum of Contentions of Fact and Law (Mar. 18, 2009) at 29-30, ¶ 90; Plaintiffs' Opening Post-Trial Brief at 54-55, ¶¶ 58-61. Moreover, that capital was raised principally from outside investors, not from New American Capital's parent companies. New American Capital raised $250 million in senior notes, $80 million in preferred stock, $40 million in subordinated debentures, and $30 million in common stock. *See generally* PX 16 (New American Capital 1990 annual report) at S-8 (AS1046 0411); DX 888 (July 19, 2002 Ramirez Declaration) at ¶ 5. Only the $30 million of common stock was purchased by a plaintiff in this case, New American Capital's immediate parent New American Holdings. The other debt and equity were sold to non-plaintiff investors:

| $250 million senior bridge notes[2] | Acadia Partners[3]<br>Shearson Lehman Hutton<br>First Boston |
|---|---|
| $80 million preferred stock | Acadia Partners<br>NA Preferred Partners, L.P.<br>Lerner Preferred Partnership |

---

[2] The senior bridge notes were refinanced a few months later through the issuance of $250 million of senior notes. PX 1409; Tr. 993-95 (Ramirez).

[3] Acadia Partners was "substantially capitalized" by Shearson Lehman Hutton. Tr. 745 (Bonderman).

- 11 -

| $40 million subordinated debentures | Acadia Partners |
|---|---|
| $30 million common stock | *New American Holdings (plaintiff)*[4] |
| Total = $400 million | |

*See* PX 1409 (Mar. 1989 private placement memorandum for $250 million of New American Capital senior notes) at 5 (ASDOJ-NY-23-0015); PX 1390 (Dec. 27, 1988 H-(e)2 application) at 8-19 (DOJ 48734-45).

Of this $400 million, $350 million was downstreamed by New American Capital to its subsidiary N.A. Capital Holdings, which in turn downstreamed it to American Savings. DX 81 at 17. This constituted the bulk of the "inventory capital" that American redeployed to replace the warrant capital.

As the entity that actually raised the capital, New American Capital was the entity that incurred the costs of that capital, in the form of interest and preferred dividends. *See* DX 888 (July 19, 2002 Ramirez Declaration) at ¶ 6 (describing the cost of capital as "the weighted average of the interest and dividends NA Capital actually paid as 'rent' to the providers of this capital"). "Mr. Ramirez relied on the books and records of New American Capital, Inc. to identify 'the costs of the holding company debt and of the preferred dividends that were paid out by New American Capital.'" Plaintiffs' Opening Post-Trial Brief at 54, ¶ 58 (quoting Tr. 1267-68 (Ramirez)). Accordingly, the demonstrative exhibits summarizing the cost of the capital that American Savings had to redeploy to replace the warrant capital reflect that those costs were borne by New American Capital. *See* PX 5003.27 ("Actual Cost of Capital New American Capital, Inc. Raised in Order to Contribute $350mm in Capital to American Savings Bank"); PX

---

[4] New American Holdings received the $30 million from Keystone Holdings Inc., which in turn received it from Keystone Holdings Partners. DX 81 at 16. The record does not disclose the source of funding for Keystone Holdings Partners.

5003.28 ("New American Capital's Cost of the Capital Required to Replace the Warrant Capital"). Those exhibits also indicate that the cost calculations are drawn from New American Capital's annual and quarterly financial reports.

Cost of capital is a form of expectancy damages, LaSalle Talman Bank v. United States, 317 F.3d 1363, 1374 (Fed. Cir. 2003), and, under the same case law discussed above, only the company that suffered the injury is entitled to recover expectancy damages, not its parent holding companies. Thus in SoCal, the Federal Circuit held that only the thrift plaintiff and its immediate parent holding company could recover the cost of replacement capital. 422 F.3d at 1335-36. SoCal compels a similar finding in this case that New American Capital is the plaintiff that is entitled to recover any cost of capital damages.

Indeed, far from incurring any costs in financing the original transaction, New American Capital's parent companies have recouped their initial $30 million investment many times over. As a May 1991 memorandum from Mr. Carl observed, "our return on investment is close[] to 130% annually." PX 1649 at 1 (PAS039 0551). New American Capital's annual reports show that from 1991-1995, New American Capital declared $203 million in dividends on its common stock -- a return of over $40 million per year on a $30 million investment.[5] Awarding the cost of replacement capital to New American Capital's parent company, or any of the other higher-level holding companies that funded the common stock investment, would merely compensate them for an injury they did not suffer.

---

[5] See New American Capital, Inc. and Subsidiaries ("NACI") Annual Report, Dec. 31, 1991 and 1990 at 75 ($50 million in dividends on common stock paid in 1991); NACI Annual Report Dec. 31, 1992 and 1991 at 46 ($72 million in dividends on common stock paid in 1992); NACI Annual Report Dec. 31, 1993 and 1992 at 34 ($44 million in dividends on common stock declared in 1993); NACI Annual Report Dec. 31, 1994 and 1993 at 30 ($29.5 million in dividends on common stock declared in 1994): NACI Annual Report Dec. 31, 1995 and 1994 at 32 ($7.5 million in dividends on common stock declared in 1995). Although these annual reports are not in the trial record *per se*, they are among the documents supporting plaintiffs' cost of capital calculations. See PX 5003.32.

Accordingly, any award of cost of capital damages should be directed to New American Capital, the plaintiff that incurred the costs of raising that capital. Alternatively, the award should be directed to American Savings, which was actually the entity that "redeployed" its inventory capital to replace the warrant capital, and incurred the costs of that capital in the form of dividends that American Savings paid upstream to pay for New American Capital's debt service and preferred stock dividends.

### C. Any "jury verdict" award of expectancy damages should likewise be directed to American Savings Bank or New American Capital.

It logically follows that if the Court were to find that the plaintiffs had proven injury in the form of lost profits or replacement capital costs, and if it were then to award "jury verdict" damages for that injury, those damages should be paid to American Savings if predicated on lost profits, or to New American Capital if predicated on the cost of replacement capital.

### III. THE COURT SHOULD AWARD ANY EXPECTANCY DAMAGES TO JPMORGAN CHASE, NOT TO WASHINGTON MUTUAL, INC.

Where, as here, separate plaintiffs are entitled to separate relief, it is improper to award damages jointly. "[W]here the rights of the parties and the relief to which they are entitled are different, the judgment may not be joint but should be several. If several plaintiffs properly join, but their causes of action are separate and distinct and their damages may be different, the judgment should not be for an aggregate sum but should segregate and award to each the damages or relief to which he is properly entitled." A.C. Freeman, A Treatise of the Law of Judgments § 100 (5th ed. 1993). "Thus, a joint recovery on separate, several, and independent causes of action in favor of separate plaintiffs is improper, and in such case a judgment which

does not preserve the separate rights of each in the total recovery is illegal." 49 C.J.S. *Judgments* § 39 (2009).

Accordingly, in this case damages should be awarded specifically to the plaintiff that suffered them, not to the plaintiffs jointly.

As set forth above, American Savings' "injuries that resulted in its losses … are properly its own." American Capital, 472 F.3d at 867; *see* Castle, 48 Fed. Cl. at 199 ("The lost profits claim belongs to the bank."); Statesman, 41 Fed. Cl. at 16 ("damages suffered by a corporation are recoverable by the corporation, not by its shareholders"). *See supra* at 7-10. A similar logic applies to the cost of replacement capital incurred by New American Capital. Accordingly, any expectancy damages (or related jury verdict damages) awarded by this Court should be awarded to American Savings Bank (lost profits) or New American Capital (cost of capital), or to their successor in interest, JPMorgan Chase.

JPMorgan Chase respectfully submits that this determination should be made by this Court, not by the WaMu Inc. bankruptcy court or some other court. Other courts will simply look to the findings and conclusions of this Court in determining how to allocate damages between WaMu Inc. and JPMorgan Chase. To avoid further delay in this case, this Court should make that determination now.

Alternatively, should this Court determine to defer distribution of damages, JPMorgan Chase asks that the Court make specific findings of fact and conclusions of law as to which plaintiff incurred which damages, consistent with the analysis set forth above, so that another court may subsequently be able to distribute damages on an informed basis. Any other court that confronts this issue will necessarily turn to the decisions and findings of this Court, because that court will lack this Court's familiarity with the parties, the facts and theories underlying the

damages claims, and the governing law that has developed in dozens of <u>Winstar</u>-related cases. At a minimum, the Court should not order payment of the judgment to Washington Mutual, Inc., lest such an order give rise to an argument that *res judicata* compels a finding that Washington Mutual Inc. is entitled to the judgment.

                                                  Respectfully submitted,

Dated:  September 24, 2009         /s/ Edwin L. Fountain
                                               Edwin L. Fountain
                                               JONES DAY
                                               51 Louisiana Ave., NW
                                               Washington, DC  20001-2113
                                               Tel:  (202) 879-3939
                                               Fax:  (202) 626-1700

                                               ***Counsel for Plaintiffs American Savings Bank, F.A. and New American Capital, Inc., through their successor in interest JPMorgan Chase Bank, N.A.***

- 17 -

## CERTIFICATE OF SERVICE

I certify that on this 24th day of September, 2009, I caused the foregoing copy of this Post-Trial Brief of Plaintiffs American Savings Bank, F.A. and New American Capital, Inc. Relating to Distribution of Damages to be filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

/s/ Edwin L. Fountain