No. 92-872C
(Senior Judge Smith)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

AMERICAN SAVINGS BANK, F.A., et al.,

Plaintiffs,

v.

UNITED STATES,

Defendant.

---

DEFENDANT'S POST-TRIAL REPLY BRIEF

---

MICHAEL F. HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

KENNETH M. DINTZER
Assistant Director

OF COUNSEL:

SCOTT D. AUSTIN
Senior Trial Counsel
WILLIAM G. KANELLIS
VINCENT D. PHILLIPS
JACOB A. SCHUNK
SAMEER YERAWADEKAR
Trial Attorneys
Civil Division
Department of Justice

JOHN J. TODOR
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530
Tele: (202) 616-2382
Fax:  (202) 514-8640

October 22, 2009

Attorneys for Defendant

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES. .................................................... iii

INTRODUCTION .............................................................. 1

ARGUMENT. ................................................................. 2

I.   Plaintiffs' Arguments Do Not Support Their "Second Preference" Claim ........................ 2

     A.   Plaintiffs' Mislabeling Of Their "Second Preference" Claim As
          "Essential Reliance Damages" Fails To Rescue It From Being
          Legally Precluded .............................................. 3

     B.   Plaintiffs' Contention That They Treated The Breach As "Partial"
          Defeats Their "Second Preference" Claim .......................... 5

     C.   Plaintiffs Fail To Identify Facts To Support A Separate
          *Quid Pro Quo* Exchange Of The "Second Preference" For
          The Warrant Forbearance ......................................... 6

II.  Plaintiffs' Cost Of Capital Calculation Is Legally Precluded And Factually
     Flawed. ............................................................ 9

     A.   Plaintiffs' Calculations Conflict With The Federal Circuit's
          Earlier Holding ................................................ 10

     B.   Plaintiffs' Calculations Are Unsupported And Unreliable. ......... 11

          1.   Plaintiffs Improperly Gross Up The Cost Of Preferred Stock. ......... 11

          2.   Plaintiffs Improperly Omit Common Stock From Their
               Calculations .............................................. 12

          3.   Plaintiffs' Offset Rate Contradicts The Thrift's Actual
               Experience ................................................ 13

          4.   Plaintiffs Fail To Account For Avoided Depreciation And
               Amortization Expenses. .................................... 14

III. Plaintiffs' Lost Profits Calculations Are Factually And Legally Unsupported ................ 15

     A.   The Type And Magnitude Of Lost Profits Damages Were Not Foreseeable. ........ 16

i

B.      Plaintiffs Failed To Prove Causation Of Any Lost Profits. ................................. 17

     1.      Plaintiffs Apply The Incorrect Legal Standard By Not Calculating The Damages They Would Have Incurred But For The Breach. .................................................................. 18

     2.      Plaintiffs' Lost Profits Claim Is Inconsistent With Evidence That They Replaced The Warrant Capital. ................................ 19

     3.      Plaintiffs' Three Potential Candidates For The Foregone Portfolio Cannot Support Their Lost Profits Claim. ................................. 20

C.      Plaintiffs' Lost Profits Calculations Are Not Reasonably Certain. ...................... 22

     1.      This Court And The Federal Circuit Have Rejected The Premise That A Loss Of Leverage Capacity Equates To Lost Profits. .................................................................... 23

     2.      Plaintiffs Fail To Identify Any Asset Or Liability The Bank Would Have Held Absent The Breach. ........................................... 24

     3.      Plaintiffs' Comparisons To World Savings Are Inappropriate Because The Thrifts Had Different Geographic And Asset Focuses. .................................................................... 25

     4.      Dr. Thakor Did Not Perform An Affirmative Lost-Profits Calculation, And Plaintiffs' Criticisms Of His Revision To Mr. Ramirez's Lost Profits Calculation Are Unavailing. ........................ 26

           a.      Dr. Thakor Did Not Prepare An Affirmative Lost-Profits Calculation, But Rather A Revision To Correct The Most Obvious Errors In Mr. Ramirez's Calculation. ............................ 26

           b.      Dr. Thakor's Use Of FHLB Advance Rates In His Calculation Of The Thrift's Marginal Funding Cost Was Not Erroneous. ................................................... 27

           c.      The ALCO Reports Confirm That Dr. Thakor's Weighted-Average Calculation Accurately Reflected The Thrift's Marginal Funding Cost. ........................................... 29

D.      Plaintiffs' Claim For "Jury Verdict" Damages Is Unsupported. ........................... 30

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,
960 F.2d 1020 (Fed. Cir. 1992)..................................................................................... 5

Am. Sav. Bank v. United States,
62 Fed. Cl. 6 (2004). .......................................................................................... 4, 21

Am. Sav. Bank v. United States,
519 F.3d 1316 (Fed. Cir. 2008)......................................................................... *passim*

Bank of Am. v. Doumani,
495 F.3d 1366 (Fed. Cir. 2007)........................................................................... 12

Biomedical Patent Mgmt. Corp. v. Cal. Dep't of Health Servs.,
505 F.3d 1328 (Fed. Cir. 2007)......................................................................... 5, 11

Bohac v. Dep't of Agriculture,
239 F.3d 1334 (Fed. Cir. 2001)........................................................................... 16

Cal. Fed. Bank v. United States,
245 F.3d 1342 (Fed. Cir. 2001)........................................................................... 23

Cal. Fed. Bank v. United States,
54 Fed. Cl. 704 (2002), aff'd 395 F.3d 1263 (Fed. Cir. 2005). .................................. 24

Cal. Fed. Bank v. United States,
395 F.3d 1263 (Fed. Cir. 2005)....................................................................... 16, 18

Citizens Fed. Bank v. United States,
474 F.3d 1314 (Fed. Cir. 2007)........................................................................... 19

Columbia First Bank v. United States,
60 Fed. Cl. 97 (2004). ................................................................................... 23, 30

Glendale Fed. Bank v. United States,
239 F.3d 1374 (Fed. Cir. 2001)........................................................................... 4, 24

Glendale Fed. Bank v. United States,
378 F.3d 1308 (Fed. Cir. 2004)........................................................................... 24

Granite Mgmt. Corp. v. United States,
416 F.3d 1373 (Fed. Cir. 2005).............................................................................. 24

Hansen Bancorp, Inc. v. United States,
367 F.3d 1297 (Fed. Cir. 2004).............................................................................. 19

Home Sav. Of Am. v. United States,
399 F.3d 1341 (Fed. Cir. 2005)......................................................................... 13, 14

Jamesbury Corp. v. Litton Indus. Prods., Inc.,
839 F.2d 1544 (Fed. Cir. 1988)........................................................................... 5, 11

Landmark Land Co. v. F.D.I.C.,
256 F.3d 1365 (Fed. Cir. 2001)......................................................................... 16, 17

LaSalle Talman Bank v. United States,
317 F.3d 1363 (Fed. Cir. 2003)......................................................................... 13, 19

Old Stone Corp. v. United States,
450 F.3d 1360 (Fed. Cir. 2006)................................................................................ 6

Rumsfeld v. Applied Cos., Inc.,
325 F.3d 1328 (Fed. Cir. 2003).............................................................................. 23

San Carlos Irrigation & Drainage Dist. v. United States,
111 F.3d 1557 (Fed. Cir. 1997).............................................................................. 23

So. Cal. Fed. Sav. & Loan Ass'n v. United States,
57 Fed. Cl. 598 (2003), aff'd in relevant part,
422 F.3d 1319 (Fed. Cir. 2005).............................................................................. 23

So. Nat'l Corp. v. United States,
57 Fed. Cl. 294 (2003). ........................................................................................... 19

Westfed Holdings, Inc. v. United States,
407 F.3d 1352 (Fed. Cir. 2005)................................................................................ 4

## MISCELLANEOUS

5 Arthur Corbin, Corbin on Contracts, § 1012 (1964)................................................. 16

Restatement(Second) of Contracts § 347 (1981). ...................................................... 19

Restatement(Second) of Contracts § 347, cmt. b (1981). ........................................... 18

iv

Restatement(Second) of Contracts § 351, cmt. a (1981). ............................................................ 16

Restatement(Second) of Contracts § 351(2) (1981). .................................................... 16

Restatement(Second) of Contracts § 352 (1981). ....................................................... 23

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

AMERICAN SAVINGS BANK, F.A., )
    et al., )
             )    No. 92-872C
          Plaintiffs, )
             )    Senior Judge Smith
         v. )
             )
UNITED STATES, )
             )
        Defendant. )

## DEFENDANT'S POST-TRIAL REPLY BRIEF

Pursuant to the Court's order of July 28, 2009, defendant, the United States, respectfully submits its post-trial reply brief.

## INTRODUCTION

Plaintiffs' opening post-trial brief fails to support any of their three damages claims.

First, plaintiffs unsuccessfully recast their "second preference" partial restitution claim, which the United States Court of Appeals for the Federal Circuit rejected upon appeal because the contract is not divisible, as a reliance claim. Plaintiffs do not discuss the Federal Circuit's ruling, nor do they demonstrate any factual differences between their rejected partial restitution claim and their current claim. Moreover, the evidence cited in plaintiffs' post-trial brief confirms that (1) the contract term at issue only arose in the context of a larger compromise regarding regulatory capital, (2) the compromise itself underwent numerous changes, and (3) the parties never used the second preference.

Second, plaintiffs' cost of replacement capital calculation, prepared by Mr. Ramirez, is barred as a matter of law and unsupported by the evidence at trial. Plaintiffs do not explain the much higher cost for the same $350 million pool of capital in Mr. Ramirez's Warrant

Forbearance calculation compared to Mr. Ramirez's earlier Note Forbearance calculation, which was affirmed by the Federal Circuit. The evidence cited in plaintiffs' post-trial brief also confirms that Mr. Ramirez overstated the amount and duration of capital because he did not account for the amortization and depreciation expenses plaintiffs avoided through the reversal of push-down accounting after the breach. Furthermore, Mr. Ramirez overstated the net cost of the replacement capital by ignoring common stock and inflating the cost of preferred stock and debt.

Third, plaintiffs' post-trial brief does not support plaintiffs' lost profits calculations, also prepared by Mr. Ramirez. Plaintiffs' own witnesses confirmed that they replaced the Warrant Forbearance capital. Mr. Ramirez's calculations are also speculative as a matter of economics and finance because Mr. Ramirez did not specify the assets or liabilities in the foregone portfolio. The three categories of assets plaintiffs identify as potential candidates for their foregone portfolio – adjustable-rate mortgage ("ARM") loan sales, junk bond sales, and unnamed RTC acquisitions – cannot support plaintiffs' lost profits claim. Any award based upon these assets would be pure windfall. The Government presented the only experts to testify at trial. Plaintiffs' attempts to recharacterize the testimony of these experts as supporting plaintiffs' lost profits claim is unavailing. Plaintiffs thus have failed to support any of their three damages claims.

## **ARGUMENT**

## I.   **Plaintiffs' Arguments Do Not Support Their "Second Preference" Claim**

In our opening post-trial brief, we established that plaintiffs' "second preference" claim (1) was legally precluded by the history of this litigation, and (2) failed on the merits as a matter of law and on the facts of the case. See Def. Initial Post-Trial Brief (Sept. 22, 2009) ("Def. Br."), at 3-17. Plaintiffs' opening brief fails to explain how their "second preference" claim survives

2

numerous legal barriers.[1]  Moreover, plaintiffs cite facts that defeat, rather than support, their "second preference" claim.  See Pl. Br. at 4-9 (¶¶8-24), 36-38 (¶¶160-68).

Plaintiffs contend that the Government secured the $214 million "second preference" in exchange for the Warrant Forbearance.  Id. at 50 (¶39).  They further contend that, despite the breach, plaintiffs "performed their Second Preference promise" upon sale of the thrift in 1996. Id. at 50 (¶41).  Based upon these contentions, plaintiffs claim that they proved reliance damages of $149.8 million, measured as the 70 percent of the $214 million that plaintiffs claim they "would have kept for themselves had the [G]overnment's Warrant Forbearance promise never been made instead of having been made and breached."  Id. at 50 (¶40).

Nothing in plaintiffs' opening brief supports this claim.  First, plaintiffs' mislabeling of their "second preference" claim as "essential reliance damages" does not rescue it from being legally precluded; the substance of their claim is the same as the partial restitution claim already rejected by the Federal Circuit.  Second, plaintiffs' contention that they treated the breach as "partial" is inconsistent with their claim of a separate quid pro quo of the second preference and Warrant Forbearance.  Third, the evidence at trial regarding the negotiations and ultimate sale of the thrift contradicts any claim of a separate quid pro quo exchange.  Plaintiffs' "second preference" claim thus fails and fails again.

A.     **Plaintiffs' Mislabeling Of Their "Second Preference" Claim As "Essential Reliance Damages" Fails To Rescue It From Being Legally Precluded**

Plaintiffs mislabel their "second preference" claim as "essential reliance damages," Pl. Br. at 51 (¶ 42), on the basis that they paid "$149.8 million in increased consideration," id. at 50

---

[1]  See generally Pl. Opening Post-Trial Brief (Sept. 22, 2009) ("Pl. Br."), at 4-9 (¶¶8-24), 36-38 (¶¶160-68), 49-52 (¶¶34-46).

(¶ 42), "'in . . . performance' of the contract." Id. at 49 (¶ 34) (quoting Westfed Holdings, Inc. v. United States, 407 F.3d 1352, 1368 (Fed. Cir. 2005)).  Plaintiffs' mislabeling of their claim as "essential reliance damages" cannot rescue it from being legally precluded.

The Federal Circuit and this Court (in this very case) have both defined reliance damages as compensation for expenditures made in performing the contract or collateral expenditures made in reliance upon the contract and rendered worthless by the breach.  Glendale Fed. Bank v. United States, 239 F.3d 1374, 1382-83 (Fed. Cir. 2001) ("Glendale I"); Am. Sav. Bank v. United States, 62 Fed. Cl. 6, 20-21 (2004).  Plaintiffs argue that the "second preference" somehow fits that definition.  Yet, according to plaintiffs, they paid the "second preference" to the Government because it was required under their contract – that is, it was not a cost of performance; it was the performance.  See Pl. Br. at 50 (¶ 41) ("[p]laintiffs performed their [s]econd [p]reference promise upon the sale of [the Bank] in 1996").  Thus, it could not have been reliance.

Plaintiffs "second preference" claim further fails because it seeks damages plaintiffs "would have been" entitled to under an alleged, non-existent "agreement prior to FSLIC's [Federal Savings and Loan Insurance Corporation] exchange of the Warrant Forbearance for the FSLIC Preference."  Pl. Br. at 38 (¶168).  Plaintiffs thus do not seek the "actual" damages under the actual contract.  Glendale I, 239 F.3d at 1382.

Accordingly, even assuming that plaintiffs paid the second preference, a position with which we disagree, they were providing the Government with a contractual benefit.  Because plaintiffs' "second preference" claim seeks the return of that benefit, it requests partial restitution, which is precluded as a matter of law under the Federal Circuit's mandate, res judicata, the waiver doctrine, and judicial estoppel.  See Def. Br. at 4-7; Am. Sav. Bank v. United

4

States, 519 F.3d 1316, 1325 (Fed. Cir. 2008).[2]   The Court should thus reject the "second

preference" claim, however the plaintiffs may dress it up.

### B.   Plaintiffs' Contention That They Treated The Breach As "Partial" Defeats Their "Second Preference" Claim

Plaintiffs further contend that the Government is not entitled to any offset of their

"essential reliance damages" because, by continuing to perform the contract after the breach,

plaintiffs chose to treat the Government's breach as "partial."  Pl. Br. at 51 (¶43).  Their

characterization of the Government's breach as "partial" simultaneously defeats their "second

preference" claim on the merits while calling into question their theory that the Warrant

Forbearance was exchanged for the "second preference" in a separate quid pro quo.

Plaintiffs attempt to avoid the requirement that any "second preference" recovery be

reduced by the benefits plaintiffs enjoyed under the contract.  They contend that they treated the

Government's breach as "partial," but that contention fails to avoid the offset requirement.  First,

plaintiffs theorize that no offset could exist under a "partial" breach because they "restore[d] the

bank to impressive profitability without the capital the [G]overnment promised."  Pl. Br. at 52

(¶45) (emphasis in original).  Plaintiffs, however, enjoyed the benefit of the Warrant Forbearance

capital during 1989, so even under their own theory, that benefit constitutes an offset to any

claimed "reliance" damages.

---

[2]   See also Jamesbury Corp. v. Litton Indus. Prods., Inc., 839 F.2d 1544, 1550 (Fed. Cir. 1988), overruled on other grounds, A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020 (Fed. Cir. 1992) (law of the case doctrine); Biomedical Patent Mgmt. Corp. v. Cal. Dep't of Health Servs., 505 F.3d 1328, 1341 (Fed. Cir. 2007) (judicial estoppel doctrine).

Further, plaintiffs' "second preference" claim is really a claim for partial restitution; if plaintiffs treated the breach as "partial," that election bars any restitution claim. See Old Stone Corp. v. United States, 450 F.3d 1360, 1372-74 (Fed. Cir. 2006).

Finally, plaintiffs' partial breach theory undermines their separate quid pro quo argument, which is key to their "second preference" claim. Plaintiffs contend that, "[b]ecause it eliminated only one part of the consideration the government promised under the contract, the government's Warrant Forbearance breach constitutes a partial breach." Pl. Br. at 51 (¶43) (quotation omitted). If the elimination of the Warrant Forbearance was only a partial breach, then the Government necessarily had other obligations under the contract. Plaintiffs' quid pro quo argument, however, relies upon the assumption that the Warrant Forbearance was the Government's only obligation under the alleged pairing of the Warrant Forbearance and "second preference." Plaintiffs' partial breach contention thus precludes their quid pro quo argument.

**C.     Plaintiffs Fail To Identify Facts To Support A Separate *Quid Pro Quo* Exchange Of The "Second Preference" For The Warrant Forbearance**

Plaintiffs argue that they agreed with the Government to exchange the Warrant Forbearance for a "second preference" upon liquidation as part of a separate quid pro quo exchange, and that they paid the "second preference" upon sale of the bank. See Pl. Br. at 5 (heading); 36-38 (¶¶160-68). The evidence plaintiffs cite, however, defeats the finding of any separate quid pro quo or "second preference" payment.

Plaintiffs contend that the "initial Term Sheet" did not contain any "second preference," despite the fact that they included the grant of Warrants worth 30 percent of the Bank to FSLIC. See id. at 5 (¶¶9-11). The earliest Term Sheet they identify for this contention dates from March

23, 1988.  See id. at 5 (¶¶10-11).  That Term Sheet clearly contemplates a 30 percent second

preference for FSLIC:  "FSLIC's Class B stock would represent a 30% equity interest in [New

American] (excluding the primary service corp.), but be junior in liquidation preference to a $500

million Class A common."  PX 1074 at USA0043407 (footnote omitted).  The "second

preference" thus enabled FSLIC to receive the 30 percent overall interest called for in the original

March 23, 1988 Term Sheet.  The notion that the "second preference" only emerged later in the

negotiations, when the Warrant Forbearance was being discussed, is buried beneath plaintiffs'

own evidence.

Plaintiffs further contend that "the Government secured a $214 million distribution

preference in exchange for the Warrant Forbearance promise."  Pl. Br. at 5 (heading)

(capitalization altered).  Yet, plaintiffs identify no document or transaction that captured this

exchange.  Indeed, the evidence shows that (1) the negotiations surrounding the "second

preference" and Warrant Forbearance included many other elements; (2) the alleged

"compromise" involving the "second preference" and the Warrant Forbearance did not result in

an agreement; and (3) the terms of the "second preference" and Warrant Forbearance repeatedly

changed after the alleged "compromise," and even after the parties signed the final contract.

First, plaintiffs cite a June 22, 1988 memorandum that memorialized an alleged

"compromise" between Bernard Carl and Michael Duhl, an attorney representing FSLIC during

negotiations, as evidence of a quid pro quo exchange.  See Pl. Br. at 7 (¶17).  That document,

however, differs from the Warrant Forbearance and the "second preference."  For example, it

contains a $500 million first dividend preference for plaintiffs upon a capital transaction, a $200

million (not $214 million) FSLIC "second preference" upon a capital transaction (not upon

7

liquidation), a 70-30 split thereafter, a definition of a capital transaction, and the allowance of a 4-to-1, debt-to-equity ratio in the Bass Group's initial capital contribution.  PX 1115 at WOQ488 2085.  Because the document does not single out the "second preference" and Warrant Forbearance, plaintiffs' claim of a separate quid pro quo fails.

Second, plaintiffs admit that the negotiations between Messrs. Carl and Duhl did not result in an agreement.  Plaintiffs quote Mr. Carl saying that Mr. Duhl "would bring [the 'compromise'] to the Bank Board" and that Mr. Carl "would bring it back to David Bonderman and [his] colleagues."  Pl. Br. at 7 (¶19).  Regardless of plaintiffs' description of Mr. Duhl as "lead negotiator" for FSLIC, id. at 7 (¶16), plaintiffs concede that Mr. Duhl lacked the authority to bind the Bank Board.  See id. at 7 (¶19).  Accordingly, neither the Bank Board nor the Bass Group agreed to the alleged June 22, 1988 "compromise."

Third, as plaintiffs concede, there were several changes to the terms of the "compromise" both before and after the final contract was signed.  This confirms that the "compromise" did not constitute a separate contract.[3]  Moreover, several of these subsequent changes to this "compromise" related to the contingency capital component for the proposed merchant bank subsidiary, not simply the Warrant Forbearance and second preference.[4]  Ms. Grimditch testified

---

[3]  See Pl. Br. at 8-9 (¶¶23-24) (Bass Investors' initial contribution lowered to $350 million, warrant value and Warrant Forbearance amount reduced to $167 million after closing, and "second preference" amount no longer pegged to warrant value).

[4]  See DX 428 at FAS029 0942 (Aug. 17, 1988 letter from Carl to FHLBB) (stating that $214 million "second preference" would be recognized "based on the understanding that ORPOS [Office of Regulatory Policy, Oversight, and Supervision] had waived any requirement for contingency component capital for the MB loan and that the subject "restricted" RAP capital would be incremental capital."); DX 1152 at USA0006798 (Nov. 20, 1988 memorandum from Carl to Brewer and Grimditch) ("Moreover, the purpose for the $214m RAP capital was to ease the strain on regulatory capital caused by our begrudging commitment, given in part in reliance

that having the investment in the service corporation excluded from contingency capital was "a very big issue and one that the Bass Group felt strongly about." Tr. 1668:11-23; 1672:4-17 (Grimditch). As of July 1988, ORPOS's position was to deny the Warrant Forbearance and grant the exclusion from contingency capital. PX 1125 at USA0131401-04. Thus, no agreement was in place until the final agreement.

Plaintiffs' contention that they paid the "second preference" upon the thrift's sale is further undermined by the deal's restructuring before the sale. Plaintiffs admit that the "second preference" entitled the Government to cash, and that the Government received shares of stock instead. Pl. Br. at 37 (¶¶162-66). Plaintiffs accordingly never paid the "second preference" – they paid shares pursuant to a renegotiated deal that did not include any "second preference." Plaintiffs cannot demand return of a payment they never made.

## II.   Plaintiffs' Cost Of Capital Calculation Is Legally Precluded And Factually Flawed

In our opening brief, we explained that plaintiffs' cost of capital calculation is legally barred because it conflicts with plaintiffs' Note Forbearance calculation, which the Federal Circuit affirmed as reflecting the "actual costs paid to capital providers." Am. Sav., 519 F.3d at 1323; Def. Br. at 18-21. Even if plaintiffs' Warrant Forbearance calculation is not legally barred, plaintiffs' claim is factually flawed, unreliable, and unsupported by principles of economics and finance. Plaintiffs' post-trial brief reinforces this conclusion.

---

on having this RAP capital, to have full 'contingency capital' to support the Affiliated Service Corp. investment.").

### A.     Plaintiffs' Calculations Conflict With The Federal Circuit's Earlier Holding

The Court should reject plaintiffs' Warrant Forbearance cost of capital calculation because it seeks a markedly higher net cost for the same pool of capital than their earlier Note Forbearance calculation. Plaintiffs inexplicably assert that both calculations are reasonably certain despite this divergence in net cost.[5] This paradox demonstrates that plaintiffs' Warrant Forbearance calculation is properly rejected.

In their post-trial brief, plaintiffs fail to acknowledge that their Warrant Forbearance calculation differs significantly from their Note Forbearance calculation. Mr. Ramirez, however, admittedly altered a farrago of assumptions from the Note Forbearance calculation, including: (1) changing the cost of preferred stock from 17.25 percent to 23.96 percent;[6] (2) adopting a zero-percent weight for common stock compared to a 7.08-percent weight;[7] and (3) applying an offset based upon the one-year constant maturity Treasury ("CMT") rate rather than the FSLIC Note rate.[8] As Dr. Thakor testified, these changes resulted in the net spread between the cost of capital rate and the offset rate being "almost four percentage points higher – 3.92 percent, to be

---

[5]  Compare Pl. Br. at 53 (¶52) ("readily quantifiable" and "reasonably certain") with Pl. Mot. Summ. J. I ("FSLIC Note") (July 26, 2002) at 18 ("dollar amounts plaintiff NA Capital actually paid to the various capital providers are indisputable"), 18 n.19 ("summaries of undisputed facts contained in business records").

[6]  Pl. Br. at 54-55 (¶60); compare DX 888 (17.25 percent) with PX 1820 (23.96 percent); Tr. 1326:21-1327:1 (Ramirez); Tr. 2323:13-18 (Thakor).

[7]  Pl. Br. at 55-56 (¶¶63-65); DX 898; DX 2132; Tr. 2322:13-17 (Thakor).

[8]  Pl. Br. at 56-57 (¶¶67-71); DX 898; DX 2133; Tr. 2336:3-9 (Thakor). In their Note Forbearance calculations, plaintiffs presented five possible offset rates, including the FSLIC Note rate adopted by this Court. The plaintiffs, however, did not offer a one-year CMT rate. DX 898; Tr. 1386:3-1387:18 (Ramirez); see also Am. Sav., 519 F.3d at 1323.

precise," for "the same pool of capital."  Tr. 2339:2-6 (Thakor); DX 2136.  These altered

assumptions – ignoring the other flaws in Mr. Ramirez's calculations – result in a $58.95 million

damage overstatement.  Tr. 2340:9-23 (Thakor); DX 2137.

These contradictions artificially inflate plaintiffs' damages, and plaintiffs are barred from

proceeding based upon conflicting representations both about the substance of their claim and the

reliability of their calculations.  Def. Br. 25-26.  Plaintiffs' current calculations are thus barred by

judicial estoppel and the law of the case.  Biomedical Patent Mgmt. Corp., 505 F.3d at 1341

(judicial estoppel); Jamesbury Corp., 839 F.2d at 1550 (law of the case).

## B.      Plaintiffs' Calculations Are Unsupported And Unreliable

Even if the Court were to find that plaintiffs' cost of capital calculations are not legally

barred, their calculations are unsupported by the evidence at trial and basic principles of

economics and finance.  Indeed, plaintiffs' brief highlights flaws in four aspects of their cost of

capital calculations: (1) the use of the pre-tax cost for preferred stock; (2) the omission of

common stock from their calculations; (3) the use of the one-year CMT rate to calculate the

appropriate offset; and (4) the failure to account for the effects of amortization and depreciation.

### 1.      Plaintiffs Improperly Gross Up The Cost Of Preferred Stock

Plaintiffs ignore basic principles of finance by erroneously grossing up the cost of

preferred stock, which results in a 23.96 percent preferred stock rate instead of the 17.25 percent.

Plaintiffs argue that the higher rate should be used "since [the thrift] effectively paid 28% of its

pre-tax income over to the government in lieu of taxes."  Pl. Br. at 54-55 (¶60).  This grossed-up

rate is inconsistent with the rate actually found in plaintiffs' books (and that was used for the

Note Forbearance calculation).  See Def. Br. at 33-34.

11

Dr. Thakor established that a gross-up for preferred stock payments is incorrect and inconsistent with the basic principles of finance because a gross up is inconsistent with how the weighted average cost of capital is computed.[9]  Plaintiffs do not, and cannot, rebut this expert testimony, and have offered no support for their unprecedented damages calculation.

### 2.  Plaintiffs Improperly Omit Common Stock From Their Calculations

Plaintiffs' omission of common stock from their cost of capital calculation contradicts Federal Circuit precedent and common sense.  The Federal Circuit has found that, when calculating the cost of replacing capital with retained earnings (i.e., a common stock interest), the actual dividends paid were the proper cost of retained earnings.[10]  Disregarding this precedent, plaintiffs wrongly argue that it is difficult to observe the cost of common equity directly, and that omitting the cost of common stock tends to underestimate plaintiffs' cost of capital.  Pl. Br. at 55-56 (¶¶63-65).  Not only was it possible to calculate plaintiffs' cost of common stock, but Dr. Thakor did so.[11]  Moreover, the omission of common stock results in the preferred stock and debt being given more weight in the thrift's capital structure than they had in either the actual world,[12] or in Mr. Ramirez's prior calculations.[13]

---

[9]  Tr. 2280:23-2282:4; 2353:21-2354:2 (Thakor); DX 2122; DX 2123.

[10]  Bank of Am. v. Doumani, 495 F.3d 1366, 1371-73 (Fed. Cir. 2007).

[11]  Tr. 2287:23-2288:3 (Thakor); DX 2124; DX 2127.

[12]  Tr. 2293:8-2294:6 (Thakor); DX 2127.

[13]  DX 888; DX 898.

### 3. Plaintiffs' Offset Rate Contradicts The Thrift's Actual Experience

Plaintiffs' assertion that the proper offset rate is the one-year CMT rate – a much lower rate than either the FSLIC Note rate from their Note Forbearance calculation or the thrift's actual yield on earnings assets – lacks legal merit and is unsupported by the facts of this case.

As an initial matter, although unclear, plaintiffs appear to make a new and erroneous argument that an offset is not warranted because plaintiffs "received no direct investment earnings on the redeployed tangible capital that [they] would not have received absent the breach." Pl. Br. at 56 (¶67). To the extent plaintiffs contend that no offset is warranted, their argument is baseless. The Federal Circuit affirmed this Court's cost of capital award, including the offset calculation, upon the grounds that, "[a]bsent the breach, this capital would have been available to Plaintiffs for other profitable uses or for repayment to investors to avoid the ongoing costs of maintaining the capital." Am. Sav., 519 F.3d at 1323. Per the Federal Circuit's ruling, if plaintiffs incurred costs they would not have incurred absent the breach, plaintiffs also received earnings they would not have received absent the breach. Moreover, plaintiffs do not, and cannot, distinguish this case from similar Winstar-related cases wherein the Federal Circuit has recognized that an offset is necessary because of the inherent benefits of cash over intangible capital.[14] An offset thus is required.

Plaintiffs erroneously contend that, for any offset, the rate should be the one-year CMT rate because it tracks plaintiffs' yield on short-term investments. Pl. Br at 57 (¶69). It is undisputed, however, that plaintiffs never owned a significant short-term Treasury portfolio. Tr.

---

[14] Home Sav. of Am. v. United States, 399 F.3d 1341,1354 (Fed. Cir. 2005); LaSalle Talman Bank v. United States, 317 F.3d 1363, 1375 (Fed. Cir. 2003) ("[T]he benefits of . . . capital must be credited, as mitigation due to the replacement of goodwill with cash.").

2327:3-5; 2335:18-24 (Thakor); DX 2134.  Moreover, as Dr. Thakor explained, because capital

is fungible, "we don't draw arrows from specific liability items to specific asset items" because

capital is "available for investment in anything that the bank is permitted to invest in under its

charter."  Tr. 2331:18-2332:3; 2334:17-23 (Thakor).  As a result, Dr. Thakor explained that the

actual yield upon earning assets is a more "representative" offset rate that is "traceable to the

books and records of the bank."[15]

Plaintiffs' reliance upon the Federal Circuit's ruling in <u>Home Savings</u> to support the one-

year CMT rate is also misplaced.   <u>See</u> Pl. Br. at 57 (¶71).  In <u>Home Savings</u>, the Federal Circuit

affirmed the use of an intermediate Treasury rate as an offset rate, not the lower, one-year rate,

and then only because the rate was consistent with the plaintiff's actual experience.  <u>Home Sav.</u>,

399 F.3d at 1354.  As both the FSLIC Note rate and yield upon earning assets are more

representative than the one-year CMT rate, use of the one-year CMT rate is inappropriate under

<u>Home Savings</u>.

### 4.    Plaintiffs Fail To Account For Avoided Depreciation And Amortization Expenses

As we also demonstrated in our opening brief, Mr. Ramirez greatly overstates the capital

to be replaced because he erroneously ignores the effect of the avoided depreciation and

amortization expenses associated with the reversal of push-down accounting.  Def. Br. 27-31.

In their post-trial brief, plaintiffs again attempt, unsuccessfully, to justify Mr. Ramirez's

decision to ignore the depreciation and amortization expenses associated with the reversal of

push down accounting by claiming that it is unreasonable to include depreciation and

---

[15]  Tr. 2325:6-2326:9; 2361:20-2363:10; 2689:24-2690:13 (Thakor); PX 1826, Exh. 12a-
12b.

amortization, but exclude earnings.  Pl. Br. at 58 (¶¶73-77).  Plaintiffs suggest, incorrectly, that

Mr. Musika actually supports their position by taking out of context his statement on cross-

examination that "it would be incomplete and inaccurate to ignore the entire economic activity

resulting from the entire contract and just pick and choose certain components of the financial

results of the contract."  Pl. Br. at 58 (¶76) (quoting Tr. 2162:21-2163:2 (Musika)).

Contrary to plaintiffs' suggestion, Mr. Musika disagreed with Mr. Ramirez's position that

the avoided depreciation and amortization expenses associated with the reversal of push down

accounting can be ignored because purported lost earnings from the warrant capital are not being

taken into account.  Mr. Musika explained that, when measuring replacement cost, lost earnings

are not relevant to the calculation.[16]  This, of course, differs from lost profits calculations.  Id.

Mr. Musika's point that relevant economic activity must be considered concerns his

response to Mr. Ramirez's other argument that purportedly justified ignoring the avoided

depreciation and amortization expenses – that the warrant capital itself did not amortize.  Tr.

1265:23-1266:7 (Ramirez); PX 5003.24.  Mr. Musika explained that narrowly focusing upon the

non-amortizing nature of the warrant capital itself "ignores the entire transaction and the entire

forbearance and the reversal and everything else that happened . . . which is the noncurrent

assets, which do depreciate and amortize."  Tr. 2106:15-20 (Musika).

**III.   Plaintiffs' Lost Profits Calculations Are Factually And Legally Unsupported**

Plaintiffs have not proven that ASB would have been more profitable and successful in a

hypothetical world than it was in the actual world.  To support their lost profits claim, plaintiffs

---

[16]  Tr. 2076:21-2077:5; 2107:2-10; 2166:5-2167:25 (Musika); see also Tr. 2246:25-
2247:8 (Thakor); Def. Br. at 31.

must establish that (1) the alleged lost profits were within the contemplation of the parties because the loss was foreseeable; (2) these profits would have been realized but for the breach; and (3) the plaintiffs' alleged damages is a reasonably certain measure.  Cal. Fed. Bank v. United States, 395 F.3d 1263, 1267 (Fed. Cir. 2005) ("Cal. Fed. II").  Plaintiffs failed to establish these elements at trial, and this Court should reject plaintiffs' claim as a matter of fact and law. Plaintiffs' "jury verdict" claim is unsupported by the record and should also be rejected.

### A.     The Type And Magnitude Of Lost Profits Damages Were Not Foreseeable

Plaintiffs failed to prove that the Government had reason to foresee the magnitude of damages plaintiffs claim as lost profits.  The Government had no objective reason to believe that as a result of its breach, ASB would incur lost profits of the magnitude plaintiffs predict.

Plaintiffs bear the burden of proving "both the magnitude and the type of damages were foreseeable."[17]  In order for damages to be foreseeable, "the injury that occurs must be one of such a kind and amount as a prudent man would have realized to be a probable result of his breach."[18]  "The mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable."[19]  The court examines whether the alleged loss was foreseeable at the time of contracting, not the time of breach.[20]

---

[17]  Landmark Land Co. v. F.D.I.C., 256 F.3d at 1365, 1378 (Fed. Cir. 2001) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 351(2) (1981)).

[18]  Id. at 1378 (quoting 5 ARTHUR CORBIN, CORBIN ON CONTRACTS, § 1012 at 88 (1964)).

[19]  Id. (quoting RESTATEMENT (SECOND) OF CONTRACTS, § 351, cmt. a (1981)).

[20]  Bohac v. Dep't of Agriculture, 239 F.3d 1334, 1340 (Fed. Cir. 2001).

Plaintiffs' contention that damages were foreseeable betrays the standards established by the Federal Circuit.  See Landmark, 256 F.3d at 1378.  Plaintiffs argue that the Government knew, or should have known, that Plaintiffs intended to leverage the Warrant Forbearance capital, and that a breach could cause lost profits.  Pl. Br. at 40 (¶¶8-9).  Even if these assertions were correct, they would support only that a general loss of profits should have been foreseeable at the time of contracting, not the magnitude of the alleged losses.

Plaintiffs' alleged lost profits were not reasonably foreseeable because their lost profits calculations are out of step with basic principles of economics and finance.  Plaintiffs contend that, but for the breach, the thrift could have grown "without a material reduction in its rate of profitability as measured by return on average assets [ROAA][.]"  Pl. Br. at 42 (¶15).  Mr. Ramirez thus extrapolates the thrift's historical ROAA to his foregone portfolio.[21]  As Dr. Thakor explained, however, Mr. Ramirez wrongly extrapolates the thrift's ROAA to an expanded portfolio without accounting for the economic principle of diminishing marginal returns.[22]  Furthermore, plaintiffs' executives acknowledged that growth is not always profitable for a thrift.  Tr. 225:7-23 (Barnum).  The evidence thus rebuts plaintiffs' argument that the alleged lost profits from Mr. Ramirez's calculation were reasonably foreseeable.

### B.     Plaintiffs Failed To Prove Causation Of Any Lost Profits

Because plaintiffs failed to prove causation of any lost profits, the Court should reject their lost profits claim.  First, plaintiffs applied the incorrect legal standard for causation in their

---

[21]  Tr. 1241:1-12 (relies upon bank's ROAA); 1225:7-13 (only needed to derive size of hypothetical portfolio) (Ramirez).

[22]  Tr. 2404:9-2406:17; 2445:24-2446:1 (Thakor).

opening brief by not calculating the damages they would have incurred but for the breach.

Second, the evidence at trial establishing that plaintiffs replaced the warrant capital defeats any

claim of lost profits.  Third, the three categories of assets plaintiffs identify as potential

candidates for their foregone portfolio – ARM sales, junk bond sales, and unnamed RTC

acquisitions – cannot support their lost profits claim.

> **1.      Plaintiffs Apply The Incorrect Legal Standard By Not Calculating
> The Damages They Would Have Incurred But For The Breach**

Plaintiffs erroneously claim that recovery of an expectancy award merely requires them to

show that the Government's breach was a "substantial factor" in causing their alleged lost profits.

When seeking to recover a certain quantum of damages, plaintiffs must show that these damages

would not have resulted but for the Government's breach of the regulatory forbearance.

As we stated in our opening brief, the proper causation standard for evaluating a lost

profits claim is the but for standard.  The Federal Circuit has clarified that the "inability to prove

by a preponderance of the evidence that profits would have been made but for the breach will

therefore preclude recovery on a lost profits theory."  Cal. Fed. II, 395 F.3d at 1268.  The "but

for" standard is consistent with elementary principles of contract law.  "If defective or partial

performance is rendered, the loss in value caused by the breach is equal to the difference between

the value that the performance would have had if there had been no breach and the value of such

performance as was actually rendered."  RESTATEMENT (SECOND) OF CONTRACTS § 347, cmt. b

(1981).

One Federal Circuit panel has held that a court may use the "substantial factor" test to

establish the fact of causation – "i.e., that a defendant that has breached a contract is liable for

those damages the other party to the contract suffered for which the breach was a substantial

factor in causing the damages." <u>Citizens Fed. Bank v. United States</u>, 474 F.3d 1314,1318 (Fed.

Cir. 2007).  But to ascertain the <u>quantum</u> of harm, rather than the <u>fact</u> of causation, a plaintiff

must limit the amount of damages sought to those lost profits that would have been realized <u>but</u>

<u>for</u> the breach.  Any damages awarded beyond that amount would result in an impermissible

windfall.  <u>See</u> <u>Hansen Bancorp, Inc. v. United States</u>, 367 F.3d 1297, 1317-18 (Fed. Cir. 2004).

The corollary rule is that the non-breaching party may not be compensated for costs or

losses caused by factors not related to the breach:  "Courts should avoid bestowing an 'unfair

windfall' on the plaintiff by compensating him or her above and beyond the losses suffered under

the breached agreement."[23]  This rule limits damages to costs resulting from the breach, as

opposed to other factors.[24]

### 2.    Plaintiffs' Lost Profits Claim Is Inconsistent With Evidence That They Replaced The Warrant Capital

Plaintiffs' assertions made to support their lost profits claim cannot be reconciled with the

contemporaneous documents and testimony of witnesses that plaintiffs replaced the warrant

capital.  Plaintiffs admit that they "redeployed their own contributed capital 'to do the work of

the warrant capital.'"  Pl. Br. at 22 (¶89) (quoting Tr. 1318:18-22 (Ramirez)).  Mr. Ramirez

testified that, "I firmly believe the Plaintiffs did replace the warrant capital by replacing – by

redeploying their own contributed capital to support the assets that  – or to do the work of the

---

[23]  <u>Hansen</u>, 367 F.3d at 1315 (citing <u>LaSalle</u>, 317 F.3d at 1371); <u>see</u> RESTATEMENT (SECOND) OF CONTRACTS § 347 (1981).

[24]  <u>See</u> <u>So. Nat'l Corp. v. United States</u>, 57 Fed. Cl. 294, 306 (2003) (rejecting claim that did not reflect opportunities thrift would have pursued in the but-for world).

warrant capital."  Tr. 1318:18-22 (Ramirez).  Further, plaintiffs admit that they were never out of

capital compliance, only that the breach reduced their capital "cushion."  Pl. Br. at 22 (¶86).

The evidence also demonstrates that the breach did not materially change plaintiffs' asset

projections.  Plaintiffs only revised their pre-breach 1990 asset projection downward by $16

million, from $18.156 billion to $18.140 billion, as plaintiffs predicted their post-breach

performance.[25]  Given that plaintiffs replaced the capital associated with the breach, did not fall

out of capital compliance, and did not materially alter their asset projection after the breach, they

cannot claim that the breach prevented them from making the investments that purportedly gird

their lost profits claim.

### 3.      Plaintiffs' Three Potential Candidates For The Foregone Portfolio Cannot Support Their Lost Profits Claim

The three candidates for the foregone portfolio identified by plaintiffs – the ARM sales,

junk bond sales, and unnamed RTC acquisitions – cannot support plaintiffs' lost profits claim.

Because the breach did not cause the loss of any of these three categories of assets, any award

based upon these assets would constitute a windfall.

With respect to the sale of the $1.1 billion portfolio of ARMs based upon the 11th-District

Cost-of-Funds Index ("COFI") in 1990, plaintiffs state that the ARM portfolio was sold solely to

reach a four-percent capital level.  Pl. Br. at 24 (¶99).  Dr. Hamm, however, explained that

plaintiffs sold these loans long before the four-percent requirement took effect at the end of 1992.

Tr. 2935:8-11 (Hamm).  Plaintiffs sale of these loans was not a result of the breach, but of an

independent business decision to reach the four-percent level before the requirement took effect.

---

[25]  Tr. 2892:12-2893:22 (Hamm); DX 2202; PX 231 at PAS128 2724; PX 1518 at
WOQ553 0700; see also Def. Br. at 40.

The inclusion of the ARM loans also contradicts the internal workings of Mr. Ramirez's lost profits calculations.  Mr. Ramirez includes the gains from the sale of those loans in the regulatory capital amount used in his calculations.  Tr. 2930:2-16 (Hamm).  If the Court were to treat the ARM loans as a component of the foregone portfolio, the same loans would be held and sold simultaneously, effectively double-counting the loans.  Such a result is nonsensical.

With respect to the junk bond sales, it must first be noted that plaintiffs ignore the fact that this Court has already ruled that the breach did not cause plaintiff to sell their junk bond portfolio.  Am. Sav., 62 Fed. Cl. at 22.  Furthermore, plaintiffs' witnesses confirmed that the breach did not cause the junk bond sale.  Tr. 756:19-25; 767:13-16 (Bonderman).  Mr. Ramirez cited to an internal American Savings estimate of what the junk bond portfolio might have returned had it been held until 1991, Pl. Br. at 28 (¶¶116-18), but Mr. Ramirez did not buy or sell any junk bonds.  Tr. 1537:12-23 (Ramirez).  A separate Bass subsidiary, Rosecliff, managed the junk bond portfolio, and plaintiffs presented no evidence as to what Rosecliff would have done absent the breach.  Tr. 916:1-21 (Bonderman).  Plaintiffs thus did not establish that the breach caused the junk bond sale.

Plaintiffs argue they could have pursued additional RTC acquisitions with the additional capital.  Pl. Br. at 28-32 (¶¶119-37).  Mr. Ramirez, however, admitted that he did not know what acquisitions the thrift would have pursued.  Tr. 1545:3-14 (Ramirez).  For the one possible acquisition identified at trial – the acquisition of Gibraltar – plaintiffs submitted a bid which was lower than the winning bid, but Mr. Ramirez did not know the amount of the winning bid, could not say what price plaintiffs would have had to pay to make the acquisition, and "did not play any role in the eventual sale of the institution."  Tr. 1572:1-17; 3259:21-3260:3 (Ramirez).  Absent

21

identification of what institutions plaintiffs would have acquired, and at what cost, plaintiffs

cannot establish any lost profits for these phantom RTC acquisitions.

Furthermore, the RTC was not offering assets that plaintiffs wanted.  Plaintiffs affirmed

in their opening brief that adding COFI ARMs was the thrift's "basic business strategy."  Pl. Br.

at 23 (¶92).  Mr. Meyer explained that, "Mr. Carl had indicated to me some frustration that [RTC

was] taking COFI ARMs and repackaging them, in securitization, into LIBOR ARMs and not

using them in the thrift resolutions, but rather selling them directly into the capital markets at the

time."  Tr. 1973:11-17 (Meyer).  Moreover, the RTC was offering cash as the predominate asset

in its thrift resolutions, and plaintiffs did not want to receive cash.  Tr. 1977:11-1978:16 (Meyer).

Plaintiffs thus could not have acquired the volume of COFI ARMs that they project in their

calculations from RTC acquisitions.

### C.    Plaintiffs' Lost Profits Calculations Are Not Reasonably Certain

Plaintiffs have failed to put forth a reasonably certain lost profits calculation.  This Court

and the Federal Circuit have decisively rejected the central premise of plaintiffs' lost profits

calculation – that additional leverage capacity inexorably leads to profits.  Mr. Ramirez's

calculation erroneously assumes lost profits from lost leverage capacity without identifying any

asset or liability that plaintiffs would have held absent the breach.

Plaintiffs erroneously attempt to recharacterize Dr. Hamm and Dr. Thakor's testimony to

support a lost profits award.  With respect to Dr. Hamm, plaintiffs incorrectly suggest that the

success of World Savings, the thrift where Dr. Hamm served as executive during part of the

alleged damages period, demonstrates that American Savings would also have earned additional

profits absent the breach.  This comparison is unavailing because World Savings pursued a

different strategy in terms of geographic and asset focus from American Savings.

With respect to Dr. Thakor, plaintiffs incorrectly argue that Dr. Thakor presented an

affirmative lost-profits calculation.  Dr. Thakor did not independently calculate lost profits, but

instead prepared a revision to correct the most obvious errors in Mr. Ramirez's calculation.

Plaintiffs also argue that Dr. Thakor admitted that he used an incorrect marginal funding cost

figure in his revision, but Dr. Thakor testified that he used the best figure from the available data.

Plaintiffs thus have failed to present a reasonably certain lost profits estimate.

### 1.       This Court And The Federal Circuit Have Rejected The Premise That A Loss Of Leverage Capacity Equates To Lost Profits

Plaintiffs' lost profits calculation proceeds from the oft-rejected premise that lost leverage

capacity equates to lost profits.  The amount of lost profits must be established with reasonable

certainty.[26]  Accordingly, lost profits may not be awarded based upon a model that is speculative

or unreliable.[27]

In the Winstar context, courts have recognized that, "[l]oss of leverage capacity for an

investment that plaintiff has not shown it would have made absent the breach is not sufficient

support for a lost profits damages claim."[28]  Conversely, courts have recognized that carrying

---

[26]  See Rumsfeld v. Applied Cos., Inc., 325 F.3d 1328, 1340 (Fed. Cir. 2003) (quoting Cal. Fed. Bank v. United States, 245 F.3d 1342, 1349 (Fed. Cir. 2001) ("Cal. Fed. I")); RESTATEMENT (SECOND) OF CONTRACTS § 352 (1981).

[27]  San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997).

[28]  Columbia First Bank v. United States, 60 Fed. Cl. 97, 112 (2004); So. Cal. Fed. Sav. & Loan Ass'n v. United States, 57 Fed. Cl. 598, 626 (2003), aff'd in relevant part, 422 F.3d 1319 (Fed. Cir. 2005) ("most importantly, growth does not necessarily equal profits").

fewer assets does not necessarily amount to lost profits or lost value.[29]   The Federal Circuit has

thus noted that such "loss models [are] inherently unreliable."[30]   Plaintiffs' assumption that

leverage leads to lost profits thus renders their calculations speculative and unreliable.

### 2. Plaintiffs Fail To Identify Any Asset Or Liability The Bank Would Have Held Absent The Breach

In their brief, plaintiffs inadvertently demonstrated why Mr. Ramirez's lost profits

calculation is speculative and unreliable.   In his calculation, Mr. Ramirez merely computed the

size of the incremental portfolio, and assumed that it was reasonable to linearly extrapolate the

thrift's actual ROAA onto the hypothetical portfolio.   Pl. Br. at 44-45 (¶¶20-25).   This

assumption is unreasonable because it contradicts (1) California's market conditions during the

proffered damages period, and (2) the principles of economics and finance.

Plaintiffs argue that American Savings "may use reasonable assumptions in computing

the profits it would have earned but for the breach[,]" and their lost profits claim "is based on

ASB's actual strategies and operations, albeit as reflected in reasonable simplifying assumptions

incorporated into the calculations."  Pl. Br. at 43, 47-48, (¶¶17, 29).   Mr. Ramirez, however,

testified that he made no assumptions regarding the assets in the foregone portfolio, or the

liabilities used to fund them.   Tr. 1507:15-1508:15 (Ramirez).   Instead, his calculations rely upon

the assumption that leveraged capital always leads to profits, which economic and financial

---

[29]   See Granite Mgmt. Corp. v. United States, 416 F.3d 1373, 1383 (Fed. Cir. 2005) (loss of capital not in itself proof of damage); Glendale I, 239 F.3d at 1378 (bank "reduced its losses" by shrinking); Cal. Fed. Bank v. United States, 54 Fed. Cl. 704, 706 (2002), aff'd, 395 F.3d 1263 (Fed. Cir. 2005) (bank not harmed by shrinking to improve its capital ratios or raising capital).

[30]   Glendale Fed. Bank v. United States, 378 F.3d 1308, 1313 (Fed. Cir. 2004).

theory reject.  Tr. 2404:9-2406:8 (Thakor).  Plaintiffs' extrapolation of prior returns unreasonably

ignores the realities of the market and principles of economics and finance.

> ### 3. Plaintiffs' Comparisons To World Savings Are Inappropriate Because The Thrifts Had Different Geographic And Asset  Focuses

Plaintiffs appear to contend that their lost profits calculations are reasonable by

comparison to the performance of an unrelated institution, World Savings.  Pl. Br. at 33 (¶138).

Aside from the absurdity of claiming that one bank would have been successful merely because

another bank experienced success, the comparison is inapt because, converse to plaintiffs' claim,

World Savings and American Savings were not "very similar institutions."  See id. at 33 (¶139).

Contrary to plaintiffs' incorrect assertion that capital was the "single material respect" where the

thrifts differed, id. at 33 (¶140), the two thrifts materially differed in geographic and asset focus.

With respect to geographic focus, whereas American Savings pursued profits exclusively

in California, World Savings had loan offices in eighteen states and branch offices in eight states.

Tr. 3131:14-3132:6 (Hamm).  World Savings made acquisitions outside of California, acquiring

thrifts in New Jersey, Florida, Colorado, Missouri, and Arizona.  Tr. 3131:12-18 (Hamm).  By

contrast, American Savings was only interested in California acquisitions.  Pl. Br. at 17-18 (¶¶64-

65); Tr. 3132:19-24 (Hamm).  World Savings thus was not as affected by the California recession

as American Savings.  Tr. 2964:8-2965:5; 3132:19-24 (Hamm).

Partly due to its broader geographic focus, World Savings also had a broader asset focus

than American Savings.  As of 1990 and 1991, World Savings originated and held a significant

portion of its loans from outside California, while American Savings exclusively focused upon

California.  Tr. 3133:5-18 (Hamm).  By 1991, World Savings also originated and held LIBOR-

based ARMs, while American Savings focused solely upon COFI ARMs.  Tr. 3133:19-3134:9

(Hamm).  Plaintiffs' comparison of American Savings to World Savings is, thus, inapt, and does

not prove lost profits.

> **4.    Dr. Thakor Did Not Perform An Affirmative Lost-Profits Calculation, And Plaintiffs' Criticisms Of His Revision To Mr. Ramirez's Lost Profits Calculation Are Unavailing**

Plaintiffs incorrectly argue that Dr. Thakor performed his own affirmative, lost-profits

calculation.  Dr. Thakor, however, only sought to revise and correct the most obvious errors in

Mr. Ramirez's calculation.  Plaintiffs also incorrectly claim that Dr. Thakor admitted to an error

in his calculation of the thrift's marginal funding cost, using a weighted average of the thrift's

reported Federal Home Loan Bank ("FHLB") advance and "other borrowings" rates.  Plaintiffs

argue that because the FHLB advance figure includes older, fixed-rate FHLB advances, it would

be more appropriate to use only the "other borrowings" rate.  Dr. Thakor, however, testified that

the weighted-average cost he computed was the most appropriate figure given the available data

because the thrift would not – and could not – have funded the foregone portfolio solely through

"other borrowings."  Lastly, plaintiffs argue that the thrift's asset and liability committee

("ALCO") reports support their criticisms of Dr. Thakor's weighted-average calculation.  The

ALCO reports, however, confirm that Dr. Thakor's weighted-average calculation accurately

reflected the thrift's marginal funding cost.

> **a.    Dr. Thakor Did Not Prepare An Affirmative Lost-Profits Calculation, But Rather A Revision To Correct The Most Obvious Errors In Mr. Ramirez's Calculation**

Plaintiffs assert, without any support in the record, that Dr. Thakor "sponsored his own

calculation of Plaintiffs' lost profits damages."  Pl. Br. at 48 (¶30).  To the contrary, Dr. Thakor

did not present an affirmative damages estimate, but merely revised Mr. Ramirez's calculations

to correct the most egregious errors:  extension of lost profits beyond 1996, pre-tax rather than

after-tax income, reinvestment of dividends, and use of historical ROAA rather than a marginal

spread.[31]  By correcting only these most obvious errors, Dr. Thakor concluded that Mr. Ramirez's

damages estimate would be revised from $83 million to $22 million.  Tr. 2495:3-13 (Thakor).

Dr. Thakor testified that using historical ROAA was incorrect, and that the correct way to

obtain the return on the incremental portfolio would be to calculate the marginal spread between

mortgage-backed securities ("MBS") yields on the asset side, and a weighted average of FHLB

advances and other borrowings on the liability side.[32]  Because the marginal rates were not

readily available, Dr. Thakor used the thrift's reported rates for MBS, FHLB advances, and other

borrowings as a "reasonable proxy."[33]  Nevertheless, Dr. Thakor testified that there were several

additional calculations and analyses he would need to perform to prepare an affirmative damages

estimate, including identifying the but-for assets and liabilities.  Tr. 2483:25-2486:3 (Thakor).

Dr. Thakor thus did not prepare an affirmative damages estimate.

### b.  Dr. Thakor's Use Of FHLB Advance Rates In His Calculation Of The Thrift's Marginal Funding Cost Was Not Erroneous

Plaintiffs wrongly assert that Dr. Thakor admitted error by incorporating the FHLB

advance rate from the thrift's books into his weighted-average marginal funding cost calculation.

Pl. Br. at 48 (¶32).  In his revision, Dr. Thakor replaced Mr. Ramirez's extrapolation of the

---

[31]  Tr. 2405:14-17; 2448:20-2449:6; 2481:3-2486:3 (Thakor); DX 2177.

[32]  Tr. 2482:1-2483:15; 2491:17-22 (Thakor).

[33]  Tr. 2568:12-2570:4; 2570:19-2572:17; 2574:3-10; 2586:17-2587:10 (Thakor).

bank's historical ROAA with a marginal spread calculation.  For the marginal asset, Dr. Thakor used MBS, and, for the marginal liability, used a weighted average of FHLB advances and other borrowings, as reported in the thrift's books.

Plaintiffs incorrectly argue that Dr. Thakor admitted that his incorporation of the FHLB advance rate was erroneous because it includes older, fixed-rate advances.  Pl. Br. at 48 (¶32). Although Dr. Thakor testified that it would be necessary to look at new financing to generate the "precise number" for the marginal cost of funding, plaintiffs did not provide any calculation of the marginal cost of funds, including FHLB advances.  Tr. 2586:17-2587:10 (Thakor).  Dr. Thakor thus explained that the FHLB advance rate figure from the thrift's books was the most reasonable proxy from the available data for the marginal cost of FHLB advances.[34]

Plaintiffs then argue that it would be more appropriate to omit the FHLB advance rate from Dr. Thakor's weighted-average calculation, and instead use only the "other borrowings" rate.  Pl. Br. at 48-49 (¶33).  First, because there is no expert testimony to support the plaintiffs' argument, the Court should reject it as unsupported.  The plaintiffs' argument is also economically unsound.  The "other borrowings" rate, by itself, is not an appropriate marginal funding cost because FHLB advances were the thrift's primary source of wholesale borrowing. Dr. Thakor explained that the thrift was "running out of deposits" and would need wholesale borrowings, including both FHLB advances and other borrowings, to expand its but-for portfolio by the $2 billion called for in Mr. Ramirez's lost profits calculation.  Tr. 2421:24-2425:8; 2492:11-25 (Thakor).  Dr. Thakor's weighted-average calculation is thus a more appropriate figure for the marginal funding cost than the "other borrowings" figure by itself.

---

[34]  Tr. 2574:3-10; 2587:1-10; 2724:21-2727:23 (Thakor).

c.      **The ALCO Reports Confirm That Dr. Thakor's Weighted-Average Calculation Accurately Reflected The Thrift's Marginal Funding Cost**

Plaintiffs cite the thrift's ALCO reports in support of their argument that Dr. Thakor's weighted-average calculation was inflated by the thrift's older, fixed-rate FHLB advances.  Pl. Br. at 48 (¶32).  Plaintiffs, again, fail to back up their argument with expert testimony. Moreover, the ALCO reports confirm that Dr. Thakor's weighted-average calculation accurately reflected the thrift's marginal funding cost.  For example, the July 2, 1990 ALCO report shows that Dr. Thakor used a <u>lower</u> marginal funding cost (8.72 percent) than the thrift's anticipated FHLB advance cost (between 9.18 and 9.55 percent), resulting in a <u>higher</u> lost profits estimate.[35] The ALCO reports thus confirm Dr. Thakor's weighted-average calculation.

The ALCO reports also confirm that Dr. Thakor's weighted-average calculation was a more reasonable proxy for the marginal funding cost than the "other borrowings" figure suggested by plaintiffs.  Dr. Thakor explained that the thrift's failure to pay off its fixed-rate FHLB advances with lower-rate "other borrowings" demonstrates that it faced capacity constraints, and that the cheaper funds were not available.[36]  Similarly, the "funds availability" summary in the July 2, 1990 ALCO report showed that the amount of available FHLB advances far outstripped other sources of funding.[37]  Thus, plaintiffs' suggestion that the thrift could have funded the foregone portfolio solely through "other borrowings" is untenable.

---

[35] Tr. 3271:3-3272:17; 3276:24-3277:11 (Thakor); PX 1826 at Exh. 15; PX 661 at ASDOJ-SEASUPPTWO-1-1925.

[36] Tr. 2727:6-23; 3271:3-3272:17; 3277:12-3279:6 (Thakor).

[37] Tr. 3285:25-3287:10 (Thakor); PX 661 at ASDOJ-SEASUPPTWO-1-1912.

### D.       Plaintiffs' Claim For "Jury Verdict" Damages Is Unsupported

The Court should reject plaintiffs' alternate request for a jury verdict.  The "jury verdict

method" requires a plaintiff to establish "(1) that clear proof of injury exists; (2) that there is no

more reliable method for computing damages; and (3) that the evidence is sufficient for a court to

make a fair and reasonable approximation of damages."  Columbia First, 60 Fed. Cl. at 108.

Plaintiffs cannot establish that there is no more reliable method of computing damages in this

case because this Court has already found a reliable method for computing damages, i.e., the cost

of replacement capital for the breach of the Note Forbearance.  Am. Sav., 519 F.3d at 1323.

Plaintiffs incorrectly argue that Dr. Hamm and Dr. Thakor's testimony support a "jury

verdict" award.  Plaintiffs claim that Dr. Hamm testified that the regulatory capital promise at

issue increased the value of the acquirer's deposit insurance, implying that Dr. Hamm's

testimony supported damages for the loss of this promise.  See Pl. Br. at 59 (¶79).  Dr. Hamm,

however, testified that he had not determined whether the loss of the regulatory capital promise

caused any material harm under the facts of this case.  Tr. 3109:25-3112:21 (Hamm).

Plaintiffs also repeat their erroneous contention that Dr. Thakor performed a separate

"lost profits computation," implying that Dr. Thakor agrees that a lost profits award is

appropriate.  Pl. Br. at 59 (¶79).  As we have explained above, Dr. Thakor did not perform an

affirmative damages calculation, but rather a revision to remove the most obvious errors from

Mr. Ramirez's calculation.  Tr. 2481:3-2486:3 (Thakor); DX 2177.  Thus, neither Dr. Hamm nor

Dr. Thakor's testimony supports a "jury verdict."

Respectfully submitted,

MICHAEL F. HERTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director


s/ Kenneth M. Dintzer
KENNETH M. DINTZER
Assistant Director


s/ John J. Todor

OF COUNSEL:                        JOHN J. TODOR
SCOTT D. AUSTIN                    Trial Attorney
Senior Trial Counsel              Commercial Litigation Branch
WILLIAM G. KANELLIS               Civil Division
VINCENT D. PHILLIPS               Department of Justice
JACOB A. SCHUNK                   1100 L Street, N.W.
SAMEER YERAWADEKAR                Attn:  Classification Unit, 8th Floor
Trial Attorneys                   Washington, D.C. 20530
Civil Division                    Tele:  (202) 616-2382
Department of Justice             Fax:   (202) 514-8640

October 22, 2009                  Attorneys for Defendant

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 22nd day of October, 2009, I caused the foregoing **"DEFENDANT'S POST-TRIAL REPLY BRIEF"** to be filed electronically.  I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

<u>s/ John J. Todor</u>