# In the United States Court of Federal Claims

Case No. 92-872C
FOR PUBLICATION
FILED:  April 1, 2011

* * * * * * * * * * * * * * * * * * * * * * *

|  |  |  |
|---|---|---|
| | * | |
| **AMERICAN SAVINGS BANK, F.A.**, | * | |
| **KEYSTONE HOLDINGS, INC.**, | * | |
| **KEYSTONE HOLDINGS** | * | *Winstar* **Damages; FIRREA;** |
| **PARTNERS, L.P.**, | * | **Breach of Forbearance Allowing** |
| **N.A. CAPITAL HOLDINGS, INC.**, | * | **Inclusion of Stock Warrants in** |
| **NEW AMERICAN CAPITAL, INC.**, | * | **Regulatory Capital; Expectancy** |
| **NEW AMERICAN HOLDINGS, INC.**, | * | **Damages; Foreseeability, Causation;** |
| and | * | **Reasonable Certainty of Lost-Profits** |
| **NEW WEST FEDERAL SAVINGS** | * | |
| **AND LOAN ASOSCIATION**, | * | |
| | * | |
| *Plaintiffs*, | * | |
| | * | |
| v. | * | |
| | * | |
| **THE UNITED STATES**, | * | |
| | * | |
| *Defendant*. | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * *

  *Kent A. Yalowitz*, Arnold & Porter, LLP, New York, N.Y., for Plaintiffs.  *Melvin C. Garbow*, *Michael A. F. Johnson*, *Joshua P. Wilson*, *Michael R. Hartman*, *Alexea R. Juliano*, *Nellie C. Wigfall*, and *James K. Rideout*, Washington, D.C., of Counsel.

  *John J. Todor*, Trial Attorney, with whom were *Michael F. Hertz*, Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Kenneth M. Dintzer*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant.  *Scott D. Austin*, Senior Trial Counsel, *William G. Kanellis*, *Vincent D. Phillips*, *Jacob A. Schunk*, and *Sameer Yerawadekar*, Trial Attorneys, of Counsel.

**OPINION and ORDER**

**SMITH**, Senior Judge:

This *Winstar*-related case is before the Court following a 15-day trial on damages for the Government's breach of the Warrant Forbearance, which is on remand from the Federal Circuit, *Am. Sav. Bank, F.A. v. United States*, 519 F.3d 1316 (Fed. Cir. 2008) ("*American Savings IV*"). The Warrant Forbearance allowed American Savings Bank to count the value of stock warrants granted to the Federal Savings and Loan Insurance Corporation ("FSLIC") towards its regulatory capital. Plaintiffs seek to recover damages based upon several alternative theories: lost profits, cost of replacement capital, and/or reliance damages. The Court issues this opinion after considering trial testimony and exhibits, post-trial briefs, and closing arguments. For the reasons stated herein, Plaintiffs are hereby **AWARDED** expectancy damages for their lost-profits claim in the amount of $83,318,000.

## I. PROCEDURAL HISTORY

This matter is on remand from the Federal Circuit on damages for the Government's breach of the Warrant Forbearance. Liability was previously found for breach of contract after several years of discovery, testimony, and summary judgment briefing in *Am. Sav. Bank, F.A. v. United States*, 52 Fed. Cl. 509 (2002) ("*American Savings I*"). Thereafter, this Court awarded damages to Plaintiffs in the amount of $401,534,000 for the Government's breach of two forbearances allowing for certain regulatory capital treatment. The Court awarded Plaintiffs damages in the amount of $346,506,000 for their "FSLIC Warrant" claim and $55,028,000 for their "FSLIC Note" claim. *Am. Sav. Bank, F.A. v. United States*, 62 Fed. Cl. 6, 11–14 (2004) ("*American Savings II*"); *Am. Sav. Bank, F.A. v. United States*, 74 Fed. Cl. 756, 759, 761–62 (2006) ("*American Savings III*").

On appeal, the Federal Circuit affirmed this Court's findings of liability and further affirmed the award of $55,028,000 for the Government's breach of the Note Forbearance. *American Savings IV*, 519 F.3d at 1328. However, the Federal Circuit reversed this Court's award of $346,506,000 for partial restitution on the grounds that the Warrant Forbearance was not divisible from the rest of the transactions and remanded to determine "if damages [for breach of the Warrant Forbearance], as opposed to partial restitution, are proper under another theory." *Id.* The Federal Circuit also vacated the calculation of the Warrant Forbearance offset. *Id.*

After the mandate issued on June 27, 2008, this Court granted Plaintiffs' motion requesting the Court to enter partial final judgment on the Note Forbearance award, and judgment was entered on September 12, 2008. *Am. Sav. Bank, F.A. v. United States*, 83 Fed. Cl. 555, 559 (2008) (*American Savings V*). An Order in accordance with the Partial Final Judgment was entered on December 19, 2008. A new trial was held on damages for the Government's breach of the Warrant Forbearance. The parties then filed post-trial briefs and closing arguments were heard thereafter.

## II. BACKGROUND AND FACTS[1]

In 1988, American Savings and Loan Association of Stockton, California ("Old American"), was the largest failed thrift in the United States. It owed more than $30 billion to its depositors and other lenders and creditors, and its market value was several billion dollars below that of its liabilities. FSLIC was taken over by the Federal Deposit Insurance Corporation ("FDIC"), which assumed responsibility for the bank's liabilities and estimated that the liquidation of Old American would cost FSLIC more than $3 billion. Robert Bass and his associates ("Bass Investors" or "Bass Group") purchased Old American after extensive negotiations with Old American's federal regulator, the Federal Home Loan Bank Board ("FHLBB"), and FSLIC, Old American's deposit insurer. A plan was proposed by the Bass Investors and accepted by FSLIC and FHLBB to divide Old American into two new thrifts, a "good bank" and "bad bank." The operating thrift, or "good bank," was known as American Savings Bank, F.A. ("New American" or "ASB") and the liquidating thrift, or "bad bank," was called New West Federal Savings and Loan Association ("New West").

The Bass Investors formed Keystone Partners, L.P. ("Partnership"), Keystone Holdings, Inc. ("Keystone"), New American Capital, Inc. ("NA Capital") and other subordinate holding companies, all ultimately wholly owned by the Partnership, for the purpose of acquiring the assets and liabilities of Old American. The Plaintiffs raised $400 million in cash through NA Capital, of which $350 million was downstreamed into New American.

To balance the books of the two banks, New West issued an $8 billion dollar note to New American ("FSLIC Note"), which was guaranteed by FSLIC and recorded as an asset on the books of New American and as a liability on the books of New West. The Note had a ten-year term, with interest payments to be made regularly by FSLIC to New American. FSLIC provided Plaintiffs with a "Note Forbearance," which was written down as capital and amortized over a period of ten years.

As part of the transaction, FSLIC also received warrants for the potential purchase of stock in American Savings' holding company, effectively giving FSLIC nearly a 30-percent ownership interest in American Savings.[2] It was also agreed that the value of the warrants issued

---

[1] Detailed examination of the background of this case can be found in *American Savings I & II*. Accordingly, the background presented incorporates the Court's findings in its previous opinions and is not comprehensive. Instead, it is a summary of the contract, breach, and resulting actions and is intended to put the damages claim in context. Additional factual findings, as necessary, will be discussed as the Court addresses Plaintiffs' and Defendant's arguments in turn.

[2] In April 1988, when the FHLBB first entered into an exclusive negotiating agreement with the Bass Investors, the FSLIC valued the warrant aspect of the deal at $543 million. Later, at the time of the closing of the acquisition in December 1988, the warrants were valued at $650 million.

to FSLIC would be included as regulatory capital, pursuant to which FSLIC issued a "Warrant Forbearance" for the first ten years after the transaction (which was the expected term of the FSLIC Note).  The Warrant capital was valued at $167.2 million, which represented the deposit or branch premium of the bank.  PX 1406 (3/17/89 Ltr. from Nagle to Furer) at PAS113 0133. This agreement also granted FSLIC a $214 million "second preference" upon the sale of the bank, which gave FSLIC a second priority in the distribution of the proceeds of any sale of New American ("Second Preference").  While the Bass Investors would still receive 100% of the proceeds from a sale up to the amount of cash that they contributed, FSLIC was given a preference distribution of 100% of the next $214 million of sales proceeds.  Only after these preferential distributions would the remainder be distributed proportional to the ownership interests that the parties held in the bank (30% for FSLIC and 70% for the Plaintiffs).  Plaintiffs, FHLBB, and FSLIC entered into various agreements, including an Assistance Agreement (PX 1305), a Capital Maintenance Agreement (PX 1307), and a Warrant Agreement (PX 1787), and completed the acquisition of Old American on December 28, 1988.  At closing, American Savings held $15.409 billion in assets.  *See* PX 1303 (12/28/88 ASB Consolidated Statement of Financial Condition) at WOQ476 1303.

In August 1989, Congress enacted the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183.  The result of this legislation, in part, was that the Note Forbearance and Warrant Forbearance were invalidated, thus depleting the amount of regulatory capital held by American Savings.  Accordingly, the bank had to increase its levels of "real" capital that is investments of money or property that increased the bank's net worth.  This is unlike "regulatory capital" which only exists because regulators accept it for regulatory compliance.

During a deep recession in the California economy, American Savings became profitable and recorded net income of $247.6 million in 1990.  *Am. Sav. II*, 62 Fed. Cl. at 10.  It described itself in 1991 as "one of the most profitable depository institutions in the nation."  *Id.* (internal citations omitted).  In 1996, Plaintiffs entered into an agreement to sell American Savings to Washington Mutual, Inc.  Pursuant to its warrants, the FDIC, as FSLIC's successor, would have been entitled to receive a portion of the sales price in the Washington Mutual transaction after distribution of the preferences.  However, the FDIC and the Bass Group negotiated a modification of their prior agreements under, which the FDIC agreed to accept 14 million shares of Washington Mutual stock, with the Bass Group receiving 26 million shares (a 65-35% split).  In January 1997, the FDIC sold its Washington Mutual shares for a net amount of $651.7 million.

### III. SUMMARY OF DAMAGES AWARD

At trial, Plaintiffs presented evidence to support the following alternative damages claims:  (1) $83.318 million in lost-profits damages; (2) $149.8 million in reliance damages

based on the Second Preference; (3) $106.805 million in cost-of-replacement capital damages; or (4) a jury verdict award at the Court's discretion.

The Government, without setting forth an affirmative damages calculation at trial, presented the calculations of its expert witness, Dr. Anjan Thakor, which revised Plaintiffs' damages figures. For (1) lost profits, Dr. Thakor calculated $22.7 million in damages, and for (2) cost of replacement capital, Dr. Thakor calculated (a) $8.989 million in damages when the FSLIC Note offset rate is used and (b) $7.815 million in damages when the actual yield on earning assets is used.

The Court finds that, as a result of the Government's breach of the Warrant Forbearance, Plaintiffs are entitled to recover expectancy damages for their lost-profits claim because the requirements of foreseeability, causation, and reasonable certainty have been established by a preponderance of the evidence presented. As part of the acquisition of Old American by the Bass Group, the Government knew that Plaintiffs intended to leverage the Warrant capital to generate profits through their lending strategy, investments, and growth plan for American Savings. In fact, that was the only reasonable basis for the transaction. Therefore, it was foreseeable that the loss of the Warrant capital would result in lost profitability for the bank. The breach of the Warrant Forbearance and revocation of the Warrant capital caused Plaintiffs to shrink the bank and sell off assets in order to meet regulatory capital requirements, as well as curtail plans for growth. This deprived Plaintiffs of the profits those assets would have generated and additional capital Plaintiffs would have leveraged to also generate profits. By relying on American Savings' books and records, actual performance history, and historic investment strategies, and by using the actual leverage ratios and return on average assets of the bank, Plaintiffs calculated the quantum of lost profits to a degree of reasonable certainty. Accordingly, for the reasons set forth below, the Court awards Plaintiffs damages in the amount of $83,318,000 for the Government's breach of the Warrant Forbearance.

## IV. LOST-PROFITS DAMAGES

Expectancy damages make a non-breaching party whole by providing the benefits expected to be received under the contract in the absence of the breach. *Anchor Sav. Bank v. United States*, 597 F.3d 1356, 1361 (Fed. Cir. 2010); *see also Glendale Fed. Bank v. United States*, 239 F.3d 1374, 1379–80 (Fed. Cir. 2001) (citing RESTATEMENT (SECOND) OF CONTRACTS (hereinafter RESTATEMENT) § 344(a) (1981)). Expectancy damages include lost profits. *See Glendale*, 239 F.3d at 1380 (citing RESTATEMENT § 347). "To recover lost profits for breach of contract, the plaintiff must establish by a preponderance of the evidence that (1) the lost profits were reasonably foreseeable or actually foreseen by the breaching party at the time of contracting; (2) the loss of profits was caused by the breach; and (3) the amount of the lost profits has been established with reasonable certainty." *Anchor*, 597 F.3d at 1361; *see also Cal. Fed. Bank v. United States*, 395 F.3d 1263, 1267 (Fed. Cir. 2005) (*Cal. Fed. II*).

5

Plaintiffs claim that the loss of $167 million in capital from the breach of the Warrant Forbearance foreseeably caused American Savings to:  (1) shed its best income-earning assets; (2) sell off its high-yield or "junk" bond portfolio at the bottom of the market; and (3) abandon its acquisition strategy for growth, resulting in lost profits of $83.318 million for the bank. Plaintiffs presented evidence at trial and argued in closing arguments and post-trial briefs that but for the breach, American Savings would have retained, rather than sold in 1990, $1.1 billion of its best income-earning assets in the form of adjustable-rate mortgages linked to the Eleventh District Cost of Fund Index ("COFI ARMs").   Tr. 1160–61 (Ramirez); PX 5003.13 (demonstrative showing sum of assets ASB could have held but for the breach).

Similarly, Plaintiffs presented evidence at trial and argued in post-trial briefs that by holding and not shedding its $450 million high-yield bond portfolio, American Savings would have held assets that out-earned its overall return on average assets ("ROAA"), generating an annual spread of 470 basis points and earning American Savings an additional $60 million by 1991 alone.   Plaintiffs contend that American Savings would have also avoided the corresponding tens of millions in market-to-market losses realized by the bank and presented evidence at trial that the high-yield bond portfolio was sold off in 1990 at fire sale prices, given the economic conditions at the time.  PX 1679 (12/31/91 Mem. from Domingo to Barnum, et al.) at PAS019 0702-3.

Plaintiffs also presented evidence at trial and argued in closing arguments and post-trial briefs that but for the breach, American Savings would have grown its balance sheet by billions of dollars in profitable assets through its strategy of acquisitions.  Tr. 1116–19 (Ramirez); PX 1939 (RTC Statistical Abstract) at 67-68 (cataloguing some 20 RTC deals that ASB targeted but, because of the breach, could not complete).  Plaintiffs contend that in the absence of breach, American Savings could have grown by $2 billion through its normal course of business operations.

At trial, Plaintiffs presented the following witnesses in support of their lost-profits damages claim:  Robert Barnum, formerly Chief Financial Officer and member of the Board of Directors of American Savings, and later President and Chief Operating Officer; Bernard Carl, a former employee of Castine Partners, an affiliate of American Savings; David Bonderman, formerly Chief Operating Officer of the Bass Group and member of the Board of Directors of American Savings; and Antonio Ramirez, Jr., formerly a vice president and financial analyst at American Savings who provided calculations of the bank's lost profits resulting from the breach.

The Government argued in closing arguments and post-trial briefs that Plaintiffs' lost-profits claim is barred as a matter of law and was rebutted by the evidence at trial.   The Government asserts that because Plaintiffs state in their cost-of-replacement capital claim that they replaced the lost Warrant capital, it precludes the lost-profits claim as a matter of law.  The Government also asserts that the evidence at trial showed that the breach did not cause Plaintiffs to constrain profitable growth because the bank could have raised outside capital and there was a lack of suitable investment opportunities. Lastly, the Government maintains that Mr. Ramirez's

calculations are speculative as a matter of economics and finance because Mr. Ramirez did not specify the assets in the foregone portfolio or the liabilities used to fund them.

At trial, the Government presented the following witnesses:  Gloria Grimditch, formerly an analyst at the Federal Home Loan Bank of San Francisco and later, at the FHLBB; James A. Meyer, formerly a financial analyst and a supervisor at the Financial Assistance Division of FSLIC (and subsequently the FDIC), and currently a Regional Manager of the FDIC Division of Resolutions and Receiverships; and Charles Brewer, formerly an employee in the Office of Regulatory Affairs for the Federal Home Loan Bank system, and currently an employee of the Office of Thrift Supervision ("OTS").

The Government also presented the following expert witnesses:  Terry L. Musika, the managing director of Invotex Group and a former audit and consulting partner for the international accounting firm of Coopers & Lybrand (now PricewaterhouseCoopers); Dr. Anjan V. Thakor, the John E. Simon Professor of Finance and Senior Associate Dean at the John M. Olin School of Business at Washington University in St. Louis, and previously a professor and Chairperson of the Finance Department at the University of Michigan Business School; and Dr. William G. Hamm, a managing director of LECG, LLC and a former executive of World Savings Bank, a thrift competitor to American Savings.

*1. Foreseeability*

A party must show that the claimed damages were within the realm of reasonable foreseeability at the time the contract was entered into.  *Fifth Third Bank v. United States*, 518 F.3d 1368, 1374 (Fed. Cir. 2008); *see also Cal. Fed. II*, 395 F.3d at 1267.  "What is required is merely that the injury actually suffered must be one of a kind that the defendant had reason to foresee and of an amount that is not beyond the bounds of reasonable prediction." *Citizens Fed. Bank v. United States*, 474 F.3d 1314, 1321 (Fed. Cir. 2007) (quoting Joseph M. Perillo, 11 *Corbin on Contracts* § 56.7 at 108 (2005 rev. ed.).

As the largest thrift failure in the United States, it would have cost the FSLIC approximately $3 billion to liquidate Old American.  Faced with this large sum and lack of funding, FSLIC sought potential acquirers for Old American as a solution to the problem. Plaintiffs emerged in February 1988 as one of the few interested parties in Old American. *See* Tr. 425–26 (Carl), 1762–63 (Meyer); DX 1106 (2/22/88 Ltr. from Carl to Roger Martin).

The FHLBB and FSLIC were interested in the Bass Group because of their reputation and expertise as savvy investors and managers, eventually deciding to negotiate with them exclusively for the acquisition of Old American.  Tr. 1851 (Meyer); PX 1086 (4/14/88 FHLBB Special Mtg. Mins.) at WOR120 0234.  Mr. Bonderman was the chief operating officer and essentially the chief investment officer of the Bass Group, the leading private equity goup at the time, and is now a founding partner of Texas Pacific Group with roughly $60 billion under management.  Tr. 723–25 (Bonderman).  Mr. Carl, who has served on a Congressionally-mandated advisory board to banking regulators and is a former investment banker, testified at

7

trial that the Government was "well aware of the track record of the [Bass] [G]roup and the fact that . . . when we applied both our human and economic resources to a project, we generally did rather well."  *Id.* at 413–14, 439.

Plaintiffs presented credible evidence at trial that the Government was aware that the Bass Group viewed the Old American acquisition as a venture capital investment and accordingly expected a significant return on equity ("ROE") in the neighborhood of 30% compounded annually.  DX 1106 (2/22/88 Ltr. from Carl to Martin) at ASDOJ-NY-206-0175; Tr. 728–29 (Bonderman).  This "hurdle rate" was the minimum return that the Bass Group would look for in restructuring a business.  Tr. 434 (Carl).  The Plaintiffs' expected ROE was based on the use of the Warrant capital to leverage growth.  *Id.* at 738 (Bonderman).

The Government also expected significant profits from the Bass Group's acquisition of Old American.  *See* PX 1086 (4/14/88 FHLBB Special Mtg. Mins.) at WOR120 0207 (Statement of Jack Reid); PX 1292 (12/27/88 Supp. Mem.); PX 1080 (4/6/88 Mem. From Reid to Root). Government officials discussed the "potential for very, very impressive gains out of [the government's part] ownership of the thrift too.  These guys have[] . . . been extraordinarily successful in purchasing places and making lots of money. . . . I think that they seem to have the knack for hiring good managers and letting them manage the place."  PX 1086 (4/14/88 FHLBB Special Mtg. Mins.) at WOR120 0207 (Statement of Jack Reid).

Accordingly, the Government favored the Bass Group's acquisition of Old American because their proposal incorporated an ownership interest for the Government in the new enterprise.  Such an ownership interest would allow the Government to share in any profits from Plaintiffs' future management of Old American.  *See* PX 1086 at WOR120 0227 (Stmt. of Darrel Dochow).

Credible evidence was also presented at trial that the Government acknowledged that the Warrant Forbearance was essential to American Savings' ability to grow and generate expected profits by leveraging the Warrant capital.  The Executive Director of the FHLBB's Office of Regulatory Activities, Darrel Dochow, also noted that "[i]ncluding the Warrants as regulatory capital would allow the association to leverage its growth beyond its GAAP[3] capacity," and that "[w]ithout the Warrants, the association would exhaust its excess capital with normal growth within the year."  PX 1862 (Draft Mem. from Dochow to the Bank Board) at WOR466 0018–19. Mr. Dochow remarked that "in negotiating some [of] the key forbearances," Plaintiffs had "recognized" that the "key to [American Savings'] future prospects is management's ability to make the association profitable."  PX 1292 (12/27/88 Supp. Mem.) at 7.

As Mr. Bonderman testified at trial, "since we had . . . more than twice as much capital as we needed for the set of assets regulatorily, we were on a path to grow the bank dramatically." Tr. 744.  Mr. Bonderman further testified that under the capital regulations, "you can leverage the bank based upon how much capital it has" and "in those days, it was more like 30 times

---

[3] General Accepted Accounting Principles.

[leverage]." *Id.* at 737.  Similarly, Mr. Barnum, a bank executive with, at the time, over 20 years of thrift and related business experience, testified that the Warrant capital provided the "ability to grow assets" and "do acquisitions." *Id.* at 720.

Evidence was presented at trial regarding the Government's own valuation of the Warrants and its expectation of American Savings' future performance.  In contemplation of the acquisition of Old American by the Bass Group, the Government initially projected that its 30% interest in American Savings had a present value of $543 million at ten years, based on assumptions that the bank would "earn[] 100 basis points ROA on an asset base of $12.5 billion, and leverage[] those earnings 20 to 1 for 10 years."  PX 1080 (4/6/88 Mem. from Reid to Root) at TM 00038.  A later cost projection prepared by FSLIC for the FHLBB's review just before the acquisition's closing increased the worth of the Warrants, estimating the present value of the Warrants in five years to be $650 million.  DX 77 (12/21/88 Mem. from Reid to Wall, et al.) at WOR466 0286, 0288.  This calculation was based in part on the Government's review of the Bass Group's business plan for American Savings.  *Id.* at WOR466 0286. In fact, in 1996, American Savings was sold to Washington Mutual, an unaffiliated banking entity. PX 1756.  As a result of the merger, the Government received 14 million shares of  stock. The Government then sold the bank's shares for $651.7 million in cash, net of sales costs.

The Bass Group also submitted business plans to the Government as part of the acquisition.  These business plans included the Bass Group's intent to grow American Savings in part through (1) its COFI/COFI lending strategy;[4] (2) investment in high-yield bonds;[5] and (3) through the acquisition of other thrifts or branches of other thrifts.[6]

Plaintiffs assert in post-trial briefs that they have satisfied the foreseeability requirement for an award of lost profits because the *Winstar* cases have established that "[the Government] had reason to know that if [a plaintiff's] supervisory goodwill and capital credit[s] were taken

---

[4]  *See* DX 980 (1989 ASB Business Plan) at PAS0740295-0296 (projecting growth based upon ARM originations, assuming that "60% of all originations are single-family ARM which are kept in portfolio," and modeling funding "as a function of the 11th District Cost of Fund Index"); Tr. 44 (Barnum) (The bank planned to "put [the COFI assets] in a portfolio and earn spread income.").

[5]  PX 1292 (12/27/88 Mem. from Dochow to the FHLBB) at WOR466 0330 ("The Investment Group anticipates that New American's corporate debt portfolio should have a gross annual yield of approximately 14.5%."); Tr. 125–26 (Barnum) ("[P]art of the acquisition deal with the government, part of the business plan of American . . . had the company acquiring, I think, about a billion and a half dollar position in high-yield securities.").  The FSLIC also favored "utilizing the Bass expertise in the high-yield portfolio . . . to generate higher than market returns from activities activated by the Bass Group."  Tr. 137 (Barnum).

[6]  The OTS examiners responsible for American Savings recognized that the bank's management intended to "utiliz[e] any surplus capital above the minimum for acquisitions."  PX 312 (10/16/89 OTS Exam Report) at USA 0154013.

away that [the plaintiff] would lose potential profits from leveraging that capital." *Citizens Fin. Servs. v. United States*, 64 Fed. Cl. 498, 504 (2005); *see also Globe Sav. Bank v. United States*, 65 Fed. Cl. 330, 348 (2005), *aff'd in relevant part, vacated in part*, 189 Fed. App'x 964 (Fed. Cir. 2006). Therefore, Plaintiffs argue that based on the negotiated terms of the Warrant Forbearance and other evidence offered at trial, it was reasonably foreseeable to the Government at the time of contracting that a breach eliminating the Warrant capital could cause American Savings to lose substantial profits because the Government knew or should have known that Plaintiffs intended to leverage the Warrant capital to grow and make profits.

The Government argued in closing arguments and post-trial briefs for a narrower standard of foreseeability. First, the Government maintains that the actual loss that occurred must be foreseeable, not only that the general kind of injury claimed was foreseeable. *See Landmark Land Co. v. F.D.I.C.*, 256 F.3d 1365, 1378 (Fed. Cir. 2001) ("The mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable.") (quoting RESTATEMENT § 351, cmt. a (1981)). Second, the Government maintains that the magnitude of the damages must be foreseeable. *See Landmark Land Co.*, 256 F.3d at 1378 ("[T]he injury that occurs must be one of such a kind and amount as a prudent man would have realized to be a probable result of his breach . . . .") (quoting 5 ARTHUR CORBIN, CORBIN ON CONTRACTS, § 1012 at 88 (1964)). The Government asserts that Plaintiffs bear the burden of proving that "both the magnitude and the type of damages were foreseeable." *Landmark Land Co.*, 256 F.3d at 1378.

The Federal Circuit has rejected the Government's proposed foreseeability test as being too narrow in *Anchor Savings*, 597 F.3d at 1362, *aff'g in relevant part*, *Anchor Sav. Bank v. United States*, 81 Fed. Cl. 1, 153 (2008) (awarding thrift over $356 million in lost profits and other damages stemming from the post-breach sale of a profitable subsidiary in order to maintain capital compliance). The Federal Circuit held that it is not necessary that the "specific loss in question must have been within the contemplation of the parties at the time of contracting," nor that the "specific mechanism of loss must be foreseeable." *Anchor Sav. Bank*, 597 F.3d at 1364.

The Court finds that the Plaintiffs' argument and the evidence presented are persuasive. The Government's contention that lost profits were not foreseeable as a result of the breach lacks merit. The Warrant capital and Warrant Forbearance were bargained for in the negotiations with the Government for the Bass Group's acquisition of Old American, with the full expectation by both parties that Plaintiffs would leverage the Warrant capital to generate profits. The Government wanted and planned to share in these profits vis-à-vis its ownership interest in the bank. No evidence has been presented by the Government to rebut these facts. Therefore, it was foreseeable that the Government's breach of the Warrant Forbearance could cause lost profitability for American Savings because the bank would lose the use of the Warrant capital and be unable to continue to leverage it to generate profits. In addition, given the pre-breach valuation of the Warrants and expectation of American Savings' future performance, the amount of Plaintiffs' lost-profits claim is not "beyond the bounds of reasonable prediction."

*2. Causation*

A party must establish causation of damages as a result of the breach in order to obtain recovery. *Fifth Third Bank*, 518 F.3d at 1374; *see also Cal. Fed. II*, 395 F.3d at 1267. Use of the "substantial-factor" test rather than a "but-for" theory of causation in a *Winstar*-related case is within the trial court's discretion and depends upon the facts of the particular case. *Citizens*, 474 F.3d at 1318–19; *see also Bluebonnet Sav. Bank v. United States*, 266 F.3d 1348, 1356 (Fed. Cir. 2001). The substantial factor standard is properly invoked when the parties assert multiple possible causes for the claimed damages. *See Citizens*, 59 Fed. Cl. at 514–16. A defendant will be liable under the substantial-factor test for causation when the breach of a contract by the defendant was a "substantial factor" in causing the damages the other party to the contract suffered. *Citizens*, 474 F.3d at 1318. It is not necessary for the breach to "be the sole factor or the sole cause of the plaintiff's loss." *Anchor Savings*, 597 F.3d at 1366.

The Government maintains that the but-for standard is the proper causation standard for evaluating a lost-profits claim. *Cal. Fed. II*, 395 F.3d at 1268 ("[The] inability to prove by a preponderance of the evidence that profits would have been made but for the breach will therefore preclude recovery on a lost profits theory."). Plaintiffs contend that the substantial-factor test is the correct standard. *See Energy Capital Corp. v. United States*, 47 Fed. Cl. 382, 395 (2000), *aff'd in relevant part, rev'd in part*, 302 F.3d 1314 (Fed. Cir. 2002). However, Plaintiffs argued in closing arguments and post-trial briefs that the breach was nevertheless also the but-for cause of Plaintiffs' damages, because the breach caused American Savings to: (1) sell off $1.1 billion in COFI ARMs; (2) abandon its high-yield bond investment strategy and to sell its portfolio at fire sale prices; and (3) abandon its strategy for growth through acquisitions.

The Government argued in closing arguments and post-trial briefs that the breach did not cause the loss of any of these three categories of assets. The Government maintains that Plaintiffs' sale of the COFI ARMs was not a result of the breach, but of an independent business decision to reach the four-percent level before the requirement took effect. Likewise, the Government states that the sale of the junk bonds was also unrelated to the breach. Finally, the Government contends that American Savings did not pursue acquisitions because it was opportunity constrained and there were no suitable acquisitions that the bank could have made, not because it was capital constrained as a result of the breach.

Based on the evidence presented at trial, the Court finds that the breach was not only a substantial factor, but also the but-for cause in American Savings' lost profitability. Prior to the breach, American Savings led the thrift industry in profits; after the breach, the bank drastically sold off its assets and dramatically changed its growth strategy in order to raise its regulatory capital levels.

<u>American Savings Prior to the Breach</u>

Plaintiffs issued a Private Placement Memorandum ("PPM") in March 1989 in connection with the refinancing of bridge loans obtained as part of the Bass Group's acquisition

of Old American.  PX 1409 (3/20/89 PPM) at ASDOJ-NY-23-0006, 20–21; Tr. 42–45 (Barnum).
The PPM projected that American Savings would grow its assets from $15.6 billion in 1989 to
$20.8 billion in 1993.  PX 1409 (3/20/89 PPM) at ASDOJ-NY-23-0019.  It also stated that "the
loss of some or all of the forbearances granted in the Forbearance Letter could have a material
adverse effect on [ASB]."  PX 1409 (3/20/89 PPM) at ASDOJ-NY-23-0013.  Mr. Barnum
testified at trial and explained, "if [Plaintiffs] had the regulatory forbearances, we had lots of
capital.  If we didn't have the forbearances, not only did we lose the capital, but we put the whole
company at risk."  Tr. 46–47.

American Savings outperformed the growth projections for 1989 contained in the PPM.
Instead of growing by the predicted $300 million, the bank instead grew by $1 billion.  PX 1409
(3/20/89 PPM) at ASDOJ-NY-23-0019; PX 1 (ASB 1989 Annual Report) at WOQ553 1390;
Tr. 58-59 (Barnum).  American Savings earned $214.212 million of profits over the course of
1989, generating an annual return on average assets of 1.31% or 131 basis points.  PX 1 (1989
ASB Annual Report) at WOQ553 1391.  American Savings ended 1989 with $16.3 billion in
assets on its balance sheet, marking "one of the most profitable years in S&L history."  Tr. 1027–
28 (Ramirez).  Plaintiffs' witnesses at trial all testified to the bank's leading performance and
profitability.  *See id.* at 59 (Barnum) (In 1989 ASB was "the best performing thrift . . . in terms
of return on assets and return on equity."); *id.* at 519 (Carl) ("[W]e had by the end of [1989]
become the most profitable bank in our sector."); *id.* at 740 (Bonderman) (In 1989, ASB "was
among the, if not the most[,] profitable thrift[s] in the United States.").

American Savings' regulators also contemporaneously recorded the bank's performance
and profitability, and spoke highly of its management.  OTS described ASB as a "thriving
institution," and stated that "management is to be commended for the significant strides made in
restructuring and improving the profitability of the institution."  PX 312 (10/16/89 OTS Exam
Report) at USA 0154006.  The examiners also noted that "[ASB] is a profitable institution," and
that "[m]anagement's overall performance to-date has demonstrated sound policy and strategy
implementation."  *Id.* at USA 0154004.  The examiners added that ASB's "net interest
income . . . significantly exceed[ed] the peer group average . . . because of the institution's
superior yield . . . on its earning assets."  *Id.* at USA 0154018.

The FDIC noted in its examinations that "ASB is one of the most profitable institutions in
the Eleventh District," and that its "earnings are well above the peer group . . . ."  PX 313
(10/16/89 FDIC Exam Report) at USA 0154142, USA 0154144.  Per American Savings'
business plan, the bank minimized its interest-rate risk and became "more of an ARM-rate
lender," "earn[ing] a . . . dependable spread, and didn't have that ratio risk inherent in having
long assets and short liabilities."  Tr. 516 (Carl).

Plaintiffs presented evidence at trial that the Bass Group turned the largest thrift failure of
its time into a conservatively run, traditional retail bank by hiring top management, improving
operations, and restoring consumer confidence in American Savings.  *Id.* at 516–18 (Carl).
Profitability increased due to management's efforts to increase discipline in mortgage

underwriting and lower the cost of deposits and administrative expenses.  *Id.* at 514–15, 518 (Carl).

Another strategy of the bank to increase profitability was through acquisitions because adding assets tends to reduce average administrative cost.  PX 238 (11/28/90 ASB Strategic Planning Summary) at PAS030 2612–29 (comparing marginal to average returns on various assets).  Accordingly, American Savings' business plan included "build[ing] the branch system through acquisition and consolidation of other institutions."  Tr. 525 (Carl) (explaining that Shearson Lehman Hutton would periodically update ASB on acquisition opportunities); *see also* PX 1427 (8/4/89 Shearson Lehman Hutton presentation on acquisition opportunities).

Plaintiffs presented at trial the credible testimony of Mr. Ramirez, a vice president of American Savings, describing the bank's acquisition strategy of targeting multi-billion-dollar size California financial institutions.  Tr. 1029–30 (Ramirez).  One of the bank's growth objectives was to increase its presence in Southern California through a large acquisition to become one of the most significant retail banks in the area.  *Id.* at 530 (Carl).  Mr. Carl further testified that American Savings had the surplus capital in late 1989 to acquire institutions "probably in the 1 to 2 and a half billion dollar range," such as Home Fed Bank and Great American.  *Id.* at 534–36.  Mr. Bonderman also testified that in 1989, "we had approximately 400 million dollars of excess capital," which he "expected the bank to use . . . to grow itself."  *Id.* at 788; PX 231 (ASB 1990 Business Plan) at PAS128 2725 (discussing projected capital and potential acquisitions).

The Federal Home Loan Bank of San Francisco ("FHLB-SF") further detailed American Savings' potential for growth through acquisitions.  It wrote in a memorandum approving a $200,000,000 FHLB advance to American Savings that

> [American Savings was] well positioned to take advantage of lost market share from marginal shops that are expected to disappear as a result of FIRREA.  Its 180 branch network and 23 loan production offices, coupled with the New West Note that could have a zero-based weighting for regulatory capital purposes, make growth possible amidst an increasingly competitive environment.

DX 150 (10/11/89 FHLB-SF Risk Assessment and Approval Mem.) at WOQ476 1943.

Pursuant to American Savings' business plan submitted as part of the acquisition, the bank acquired approximately $500 million of high-yield securities in 1989, $350 million of which were authorized in the first quarter.[7]  Mr. Barnum testified at trial that "part of the

---

[7]  *See* Tr. 31 (Barnum), 754 (Bonderman); PX 329 (2/9/89 ASB Bd. Mtg. Mins.) at ASDOJ-SEA-00128 (resolution authorizing $100 million high-yield investments in the first quarter of 1989); DX 117 (2/22/89 ASB Bd. Mtg. Mins.) at WOQ476 0249 (resolution

acquisition deal with the government, part of the business plan of American, and part of the [PPM] all had the company acquiring, I think, about a billion and a half dollar position in high-yield securities." Tr. 125–26.

Plaintiffs also presented the credible testimony of Mr. Bonderman at trial regarding the suitability and profitability of American Savings' high-yield bond portfolio given its well-capitalized position before the breach.  Mr. Bonderman testified that the risk-adjusted rate of return for high-yield securities is "worthwhile," if "you have a capital base that will withstand the additional volatility" associated with high-yield investments.  Tr. 746.

American Savings projected significantly greater growth and success in 1990 based upon its strong performance in 1989.  *See* PX 231 (1990 Business Plan) at PAS128 2703 (comparing March 1989 PPM and 1990 Business Plan projections of ASB asset levels at year-end 1990); Tr. 65 (Barnum) (ASB's "forecast for 1990 looked better than it did [even] in early 1989.").  The bank projected assets of $18.2 billion in 1990 and "assume[d] that capital forbearances granted by the FHLBB in connection with the acquisition on December 28, 1988 will continue to govern."  PX 231 (1990 Business Plan) at PAS128 2686, 2703 (March 1989 PPM and 1990 Business Plan projections of ASB asset levels at year-end 1990).

The Breach of the Warrant Forbearance

The OTS issued Thrift Bulletin 38-2 ("TB 38-2")[8] on January 9, 1990, which interpreted FIRREA to require the exclusion of the Warrants from American Savings' regulatory capital. PX 3 (1991 ASB Annual Report) at FAS0121263.  Because FIRREA was thought to eliminate only "regulatory or supervisory goodwill," Plaintiffs originally thought the forbearances would not be affected and corresponded with regulators regarding the status of the Warrant Forbearance.  Tr. 520–21 (Carl).  Regulators also examined how the elimination of the Warrant Forbearance would affect the Government's Warrant interest in American Savings.  *See* DX 248 (1/29/90 Mem. from Meyer to Creedon, Stanton and Satterfield); DX 247 (1/29/90 Mem. from Meyer to Wall).

The Government presented at trial the testimony of Mr. Meyer, who was the regulator directly responsible for overseeing the Government's Warrant interest in American Savings. However, Mr. Meyer had written to OTS Director Danny Wall that "[I]t is still believed the Warrants will carry greater value to Bass, and hence the FSLIC Resolution Fund, as part of American Savings Bank's capital structure."  DX 248 (1/29/90 Mem. from Meyer to Creedon, Stanton and Satterfield) at FAS013 0998.

---

authorizing $250 million high-yield investments in the first quarter of 1989); DX 148 (6/27/88 ASB Bd. Mtg. Mins.) at WOQ476 0151 (authorizing $500 million high-yield investments in the third quarter of 1989); PX 313 (1/22/90 FDIC Exam Report) at USA 0154143.
    [8] PX 1470.

To preserve the value of the bank, the FDIC favored "an accommodation . . . that will enable ASB to carry the Warrants on its books for $167.2 million." DX 247 (1/29/90 Mem. from Meyer to Wall). Mr. Meyer stated at the time that "[i]f OTS does not grant relief, Bass will restate their financial statements for 1989 which will have the following impact: . . . Long term earnings will decrease thus adversely affecting the value of the Warrants." PX 1476 (1/18/90 Mem. from Meyer to Creedon, Stanton and Satterfield) at WFZ007 1480. At trial, Mr. Meyer testified on cross-examination that the FDIC sought to exempt ASB from TB 38-2 because "the Warrants would carry greater value to the FSLIC if the Warrant capital were preserved." Tr. 1874–76; DX 247 (1/29/90 Mem. from Meyer to Wall).

On January 22, 1990, the FDIC informed American Savings that the Warrants would not be allowed to count towards regulatory capital. *See* PX 313 (1/22/90 FDIC Exam Report) at USA0154142, USA0154145. As a result, the Government breached the Warrant Forbearance and Plaintiffs lost the use of $167 million in Warrant capital. *See id; see also Am. Sav. Bank, F.A. v. United States*, 52 Fed. Cl. 509 (2002), *aff'd*, 519 F.3d 1316 (Fed. Cir. 2008).

Without the inclusion of Warrant capital in the bank's regulatory capital levels, American Savings' capital ratio went from roughly 8%, well in excess of 4.5%, to a "razor's edge of capital" of only 1/100th of a percent above the minimum capital level. Tr. 82 (Barnum), 553–54, 569–70, 699 (Carl); PX 313 (1/22/90 FDIC Exam Report) at USA0154145. Mr. Barnum further testified at trial that the breach caused American Savings to go "from offense to defense," with efforts to meet capital requirements becoming "the total focus of the company." Tr. 66.

American Savings After The Breach

Plaintiffs presented the testimony of witnesses and exhibits at trial to demonstrate that the breach drastically changed the operations of American Savings. The bank changed from a platform of growth to shrinking its assets in an effort to reduce leverage and increase its capital to avoid sanction and in anticipation of further regulatory changes. The harmful effect of the breach on American Savings is illustrated by comparing the pre-breach 1990 business plan to the bank's actual results for 1990. The 1990 business plan projected pre-breach growth of 12% or $2 billion in assets, with a year-end balance of $18,155,000,000,[9] but after the breach, American Savings grew by only 1% or $198.7 million in assets, ending the year with $16,493,309,000 in total assets. *See* PX 2 (1990 ASB Annual Report) at FAS012 1218.

Instead of increasing asset growth by $2 billion through the retention of ARMs as anticipated in the 1990 business plan, American Savings divested more than $1 billion of profitable ARM loans in the fourth quarter of 1990 in order to meet its regulatory capital targets and contrary to its core business strategy.[10] Plaintiffs presented at trial the credible testimony of

---

[9] *See* PX 231 (1990 Business Plan) at PAS128 2676, 2678.

[10] *See* PX 313 (1/22/90 FDIC Exam Report) at USA 0154159; PX 263 (12/31/90 ASB Secondary Marketing Sales) at ASDOJ-BAXTER-1393-94; PX 16 (12/31/90 N. A. Capital, Inc.

Mr. Barnum, who stated, "the ARM portfolio was sold solely to reach the capital levels at that time, which I think was four percent." Tr. 36. The ARMs were among the bank's best assets because they had the lowest cost of capital, but were sold because they would command the highest price from investors. *Id.* at 264 (Barnum). Mr. Barnum further testified at trial that the fourth quarter 1990 sale "was probably the only time we ever sold adjustable rate mortgages." *Id.* at 73; *see also id.* at 1018–19 (Ramirez) (ASB's strategy was to sell fixed rate mortgages and hold adjustable rate mortgages).

The 1990 business plan also forecast the portfolio of high-yield bonds to remain constant at $457 million during 1990 and that Plaintiffs intended to hold the portfolio for as long as possible. PX 231 (1990 Business Plan) at PAS128 2681 (discussing plan for high-yield investments); Tr. 762–63 (Bonderman). Although the Government argues in post-trial briefs that FIRREA, not the breach of the Warrant Forbearance, caused Plaintiffs to sell the high-yield bond portfolio, the Court finds the evidence presented by Plaintiffs convincing and that the bonds would have been held until required to be sold by the July 1, 1994 statutory deadline. *See* PX 339 (9/26/89 ASB Bd. Mtg. Mins.) at ASDOJ-SEA-00479 (American Savings "shall divest of its portfolio of corporate debt securities not of investment grade, as said term is defined in the Federal Deposit Insurance Act, at the earliest time prudently possible, where such disposition does not adversely affect the risk/return characteristics of American's portfolio, but not later than July 1, 1994").

Plaintiffs presented evidence at trial that because of the risky nature of the investments and American Savings' low capital levels post-breach after the elimination of the Warrant Capital, regulators required the bank to sell the high-yield bond portfolio more quickly than otherwise required by law. PX 312 (10/16/89 OTS Exam Report) at USA 0154004; PX 313 (2/2/90 FDIC Exam Report) at USA0154143. The Chairman of American Savings, Mario Antoci, received the Board's approval to aggressively divest the high-yield bond portfolio over a period of approximately four months and reported the plan to the FDIC Regional Director, John Sexton. PX 1498 (2/21/90 Ltr. from Antoci to Sexton). American Savings sold the bonds at a loss of approximately $112.3 million. PX 2 (1990 ASB Annual Report) at FAS012 1235; Tr. 775–76 (Bonderman). Plaintiffs presented evidence at trial that absent the breach, American Savings would have earned increased profits of $60 million pre-tax if the bank had held its high-yield bond portfolio through year-end 1991 as the market improved, and had not been compelled to sell in 1990. PX 1679 (12/31/91 Mem. from Domingo to Barnum, et al.) at PAS019 0702-0703 (calculating income foregone with the rapid divestment of the high-yield securities).

The breach also changed Plaintiffs' growth plan for the bank through strategic acquisitions, particularly in Southern California. Defendant's witness Mr. Meyer testified that American Savings did several Resolution Trust Corporation ("RTC") acquisitions that improved the bank's branch network. Tr. 1825–26, 1938–39. Plaintiffs' witnesses Mr. Carl and

Annual Report) at AS1046 0342 ("In 1990, American sold $1.9 billion of acquired and originated loans . . . . Of these loans, $1.4 billion were sold in the fourth quarter of 1990 . . . .").

Mr. Barnum testified that American Savings did these small branch trades to improve the value of the franchise, but as a result of the breach, were unable to do larger acquisitions that would grow the balance sheet and assets of the bank as originally envisioned by the Bass Group. *Id.* at 546, 556–57, 576 (Carl), 110, 118 (Barnum).

During 1990–1991, the unique consolidation in the thrift industry provided many attractive acquisition opportunities to banks that could afford to take advantage of them, as noted by American Savings' regulators. *See id.* at 1881–82 (Meyer) ("I believe there was a shakeout in the industry" in 1990 that produced numerous opportunities to acquire assets and deposit franchises); DX 275 (3/19/90 Ltr. from Furer to Meyer) at PAS136 0892 ("[T]he shakeout currently occurring in the savings industry presents a rare opportunity to acquire attractive assets and liabilities . . . ."). Given the precarious capital positions of many thrifts, a bank with ample capital could outbid its competitors for desirable assets. *See* DX 240 (1/23/90 FHLB-SF Internal Mem.) at WOQ553 0879.

American Savings continued to try to follow its acquisition strategy given the opportunities available. The FDIC noted that American Savings' "primary focus for growth will be through the acquisition of entire thrift franchises or branches when economically advantageous," and that "management is considering the acquisition of thrifts from the RTC both to improve branch economics and to increase market share." PX 317 (6/30/91 FDIC Exam Report) at ADDOJ-SEASUP-9-0869. American Savings did acquire Columbia Savings, another failed thrift, although it did not have a large deposit base. Tr. 121 (Barnum). American Savings also partnered with Security Pacific in an unsuccessful attempt to acquire Great American, a San Diego thrift. However, the deal fell through when Security Pacific withdrew from negotiations. *Id.* at 37 (Barnum). Mr. Carl and Mr. Bonderman testified that American Savings did not have enough capital as a result of the breach to pursue significant acquisitions. *Id.* at 552–53, 584 (Carl), 789 (Bonderman). The OTS, FDIC, and the RTC also maintained that American Savings was too undercapitalized to make major acquisitions as management planned. *See* PX 317 (6/30/90 FDIC Exam Report) at ADDOJ-SEASUP-9-0858; PX 350 (5/22/90 ASB Bd. Mtg. Mins.) at ASDOJ-SEA-00755-56.

Accordingly, American Savings realized it would be unable to pursue its Southern California growth plan and withdrew from the San Diego County market. PX 1558 (5/22/90 Kaplan Smith presentation regarding branch acquisitions) at ASDOJ-NY-147-0019 (discussing withdrawal from San Diego County). Mr. Carl testified that Plaintiffs "coveted [Home Fed] for a long time" "in order to have a meaningful presence in San Diego County," but after the breach ASB "trad[ed] our San Diego branches back to Home Fed, basically ceding all our ambitions to" be in that market "because we couldn't afford it anymore." Tr. 558.

The Government argued in closing arguments and post-trial briefs that American Savings did not pursue acquisitions because it was opportunity constrained, not because it was capital constrained as a result of the breach. The Government's expert witness, Dr. Hamm, testified at

trial that American Savings did not pursue acquisitions after the breach because there were no viable opportunities.

However, Plaintiffs presented evidence at trial, including a statistical abstract compiled by the RTC, that 315 RTC-owned thrifts were available for acquisition during 1990, and that 232 such institutions were available in 1991. *See* PX 1939 (RTC Statistical Abstract) at 10; Tr. 1110–11 (Ramirez). Plaintiffs' witness Mr. Ramirez provided credible testimony that American Savings considered acquiring the following RTC-owned thrifts that would have furthered the bank's Southern California growth plan: Mercury Savings, Gibraltar Savings, Investment Federal Savings and Loan, Southwest Federal Savings and Loan, Lincoln Savings, City Savings and Loan, Perpetual Savings Association, Great American, County Bank, Malibu Savings Bank, Guardian, Unity Savings & Loan, Beach Savings Bank, Progressive Savings Bank, Home Fed Bank, Western FSB, Imperial FSA, Santa Barbara FS&LA, and Westwood S&LA. Tr. 1116-19; PX 1939 at 67–68. Mr. Ramirez further testified that American Savings could have purchased and integrated the whole loans of RTC institutions. *See* Tr. 3219–23; PX 49 (6/30/92 Quarterly Financial Report for N. A. Capital, Inc.) at PAS123 1684 (detailing acquisition by ASB of $658.1 million in loans from RTC as receiver for the Valley Federal institution). Therefore, the Court finds the Government's argument that American Savings was opportunity constrained without merit.

Based on the evidence presented, the Court finds that the Government's breach of the Warrant Forbearance had a significantly negative impact on American Savings and caused the bank to lose profits. The loss of the Warrant capital created the danger that the bank would fall out of capital compliance. Plaintiffs reacted to the breach by shrinking the bank's assets in order to increase regulatory capital levels. Accordingly, American Savings sold COFI ARMs and its high-yield bond portfolio acquired prior to the breach, instead of retaining these income-generating assets pursuant to the bank's business plan. American Savings also abandoned its strategy for growth through acquisitions due to a lack of capital. In contrast to the bank's strong performance in 1989 before the breach, American Savings grew only nominally from year-end 1989 to year-end 1990, increasing its total assets by only $199 million, from $16.294 billion to $16.493 billion.

American Savings began to recover its profitability after the breach and eventually regained impressive profitability. Despite the bank's restrained growth as a result of the breach, Mr. Carl testified that American Savings "was substantially valuable because [Plaintiffs] had built a real franchise out of it with real earnings." Tr. 698. The bank's regulators also gave American Savings and its management favorable examinations in 1992 following the breach. PX 321 (7/7/92 OTS Exam Report). From 1992 to 1996, American Savings continued to grow and remain profitable. Tr. 575–76 (Carl). By 1996, American Savings had returned to its pre-breach performance and was "again, the best earning thrift" in the country. *Id.* at 30 (Barnum). Plaintiffs' witness Mr. Barnum further testified, "if you talk to most people that worked at American at the time, . . . people felt very proud of it. They . . . took an institution from the ashes and resurrected it and ended up with a very successful conclusion." *Id.* at 152.

*3. Reasonable Certainty*

"[T]he measure of damages must be reasonably certain, although if 'a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery.'"  *Fifth Third Bank*, 513 F.3d at 1374–75 (quoting *Glendale Fed. Bank v. United States*, 378 F.3d 1308, 1313 (Fed. Cir. 2004) (*Glendale II*)); *see also Cal. Fed. II*, 395 F.3d at 1267).  The Federal Circuit has interpreted the "reasonable certainty" standard to apply only to the fact of damages, after which the court may "make a fair and reasonable approximation of the damages." *Fifth Third Bank*, 518 F.3d at 1379 (quoting *Bluebonnet*, 266 F.3d at 1356–57).  "The ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision:  It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation."  *Bluebonnet*, 266 F.3d at 1355 (quoting *Elec. & Missile Facilities, Inc. v. United States*, 416 F.2d 1345, 1358 (1969)).

The Government argued in closing arguments and post-trial briefs that expectancy damage claims in *Winstar*-related cases are speculative where the plaintiff fails to identify the investments the subject thrift would have made in the "but-for" world.  *See, e.g.*, *Citizens Fin. Servs.*, 64 Fed. Cl. at 514.  The Government maintains that "[l]oss of leverage capacity for an investment that plaintiff has not shown it would have made absent the breach is not sufficient support for a lost profits damages claim."  *Columbia First Bank v. United States*, 60 Fed. Cl. 97, 112 (2004); *see also S. Cal. Fed. Sav. & Loan Ass'n v. United States*, 57 Fed. Cl. 598, 626 (2003), *aff'd in relevant part*, 422 F.3d 1319 (Fed. Cir. 2005).  However, in the instant case, Plaintiffs have presented extensive evidence at trial demonstrating that Plaintiffs' lost-profits claim is based on its pre-breach investments and pre-breach growth strategies set forth in American Savings' pre-breach business plans.  Therefore, the Government's above contentions are not on point.

To calculate American Savings' lost profits, Mr. Ramirez used the bank's actual leverage ratios and actual ROAA over the period of the contracted-for Warrant Forbearance.  Relying upon the institution's books and records, actual performance history, and historic investment strategies, Mr. Ramirez calculated that the breach cost Plaintiffs $83.318 million in lost profits.  Mr. Ramirez testified at trial that had American Savings (1) leveraged the Warrant capital at the same capital-to-asset ratios as in the real world, (2) earned the same ROAA as in the real world, and (3) grown by approximately $2 billion more instead of selling off its best assets, American Savings would have earned an additional $83.318 million.  Mr. Ramirez also presented graphic demonstrative exhibits at trial that showed the layer of growth underlying his lost profits calculations (PX 5003.12), and how the categories of assets identified by Plaintiffs could have fit into American Savings' asset portfolio but for the breach (PX 5003.13).

The Government contends that Plaintiffs' lost profits calculations are not reasonably certain for several reasons and relies upon the testimony of its expert witness, Dr. Thakor.  The Government asserts that Mr. Ramirez is a lay witness and as such, is not qualified to model

the thousands of hypothetical transactions the Government claims is necessarily involved in the lost profits calculations. The Government also asserts that Plaintiffs fail to identify the investments American Savings would have made absent the breach. The Government maintains that the COFI ARMs sale, the high-yield bond portfolio sale, and the abandoned RTC acquisitions that Plaintiffs identified as possible components of the foregone incremental asset portfolio do not support Plaintiffs' lost profits calculations. Accordingly, the Government argues that Plaintiffs' lost-profits claim is speculative because Plaintiffs' lost profits calculations do not identify any specific assets that Plaintiffs would have acquired, and do not incorporate a return on specific assets. The Government finally asserts that Plaintiffs' lost profits calculations contradict fundamental principles of economics, and result in an impermissible windfall to Plaintiffs because (1) Mr. Ramirez's extrapolation of American Savings' historical return to the foregone portfolio ignores the principle of diminishing marginal returns and (2) Mr. Ramirez's dividend payout ratio overstates the amount of lost capital.

The Court finds the Government's argument that Mr. Ramirez is not qualified to present lost profits calculations without merit. Mr. Ramirez is a graduate from Yale College and received his MBA from the Stanford Graduate School of Business. Mr. Ramirez, in his capacity as vice president and financial analyst for American Savings, regularly performed calculations of the bank's projected performance for senior management and regulators. The Court found Mr. Ramirez to be a credible witness with actual experience and knowledge of the bank's performance both prior to and after the breach. Therefore, Mr. Ramirez is qualified to present Plaintiffs' lost profits calculations which came from his actual experience with the data. His factual testimony was grounded in the data he actually worked with and not in any theoretical expertise. His conclusions were not based on models but on generally straightforward mathematics of the kind he works with. His conclusions were well within the scope of sophisticated lay witness testimony.

Regarding the Government's argument that Plaintiffs' lost-profits claim is speculative as a matter of law, the Federal Circuit has affirmed lost profits in several *Winstar* cases where Plaintiffs made reasonable assumptions based on a thrift's operating history to project the damages from lost opportunities. *See, e.g.*, *Globe Sav. Bank v. United States*, 65 Fed. Cl. 330, 350–57 (2005), *aff'd in relevant part*, *vacated in part*, 189 Fed. App'x 964 (Fed. Cir. 2006) (awarding lost profits in a Winstar case based in part on a proxy calculation); *see also Commercial Fed. Bank v. United States*, 59 Fed. Cl. 338, 350–51 (2004) (award of lost profits not appealed); *First Fed. Sav. & Loan Ass'n of Rochester v. United States*, 76 Fed. Cl. 106, 116–22 (2007), *aff'd*, 290 Fed. App'x 349 (Fed. Cir. 2008) (affirming award of lost profits and remanding for revised calculations); *Astoria Fed. Sav. & Loan Ass'n v. United States*, 568 F.3d 944 (Fed. Cir. 2008); *LaSalle Talman Bank v. United States*, 462 F.3d 1331 (Fed. Cir. 2006).

In *Globe*, the bank followed a business plan that had been approved by regulators prior to the plaintiffs' acquisition of the failed thrift, as did American Savings. Globe acquired assets prior to the breach pursuant to its business plan. Like many *Winstar* actions, the business plan was premised on the bank's use of supervisory goodwill towards its regulatory capital levels.

20

After the breach eliminated the supervisory goodwill, Globe could no longer meet its regulatory capital minimums. The bank determined it could not follow its business plan without sufficient capital and proceeded to sell off its assets. The Federal Circuit affirmed the Court's adoption of plaintiffs' lost profits model that was based upon the bank's projections in its pre-breach business plan and which used its historical figures. That is similar to the present case.

Likewise, in *Commercial Federal*, the plaintiff offered a lost profits model that projected earnings by applying the thrift's historic ROAA to a selection of foregone assets that were based on the thrift's actual, historic portfolio. *See* 59 Fed. Cl. at 350. The model "assume[d] that, but for the breach, plaintiff would have been able to grow its assets at an annual rate of 10 percent from July 1989 to June 1994 and that those assets would have produced an average return of one percent for the period." *Id.* at 344. The model then "extrapolate[d the] plaintiff's profits based on its actual earnings through fiscal year 1994, looking to the percentage of plaintiff's actual asset pool to determine what proportion of the 'but-for' assets would be leveraged and earning profits through 2011." *Id.* The Court accepted plaintiff's model in its award of lost profits. *Id.* at 358. Mr. Ramirez uses similar methodology in his lost profits calculations. *See First Fed. Sav.*, 76 Fed. Cl. at 120 (awarding lost profits calculated by applying 87-basis-point spread to $400 million in foregone assets).

*Citizens* is inapposite to the Government's argument. In *Citizens*, the Court found that plaintiff's lost profits model was based on assumptions (10% capital target and a 20% intended growth rate) that were unsupported by the bank's business plans. *See Citizens Fin. Servs. v. United States*, 64 Fed. Cl. 498, 513 (2005). In contrast, Plaintiffs in the instant action have provided ample evidence that the projections in Mr. Ramirez's lost profits calculations are based on American Savings' pre-breach business plan. The Court in *Citizens* did, however, object to the lack of specificity regarding assets in plaintiff's lost profits model. There, plaintiff's expert witness could not identify any class of investments that would have generated the 1.1% rate of return assumed in the model. *Id.* Here, Plaintiffs have identified specific assets and classes of assets, including those held prior to the breach in accordance with American Savings' business plan, that would have generated returns commensurate with the bank's real world ROAA.

At trial, Dr. Hamm testified that American Savings did not grow in the early 1990s because the bank was opportunity constrained. He also testified that even if American Savings could have grown by $2 billion absent the breach, the bank's ROAA would have declined as its asset base expanded.

The Court did not find Dr. Hamm's testimony to be credible. Dr. Hamm was an employee of World Savings & Loan of Oakland ("World Savings"), a large California thrift that was a peer and competitor of American Savings during the damages period. World Savings was a well-capitalized thrift. It grew by more than $4 billion and completed more than half a dozen acquisitions during 1990 and 1991. Dr. Hamm acknowledged at trial that World Savings was able to improve its profitability while growing. In 1990, World Savings grew by 15% and added $3 billion in assets, improving its overall ROAA. Tr. 3013–15 (Hamm). In 1991, World Savings grew by another $1.7 billion and continued to improve its ROAA, achieving the

company's "best performance ever." *Id.* at 3021, 3026–27 (Hamm).   Dr. Hamm also acknowledged during cross-examination that despite the recession in California, World Savings was able to achieve its growth because of its capital position.   Therefore, the Court finds that Dr. Hamm's testimony tends to support the premise of Plaintiffs' lost-profits claim, and is not a credible critique of that claim.

### Dr. Thakor's Revised Calculation of Lost-Profits Damages

The Government argued in closing arguments and post-trial briefs that Mr. Ramirez's damages calculations overstates his lost-profits estimate.   The Government states that although Dr. Thakor did not present an affirmative damages estimate, and did not endorse Mr. Ramirez's approach, Dr. Thakor corrected Mr. Ramirez's calculations by: (1) terminating damages after December 31, 1996; (2) computing lost profits on an after-tax basis; (3) excluding the reinvestment of dividends; and (4) using a marginal spread based upon wholesale assets and liabilities instead of historical ROAA.  Tr. 2481:3-2482:9 (Thakor).   These revisions lower Mr. Ramirez's lost-profits estimate from $83.8 million to $22.7 million.  Tr. 2495:7-13 (Thakor); PX 1826, Exh. 16C.

Dr. Thakor replaced Mr. Ramirez's projection of the bank's historical ROAA with a marginal spread calculation.   For the marginal asset, Dr. Thakor used wholesale mortgage-backed securities, and, for the marginal liability, he used wholesale FHLB advances as a "reasonable proxy" because the marginal rates were not readily available.  PX 1826, Exhs. 15, 16C; *see also* Tr. 2568:12-2570:4; 2570:19-2572:17; 2574:3-10; 2586:17-2587:10 (Thakor).  Dr. Thakor testified that the wholesale liabilities were the most appropriate marginal funding source because in the real world, American Savings was "running out of deposits" and would need wholesale borrowings to grow the bank by $2 billion.  Tr. 2492:11-25.

The Court does not find Dr. Thakor's marginal spread calculation more appropriate than American Savings' historical ROAA.   The Court notes that Dr. Thakor erred in computing the cost of the funds his model assumes American Savings would have borrowed to fund the incremental portfolio.   Dr. Thakor incorporated the costs of $1.8 billion fixed-rate, fixed-term FHLBB advances that were on American Savings' books from the failed Old American.  *See* PX 1826 (Dr. Thakor's 1/16/09 Expert Report) at Ex. 15; PX 798 (10/26/92 ALCO Mtg. Materials) at ASDOJ-SEASUPPTWO-2-3128-48 (showing that fixed-rate, fixed-term FLHBB advances remained on ASB's books at 9.78%).  This error increased the cost of the wholesale FHLB advances that Dr. Thakor computed.   The Old American advances did not reflect American Savings' marginal funding cost at any time after the acquisition.  Tr. 3199-3200 (Ramirez).  Dr. Thakor acknowledged this error under cross-examination at trial.

Relying on the testimony of Dr. Thakor, the Government also argued in closing arguments and post-trial briefs that (1) the principle of "diminishing marginal returns" means that the projected $2 billion in additional assets would have been less profitable than the assets in American Savings' existing portfolio, and (2) American Savings' ROAA is inflated by the

FSLIC Note, which the Government claims performed better than the rest of American Savings' portfolio.

The principle of diminishing marginal returns applies to closed systems. For example, an investor with only a limited universe of opportunities will make the best investments first. He will invest in lower-yielding investments only after he has exhausted his best investment opportunities. *See* Tr. 2408–09 (Thakor).

The Court finds Plaintiffs' evidence, that the principle of diminishing marginal returns does not apply to their lost-profits claim, is persuasive. Much of the growth contained in Mr. Ramirez's calculations were the result of taking away the effects of the breach and retaining the COFI ARMs and high-yield bonds as assets. This reversal is not an investment in less desirable assets, but rather returns some of American Savings' best assets to its balance sheet.

In addition, Plaintiffs presented evidence that the $450 million high-yield bond portfolio would have generated an annual spread of 470 basis points and out-earned American Savings' historical ROAA, thereby making the bank more profitable, not less. Plaintiffs also presented evidence that the RTC acquisitions that the bank would have pursued but for the breach were sold at bargain prices, and presented new and previously unavailable opportunities as a result of thrift failures. DX 275 (3/19/90 Ltr. from Furer to Meyer) at PAS136 0892; *see also* Tr. 3010–11, 3022–28 (Hamm) (World Savings grew profitably through RTC acquisitions).

The Court also finds the Government's contention that income from the FSLIC Note inflated American Savings' real world ROAA without merit. Plaintiffs presented exhibits at trial, including an OTS exam report and a FHLB-SF credit analysis, to demonstrate that American Savings' earnings were proportionally attributable to the Note income and the interest earnings generated by the bank's non-Note assets. *See* PX 312 (10/16/89 OTS Exam Report) at USA 0154018; DX 150 (10/11/89 FHLB-SF Credit Mem.) at WOQ476 1943–44.

<u>Defendant's Affirmative Procedural Defenses</u>

The Government argued in closing arguments and post-trial briefs that Plaintiffs are precluded from recovering lost profits damages because Plaintiffs have presented a cost-of-replacement capital damages claim that states Plaintiffs replaced the Warrant capital after the breach. The Court finds no basis for this argument. Plaintiffs are entitled to present damages claims in the alternative. A mitigation theory (cost-of-replacement capital) may be presented as an alternative to an expectation damages theory (lost profits). *Figueroa v. United States*, 57 Fed. Cl. 488, 496 (2003), *aff'd*, 466 F.3d 1023 (Fed. Cir. 2006).

Under their contract with the Government, Plaintiffs were entitled to both the Warrant Forbearance capital and the $350 million in tangible capital that the Bass Group raised for the acquisition of Old American. *See Am. Sav. Bank, F.A., v. United States*, 62 Fed. Cl. 6, 9–10 (2004), *aff'd*, 519 F.3d 1316 (Fed. Cir. 2008). Only the $350 million in tangible capital carried

ongoing costs, but either form of capital could have been leveraged for profit.  After the breach, Plaintiffs lost the use of the "cost-free" Warrant capital and had to redeploy costly tangible capital, raised for the Bass Group's initial investment, to replace it.  *See* Tr. 1593–94 (Ramirez) (redeploying ASB's tangible capital to meet required capital ratios did not add any assets to ASB's balance sheet).

The Court finds the redeployment of Plaintiffs' tangible capital to replace the Warrant capital lost as a result of the breach to be analogous to a situation where a person destroys his car in a car accident, but owns another car that can be used instead of the first car.  Although the other car can be used to go to work, run errands, and so forth, thereby being "redeployed" to "replace" the first car, the person has lost his second car and can now only use one car.  If the person bought a new second car he would still be deprived of the value of the destroyed car.  Plaintiffs would have had the use of both their tangible capital and the Warrant capital to leverage for the bank's profitability.  Without the use of the Warrant capital, Plaintiffs redeployed the tangible capital instead, and lost the benefit of having *both* forms of capital available to leverage for profit.

The Government also argued in closing arguments and post-trial briefs that this Court and the Federal Circuit's findings and award for the breach of the Note Forbearance are "inconsistent" with Plaintiffs' lost-profits claim for the breach of the Warrant Forbearance.  The Court also finds this argument to be without merit.  Damages for the breach of the Note Forbearance were awarded on summary judgment.  The findings in connection to the Note Forbearance breach are not relevant to the current trial issues regarding the Warrant Forbearance breach.  Therefore, Plaintiffs' lost-profits claim is not barred by the mandate rule.  The Government has also failed to make the showing required to establish judicial estoppel.  *Ryan Operations v. Santiam-Midwest Lumber*, 81 F.3d 355, 365 (3d Cir. 1996).

The Court further finds without merit the Government's argument that because Plaintiffs did not appeal the Court's previous summary judgment decision, Plaintiffs cannot rely on American Savings' high-yield or junk bond portfolio as a basis for its lost-profits claim.  Plaintiffs have not reasserted the "ARMs Sale" and "Junk Bond" summary judgment claims, and are not required to appeal the denial of those motions to present a lost-profits claim on remand.  *See Granite Mgmt. Corp. v. United States*, 416 F.3d 1373, 1379 (Fed. Cir. 2005).

The Government also argues in post-trial briefs that Plaintiffs failed to mitigate their damages after the breach of the Warrant Forbearance.  The Government maintains that evidence at trial demonstrated that Plaintiffs could have paid lower amounts of dividends to its holding company investors, or could have raised capital to replace the Warrant capital.

"[T]he rules of mitigation do not require the non-breaching party to subject itself to the risk of additional losses."  *S. Cal. Fed. Sav. & Loan Ass'n v. United States*, 57 Fed. Cl. 598, 640–41 (2003), *aff'd in relevant part*, 422 F.3d 1319 (Fed. Cir. 2005); *see also* RESTATEMENT § 350 (2009) (no duty to mitigate where mitigation imposes "undue risk[s]" and "burden[s]" upon

breach victim).  The non-breaching party is only required to take reasonable steps to mitigate damages.  *See S. Cal.*, 57 Fed. Cl. at 640; RESTATEMENT § 350.  Plaintiffs acted to reasonably mitigate the effects of the breach of the Warrant Forbearance by shrinking the bank and selling assets to meet regulatory capital levels.  Plaintiffs are not required to raise costly capital or alter dividend payments to limit the harm from the breach.  These actions do not limit the harm they merely shift it around.

Plaintiffs faced serious difficulties in raising capital after the breach.  At trial, Plaintiffs presented evidence that any capital contribution by the Bass Group to American Savings would have been "[s]ubject to limitations in the IRS closing agreement," and to the risk of "getting no return whatever on it."  Tr. 904 (Bonderman).  Both Plaintiffs' and the Government's witnesses testified at trial that raising capital was also undesirable because the government had a 30% stake in any capital contribution, which "would have transformed the economics of the deal in ways which were unfavorable and not contemplated," and "would have caused . . . lower returns than had been underwritten because of the breach."  *Id.* at 907 (Bonderman), 1910–15 (Meyer). Plaintiffs also unsuccessfully tried to raise capital after the breach from an affiliate.  *See id.* at 1052–59 (Ramirez).

In addition, Plaintiffs presented evidence at trial that the parties' Tax Sharing Agreement required American Savings to pay tax-sharing dividends to its parent Keystone.  PX 1409 (March 1989 Private Placement Memorandum) at ASDOJ-NY-23-0087; Tr. 267-68 (Barnum), 3100 (Hamm).  Pursuant to American Savings' dividend policy, it could pay additional cash dividends "as required by the debt requirements of the parent company or when retained earnings [we]re not required to fund additional growth, either internally or through acquisitions."  PX 231 (1990 Business Plan) at PAS128 2726; Tr. 574–75 (Carl).  Plaintiffs' witness Mr. Bonderman testified that accordingly, "tax dividends aside, which were separate contractually, [American Savings] never paid significant dividends. Dividends averaged around seven or eight million dollars a year, which, for an institution with 16 billion dollars of assets, was trivial."  Tr. 743 (Bonderman).  American Savings also did not pay any common dividends in 1990, where Mr. Ramirez projects most of the growth in his calculations.  *Id.* at 3101–02 (Hamm).

Accordingly, based on the evidence presented at trial, the Court finds Plaintiffs' lost-profits claim persuasive and **AWARDS** expectancy damages in the amount of $83,318,000. Because Plaintiffs have prevailed on their lost-profits claim, the Court need not address Plaintiffs' alternative claims for cost-of-replacement capital or reliance.

## V. CONCLUSION

The Court believes this opinion does only very partial justice.  Plaintiffs' post-breach performance would indicate that the $83,318,000 amount proven by the evidence is based on very conservative estimates and assumptions.  However, the real injustice of this opinion is that it does not include any interest or attorneys' fees award.  Sovereign immunity does not allow the Court to grant these amounts.  In dollar terms Plaintiffs will receive about one third of the value of what they have lost by the breach.  This is unfair and unjust but the Congress, not the Court, must address this injustice.  Unfortunately, the courts, at least at this juncture, are not the fora that can make the damaged parties whole. This represents one of those gaps in our Nation's system of the rule of law. Our great Constitution's Framers were men of extraordinary vision. They understood that while a framework for the protection of rights under law had been established in 1789, its complete fulfillment was an ongoing project for the ages. Through statute and executive action our Nation has moved toward that goal. This is a case where the movement should continue through the legislative process.

For the reasons set forth above, Plaintiffs are hereby **AWARDED** $83,318,000 in expectancy damages for their lost-profits claim, for the Government's breach of the Warrant Forbearance.  The Clerk is directed to enter final judgment accordingly.

It is so **ORDERED.**

/s Loren A. Smith
LOREN A. SMITH,
Senior Judge